## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **IN RE:** | ) | CA:2: O6 CV 746-WHA |
| | ) | |
| **TERRY MANUFACTURING** | ) | **CASE NO. 03-32063-WRS** |
| **COMPANY, INC.,** | ) | |
| | ) | **CHAPTER 7** |
| **Debtor** | ) | |
| | ) | |

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **TERRY UNIFORM** | ) | **CASE NO. 03-32213-WRS** |
| **COMPANY, LLC,** | ) | |
| | ) | |
| **Debtor** | ) | |

| | | |
|---|---|---|
| **J. LESTER ALEXANDER, III,** | ) | |
| **TRUSTEE OF TERRY** | ) | |
| **MANUFACTURING COMPANY,** | ) | **ADVERSARY      PROCEEDING** |
| **NO.:** | ) | |
| | ) | **05-03042** |
| **INC, AND TERRY UNIFORM** | ) | |
| **COMPANY, LLC** | ) | |
| | ) | |
| **VERSUS** | ) | |
| | ) | |
| **N.D. HORTON, JR. AND JAMES M.** | ) | |
| **REYNOLDS, III** | ) | |

## DESIGNATION OF RECORD ON APPEAL
## AND STATEMENT OF ISSUES

COME now the Defendants, N.D. Horton, Jr. and James M. Reynolds, III,

and pursuant to Bankruptcy Rule 8006: 1) designate the following items to be included in

the record on appeal; and 2) state the issues to be reviewed on appeal:

1

## RECORD ON APPEAL

1.      Transcript of Proceedings before the Honorable William R. Sawyer, United States Bankruptcy Judge, Vol. I - Pages 1 to 202. (Docket No. 84)

2.      Transcript of Proceedings before the Honorable William R. Sawyer United States Bankruptcy Judge, Vol. II - Pages 203 to 268. (Docket No. 85)

3.      Deposition Transcript and Exhibits of Roy Terry dated January 27, 2006. (Admitted during trial).

4.      Plaintiff's Trial Exhibits 1-22 and 45-46.

5.      All Defendant's trial exhibits.

6.      Complaint (Docket No.1)

7.      Answer to Complaint (Docket No. 23)

8.      Amendment to Answer (Docket No. 28)

9.      Motion to Amend Answer (Docket Nos. 43 and 44)

10.     Order Granting Motion to Amend (Docket No. 47) *Text Order*

11.     Trustee's Motion to Amend Complaint (Docket No. 55)

12.     Order Granting Trustee's Motion to Amend Complaint (Docket No. 57)

13.     Memorandum Decision Opinion (Docket No. 69)

14.     Answer to First Amended Complaint (Docket No. 81)

15.     Proposed Findings of Fact and Conclusion of Law (Docket No. 86)

16.     Memorandum Decision (Docket No. 88)

17.     Judgment (Docket No. 89)

18.    Motion to Alter and/or Amend or For Further Findings (Docket No. 91)

19.    Trustee's Objection to Motion to Alter or to Amend (Docket No. 96)

20.    Order Denying Motion to Alter or Amend (Docket No. 101)

## STATEMENT OF ISSUES

1.    Whether the Court erred (or misinterpreted the law) in finding that the $5.5 million in loan proceeds received by the Debtor from the loan made by Mr. Horton's company, American Real Estate Investment Company, Ltd., L.P. ("ARE"), did not constitute "reasonably equivalent value" for the Debtor's guaranties and payments?

2.    Whether the Court erred (or misinterpreted the law) in finding that the $1.5 million loan to the Debtor by Peoples Bank and guaranteed by Mr. Horton did not constitute "reasonably equivalent value" to the Debtor in exchange for the Debtor's payments?

3.    Whether the Court erred (or misinterpreted the law) in failing to find that the following loans constituted "reasonably equivalent value:"

(1) one for $500,000 from ARE dated February 25, 2003; (2) one for $175,000 from N.D. Horton, Jr. dated January 10, 2003; and (3) one for $88,000 from N. D. Horton, Jr. dated February 10, 2003.

4.    Whether the Court erred (or misinterpreted the law) in failing to find that the Terrys and the Debtor were "alter egos" or had a substantial "identity of

3

interest" such that the reduction of the Terrys' obligations by payments from the Debtor constituted "reasonably equivalent value?"

5.    Whether the Court erred (or misinterpreted the law) in failing to find that the Terrys and the Debtor were "alter egos" or had a substantial "identity of interest" such that the guaranties provided by the Debtor were supported by "reasonably equivalent value?"

6.    Whether the Court erred (or misinterpreted the law) in failing to find that the payments by the Debtor to Horton and/or ARE resulted in "reasonably equivalent value" by having Horton and/or ARE defer from calling their various loans?

7.    Whether the Court erred (or misinterpreted the law) in failing to resolve expressly the defendants' contention regarding Ala. Code § 8-9A-8(d)?

8.    Whether the Court erred (or misinterpreted the law) in failing to hold that the defendants were entitled to relief pursuant to Ala. Code § 8-9A-8(d)?

9.    Whether the Court erred (or misinterpreted the law) by not requiring the Trustee to establish that the ultimate source of the funds utilized for the purportedly fraudulent transfers came from the Debtor and not from the Terrys or Horton or ARE?

10.    Whether the Court erred (or misinterpreted the law) in not finding that the payments by the Debtor (and the commensurate reduction in its contingent liability) constituted "reasonably equivalent value?"

4

11.    Whether the Court applied the correct legal standard in assessing whether "reasonably equivalence value" had been received by the Debtor for its guaranties and payments?

WHEREFORE, premises considered, the defendants respectfully request this Court to include all of the above referenced items in the record on appeal.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Defendants
N.D. Horton, Jr., and James M.
Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:     (205) 244-5237
Telecopier:     (205) 244-5437

5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Designation of Record on Appeal and Statement of Issues has been served by electronic filing and/or by placing same in the United States mail, properly addressed and postage prepaid, as follows:

Brent B. Barriere
Katie Laskey
365 Canal Street
Suite 2000
New Orleans, Louisiana 70130

This the \7th\ day of August, 2006.

\s\ C. Ellis Brazeal III
OF COUNSEL

6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| TERRY MANUFACTURING COMPANY, | ) |
| INC., | ) |
|     Debtor | ) Case No. 03-32063 |
| | |
| J. LESTER ALEXANDER, III | ) |
| Trustee for Terry Manufacturing | ) |
| Co., Inc. and Terry Uniform | ) |
| Co., LLC | ) |
| | ) |
| vs. | ) Adv. No. 05-03042 |
| | ) |
| N. D. HORTON, JR., ET AL. | ) |
| | Montgomery, AL |
| | March 28, 2006, 9:19 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

Vol. I - Pages 1 to 202

APPEARANCES:                          Brent B. Barriere
                                      Catherine E. Lasky
                                      Phelps Dunbar, LP
                                      365 Canal St., Suite 2000
                                      One Canal Place
                                      New Orleans, LA 70130

                                      C. Ellis Brazeal, III
                                      Walston, Wells
                                       & Birchall LLP
                                      1819 Fifth Ave. N, #1100
                                      Birmingham, AL 35203

Electronic Recorder
Operator:                             Linda Bodden

Transcriber:                          Patricia Basham
                                      6411 Quail Ridge Drive
                                      Bartlett, TN  38135
                                      9O1-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J. Lester Alexander III | 34 | 108 | -- | -- |
| N. D. Horton, Jr. | 156 | 185 | 196 | -- |

3

```
1              (CALL TO ORDER)

2              THE COURT: Please be seated.

3              MR. BARRIERE: Good morning, Your Honor.

4              THE COURT:  Good morning.

5              COURTROOM  DEPUTY:  Adversary  case  number  05-3042,

6    Alexander versus Horton, Jr., et al.

7              THE COURT: All right.  Let's start with appearances.

8    I guess we will start over here.

9              MR. BRAZEAL: Thank you, Your Honor.  Ellis Brazeal for

10   N. D. Horton and James Reynolds.

11             THE COURT: All right, Mr. Brazeal.

12             MR. BARRIERE: Good morning, Your Honor.  I am Brent

13   Barriere.  I represent the trustee.  I am joined this morning

14   by Katie Lasky and by the trustee, J. Lester Alexander, the

15   plaintiff in this case.

16             THE COURT: All right.  Let me pull up my docket here.

17   My recollection is there was some dispute having to do with

18   witnesses and, Mr. Barriere, you objected.  Have you resolved

19   that or do we have a difference of opinion as to –

20             MR. BARRIERE: I think not, Your Honor, and I was going

21   to suggest before we had openings that we address the issue of

22   our objection with respect to the experts, Messrs. Averett and

23   Slaton.

24             THE COURT: All right.  Let's do that, then.  I guess

25   you are the objecting party.  I will hear from you first and
```

4

1    then I will hear from Mr. Brazeal.

2         MR. BARRIERE: Your Honor, the trustee requests that

3    Randy Averett be stricken as an expert witness because he has

4    failed to comply with any, and I stress "any," disclosure

5    obligations imposed by Federal Rule 26, Bankruptcy Rule 7026.

6         Mr. Averett has testified he did not perform any

7    independent analysis; he did not draft, sign or even edit the

8    expert report tendered by the defendants.  Indeed, he has

9    acknowledged under oath that he first read that report after it

10   was tendered to the trustee.  The expert report that was

11   generated by the defendant was supplemented by correspondence

12   authored by Mr. Slaton, Jesse Slaton and dated February 27 of

13   2006.  Mr. Averett has acknowledged he first read that letter

14   during the course of his deposition conducted on March 17.

15        In contrast to Mr. Averett, Mr. Slaton has complied

16   with some, although not all, of the disclosure obligations

17   required by Rule 26.  He has authored and signed the report.

18   He has not made some of the other disclosures required by the

19   rules.   He hasn't provided, for example, a list of

20   qualifications timely; he didn't provide an indication of his

21   compensation; matters in which he has acted as an expert.

22        We are not seeking to bar him on that basis.  Rather,

23   we are requesting that Mr. Slaton be excluded because he does

24   not meet the threshold requirement under Federal Rule of

25   Evidence 702.

5

1        Apparently Mr. Slaton is going to provide testimony

2    with respect to the tracing of three loans made by entities

3    which are not defendants in this adversary proceeding.

4        THE COURT: Let me stop you there for just a second

5    because I did see something about that.  Why is that important

6    in this case?

7        MR. BARRIERE: I think it is not, Your Honor.

8        THE COURT: Okay.  I will let you address that later

9    then.  Okay.

10       MR. BARRIERE: I'm sure Mr. Brazeal has a different

11    view of that, but let me turn to that.  Let me first talk just

12    about Mr. Averett and why I believe he is properly excluded.

13       Rule 26(a)(2)(B) of the Federal Rules of Civil

14    Procedure and Bankruptcy Rule 7026 require the proper expert

15    specifically identify and tender, and I am quoting now, Your

16    Honor, a written report prepared and signed by the witness.

17       The expert report that was tendered by the defendants

18    on February 27 and the supplemental correspondence tendered by

19    the defendants were prepared by Mr. Slaton.  It was Mr. Slaton

20    who reported the analysis.  Mr. Averett has been candid in

21    acknowledging that he didn't draft it; he didn't edit it; he

22    didn't sign it; he didn't see it until it was turned over to

23    counsel for the trustee.

24       Likewise, the other disclosures required by Rule 26,

25    the current curriculum vitae; the list of compensation; other

6

1  matters in which Mr. Averett may have acted as expert, none of

2  those materials were provided.

3           So my basic concern with Mr. Averett, he simply hasn't

4  complied with anything under Rule 26.  Now that problem here is

5  compounded with respect to the solvency testimony.  The court,

6  I assume, has reviewed the memo and knows what I am referring

7  to.

8           By way of background, there was extensive discussion

9  between the parties over a period of probably six weeks with

10  respect to whether the defendants would engage an expert at all

11  and, if so, what that expert would do and when he would do it

12  by.

13          We were told repeatedly, both Mr. Alexander and

14  myself, that Mr. Averett or whatever expert ultimately was

15  engaged would not be addressing solvency issues, and I am

16  referring to the issue of whether this company had a negative

17  balance sheet, whether unreasonably small capital, whether it

18  could pay its debts as they became due.  We were specifically

19  told that would not be addressed and, consistent with that,

20  the report that was finally tendered on February 27 makes no

21  issue of any of the solvency issues whatsoever.

22          Now the item we have been told Mr. Averett would

23  address, or Mr. Slaton would address, would be the tracing of

24  these various loans.  And there is a letter dated February 24

25  sent by counsel for the defendants to me.  I don't have a

7

1    record that it was received, but I assume it was, that says

2    that Mr. Averett or Mr. Slaton may testify to the opinions set

3    forth in the, quote, bank reports, unquote.  What that refers

4    to, of course, are the approximately seventy pages of expert

5    reports Mr. Slaton's firm generated in connection with the bank

6    litigation, the litigation against Wedowee, Tuskegee and

7    Peoples Bank, matters that were resolved earlier in the first

8    quarter of this year.

9          Of that some seventy pages, virtually all is devoted

10   to a tracing analysis.  The court may recall there the

11   principal issue was were these loans made to the Terrys

12   individually ultimately delivered to Terry Manufacturing and

13   used in its business.

14         So when I saw the words that in this case Mr. Slaton

15   or Mr. Averett may be addressing the opinions in the bank case,

16   it seemed to be consistent with what we had been told, that

17   here there would be an attempt to trace certain other loans,

18   not the loans at issue but certain other loans and how those

19   funds were used.  Again, no mention of solvency whatsoever.

20         At the start of the deposition conducted on March 17,

21   we were told by counsel for the defendants that in contrast to

22   the repeated representations that these experts would not be

23   addressing solvency, that in fact they would be doing so.

24         Now, Your Honor, this raises two fundamental issues in

25   our view.  First, plainly Rule 26 requires that the report

8

1    address all opinions the expert intends to proffer, together

2    with the reasons therefor.  And, as noted, the report here by

3    Mr. Slaton does not address solvency in any fashion whatsoever.

4    Words do not appear.

5            Secondly, we have the very real practical problem of

6    an inability to access witnesses who we would have called live

7    had we been given timely notice.

8            In May of 2005, Mr. Averett did address solvency in

9    the bank cases, and he basically came to an opinion as to what

10   he  believes  is  the  appropriate  model  for  the  Terry

11   Manufacturing balance sheet at December 31, 2000, and then

12   makes additional commentary concerning the years thereafter.

13           The key to that analysis, in our view, at least, are

14   certain assumptions Mr. Averett's firm made with respect to the

15   fair market value of furniture, fixtures and equipment; fair

16   market  value  of  real  estate  and  certain  debt  of  Terry

17   Manufacturing.  Had we been given adequate notice that solvency

18   would be an issue here, we would have brought the witnesses in

19   on those topics.  We have some depositions, but they are not

20   going  to  be  an  effective  substitute,  I  think,  for  live

21   testimony.

22           THE  COURT:  When  did  you  first  learn  that  the

23   defendants might go there, might contest solvency?

24           MR. BARRIERE: About five minutes before the start of

25   Mr. Averett's deposition on March 17 or ten days ago.

9

1          THE COURT: Okay.  Thank you.

2          MR. BARRIERE: So, Your Honor, to close out these two

3     topics, with respect to Mr. Averett, we ask that he be stricken

4     because of complete failure to comply with Rule 26.  We have no

5     objection to Mr. Slaton on that basis.  He was the author of

6     the report.

7          Secondly, we object to either addressing solvency for

8     lack of notice and the tardy reversal of the repeated

9     representation that solvency would not be part of their

10    analysis.

11         Your Honor, let me finally then turn to the substance

12    of Mr. Slaton's report and why we submit it should not be

13    admitted in this proceeding.

14         Federal Rule of Evidence 702 permits the testimony of

15    an expert witness, and I quote, "if scientific, technical or

16    other specialized knowledge will assist the trier of fact to

17    understand the evidence or to determine a fact or issue."

18         Now this case concerns three basic transactions – a

19    promissory note given by Cotina Terry for stock sold by N. D.

20    Horton and James Reynolds; a promissory note given by Allie

21    Robinson, Rudolph's wife, for the same purpose; and then a

22    promissory note given by Roy and Rudolph purportedly for stock

23    they acquired.  And all of those payments – and this is

24    stipulated – all of those payments were made by Terry

25    Manufacturing.

10

1          Mr. Slaton has studied and traced three loans made by

2    American Real Estate – two loans by American Real Estate and

3    one by Peoples Bank, one to Roy and Rudolph Terry, the People's

4    Bank loan to Perky Cap, and he is going to appear, as we

5    appreciate, and testify as to the flow of those funds.

6          Now we haven't sought any relief with respect to any

7    of those loans.  We haven't named – certainly Peoples Bank has

8    been named here.  We haven't filed suit against American Real

9    Estate.

10         Quite simply, I think Mr. Slaton got it wrong.  He

11   opens his report that he has provided an analysis with respect

12   to the loans at issue in this case.  That is not the case.  We

13   have made no objection, no issue with respect to those loans

14   whatsoever.

15         Now, I appreciate the defendants are going to attempt

16   to prove up the theory that loans by entities otherwise

17   affiliated with Mr. Horton to Roy Terry and Rudolph Terry, the

18   proceeds of which may have ultimately ended up in the coffers

19   of Terry Manufacturing, somehow provide value for these three

20   transactions, but the fact of the matter is the tracing of

21   those funds and those specific loans are simply not at issue.

22   And, as a result, I fail to see how Mr. Slaton's testimony can

23   remotely reach the threshold of Rule 702.

24         Unless the court has any further questions, Your

25   Honor, I will pass the stand to Mr. Brazeal.

11

1          THE COURT: Thank you.

2          MR. BRAZEAL: Good morning, Your Honor.

3          I guess a bit of a brief history is in order just to

4    lead into the motion.  During January, Mr. Barriere and I were

5    discussing whether we could resolve the matter, and obviously

6    I'm not going to disclose any of our settlement discussions,

7    but that was a topic that came up.  And Mr. Barriere said – I

8    said, "Well, look, Mr. Barriere, the payments on the Allie

9    Robinson note and the Cotina Terry note were both made pursuant

10   to a guaranty; they were made on an antecedent debt; therefore

11   we win.  That is reasonably equivalent value."  And he said,

12   "Well, no, I think the guaranties themselves are flawed, that

13   they constitute fraudulent transfers."

14         And, Judge, at that point I said, well, if that is the

15   case, then I may need an expert because I think that changes

16   the complexion of the case, Your Honor, and then we have to

17   look for other issues of reasonably equivalent value.

18         And as Your Honor may recall, by consent or

19   stipulation the complaint was amended on January 30 of this

20   year to add in the guaranty issue.

21         Mr. Barriere and I agreed that I would then be able to

22   designate an expert, which we did on or about – well, I guess

23   he knew before February 24 that we were going to use Mr. Slaton

24   and/or Mr. Averett.

25         And then on February 24, I talked to Mr. Barriere and

12

1    I sent him correspondence and I sent him a report that Mr.

2    Slaton had drafted with input from Mr. Averett.  Your Honor, it

3    is not that Mr. Slaton did it – well, with input from Mr.

4    Averett.  And given the time schedule we had in trying to get

5    everything done – in other words, when the complaint was

6    amended at the end of January, rather than trying to push back

7    the trial date, we just agreed and Mr. Barriere agreed to

8    extend some of the deadlines on the expert witnesses, which we

9    did.

10         On February 24, I forwarded to him the report drafted

11   by Mr. Slaton which contains the tracing analysis and also

12   indicated, as he said, that Mr. Slaton and/or Mr. Averett would

13   express some opinions from the bank cases.

14         And, Judge, my point on the solvency issue, and I am

15   actually going to bring that up last, but my point on the

16   solvency issue is that is really the only opinion from the bank

17   cases that might have any relevancy in ours.

18         But, be that as it may, on the issue of whether the

19   three loans that Mr. Slaton traced have any relevance and are

20   therefore admissible and the proper subject of expert

21   testimony, Your Honor, the first two stock notes and the

22   guaranty of those notes from Terry Manufacturing all took place

23   on November 10 of 2000.

24         On that very same day, American Real Estate, which is

25   controlled by Mr. Horton – and I am sorry, Your Honor, I didn't

13

1    introduce Mr. Horton earlier, Mr. N. D. Horton.

2              THE COURT: Good morning.

3              MR. HORTON: Thank you.

4              MR. BRAZEAL: Entered into a five point five million

5    dollar line of credit note with Roy and Rudolph Terry.  So on

6    the very same day that the stock notes were executed by the

7    Terry women – I'm just going to call them the Terry women.  I

8    never can remember, Judge – there is Allie Robinson and Cotina

9    Terry.  I can't remember which is the daughter and which is the

10   wife, but the two Terry women, on the very same day that that

11   occurred, Your Honor, the Terry individuals borrowed five point

12   five million from American Real Estate.  And over the next

13   three months, five point five million dollars was advanced to

14   the Terrys and then placed in the debtor.

15             So, Your Honor, as set forth in the *Rubin versus Manny*

16   *Hanny* case, 661 F2d 979, it is clear that consideration that

17   flows to the nontransferor – the debtor is the transferor of

18   the alleged fraudulent conveyances – but the consideration that

19   goes to a non-transferor, and this was five point five million

20   that went to the Terrys individually and then they put it in

21   the debtor, can be looked at to determine whether there is

22   reasonably equivalent value.  And that is the basis –

23             THE COURT: Okay.  So you say there is a connection

24   between the five point five million and then like the two

25   hundred thousand or whatever the stock notes were?

14

1          MR. BRAZEAL: Yes, sir.  And the same thing on the

2     other two loans, Your Honor.  All of the loans were cross-

3     defaulted and you will see, Your Honor, that the two hundred

4     thousand dollar loans were cross-defaulted with the five point

5     five million; that if the debtor had ever stopped paying on the

6     two, two hundred thousand dollar notes, Mr. Horton would have

7     been able to call the five point five million due and payable.

8          So I would submit, Your Honor, that it is relevant and

9     that is why we had Mr. Slaton conduct that analysis.

10          THE COURT: Let's talk for a minute about the solvency

11     issue.

12          MR. BRAZEAL: Yes, Your Honor.  On the solvency issue,

13     when I went back and read the letter, I can understand why Mr.

14     Barriere would say, well, you just said in general opinions

15     from the other case.  And, Your Honor, the thrust of Mr.

16     Averett's May 31, 2005, report in the bank case, about which he

17     has been deposed ad nauseam, really deals with issues in Mr.

18     Alexander's report, which in large part stem from the shoddy

19     shape of the debtor's records.  I mean, I remember when this

20     case was first filed, Your Honor, and we were down here and he

21     was telling horror stories about the debtor's location.

22          And so I'm not offering Mr. Averett to say here is the

23     value of the company at any particular point.  That is what Mr.

24     Barriere was taking issue with because he would like to bring

25     in the appraiser and say there is four million dollars on land

15

1    that Mr. Averett used.

2            My point in Mr. Averett's testimony, Your Honor, is

3    just to point out issues in the report of the trustee or the

4    trustee's expert based largely upon the deficiencies in the

5    debtor's records.

6            What I was going to suggest, Your Honor, I can largely

7    deal with those through cross-examination and I would just

8    request on that issue that at the end of cross-examination – I

9    mean, it may be that Mr. Averett's testimony on that issue is

10   not even necessary.

11           THE COURT: Okay.  Now on the issue, the earliest note,

12   the two notes to the family members, the wife and the daughter,

13   those were executed on November 10, 2000; is that correct?

14           MR. BRAZEAL: Yes, Your Honor.

15           THE COURT: And guarantees were executed by Terry

16   Manufacturing at the same time?

17           MR. BRAZEAL: Yes, Your Honor.

18           THE COURT: And the other note involving Roy and

19   Rudolph Terry, that was somewhat later in time?

20           MR. BRAZEAL: No, it was executed the very same day.

21           THE COURT: Everything was on November 10?

22           MR. BRAZEAL: Yes, Your Honor.

23           THE COURT: Okay.  Do you contend that Terry

24   Manufacturing was solvent on November 10, 2000?  I mean is that

25   an issue?

16

1      MR. BRAZEAL: Your Honor, I don't think anybody can

2   say.  My only point, and that is what I'm going to try to bring

3   out in Mr. Alexander's cross-examination, is I don't believe

4   that anybody can tell whether the company was solvent at that

5   point because of the deficiencies in the records.

6      THE COURT: Okay.  So not to put too fine a point on

7   this, you're just saying you don't think the trustee can meet

8   his burden to prove solvency as of that date?

9      MR. BRAZEAL: On the solvency, that is right, Your

10  Honor.

11     THE COURT: All right.  Well, here is what we will do,

12  then.  The trustee has the burden of proof.  He will go first.

13  We will let that rock along and then we are going to get to the

14  point where if you want to introduce something that Mr.

15  Barriere has got a problem with, I will make the call then.  I

16  will be in a much better position.  Frankly the case is a

17  little bit difficult to get my hands around.  If I rule – I

18  will do one of three things.  Either I will rule for Mr.

19  Barriere but then I will let you make an offer of proof so that

20  you have got a record of what it is you wanted in even if it

21  doesn't come into evidence, so you have got it.  You will want

22  that in the event of an appeal.  I may rule in your favor.  In

23  which case, it comes in over his objection and then he has got

24  the issue for appeal or, you know, the third option, I guess,

25  is we will figure something else out of that point and try to

17

1     resolve the issue, you know, without a big battle.

2          But, anyway, I am not going to make the decision right

3     now.  I will make the decision at the time you offer and he

4     makes an objection, and we will take that up.

5          So we will start, then, with Mr. Barriere.

6          MR. BARRIERE: Thank you, Your Honor.

7          Your Honor, I will beg the court's indulgence.  As I

8     think you probably heard, the computer system went down, so

9     we're struggling a bit here.

10         Your Honor, before I start my opening, let me

11    approach, if I may, stipulations which I think may be a helpful

12    guidepost for the court were executed by the parties and filed

13    electronically on Friday of last week.  I have a hard copy here

14    for the court.

15         Good morning, Your Honor.  Brent Barriere.  I

16    represent the trustee, along with Katie Lasky.  The trustee is

17    here this morning.

18         Your Honor, the court indicated  when we got started

19    this morning that it had some trouble getting its hands around

20    this case.  I will suggest to you this is actually an unusual

21    matter in that I believe, with respect to the core transactions

22    at issue, most of the facts are stipulated.

23         By this action the trustee is seeking to recover just

24    in excess of five hundred and ninety-six thousand dollars paid

25    by Terry Manufacturing to N. D. Horton and James Reynolds.

18

1    Those payments were with respect to three promissory notes,

2    which I will address now in some detail.

3          By way of background, Your Honor, Terry Manufacturing

4    is, as the court knows, in the uniform manufacturing business.

5    Starting in about 1990 it acquired caps from Perky Cap Company.

6    It was indeed Perky Cap's largest customer.  In 1994, Roy Terry

7    and Rudolph Terry acquired something in the range of thirty-two

8    percent of the stock of Perky Cap from Mr. Reynolds and Mr.

9    Horton.  They put down cash.  They gave a note.  That note was

10   paid by Terry Manufacturing.  It is not the subject of today's

11   case.  The statute of limitations has run on that.

12         In November an agreement is reached by which Cotina

13   Terry, who is Roy's daughter, and Allie Robinson, who is

14   Rudolph's wife, would each acquire ten percent of the common

15   stock of Perky Cap from Messrs. Horton and Reynolds.  In order

16   to do so, they signed a two hundred thousand dollar promissory

17   note payable to those individuals individually.

18         Notably the stock was not registered in the name of

19   Terry Manufacturing.  It did not receive any of the benefits of

20   a shareholder of Perky Cap.  For example, Perky Cap is a sub S.

21   Corporation.  It consistently lost money.  And indeed one of

22   the questions that the court may be left with today is how a

23   company that lost literally hundreds of thousands of dollars

24   each year was valued at, for example, two hundred thousand

25   dollars or ten percent of its stock, but the one benefit a

19

1   shareholder did receive, because it was a sub S. Corporation,

2   there was a flow-through of those losses and that flow-through

3   went exclusively to Cotina Terry individually or Allie Robinson

4   individually.

5           The trustee has exhaustively reviewed the records,

6   including the tax returns actually filed by Terry Manufacturing

7   and it is abundantly plain that it received no benefits payable

8   to a shareholder, including taking recognition of those losses.

9           Notwithstanding the fact that Terry Manufacturing had

10  no interest in the stock, it made all payments on the

11  promissory notes.  Those notes were paid timely.  They were

12  never in default.  Each Reynolds and Horton received two

13  hundred and thirty-four thousand, three hundred and seventy-

14  five dollars, and those facts, Your Honor, are not in dispute.

15  They have been stipulated to in the stipulation I handed the

16  court a moment ago.

17          Now the mere fact that Terry Manufacturing was making

18  those payments, and there they are, unfortunately they can't be

19  read very clearly.  I will assure the court, when you get to

20  the bottom of that list, and I have a hard copy for you, those

21  are the monthly installments that total two hundred and thirty-

22  four thousand.

23          Terry Manufacturing, and I will return to it in a

24  moment, was insolvent throughout that period.  It remained

25  insolvent in May of 2000 when Roy and Rudolph Terry agreed to

20

1    buy an additional block of stock from Horton and Reynolds for

2    six hundred and twenty-four thousand dollars.

3         As with the Cotina Terry and Allie Robinson notes, no

4    cash was exchanged.  A promissory note was tendered in

5    satisfaction of the price.  Now, quite friendly, Your Honor,

6    one serious question is this promissory note was supposedly

7    given in consideration of thirty-one percent, and I say

8    supposedly given in consideration because it is not apparent

9    that in fact that sale ever occurred; and indeed the trustee

10   will introduce evidence today to suggest that there was no

11   transfer of the stock.

12        In that regard, the court will see the federal tax

13   returns prepared by Mr. Horton's personal account, David

14   Giddens, which shows the stock in 2002 and 2003, both after the

15   purported transfer, that stock remaining in the names of Mr.

16   Horton and Reynolds.

17        Also, in contrast to the sale to Cotina Terry and

18   Allie Robinson, where we have obtained production of actual

19   stock certificates, there are no stock certificates to Roy and

20   Rudolph Terry in connection with this 2002 purported transfer.

21        This is not particularly lucid, Your Honor, but what

22   I have put before the court is the 2001 K-1 for Perky Cap for

23   Mr. Horton.  This K-1 would have been generated approximately

24   eleven months after the alleged sale to Roy and Rudolph Terry

25   and continues to show that stock in the name of N. D. Horton.

1          Likewise, in the following year we have that stock

2     remaining in N. D. Horton's name.  Again, this is the K-1

3     prepared for Perky Cap by David Giddens, Mr. Horton's personal

4     account.  Likewise, the 2001 and 2002 K-1's for James Reynolds,

5     prepared by Mr. Giddens, show the stock remaining in his name

6     at all times.

7          Now, what raises serious doubt with respect to whether

8     this stock transfer ever occurred is that we will demonstrate

9     that commencing in the summer of 2002, at about the same time

10    as the stock sale, an entity known as Wholesale Distributors,

11    which is an entity controlled by Mr. Horton, and Terry

12    Manufacturing engaged in a series of swaps of bogus invoices.

13    Routinely Terry Manufacturing was issuing to Wholesale

14    Distributors millions of dollars of invoices reflecting sales

15    of product when, in fact, no product was being sold.  At the

16    same time, Wholesale Distributors, which is, as an aside, a

17    distributor of components for mobile homes.  It doesn't produce

18    anything that would be used by Terry Manufacturing.  Wholesale

19    Distributors was issuing back to Terry Manufacturing invoices

20    purporting to represent product that was being transferred when

21    none was actually being sold.

22          This is a memo from Rudolph Terry to Mr. Horton which

23    summarizes this swap of bogus invoices and related payments.

24    Terry Manufacturing is enclosing checks for one million, nine

25    hundred and fifteen thousand dollars.  It is simultaneously

22

1    issuing invoices, one for a million five, another for five

2    hundred and ninety thousand dollars.

3          At the same time, Terry is to pick up a check for one

4    million, five hundred thousand dollars, and then will pick up

5    an additional check for five hundred and ninety thousand

6    dollars.  So these are the payments on these bogus invoices.

7    Then Wholesale Distributors is to issue a new invoice for two

8    million, one hundred and forty thousand dollars to be paid by

9    Terry Manufacturing.

10          So what we have, Your Honor, for reasons that have

11   never been explained, documentation of transfers of product

12   going back and forth which plainly are not occurring; swapping

13   of invoices going back and forth; and related cash payments.

14   This, of course, is in late December of 2002.  By that time, as

15   we will hear in a moment, Terry Manufacturing is in a desperate

16   condition.  As the court will recall, it ultimately files for

17   Chapter 11 relief in July of 2003.

18          Why is this relevant, Your Honor?  I submit it is

19   relevant because the purported stock sale, the stock sale that

20   was never reflected on the tax returns of Perky Cap, never

21   reflected on Mr. Horton's K-1, is occurring at the same time

22   and we believe is part of the same general scheme of transfer

23   of instruments for reasons to demonstrate creditors' activity

24   that is in fact not occurring.

25          THE COURT: Okay.  So what you are saying is, even

23

1    aside from the question of a transfer for less than full

2    consideration, is this evidence of actual intent to defraud?

3         MR. BARRIERE: Exactly, Your Honor, but there was no

4    transfer at all.

5         Now what is certain, Your Honor, is that Terry

6    Manufacturing didn't receive ownership of any stock; didn't

7    receive any benefit of any stock; and on the Roy and Rudolph

8    note, paid a hundred and twenty-seven thousand, nine hundred

9    and eighty-six dollars. Indeed ironically as late as May, when

10   Terry Manufacturing isn't paying any of its creditors, it is

11   continuing to make payments to Mr. Horton.

12        It is not particularly legible, Your Honor, but that

13   is the list of monthly payments and, as the court can see, I

14   hope, the last of those occurs on June 2, 2003, or

15   approximately one month prior to the Chapter 11 filing, total

16   payments on that loan of a hundred and twenty-seven, nine

17   hundred and eighty-six thousand dollars – excuse me – a hundred

18   and twenty-seven thousand, nine hundred and eighty-six dollars.

19        Now, there is, as I said, Your Honor, no dispute that

20   the payments were made by Terry Manufacturing. There is no

21   dispute that all of the stock went to the insiders.

22   Nonetheless, we have been presented and the court will hear of

23   a sort of smorgasbord of value, purported value, which the

24   defendants would claim represents reasonably equivalent value.

25        I would ask, as the court considers that evidence, to

24

1    recall that it is reasonably equivalent exchange for the

2    transfer.  There must be an exchange.  And the mere fact that

3    there are other unrelated transactions between the parties is

4    really of no moment.

5         With that in mind, let me address briefly the evidence

6    concerning the purported reasonably equivalent value.  First,

7    we have been told that Terry Manufacturing needed to have some

8    interest indirectly in Perky Cap relating to the stock sale to

9    acquire head wear.  The evidence will demonstrate that starting

10   long before even the initial transaction involving the Terrys,

11   Terry Manufacturing was Perky Cap's largest customer; the

12   largest volume of caps were acquired well before these

13   transactions; and indeed during the years in question, Terry

14   Manufacturing either made loans to Perky Cap or cash payments

15   substantially in excess of the amount of caps it purchased.

16   Terry Manufacturing was a net lender to Perky Cap.

17        Secondly, there has been the suggestion that loans

18   made by American Real Estate to the Terrys individually somehow

19   provide reasonably equivalent value for these transactions; but

20   Mr. Horton, himself, has testified these were entirely

21   unrelated transactions.

22        We are now talking about the six hundred and twenty-

23   four thousand dollar note.  The question was – and, of course,

24   since he is a party, his testimony is admissible at any time

25   for any purpose – "At the time Exhibit 14, the six hundred and

25

1    twenty-four thousand dollar note, was signed by Roy and Rudolph

2    Terry, did you personally commit to them you would make

3    additional loans to either them personally or to Terry

4    Manufacturing?" "Not in connection with this. We were working

5    on that Terry Promotional Products, but it was two totally

6    different deals." "Totally separate?" Answer, "Yes."

7        And, Your Honor, we will have more of this testimony

8    during the course of the trial but the consistent theme is that

9    these other loans by other Horton entities were not in any way

10   tied to or, in the words of the statute, in exchange for these

11   stock sales and related payments.

12       Your Honor, as the court knows, a debtor can spend his

13   money as it wishes. He can throw it off of the side of the

14   bridge, give it to his mother, as long as he is solvent. So

15   the penultimate issue, of course, will be not only is there

16   value, was it reasonably equivalent value, but was Terry

17   Manufacturing solvent at the time of these transfers.

18       We will introduce evidence by the trustee that

19   commencing no later than December 31, 1999, Terry Manufacturing

20   was insolvent from a balance sheet standpoint. We will

21   likewise demonstrate that it had unreasonably small capital.

22   That, in point of fact, one of the reasons the Terrys were

23   engaged in the series of schemes that have been detailed both

24   in this proceeding and Roy Terry's criminal conviction and

25   other cases that have been heard by this court, is that it did

26

1    not have adequate capital to pay its bills timely, in large

2    measure because the company was being looted.

3         Finally, we will demonstrate that Terry Manufacturing

4    was incurring debts beyond its ability to pay timely.  Of its

5    four largest vendors, the range of terms was from thirty to

6    sixty days.  In each instance, we will show that Terry was

7    consistently paying those bills hundreds of days late.

8         Your Honor, let me close on one other note.  There has

9    been a suggestion, and this is primarily for legal argument, so

10   I will leave it to closing, that the Alabama statute permits

11   value to be interpreted not from the debtor's standpoint but

12   from third parties, that if the debtor makes a transfer and the

13   transferor – or transferee, pardon me –  gives some value to a

14   third-party, that is reasonably equivalent for purposes of the

15   Alabama statute.

16        The court's question may be has there ever been a case

17   finding, and the answer to that is no.  I would simply point

18   out that this theory, if adopted, really opens the doors to

19   massive looting by insiders.  We could have the very

20   transaction we are looking at here, the debtor making

21   significant transfers to a party; that party giving some value

22   to the insiders; and that, according to the defendants, is an

23   acceptable arrangement. We do not believe that is the law.  We

24   believe the case here will demonstrate that this case,

25   consistent with that triangular transaction, is a classic

27

1    instance of the debtor being looted to pay the insiders'

2    obligations.  And we will ask at the close of the trial that

3    the court avoid that entire transaction and direct a return to

4    the estate of a little more than five hundred and ninety-six

5    thousand dollars.

6                THE COURT: Thank you.

7                MR. BARRIERE:  Thank you, Your Honor.

8                MR. BRAZEAL: Good morning, Your Honor.  Thank you for

9    the opportunity to give you a bit of an overview of the matters

10   which we say are germane, Your Honor.

11               As Your Honor is aware, the trustee filed a motion for

12   summary judgment and the trustee does contend that it is a

13   fairly simple case.  I wish it were, Your Honor.  If all Mr.

14   Horton was going to be out was five hundred and ninety-six

15   thousand dollars, it would be a fairly simple case, Your Honor.

16               But, instead, and the testimony I would suggest, Your

17   Honor, will demonstrate that Mr. Horton and/or American Real

18   Estate, the company that he controls, loaned over eight and a

19   half million dollars to the debtor.  Wholesale Distributors and

20   American Testing Laboratories that Mr. Barriere referred to

21   also advanced monies to the debtor.  And as evidenced by the

22   proofs of claim filed in this action by the various entities

23   owned or controlled by Mr. Horton, there is over eight million

24   dollars still outstanding to Mr. Horton.

25               Judge,    as   Mr.   Barriere   indicated,   the   first

28

1    involvement between Mr. Horton and the Terrys began back in the

2    mid 1990s and, at that point in time, as Mr. Barriere

3    indicated, the Terry brothers purchased thirty thousand shares

4    of Perky Cap stock.  Mr. Horton is going to testify about his

5    relationship with the Terrys.

6         Well, between 1994 and November 10 of 2000, there were

7    numerous other loans from Mr. Horton and/or American Real

8    Estate to Terry Manufacturing, all of which were paid timely,

9    all of which were paid in full, Your Honor.  And the timeliness

10   of the payments were such that, if Mr. Terry was going to be a

11   day late, he would contact Mr. Horton and say I'm going to be

12   a day late with the payment.  It came as a great shock to Mr.

13   Horton when all of this tanked and went into bankruptcy.

14        But, as Your Honor can see – maybe not great, Judge –

15   this is a five point five million dollar note, dated November

16   10 of 2000, and this reflected five point five million dollars

17   that was ultimately advanced to the Terry brothers and then the

18   evidence is going to show, Your Honor, ultimately made its way

19   into the debtor.

20        Judge, there were several million dollars that was

21   advanced and ultimately made its way into the debtor's coffers.

22   Judge, our argument about reasonably equivalent value is that

23   on November 10 of 2000, at the point in time when the two stock

24   notes were executed by the Terry wife and the Terry daughter,

25   that five point five million dollars went into the debtor's

29

1    coffers and that that –

2         THE COURT: Okay.  So do you believe the evidence is

3    going to show some sort of connection or relationship between

4    the five point five million and the stock notes?

5         MR. BRAZEAL: Yes, sir.  And that connection is that

6    they were all cross-defaulted and –

7         THE COURT: Tell me what you mean by cross-defaulted.

8    Do you mean if any one goes into default, they all can be

9    declared in default?

10        MR. BRAZEAL: Yes, Your Honor, then they could all be

11   declared in default.  And the other point about it, during Mr.

12   Horton's examination where Mr. Barriere was asking him were

13   they totally separate, they were two separate deals in the

14   sense that one dealt with the five point five million was to be

15   used for an Internet business and the other was to be dealt

16   with Perky Cap, but they were not separate in the terms of

17   reasonably equivalent value, Your Honor.

18        Subsequent thereto, in August of 2001, another one

19   point five million dollars was loaned to the debtor by American

20   Real Estate.  Similar to the prior five and a half million

21   dollars, this one and a half million dollars was also cross-

22   defaulted.  If at any point in time any of the payments that

23   are being sued for by the trustee had not been made, all of the

24   loans at issue could have been called and that would've been

25   over seven million dollars.

1          Later, Your Honor, in May of 2002 – (Pause).  I don't

2     know why it is not opening.  Well, in May of 2002, when the

3     second stock or actually the third set of stock purchase took

4     place, the Terrys communicated with Mr. Horton that they wanted

5     to completely take over Perky Cap, which they essentially did

6     except for the stock that remained owing to or owned by Mr.

7     Jack Perkinson.

8          Contrary to Mr. Barriere's assertion that the stock

9     purchase never took place, if I could open the exhibit, Your

10    Honor, I have Exhibit 46 which has the bill of sale of the

11    common stock that occurred on May 30 of 2002, which is where

12    the Terrys acknowledged receipt of this additional stock.  I

13    also have the two exhibits which reflect the resignation of Mr.

14    Horton and Mr. Reynolds as officers of Perky Cap and from the

15    board of Perky Cap.

16         So regardless of what his tax returns show, regardless

17    of whether his accountant got the information right, there was

18    a stock sale that occurred and the Terrys took over control of

19    Perky Cap.

20         Well, Your Honor, when the Terrys took over control of

21    Perky Cap in May of 2002, they utilized the assets of Perky Cap

22    to go to Peoples Bank of Eatonton.  And Your Honor has already

23    heard some about that in a related matter.  The Terrys utilized

24    assets of Perky Cap, along with the assistance of Mr. Horton,

25    to obtain a one point five million dollar loan from Peoples

31

1    Bank which then went into the debtor.

2            So in May of 2002 when this additional or this third

3    stock sale took place, one point five million dollars was

4    borrowed and placed into the debtor and, but for the purchase

5    of that additional stock, Mr. Horton and Mr. Reynolds would not

6    have stepped down from the board and Perky Cap would not have

7    been able to borrow the money and place it into the debtor.

8            And, Judge, I apologize.  Before my witness gets on

9    the stand, I will figure the computer out.

10           My final comment, Your Honor, is this, and it is

11   directed to Mr. Barriere's comments about the Alabama

12   Fraudulent Transfer Act.  Judge, the Alabama Fraudulent

13   Transfer Act contains language that is different from the

14   Uniform Act and from virtually any other state.  The Alabama

15   act says that – and it is under Alabama code section 8-9A-8(d)

16   – it provides that if in a triangular transaction the

17   transferee – in this case, Mr. Horton – provides value to

18   someone other than the debtor, then he gets the benefit of

19   that.  Okay.

20           The point about it is – and there are cases

21   essentially to that effect.  The *Rubin versus Manny Hanny* case

22   that we talked about earlier, Your Honor, and others, which

23   say, look, if the transferee gives some benefit either in the

24   value of the Perky Cap stock or in the reduction of the debt of

25   the Terrys individually, then the transferee is entitled to an

32

1    offset in that amount.  And that is the provision in the code

2    that Mr. Barriere and I are at issue about.  And I would submit

3    to you, Your Honor, that when you look at the case law dealing

4    with triangular transactions, that the Alabama case will allow

5    us to have an offset of the value that was provided to the

6    Terrys.  And as Your Honor is well aware, there are numerous

7    cases that say that value is – or that reduction of an

8    antecedent debt is tantamount to value.

9         So we believe, Your Honor, that every time there was

10   a dollar for dollar reduction in the debt owing from the Terry

11   individuals to Mr. Horton and Mr. Reynolds, that that conveyed

12   value to those parties and that that value gets attributed or

13   they get credit for that in the claims brought by the debtor.

14        THE COURT: Wait a minute.  Well, we will get into that

15   later.

16        MR. BRAZEAL: Thank you, Judge.

17        THE COURT: Why don't we do this: Why don't we break

18   for about ten minutes?  Bill, maybe you could get Carlene up

19   here.  He is having trouble opening one of those PDF's.  I

20   mean, you should just be able to right-click and open it.  It

21   should just pop right up.  That should do it right there and it

22   is not opening.  It is not doing it.  Oh, there she is.

23   Carlene, why don't you come on in?  We are going to break for

24   about ten minutes and why don't you have a look at the

25   computer.  Thank you.

33

1          (Recess from 10:09 a.m. until 10:27 a.m.)

2          THE COURT: Please have a seat. Mr. Barriere, I think

3     you are up.

4          MR. BARRIERE: Your Honor, I would like to at this time

5     mark and introduce into evidence Plaintiff's Exhibits 1 through

6     48, previously provided to Mr. Ellis and I don't think he has

7     any objection.

8          MR. BRAZEAL: No objection, Your Honor.

9          THE COURT: All right.  Plaintiff's 1 through 48 are

10    admitted without objection.

11         MR. BARRIERE: Your Honor, I also made – we are going

12    to have some PowerPoints with Mr. Alexander and we made hard

13    copies just in case you find that on the wall to be illegible.

14         THE COURT: Okay.

15         MR. BARRIERE: Your Honor, the trustee would call the

16    trustee.

17         THE COURT: Okay.  Let's just make sure.  I didn't know

18    if there was a separation of witnesses or who these folks are.

19         MR. BRAZEAL: No, not unless they want to call Ms.

20    Horton.

21         THE COURT: I am sorry?

22         MR. BRAZEAL: Judge, this is Ms. Horton and a gentleman

23    that works for Mr. Horton.  We are not –

24         THE COURT: Okay.  I just wanted to make sure we hadn't

25    created a problem.

34

1          MR. BARRIERE: I am not intending to call them.

2          THE COURT: Okay.  Then you folks are welcome to come

3     and go as you please.  Thank you.

4          MR. BARRIERE: Mr. Alexander, would you take the stand,

5     sir.

6          (J. LESTER ALEXANDER, III, WITNESS, SWORN)

7                    DIRECT EXAMINATION

8     BY MR. BARRIERE:

9     Q.      Good morning, Mr. Alexander.  Would you state your

10    full name and address for the record, sir?

11    A.      My name is Julian Lester Alexander, III.  My address

12    is Suite 1400, 2 Twentieth Street North, Birmingham, Alabama.

13    Q.      By whom are you employed, sir?

14    A.      AEA Group.

15    Q.      And what is your position with the AEA Group?

16    A.      I am the managing principal and president.

17    Q.      What is your profession, sir?

18    A.      I am a CPA.

19    Q.      All right.  You act as trustee in the Terry

20    Manufacturing and Terry Uniform cases; is that correct?

21    A.      I do.

22    Q.      All right.  Could you give the court a brief summary

23    of your educational background, beginning with your graduation

24    from college, sir?

25    A.      I attended the University of Alabama and graduated

35

1    with a business degree and a concentration in accounting.  I

2    have sat for and passed the CPA exam and I am licensed in

3    approximately three states.

4    Q.      When were you first licensed in the state of Alabama?

5    A.      1981.

6    Q.      Has your license as a CPA remained in full force since

7    1981?

8    A.      Yes, it has.

9    Q.      Has it ever been subject to suspension or revocation

10    proceedings?

11    A.      No.

12    Q.      What other states are you a certified public – in what

13    other states are you recognized, pardon me, as a certified

14    public accountant?

15    A.      Florida and Tennessee.

16    Q.      All right.  Are you a certified fraud examiner?

17    A.      Yes, I am.

18    Q.      Would you explain to the court what is a certified

19    fraud examiner?

20    A.      A certified fraud examiner is a professional

21    designation given by an organization to individuals who have a

22    special concentration in investigating fraud.

23    Q.      In the trial binder we placed on the witness stand,

24    Exhibit, I believe, 48 is the expert report that you rendered

25    in this case; is that correct?  I am sorry, 44.

36

1    A.        Exhibit 44 is my expert report, yes.

2    Q.        And attached thereto, is that a true and correct copy

3    of your current curriculum vitae?

4    A.        It is the version at that time.  It has been updated

5    for little things like now I have crossed the twenty-seven-year

6    mark of professional practice.

7    Q.        I congratulate you, sir.

8    A.        Thank you.

9    Q.        Sir, were you asked to do an analysis of the payments

10   made by Terry Manufacturing to Mr. Reynolds and Mr. Horton in

11   connection with notes given by Cotina Terry, Allie Robinson and

12   Roy and Rudolph Terry?

13   A.        I was, yes.

14   Q.        Have you done so?

15   A.        I have.

16   Q.        Were you asked to perform an analysis of whether Terry

17   Manufacturing's liabilities exceeded the fair value of its

18   assets during the period of November 2000 through July of 2003?

19   A.        Yes, I was.

20   Q.        Were you asked to perform an analysis of whether Terry

21   Manufacturing had adequate capital during that same time

22   period?

23   A.        Yes.

24   Q.        Did you in fact perform an analysis of whether Terry

25   Manufacturing's assets – strike that – whether Terry

37

1    Manufacturing's liabilities exceeded the value of its assets

2    during that time frame?

3    A.      Yes, I have.

4    Q.      All right.  And you're prepared to testify to that

5    here today?

6    A.      I am.

7    Q.      Did you reach conclusions with respect to the

8    adequacy, the reasonableness of Terry Manufacturing's capital

9    during that same time frame?

10    A.      I have, yes.

11    Q.      And you're prepared to testify with respect to that

12    topic today?

13    A.      I am.

14    Q.      Finally, sir, were you asked to perform an analysis of

15    whether Terry Manufacturing incurred debts beyond its ability

16    to pay timely during the period of November of 2000 through

17    July of 2003?

18    A.      I have.

19    Q.      You have performed such an analysis?

20    A.      Yes, I have.

21    Q.      And you're prepared to address that topic today?

22    A.      I am prepared, yes.

23          MR. BARRIERE: Your Honor, the court has obviously

24    accepted Mr. Alexander as an expert in the past.

25    Q.      Mr. Alexander, have you been accepted as an expert in

38

1    other courts besides this bankruptcy court?

2    A.      Yes.

3    Q.      All right.  Have you been accepted as an expert in the

4    United  States  District  Court  for  the  Middle  District  of

5    Alabama?

6    A.      Yes, I have.

7    Q.      Have  you  been  accepted  as  an  expert  on  business

8    valuation?

9    A.      Yes.

10   Q.      Have you been accepted as an expert as an accountant

11   involved in the reconstruction of financial records?

12   A.      Yes.

13   Q.      Have  you  been  accepted  as  an  expert  in  the  area  of

14   fraud examination and have testified with respect to certain

15   transactions evidencing fraud?

16   A.      Yes.

17   Q.      And you have been accepted in both federal and state

18   courts here in Alabama?

19   A.      Yes.

20          MR. BARRIERE: Your Honor, I can obviously prolong this

21   but I would tender Mr. Alexander at this time as an expert to

22   testify with respect to the topics I just outlined.

23          MR. BRAZEAL: I have no objection in that regard.

24          THE COURT: All right.

25   Q.      Mr.  Alexander,  when  were  you  appointed  trustee  of

39

1    Terry Manufacturing and Terry Uniforms?

2    A.        July of 2003.

3    Q.        All right.  The companies were in Chapter 11 at that

4    time?

5    A.        Yes, they had already filed.

6    Q.        Were you reappointed as trustee when the cases were

7    converted to Chapter 7s in May of 2004?

8    A.        Yes, I was.

9    Q.        All right.  Can you describe for the court generally

10   what you found the condition of the financial records of Terry

11   Manufacturing at the time you assumed your duties as trustee?

12   A.        Well, generally speaking, the records were in a

13   complete disarray.  Filing cabinets had been opened up and

14   dumped on desks.  It was a real mess.

15   Q.        Did you take control of the records at that time?

16   A.        Yes, I did.

17   Q.        Can you describe for the court generally – we will go

18   into this in more detail – can you describe for the court

19   generally what you have attempted to do to reconstruct the

20   financial records as you found them in July of 2003?

21   A.        Generally speaking, we started with third-party

22   information.  We collected it on-site but we worked with bank

23   statements and then supplemented the information that way, and

24   then we went to public records looking for title searches and

25   liens and that type of information.  And the last step was to

40

1    review the documents at Terry Manufacturing.

2    Q.      Did you collect, to the extent you could, all checking

3    account statements for Terry Manufacturing?

4    A.      Yes.

5    Q.      How many bank accounts did Terry Manufacturing have?

6    A.      I am not ready for that one.  More than twenty.

7    Q.      And these were several banks?

8    A.      Yes, several different institutions, yes.

9    Q.      At the time you assumed your duties as trustee, were

10   there certain records that you would have anticipated a company

11   of the size and revenues that Terry Manufacturing would have

12   that you could not locate?

13   A.      Yes.

14   Q.      What sort of records are you referring to?

15   A.      Well, they didn't have a general ledger accounting

16   system.  They didn't have fixed asset accounting.  Other than

17   the McDonald's operation, they had no inventory or accounts

18   receivable accounting, and generally their purchasing system

19   represented a listing of manual checks.

20   Q.      What about a computer system; were their financial

21   records maintained on any sort of computer system?

22   A.      Well, they did have a computer system on site.  It had

23   virtually no information on it.  And also we were told when we

24   arrived there were approximately ten personal computers that

25   had been taken off-site and we have been unable to recover

41

1    those and I don't know what is on those computers.

2    Q.      Very well.  I want to focus, if we can, rather than on

3    the broad issue of records, on the specific records you looked

4    at with respect to the three notes at issue here.  You are

5    aware, sir, that Cotina Terry provided a promissory note to N.

6    D. Horton and James Reynolds?

7    A.      Yes.

8    Q.      All right.  Did you attempt to reconstruct the amount

9    of payments made on that note by Terry Manufacturing?

10   A.      Yes.

11   Q.      Could you describe the methodology employed?

12   A.      Well, we used payments clearing with the bank accounts

13   to reconstruct it.

14   Q.      Did you look at the actual canceled checks?

15   A.      Yes.  They are photocopy images they came from the

16   banks but, yes.

17   Q.      All right.  Did you calculate the total amounts paid

18   by Terry Manufacturing on the Cotina Terry note?

19   A.      Yes.

20   Q.      And what is that amount?

21   A.      It is two hundred and thirty-four thousand, three

22   hundred and seventy-six dollars.

23   Q.      Now you are aware that Allie Robinson gave a note in

24   the same amount at the same time, November 10, 2000?

25   A.      I am.

42

1    Q.     All right.  Did you likewise attempt to calculate the

2    amount paid on that note by Terry Manufacturing?

3    A.     We followed the same procedure, yes.

4    Q.     And what was the amount paid on Ms. Robinson's note?

5    A.     The same amount, two hundred and thirty-four thousand,

6    three hundred and seventy-six dollars.

7    Q.     And all of these payments were from the coffers of

8    Terry Manufacturing?

9    A.     Yes.

10    Q.     All right.  Did you find any evidence whatsoever that

11    either Cotina Terry or Allie Robinson reimbursed the company

12    for those payments?

13    A.     No, there is no evidence, no.

14    Q.     Do you have an opinion as to whether in fact they

15    reimbursed the company for those payments?

16    A.     I do have an opinion.

17    Q.     And what is that?

18    A.     That they did not reimburse the company.

19    Q.     All right.  Have you reviewed the Terry Manufacturing

20    tax return, federal tax returns I am referring to?

21    A.     Yes.

22    Q.     All right.  Did you ascertain that there were multiple

23    sets of tax returns for the same year?

24    A.     I did, yes.

25    Q.     Would you explain to the court what you mean by that?

43

1    A.       Upon arrival we found two sets of tax returns, one set

2    for years dating back to approximately 1999, maybe longer, that

3    showed profits that could be reconciled to the supposed audited

4    financial statements; and then we found penciled copies of

5    another version, as well as an analysis weighing the pros and

6    cons of filing profit returns versus filing loss returns, and

7    the penciled copies reflected losses for all of those years.

8    Q.       All right.   What steps, if any, did you take to

9    ascertain which returns were actually filed with the federal

10   government?

11   A.       Well, immediately we contacted the IRS and, in my

12   position, they were able to confirm to me via fax key amounts

13   on the tax returns as filed, which confirmed that the returns

14   showing losses were filed and then, subsequent to that, we

15   received the actual filed returns from the IRS.

16   Q.       All right.   So as I understand your testimony, there

17   was a set filed with the federal authorities showing losses,

18   there was another set floating around which showed profits; is

19   that correct?

20   A.       That is correct.

21   Q.       And how, as you understood it, were the returns

22   showing profits employed by Terry Manufacturing or by the

23   Terrys?

24   A.       It is my understanding they were used in connection

25   with soliciting debt and investments.

44

1    Q.       On what do you base that understanding?

2    A.       Well, I was told that my bankers and I believe there

3    has been testimony to that effect.

4    Q.       All right.   You have now obtained the actual tax

5    returns filed with the Internal Revenue Service?

6    A.       Yes.

7    Q.       And those are the returns that show the losses

8    incurred by Terry Manufacturing?

9    A.       That is correct.

10   Q.       Do those tax returns in any way evidence that Terry

11   Manufacturing was able to take advantage of losses by Perky

12   Cap?

13   A.       No, they do not.

14   Q.       Are you aware that Perky Cap is a sub S. Corporation?

15   A.       I am.

16   Q.       Are stockholders of a sub S. Corporation in a position

17   to take their proportionate share of losses of the corporation?

18   A.       Generally speaking, yes.

19   Q.       All right.   Did you review the actual filed tax

20   returns to determine whether Terry Manufacturing took advantage

21   of any losses flowing from Perky Cap?

22   A.       Yes, I did review them.

23   Q.       And what did you find in that regard?

24   A.       There is no Perky Cap losses reported on the tax

25   returns.

45

1    Q.      In your review of the Terry Manufacturing records, did

2    you find any evidence that any stock of Perky Cap was

3    registered in the name of Terry Manufacturing?

4    A.      I found no such evidence, no.

5    Q.      All right.  Sir, you're also aware, are you not, of

6    the promissory note given by Roy and Rudolph Terry to Mr.

7    Horton and Mr. Reynolds on or about May 20, 2002?

8    A.      I am, yes.

9    Q.      You have reviewed a copy of that promissory note?

10    A.      It is May 30 but, yes.

11    Q.      May 30, pardon me.  And have you attempted to

12    calculate the amounts paid on that promissory note?

13    A.      I have.

14    Q.      Did you employ the same methodologies you described

15    for the calculation of the amounts paid on those other two

16    notes?

17    A.      Yes.

18    Q.      All right.  What did you determine to be the amount

19    paid by Terry Manufacturing?

20    A.      One hundred and twenty-seven thousand, nine hundred

21    and eighty-six dollars.

22    Q.      All right. Now, I have put up on the screen a slide

23    that totals those amounts of five hundred and ninety-six

24    thousand, seven thirty-eight.  Is that your calculation of the

25    total amount paid by Terry Manufacturing in connection with

46

1    these three notes?

2    A.        Yes, it is.

3    Q.        And just so the record is clear, did you find any

4    evidence whatsoever that Roy and Rudolph Terry may have

5    reimbursed the company for payments it made on their behalf?

6    A.        No.

7    Q.        Do you have an opinion as to whether they did so?

8    A.        It is my opinion they did not.

9    Q.        Sir, now, I would like to turn, if I may, next to your

10   efforts to reconstruct the financial statement of Terry

11   Manufacturing to determine whether it was solvent or insolvent

12   at various points in time.

13           MR. BARRIERE: Your Honor, there should be a hard copy

14   of that both in the PowerPoints I handed up to you, as well as

15   the expert report.

16           THE COURT: Okay.  I have got it.

17   Q.        Is this your work product, Mr. Alexander?

18   A.        Yes, it is.

19   Q.        All right.  I would like to focus, if I may, initially

20   on the period ending December 31, 1999.  First, let me ask you,

21   sir, did you find financial statements of Terry Manufacturing

22   dating to December 31, 1999?

23   A.        I did.

24   Q.        And what did those reflect with respect to whether the

25   company was solvent or insolvent?

47

1    A.       They showed a profitable, solvent company.

2    Q.       All right.  I take it that you have concluded those

3    were erroneous?

4    A.       Yes, I have.

5    Q.       All right.  Could you give the court an overview of

6    how you have concluded that those financial statements were not

7    accurate?

8    A.       Well, generally speaking, the assets are overstated,

9    mainly inventory and accounts receivable, fixed assets and

10   investments, and the liabilities are understated.  The sales

11   are overstated and the costs are understated.

12            And the way we determined that was initially I was

13   brought in with the statement by Southtrust Bank that Roy Terry

14   had essentially recalled his 2003 financial statements because

15   of a thirty-two million dollar inventory and accounts

16   receivable discrepancy.  So when I came in, it was already

17   known that in 2003 there was thirty-two million dollars

18   missing.

19   Q.       All right.  So just so the record is clear, Mr. Terry

20   had acknowledged that the accounts receivable and inventory

21   were overstated by thirty-two million dollars?

22   A.       That is correct.

23            MR. BRAZEAL: We would object, Your Honor, and move to

24   strike.  I mean, if Mr. Terry told that to Mr. Alexander, that

25   is fine, but if he learned that from a bank officer, I'm not

48

1    sure that is appropriate, Your Honor.  It would be hearsay.

2             MR. BARRIERE: Well, he is acting here as an expert,

3    Your Honor, so I think the rules are significantly low with

4    respect to what he can attest to.

5             THE COURT: Well, I will overrule the objection and

6    allow it to the extent it impacts upon his opinion but, if

7    there is a difference, I will not allow it as to the underlying

8    substance of what he said.

9             MR. BRAZEAL: Thank you, Judge.  And, for the record,

10   I mean, we don't dispute that the financial statements were

11   fraudulent.  I'm not sure about the thirty-two million.  Thank

12   you, Your Honor.

13   BY MR. BARRIERE:

14   Q.       Mr. Alexander, I would like, if I could, to walk

15   through with you your reconstructed financial statements and

16   ask you the specific sourcing for conclusions you reached in

17   this statement.

18            Let's focus, if we may, initially on December 31,

19   1999.  You are showing cash at that time of two hundred and

20   twenty-four thousand dollars.  Am I reading that correctly?

21   A.       That is correct.

22   Q.       And where did you obtain that figure from?

23   A.       From Schedule "L" of the tax returns that were filed

24   with the federal government.

25   Q.       All right.  Have you done anything to attempt to

49

1   confirm the accuracy of the figure that appeared on schedule

2   "L?"

3   A.      We have, not in 1999 but in other years we have.

4   Q.      And what have you done in that regard?

5   A.      We have rebuilt the cash account amount based on bank

6   statements, deposits in transit and checks in transit.

7   Q.      Have you determined, based on that analysis, that

8   Schedule "L" is generally consistent with what you have found

9   to be the cash reserves at year-end?

10  A.      With respect to – there are differences that go either

11  way but, with respect to an opinion on solvency, it made

12  absolutely no difference.

13  Q.      So I take it by that, there may be a little more or a

14  little less cash in the accounts than set forth in Schedule "L"

15  but it is immaterial to your ultimate conclusion?

16  A.      That is correct.

17  Q.      Okay.  Now your next figure is accounts receivable

18  that you show to be two million, three hundred and fifty-six

19  thousand dollars.  What was the source of that information?

20  A.      The same 1120 filed with the federal government.

21  Q.      Were you able to reach an opinion as to whether the

22  filed tax returns, not those that were being used for finance

23  purposes, those that actually went to the federal government,

24  whether those appeared to accurately reflect Terry

25  Manufacturing's operations during the course of a given year?

50

1  A.      To the extent it is a reasonable proxy, yes, because

2  two things that we located.  One was there was an actual

3  analysis done.  We recovered it from Sydney Johnson's office,

4  who was the, for lack of a better description, the controller,

5  weighing the pros and cons of filing what I will call loss

6  returns versus filing profit returns which were fraudulent.  So

7  that seemed evidenced to me of deciding to file real numbers

8  versus fraudulent, inflated numbers, and they ultimately

9  concluded to file the real numbers and still falsify the tax

10 returns and give those to the bank.

11         Second, we have got the penalties of perjury and all

12 of the other things that can happen to you if you commit tax

13 fraud, which is another motive or incentive from a fraud

14 investigator point of view that would lead me to conclude that

15 the tax returns are a reasonable proxy for the right numbers.

16         And then the last reason is the tax return assets are

17 significantly lower on the filed tax return than the financial

18 statements and the profits are lower.  So it leads me to

19 conclude they are probably are accurate.

20 Q.      Okay.  You valued the inventories at 12-31-99 at six

21 million, three hundred and seventy-five thousand dollars.  From

22 what did you obtain that information?

23 A.      In the case of inventory, we took inventory amounts

24 and then marked them up as if they were finished based on our

25 study of the cash receipts and cash flows from approximately

51

1    2000 until the bankruptcy date.  We were able to determine a

2    profit margin.  So we marked up the inventory amounts to fair

3    market value.

4    Q.      What was the base amount you used for inventory?  You

5    said you marked it up, but where did you start with, what was

6    that figure?

7    A.      Well, in the '98 and '99, 2000 and 2001 year, we used

8    the tax return to mark it up.

9    Q.      All right.  And then you would mark it up to show a

10   profit for a finished product?

11   A.      That is correct.

12   Q.      And how did you calculate that mark up?

13   A.      We studied the cash flows coming from their three main

14   lines of business, the cash in versus the cash out, to come up

15   with a mark up.

16   Q.      And that was an average markup for those three lines

17   of business?

18   A.      It was average for all three for the approximately

19   three-year period.

20   Q.      And just so the record is clear, what are those three

21   lines of business of Terry Manufacturing?

22   A.      They have a McDonald's line business, a licensed

23   apparel goods for McDonald's.  They had a Department of Defense

24   contract to manufacture battle dress uniforms; and then they

25   had a series of contracts with the Forestry Department to make

52

1     fire retardant protective material, uniforms.

2     Q.     The next figure you have is land and buildings, three

3     hundred thousand dollars.  Do you see what I am referring to?

4     A.     Yes.

5     Q.     All right.  Could you describe to the court what land

6     and buildings were owned by Terry Manufacturing?

7     A.     While Terry Manufacturing had three locations, they

8     only owned one of them.  It was a location in Roanoke, Alabama.

9     It was a former schoolhouse that had some modifications and

10    renovations done to it.

11    Q.     You chose the figure of three hundred thousand

12    dollars; is that correct?

13    A.     That is correct.

14    Q.     And on what did you base that?

15    A.     We immediately, I guess within a couple of months of

16    my appointment, began marketing on a dual track the business as

17    a whole and the individual assets, and ultimately were able to

18    identify and find a buyer for the land.  The buyer that ended

19    up buying it really bought the warehouse and the land for

20    expansion, and so I have used that transaction as a reasonable

21    proxy for fair market value.

22    Q.     How many buyers did you solicit in connection with

23    that sales effort?

24    A.     Well, there was over eighteen potential buyers that

25    were brought in, in one capacity or another, and every one of

53

1    them we attempted to market either the company as a whole or

2    individual assets, including the real estate.

3         There were six principal buyers that I would call more

4    likely than not strategic buyers.  Crest is one, which is a

5    competitor.  In fact, I'm going to refer to my cheat sheet

6    here.  There is Higgins Manufacturing; American Apparel; White

7    Star Sports Gear; The Brian Jordan Group; The Al Whitfield

8    Group; and Crest Uniform; and then there were others.

9    Q.        Now are you aware, sir, that there were appraisals of

10   these properties made from time to time?

11   A.        I am.

12   Q.        Have you reviewed those in connection with your duties

13   as trustee?

14   A.        I did.  In reaching my decision of value, I gave

15   consideration to all of the appraisals that I was aware of and

16   still am aware of in this case.

17   Q.        Let me show you a –

18         MR. BARRIERE: And this is not part of the record, Your

19   Honor.  I will approach the witness if I may.  This will be

20   Exhibit 49,  Your Honor.

21   Q.        Do you recognize this to be the appraisal performed on

22   the property by Real Estate Appraisers, LLC, in January of

23   2004?

24   A.        Yes.

25   Q.        What conclusion did that appraiser reach with respect

54

1    to the fair market value of this property?

2    A.    John Hall reached the conclusion that the property was

3    worth seven hundred and seventy-seven thousand dollars.

4    Q.    All right.  You did not include that figure; is that

5    correct?

6    A.    I did not use that number, no.  I did consider using

7    it and decided not to.

8    Q.    Over what period of time did you attempt to market

9    this property?

10    A.    Oh, gosh, over a year.  I can't remember exactly.

11    Q.    All right.  So this was not a sheriff's sale or a

12    liquidation sale that you engaged in?

13    A.    No.

14    Q.    Now let me just ask you, sir, had you chosen Mr.

15    Hall's seven hundred and seventy-seven thousand approximate

16    figure, what effect, if any, would it have upon your opinion as

17    to the solvency of this company at any time during December of

18    1999 and 2003?

19    A.    I'm sorry, Brent.  I am still rethinking.  I think it

20    was approximately a year on time of market.  I am sorry.

21    Q.     That's fine.  My question simply was if you had used

22    Mr. Hall's appraised figure, would it have had any effect on

23    your conclusion with respect to solvency?

24    A.    No.

25    Q.    Now obviously one of the challenges presented, sir, is

55

1    you were attempting to market this property in the 2003/2004

2    timeframe, and we are now talking about its value in 1999.  In

3    connection with your duties as an expert, did you attempt to

4    ascertain what had been market trends for properties of this

5    type during that approximate four year period?

6    A.        Yes, I did.

7    Q.        And what were you told in that regard?

8    A.        Well, I learned that within a fifty mile radius to a

9    hundred mile radius of the plant, there were numerous

10   properties that had been on the market for long, long time,

11   much longer than the time we had ours on the market.

12   Q.        Okay.  What advice or what expert opinions were

13   provided by Mr. Hall with respect to the trend in the market

14   for this property?  It had gone up in that four year period,

15   stayed the same, gone down?

16   A.        As it relates to '99 versus 2003?

17   Q.        Yes, sir.

18   A.        Mr. Hall, I recall him testifying that the market has

19   gotten better since 1999, market conditions have improved.

20   While it might be marginally, they have improved.

21   Q.        So based upon that, your three hundred thousand dollar

22   figure from 2003 may actually be higher than the property would

23   have brought in 1999; is that correct?

24   A.        That is correct.

25   Q.        All right, sir.  I would like to turn next to the

56

1    fixed assets.  What sort of property does this include?

2    A.       It   is   principally   textile   equipment,   apparel

3    manufacturing equipment, sewing machines, embroidery machines,

4    that type of equipment.

5    Q.       And on what did you base your figure of three hundred

6    and fifty-four thousand dollars?

7    A.       The actual sales of that equipment.

8    Q.       All right.  Now, sir, when you became trustee, did you

9    become aware of a purported appraisal of this equipment showing

10   a value well in excess of three million dollars prepared by

11   Henderson Sewing Machine?

12   A.       Yes.

13   Q.       All right.  Did you do any investigation concerning

14   that appraisal?

15   A.       Yes.

16   Q.       What did you do in that regard?

17   A.       Well, I discovered a marked-up copy, a cut and paste

18   marked-up copy of that in, I believe, Sidney Johnson's office

19   reflecting different amounts.

20   Q.       Did it appear it was a document generated by someone

21   at Terry Manufacturing as opposed to Henderson Sewing?

22   A.       Yes.

23           MR. BRAZEAL: I'm going to object to that, Your Honor.

24   I can take that up on cross.  It is just hard for me to imagine

25   that the man can say I have read this report and I can tell who

57

1    doctored it, if in fact it was doctored.

2              THE COURT: Okay.  Well, I am going to overrule.  You

3    can do that on cross.

4    BY MR. BARRIERE:

5    Q.        Well, let me ask you, sir, on the – the doctored

6    version, we will call it, was found where?

7    A.        In the offices of Terry Manufacturing.

8    Q.        Was there any handwriting on that doctored version?

9    A.        Yes.

10   Q.        And whose handwriting did that appear to be?

11   A.        It appeared to be Roy Terry's handwriting.

12   Q.        And what did you base that conclusion on?

13   A.        Roy Terry maintained meticulous journals, handwritten

14   notes.  I have got logs and logs of them and the handwriting

15   was consistent with the handwriting in Roy's personal journals.

16   Q.        All right.  Are you aware that Mr. Henderson has been

17   called to testify in proceedings brought by you?

18   A.        Yes.

19   Q.        You reviewed his deposition?

20   A.        I have.

21   Q.        You are aware that he has testified that this was a

22   bogus appraisal; are you not?

23   A.        Yes, I am.

24   Q.        Now are you aware of Mr. Henderson's opinion with

25   respect – strike that.  Are you aware generally of the nature

58

1    of Mr. Henderson's business?

2    A.        Yes.

3    Q.        What line of business is he in?

4    A.        He buys and sells textile manufacturing equipment.

5    Q.        To your knowledge and based upon his testimony under

6    oath, does Mr. Henderson in fact provide appraisals, not the

7    one you looked at but does he provide legitimate appraisals

8    from time to time?

9    A.        Yes, he does.

10   Q.        All right.  Are you aware based upon his sworn

11   testimony as to what he believes to have been the value of the

12   fixed equipment?

13   A.        I am.

14   Q.        And what is that figure?

15   A.        He believed that, after he reconditioned it, he could

16   sell it for somewhere around two hundred thousand dollars.

17   Q.        All right.  So the figure you reached for the sale was

18   actually greater than the appraised amount; is that correct?

19   A.        Yes.

20   Q.        All right.  Let's turn next to the 431 building.  What

21   is that?

22   A.        The 431 building was a warehouse located on Highway

23   431.

24   Q.        Okay.  It does not appear as an asset after December

25   31, 2000.  Why is that the case?

59

1    A.       It was sold to the Marshalls.

2    Q.       The marshals as in sheriffs or –

3    A.        Oh, no, the Marshalls.  I have forgotten their first

4    names, but they are stockholders of the company.

5    Q.       Okay.  It was sold for a million dollars?

6    A.       Yes.

7    Q.       And that is why you used that figure?

8    A.       That is correct.

9    Q.       Okay.  And, finally, there is land sold to Rudolph

10   Terry.  On what did you base that value?

11   A.       I based it on the information we have for the proceeds

12   of that sale.

13   Q.       All right.  Three hundred and forty-one thousand

14   dollars?

15   A.       Yes.

16   Q.       All right.  And that is property located where?

17   A.       Let me put my glasses on.  At this time, I can't

18   recall where the property was located.

19   Q.       All right.  So totaling all of those figures you came

20   up with a total value of the assets of ten million, nine

21   hundred and fifty thousand dollars; is that correct, sir?

22   A.       That is correct.

23   Q.       Let's turn to the liability side of the ledger, if we

24   may.  The first is the accounts payable of three million, nine

25   hundred and seven thousand dollars.  The first question I have

60

1    for you is where did you derive that figure from?

2    A.       I used the "as filed" tax returns or the "loss"

3    returns.

4    Q.       Did you do anything to confirm the accuracy of what

5    appeared on Schedule "L," the three million, nine hundred and

6    seven thousand dollars?

7    A.       Yes, I did.

8    Q.       And what did you do in that regard?

9    A.       I was able to reconstruct accounts payable balances

10   for certain vendors, and I did that and then compared it to the

11   amounts that I used.

12   Q.       Which vendors did you use?

13   A.       Oh, gosh, there were several deposed.  I used every

14   one that was deposed.  I think there was nine of them.  I have

15   summarized just a few of them right here.  For just Darwood,

16   Millikin, Southern Mills, HLC, Bonifay and American Express,

17   which is four of approximately a hundred and sixty-five

18   vendors, but these are fairly significant vendors in 1999,

19   there balance alone was three point nine million.

20   Q.       All right.  Did that lead you to conclude that the

21   three million nine figure placed on the tax return was low?

22   A.       Yes.

23   Q.       Those four or five names you just gave us, do those

24   represent the principal vendors of Terry Manufacturing,

25   excluding bank debt now?  I'm talking about actual trade

61

1     creditors.

2     A.     They are the primary ones involved in the lines of

3     business that they are in, yes.  They are the material

4     suppliers.

5     Q.     All right.  Are you of the opinion, sir, that had you

6     obtained the accounts payable actually due to all vendors as of

7     December 31, 1999, that figure would be greater than three

8     million, nine hundred thousand dollars?

9     A.     I am pretty sure – I have rounded the three point nine

10    million, but I believe that number is already greater than the

11    amount I used on Appendix "A."

12    Q.     And that was only employing, what, five of a hundred

13    and sixty odd vendors?

14    A.     That is correct.

15    Q.     All right.  So were you to have totaled all amounts

16    owed to vendors, are you of the opinion it would cause your

17    balance sheet to show even a greater negative net worth?

18    A.     There is no question it would go down.

19    Q.     Okay.  Let's turn next to note payables, which you –

20    A.     Or a net worth loss would be greater.  I'm not sure

21    that is clear.

22    Q.     It would be more in the red?

23    A.     It would be more in the red, yes, that is correct.

24    Q.     All right.  Notes payable, fourteen million, eight

25    hundred and eighty-six thousand dollars.  Where did you obtain

62

1    that figure from?

2    A.      From the tax return.

3    Q.      All right.  Did you confirm that with any of the banks

4    or other secured lenders?

5    A.      We agreed it to the information we had on the

6    amortization of the loan, yes.

7    Q.      All right.  Who were the principal lenders shown on

8    the financial statements as of 12-31-1999?

9    A.      At this time, I can't recall when, and it gets a

10   little confusing, NationsBank was a principal lender during

11   some period of this time and then Southtrust Bank came in and,

12   I believe, took NationsBank out; and I am not sure what year

13   that was.

14   Q.      The next is subordinated notes payable, three million,

15   five hundred thousand dollars.  Who was the holder of that

16   promissory note, if you recall, sir?

17   A.      It is the state of Arkansas.

18   Q.      Okay.  And from what did you take that balance due?

19   A.      From the statement provided by the lender.

20   Q.      All right.  Now, sir, I would ask you to turn to the

21   exhibits appearing behind tab forty-nine in the binder before

22   you.

23   A.      That would be forty-eight in my book?

24   Q.      I am looking at the subordinated note payable detail.

25   It should be the first page.

63

1   A.      The first page of mine says deposition exhibit two,

2   list of payments.

3   Q.      Look at forty-nine.

4   A.      There is nothing in forty-nine.

5          MR. BARRIERE: I will approach the witness, Your Honor,

6   if I may.  Do you have a forty-nine?

7          COURTROOM DEPUTY: Forty-nine is the appraisal.

8          THE COURT: Well, wait a minute.  Tab forty-nine or

9   Exhibit 49?  Subordinated note payable?

10         MR. BARRIERE: Yes.

11         THE COURT: Okay.  That is what I am showing for – and

12  it has got an exhibit sticker, exhibit thirteen.

13         MR. BARRIERE: That is from the deposition, but I

14  wanted to make sure we have got the right number on the

15  exhibit.  Is that appearing behind your tab forty-eight or

16  forty-nine, Your Honor?

17         THE COURT: This is tab forty-nine.

18         MR. BARRIERE: All right.  Well, then, I would ask that

19  I admit that as Exhibit 49, and the appraisal be admitted as

20  Exhibit 50, if I may.

21         THE COURT: Okay.  Now, I'm not seeing the appraisal.

22  Oh, this one here.  Okay.  I have got you.  Okay.

23  BY MR. BARRIERE:

24  Q.      Mr. Alexander, are you familiar with that packet of

25  information from the Arkansas Highway Employees Retirement

64

1    System?

2    A.        Yes.

3    Q.        All right.  You are aware that a representative of

4    that entity appeared for a deposition in this case?

5    A.        I am, yes.

6    Q.        All right.  Sir, an issue was raised at one point as

7    to whether that represented debt or equity.  Are you aware of

8    that dispute?

9    A.        I am.

10   Q.        All right.  Tell me, sir, in your capacity as a

11   certified public accountant, are you called upon from time to

12   time to ascertain whether an instrument represents debt or

13   equity?

14   A.        Yes.

15   Q.        Typically in what engagements or work that you perform

16   is that service required?

17   A.        Well, I have testified in court about it but typically

18   as an auditor you make those determinations in classifying

19   amounts shown on balance sheets.

20   Q.        Have you reached an opinion in this case as to whether

21   the instrument provided by Terry Manufacturing to the Arkansas

22   Retirement Fund represents debt or equity?

23   A.        I have.

24   Q.        And what is your opinion in that regard?

25   A.        It is debt.

65

1    Q.    And on what do you base that conclusion?

2    A.    Well, it is evidenced by a note; it has a stated

3    principal amount; and it has an interest rate and repayment

4    terms.

5    Q.    And the instrument itself is styled subordinated

6    promissory note, correct?

7    A.    That is correct.

8    Q.    All right, sir.  Totaling the liabilities on December

9    31, 1999, did you conclude that those amounted to twenty-two

10   million, two hundred and ninety-three thousand dollars?

11   A.    Because I can't see that on the wall, I am having to

12   flip back to mine.  Yes, I did.

13   Q.    All right.  What did that cause you, then, to conclude

14   with respect to whether Terry Manufacturing was solvent or

15   insolvent from a balance sheet standpoint as of December 31,

16   1999?

17   A.    I concluded that they were at least eleven million,

18   three hundred thousand dollars insolvent at that time.

19   Q.    You used the modifier "at least?"

20   A.    That is correct.

21   Q.    And why do you say that or why did you use that

22   modifier?

23   A.    Mainly because our continued testing of these amounts

24   has shown that in sum total these numbers were conservative and

25   would default more on making them appear solvent when they are

66

1    not.

2    Q.    All right.  So if I understood your testimony, sir,

3    your continuing studies evidence greater debt or less value of

4    assets and, in turn, greater negative net worth or more in the

5    red?

6    A.    Yes.  Thank you.  Yes, that is correct.

7    Q.    All right.  Sir, I don't want to belabor this process.

8    For the years December 31, 2001, December 31, 2000, did you

9    employ fundamentally the same methodology to evaluate the

10   solvency of Terry Manufacturing as you did for the year-end

11   December 31, 1999?

12   A.    For 2000 and 2001, we used consistent methodology.

13   Q.    All right.

14   A.    With '99, consistent with '99.

15   Q.    And you used the same sources for information that you

16   have testified to with respect to 1999?

17   A.    Yes.

18   Q.    All right.  What did you conclude with respect to the

19   solvency of Terry Manufacturing at December 31, 2000?

20   A.    That liabilities exceeded assets by eight point nine

21   million dollars.

22   Q.    Would that, again, be at least by eight million, nine

23   hundred thousand dollars?

24   A.    Yes, it would be by at least eight point nine million.

25   Q.    And what did you conclude with respect to the solvency

67

1     from a balance sheet standpoint of Terry Manufacturing as of

2     December 31, 2001?

3     A.      That liabilities exceeded assets by at least fifteen

4     point six million dollars.

5     Q.      All right.  Now, let's turn to the year-end December

6     31, 2002, if we can, sir.  Can you describe – generally was

7     there a different methodology employed for that year as opposed

8     to prior years?

9     A.      In 2002 and 2003, yes.

10    Q.      And why is that?

11    A.      There are two reasons.  One, it was the availability

12    of information, the effort required to determine the amounts at

13    the level of precision used in 2003 and 2002, so it was a

14    matter of economy and reasonableness.

15    Q.      All right.  Was there a tax return filed for the year

16    ended December 31, 2002?

17    A.      No.

18    Q.      Let me start, then, by focusing your attention to the

19    cash line, one million, five hundred and ninety-six thousand

20    dollars.  From what did you obtain or what was the basis for

21    that figure?

22    A.      Our reconstructed – well, it is not even

23    reconstructed.  It is the absolute value of cash according to

24    bank statements, and we have ignored outstanding items.

25    Q.      Okay.  So, if I understand it, you took all of the

68

1    checking account statements, figured out the balance in each

2    account as of December 31?

3    A.        That is correct.

4    Q.        And you ignored any checks that may have been issued

5    prior to December 31?

6    A.        Yes.

7    Q.        You totaled those up and you came to a million, five

8    ninety-six?

9    A.        That is correct.

10   Q.        All right.  How about accounts receivable; where did

11   you come out with the figure, eight hundred and fifty-five

12   thousand dollars?

13   A.        We used the receivable collections from July as a

14   proxy for what the receivables would have been as of December

15   31, '02.

16   Q.        All right.  Inventory is five hundred and fifty-six

17   thousand dollars.  Where did you obtain that information from?

18   A.        That is the sales value of the inventory on hand at

19   July which was used as a proxy for what would have been on hand

20   at 12-31-02.

21   Q.        Okay.    How did you attempt to reconstruct what

22   inventory might have existed as of 12-31-2002 but had been sold

23   as of July?

24   A.        Well, you can look at their cash flow.  We went back

25   and tested the number using the actual cash payments and

69

1    turnover type analysis, days outstanding analysis, to test the

2    number and it didn't materially change it, and that is how we

3    approached testing the number.  Reconstructing the number was

4    done as of July 7, 2003.  And the way we reconstructed the

5    inventory was we went and physically counted it.

6    Q.      Next is land and buildings, three hundred thousand

7    dollars.  That is the same figure used for prior years based

8    upon your efforts to sell the property?

9    A.      Yes.

10   Q.      And fixed assets, likewise you used the same figure

11   you had from 1999 based upon the actual sale of the furniture,

12   fixtures and equipment?

13   A.      Yes.

14   Q.      Let's talk about accounts payable.  You are showing

15   that as forty million, two hundred and fifteen thousand

16   dollars.  How did you calculate that figure?

17   A.      It was a function of the difference in the amounts

18   that were clearly determinable and the amounts shown on the

19   claims register.  And, just for clarification, it is not

20   properly labeled.  It is really all other liabilities, which

21   would include accounts payable.

22   Q.      Okay.  So you took off liabilities from the claims

23   register; is that correct?

24   A.      Correct.

25   Q.      Did you take out any of those figures?

70

1   A.      It seems like there were one or two types or

2   categories of claims that we may have taken out.  I would have

3   to check my notes.  It would be the Bank of Wedowee's claim if

4   we took it out, and it might be some of the preferred

5   shareholders who may have filed claims.  I just can't recall at

6   this time whether we took it out or left it in.

7   Q.      Now that figure as of July 7, 2003, is forty-one

8   million, nine hundred and forty-five thousand dollars.  Why the

9   approximate one point seven million dollar difference between

10  December 31 and July 7?

11  A.      It was based on a study of the cash flow during that

12  period.  We rolled the number back.

13  Q.      The next figure is notes payable, seventeen million,

14  eight hundred and ninety-nine thousand dollars.  Where did you

15  obtain that figure from?

16  A.      The capital lease?

17  Q.      No, on the notes payable, seventeen million, eight

18  ninety-nine as of December –

19  A.      Oh, I am on the wrong year.  Okay.  That was, again,

20  from the bank's filings in the bankruptcy, payment schedules.

21  Q.      The subordinated notes payable, is that, again, the

22  same subordinated note you testified to a moment ago owed to

23  the Arkansas Employees Retirement System?

24  A.      Yes.

25  Q.      And from what source did you obtain the balance on

71

1    that note?

2    A.        The same source that was used in the earlier years.

3    Q.        And that was the statement actually generated by the

4    retirement system?

5    A.        Yes.

6    Q.        All right.  And you are aware that a representative

7    testified to those figures in his deposition under Rule

8    30(b)(6)?

9    A.        Yes.

10   Q.        And you relied upon that testimony in preparing this

11   balance sheet?

12   A.        I actually prepared the balance sheet before that

13   testimony and I used the testimony to test the accuracy of the

14   balance sheet.

15   Q.        Fair enough.  Finally, there is a figure here for

16   capital lease obligations.  We haven't discussed that

17   previously.  It also appears December 31, 2001.  What is that

18   figure?

19   A.        When the 431 site was sold, it was immediately leased

20   back, and that is the fair value of the lease payments.

21   Q.        What did you conclude, then, to be whether the company

22   was solvent or insolvent from a balance sheet standpoint on

23   December 31, 2002?

24   A.        That the company was insolvent.

25   Q.        And by what amount?

72

1    A.       By fifty-eight point eight million dollars.

2    Q.       And what did you conclude with respect to whether the

3    company was solvent on July 7, 2003, the Chapter 11 filing

4    date?

5    A.       That the company was insolvent.

6    Q.       And by what amount, sir?

7    A.       By sixty-three point eight million dollars.

8    Q.       All right.  Now, sir, you are aware that a question

9    has been raised as to whether the books and records of this

10    company were in such complete disarray, whether so many records

11    were lost or perhaps never prepared, that it is impossible to

12    reach a meaningful conclusion as to solvency in the years prior

13    to 2002 and 2003?

14    A.       Yes, I am aware of that.

15    Q.       All right.  What is your opinion as to whether you're

16    able to make a meaningful conclusion with respect to solvency

17    for this company, Terry Manufacturing, as of December 31, 1999?

18    A.       I believe you clearly can make that determination.

19    Q.       And you are basing that on what, sir?

20    A.       Not only the work done at the time this balance sheet

21    was issued, which was February of 2005, but the information

22    gathered subsequent and the continuing work we have done to

23    test the amounts, which includes deposition testimony of

24    creditors, continued analysis of information provided in other

25    recovery actions from creditors and parties that dealt with

73

1    Terry Manufacturing.  There is probably more information.  I

2    just can't think of it.

3    Q.        All right.  Are you of the opinion that there is

4    adequate information to reach a conclusion with respect to this

5    company's solvency for 2000 and 2001?

6    A.        Yes, for the same reasons.

7    Q.        All right.  Now, sir, I would like to turn next, if I

8    may, to what has been identified as appendix "C," your sources

9    and uses of cash.

10   A.        Okay.

11   Q.        Do you have a copy of that before you?

12   A.        I do now.

13   Q.        Can you tell the court why did you prepare appendix

14   "C?"

15   A.        Well, the biggest reason was to get a handle on the

16   historical operations, as well as investing and purchasing

17   activities of the company.  We used it for several purposes.

18   One, to get a read on cash flow; two, to identify investment

19   and lending transactions; and, three, to identify fixed asset

20   purchases.

21   Q.        From this were you able to conclude that Terry

22   Manufacturing had net cash flow at least for the period of –

23   well, you tell me.  For what periods did you find the company

24   had a negative net cash flow?

25   A.        Well, overall the cash flow for the entire period was

74

1     negative.  The last six months was negative by one point three

2     million dollars, but that is misleading because during that

3     period of time the company was not paying substantial debts and

4     those debts were mounting, and that is how they were managing

5     to cash flow in those earlier years.

6     Q.     All right.  Was it your observation that the company

7     was using trade debt in effect to finance its operations?

8     A.     Absolutely.

9     Q.     All right.  Let's talk about that for a moment.  I

10    will ask you to look next to the PowerPoint concerning a

11    payable aging.

12    A.     Okay.

13    Q.     We have four vendors here – HLC Industries, Milliken

14    & Co., and Bonifay Manufacturing.  Why were those selected for

15    your study?

16    A.     Those are the three principal vendors for each line of

17    business.  If you could not do business with those vendors, you

18    were out of that business.

19    Q.     All right.  I see HLC Industries.  What do they sell

20    to Terry Manufacturing?

21    A.     Camouflage material, which is used to manufacture the

22    BDU's under their government contract.

23    Q.     And their invoices call for payments within ninety

24    days?

25    A.     That is correct.

75

1    Q.      Was Terry Manufacturing able to pay or did they pay

2    those bills within ninety days?

3    A.      No.

4    Q.      You have calculated various time frames here for '99,

5    2000 and 2001.  What was that based upon?

6    A.      The actual payment histories that we could recover

7    from Terry's records and then we confirmed that information to

8    the deposition testimony and the exhibits taken from those

9    parties.

10    Q.      So as I understand the exhibit, the HLC, ninety day

11    invoices, were paid on average of a hundred and sixty-two days

12    in 1999, a hundred and eighty-six days in 2000, and a hundred

13    and thirty-nine days in 2001?

14    A.      Yeah.  That is the average for that year, how late

15    they were.  In other words, if the bill was due in ninety days,

16    on average they paid it in a hundred and sixty-two days in

17    1999.

18    Q.      All right.  Milliken & Co., were they also a provider

19    of fabric?

20    A.      Yes.

21    Q.      And they called for payments within sixty days?

22    A.      Yes.

23    Q.      And in 2000, the average payments were, in fact,

24    within a hundred and forty-three days?

25    A.      That is correct.

76

1    Q.    And in 2001, those payments were in fact an average of

2    a hundred and seventy-four days?

3    A.    That is correct.

4    Q.    Bonifay Manufacturing called for payments in thirty

5    days.  I take it Terry Manufacturing didn't do so?

6    A.    That is correct.

7    Q.    All right.  In 1999, average payment was a hundred and

8    forty-four days?

9    A.    That is right.

10    Q.    A hundred and fourteen days in 2000?

11    A.    That is right.

12    Q.    And 2001, a hundred and seven days?

13    A.    That is correct.

14    Q.    During your two-year tenure, I guess, as trustee,

15    approaching three-your tenure as trustee, pardon me, you have

16    had opportunity to visit with numerous vendors of Terry

17    Manufacturing?

18    A.    I have, yes.

19    Q.    Based upon your conversations with those vendors and

20    the proof of claims that they have filed in this case, is it

21    your appreciation that Terry Manufacturing consistently paid

22    debts will beyond the due date?

23    A.    That is correct, yes.

24    Q.    All right.  These are not anomalies, HLC, Milliken and

25    Bonifay; they are typical of how most vendors were handled?

77

1    A.        No, they are not anomalies and also they represent

2    almost forty percent of the payments made during our study

3    period. So even though it is just three of them, it is a fairly

4    significant slice.

5    Q.        Have you reached a conclusion as to whether Terry

6    Manufacturing was able to pay its debts timely?

7    A.        I have.

8    Q.        And what is your conclusion?

9    A.        They were not able to pay their debts timely.

10   Q.        And that would be true throughout the period of 1999

11   through 2003?

12   A.        Yes.

13   Q.        Now, sir, were you also asked to consider whether

14   Terry Manufacturing had adequate capital to sustain its

15   operation?

16   A.        I was.

17   Q.        And what conclusions have you reached in that regard?

18   A.        They clearly did not have adequate capital.

19   Q.        All right.  What indicia do you rely upon or what

20   factors do you rely upon in reaching that conclusion?

21   A.        Well, it is really when you step back and analyze the

22   situation, you see that they are not paying critical vendors

23   within terms.  They are exhausting their known and disclosed

24   capital resources.  They are soliciting investments.  They are

25   soliciting off-balance-sheet and hidden financing arrangements,

78

1    paying upwards of forty percent in transaction cost to get the

2    access to that money, and they are still not paying

3    approximately sixty million dollars worth of claims by the time

4    you get to the end of 2003.

5    Q.      How were the Terrys able to maintain this house of

6    cards over this four-year period given their lack of adequate

7    capital, their failure to pay their debts timely?

8    A.      Well, there were several methods they used.  One was

9    they were able – they used fictitious vendors.  They used bogus

10   documentation but principally they used a series of numerous

11   cash transfers, combined with what I will call riding your

12   vendors to create float.

13   Q.      When you say cash transfers, what are you referring

14   to?  Can you give an illustration of that?

15   A.      Well, yeah, I can.  In fact, it may help if I step

16   over to the white board and write some numbers down if that

17   would be okay.

18          (Pause)

19          What the Terrys were –

20          THE COURT: Try to speak up a little bit because the

21   microphone is over here.  It will probably pick you up but,

22   yeah, that will help.

23   Q.      You can move that forward, Les.  I think it is on

24   wheels or is not very heavy.

25   A.      One of the things the Terrys did to obtain access to

79

1    capital was they engaged in a series of constant churning of

2    their cash balances, and I brought one example for the court.

3    It is a period of May 30, 2002, for about fifty days, to July

4    19, 2002, and it is best shown by just simply looking at the

5    bank statements and looking at the deposits.  It is about a

6    fifty day period.  I counted the days, Your Honor.  Over about

7    a fifty day period there was three hundred and sixty deposits

8    into their accounts, totaling a little over thirteen million

9    dollars.

10          Okay.  During that same period, however, only a

11   hundred and forty-seven of those deposits were from customers,

12   totaling, rounding up, six million.  Leaving a balance of two

13   hundred and thirteen interbank transfers, totaling seven

14   million dollars.

15          So what they were accomplishing, and it is not dollar

16   for dollar, but what they were accomplishing is they were

17   appearing to the banks that they were maintaining an inflow of

18   thirteen million dollars by using these numerous bank accounts

19   to continuously move money around and creating a fiction, a

20   seven million dollar fiction.

21          It also accomplished another objective for them.  It

22   made it very difficult to discover the inflated financial

23   statements.  If you are a banker, you can discover inflated

24   financial statements by looking at the sales and saying fifty

25   million dollars, you look at the bank statements, well, I don't

80

1      see fifty million dollars coming in here.  Well, this method

2      achieved an objective for the Terrys that allowed them to show

3      fifty million coming through when the real number was more like

4      twenty to thirty million.

5              The second thing that it did for them is it made, once

6      they are caught, it is the same type of technique that

7      criminals use to hide their tracks, and it is a pretty good

8      method if you wish to hide where the money ultimately ends up

9      because it gets commingled, transferred, re-commingled,

10     transferred, broken up, and then you add in the fictitious

11     vendors and the bogus documentation, and it does a very good

12     job of hiding the tracks of where the money ultimately goes,

13     making it very difficult to answer that question.

14             It does not make it difficult at all to determine what

15     their cash flow was and whether or not they were solvent,

16     though, because you just have to look at the bank statements

17     and pick them out.  It is a big job because there is a lot of

18     them.  And we have looked at this on numerous dates.  This is

19     not an anomaly.  It was a constant business practice that they

20     conducted.

21     Q.      So if I understood your testimony, sir, what you have

22     is kiting constantly between, I think you told me, over twenty

23     bank accounts which permit the fiction of large balances,

24     multiple deposits, all drawn however on a much smaller sum of

25     actual hard cash.  Is that a fair summary?

81

1   A.      That is fair.  They did not use all twenty accounts,

2   but they used a large number of them.

3   Q.      Now, sir, I would like to turn to the relationship

4   between Terry Manufacturing and Perky Cap company, if I could.

5   You are aware that Perky Cap was a vendor of head wear to Terry

6   Manufacturing?

7   A.      I am, yes.

8   Q.      All right.  And you are aware of an assertion made in

9   this case that Terry Manufacturing acquired more caps as its

10  principals acquired additional stock; that somehow there was a

11  symbiotic relationship between the purchase of stock and the

12  purchase of caps.  Are you aware of that assertion?

13  A.      I am aware of that.

14  Q.      All right.  Have you attempted to plot the actual

15  acquisition of head wear by Terry Manufacturing from Perky Cap?

16  A.      Yes, I have.

17  Q.      Did you find any relationship between the timing of

18  stock acquisition by insiders, by Cotina Terry, by Allie

19  Robinson, by Roy and Rudolph and the actual purchase of caps by

20  Terry Manufacturing and Perky Cap?

21  A.      I found a correlation.  I don't think it is a

22  relationship.

23  Q.      All right.  Tell me what you uncovered in that regard.

24  A.      The more stock they bought, the worse it got.

25  Q.      All right.  Well, I'm going to start on the left-hand

82

1    side here.  I take it you begin with the initial acquisition of

2    caps in 1991?

3    A.        That is correct.

4    Q.        All right.  You were using what documents to base this

5    analysis on?

6    A.        Financial statements of Perky Cap.

7    Q.        Did you also use their actual accounts payable ledgers

8    and their sales shipment ledgers?

9    A.        Yes, I did.

10   Q.        Now, the peak point occurs in, what, approximately

11   June of 1994?

12   A.        Sometime between, yeah, July of '94 and June of '95.

13   Q.        And the volume of caps acquired by Terry Manufacturing

14   consistently declines thereafter?

15   A.        That is correct.  It is up and down and up and down

16   but, as you can see from the trend, it is a pretty consistent

17   trend downward.

18   Q.        All right.  Now, the first of the transactions we are

19   challenging, the Cotina Terry note, the Allie Robinson note,

20   are executed in November of 2001.  Was there any relationship

21   between that stock purchase and an increase in cap purchases,

22   as best you can ascertain?

23   A.        There is no increase at all shown in that timeframe.

24   Q.        Now, the second or the final transaction, of course,

25   is the May 31 purchase of stock and note.  Did you see any

83

1    relationship there between stock and cap sales?

2    A.      I saw no change in the trend that I had seen before,

3    which was up a little bit, down a lot, up a little bit, down a

4    lot, up a little bit, down a lot, consistently going down.

5    Q.      Okay.  So as the Terry family acquires more stock, as

6    a general matter, Terry Manufacturing acquires fewer caps?

7    A.      That appears to be the case, yes.

8    Q.      All right.  Did you attempt to ascertain whether Terry

9    Manufacturing somehow benefitted by this relationship by

10   discounts or obtaining additional funds or some concessions

11   from Perky Cap?

12   A.      Yes.

13   Q.      And what did you conclude in that regard?

14   A.      I am not aware of any concessions or discounts at all

15   received by Terry Manufacturing.

16   Q.      All right.  I have placed before you a cost benefit

17   chart that you have prepared; is that correct, Mr. Alexander?

18   A.      That is correct.

19   Q.      And what does this document reflect?

20   A.      It is simply an objective analysis of the payments

21   made by the estate related to Perky Cap for the period where we

22   studied cash payments which was the years 2000 through the

23   filing date in 2003.  We compared those payments to the amount

24   of hats received, the value of the hats received.

25   Q.      And what did you find in that regard?

84

1     A.     Well, I found that there was a five hundred and
2    ninety-seven thousand in loan payments that we are talking
3    about here.  In addition, there was one point six million
4    dollars of additional payments made by TMC to Perky Cap.
5    During that same timeframe, however, only one point three
6    million in hats were acquired, which left a difference or a net
7    cost of nine hundred and forty-six thousand dollars.  There was
8    no benefit at all received from Perky Cap.

9    Q.     Just focusing a minute on the relationship with
10   respect to caps, the vendor relationship, was Terry
11   Manufacturing a net borrower or was it a net beneficiary or a
12   net lender under that relationship?

13   A.     Or a net loss, either one.  Net lender, net loss.

14   Q.     All right.  So as I understand what you have put
15   before the court, it received a million three in caps and it
16   paid a million, six seven?

17   A.     That is correct.

18   Q.     Sir, I would ask you to turn to tab number twenty-
19   three in the binder.  It is the Perky Cap tax return for 1998.

20   A.     Okay.

21   Q.     Sir, this is your area of expertise but not mine.  It
22   is my appreciation that the loss, the operating loss for Perky
23   Cap for that year is approximately two hundred and thirty
24   thousand dollars.  Am I reading that correctly?

25   A.     You are.

85

1    Q.       All right.  And of that, about fifty-six thousand

2    dollars was depreciation?

3    A.       Yes, that is correct.

4    Q.       So on a cash basis, this company lost about a hundred

5    and eighty thousand dollars that year?

6    A.       Yes.

7    Q.       Now the next tab is for 1999, which shows an operating

8    loss of a hundred and twenty-five thousand, five hundred and

9    seventy dollars.  Do you see where I am reading from?

10   A.       Now I do, yes.

11   Q.       And, again, there was about forty thousand dollars of

12   depreciation?

13   A.       Yes.

14   Q.       So on a cash basis this company lost about eighty-five

15   thousand dollars in 1999?

16   A.       That is correct.

17   Q.       All right.

18            THE COURT: Wait a minute.  Are we looking at the 1999,

19   1120-S?

20            MR. BARRIERE: Yes, sir.  That is behind tab twenty-

21   four.

22            THE COURT: Okay.  Wait a minute.  I am seeing a

23   schedule K-1 behind twenty-four.

24            MR. BARRIERE: It may be out of order.  May I approach,

25   Your Honor?

86

1          THE COURT: Yes.  Let's see.  Behind twenty-three, we

2     have got the '98.

3          MR. BARRIERE: Right.

4          THE COURT: Behind twenty-four, the first thing I am

5     seeing is the shareholder –

6          MR. BARRIERE: I apologize.  I think they were just

7     incomplete copies.  I am going to give you mine.

8          THE COURT: Okay.  Mr. Brazeal, if you look at your tab

9     twenty-four, what is the first thing you are looking at?

10          MR. BRAZEAL: The 1120-S, 1999.

11          THE COURT: Okay.  You've got 1120-S for 1999.  Okay.

12     Well, you have got what you are supposed to have then.  All

13     right.  Thank you.

14     BY MR. BARRIERE:

15     Q.     All right.  So my question, sir, am I correct on

16     understanding on a cash basis this company lost approximately

17     eighty-four thousand dollars in 1999?

18     A.     You are correct.

19          THE COURT: Okay.  So you are taking a loss and then

20     you are adding back the depreciation?

21          THE WITNESS: That's correct.

22          THE COURT: Okay.  Thanks.

23     Q.     Turning next to 2000, am I correct in understanding –

24     I hope the court has the correct –

25          THE COURT: I do have.  I have got an 1120-S for 2000.

87

1          MR. BARRIERE: Thank you.

2     Q.      An operating loss of four hundred and eleven thousand,

3     four hundred and sixty-five dollars; depreciation of thirty

4     thousand, eight fifty-nine?

5     A.      That is correct.

6     Q.      So a cash loss of approximately, what, three hundred

7     and eighty-one thousand dollars?

8     A.      Yes.

9     Q.      Now, the other thing that interested me, at the top of

10    that page it has (d) – it should be (e) – total assets, seven

11    hundred and fifty-nine thousand, eight twenty-nine.  Do you see

12    what I am referring to on the 2000 tax return?

13    A.      Yes.

14    Q.      What does that figure represent?

15    A.      It is the same number that shows up on page four of

16    schedule "L," which is the balance sheet and it is the total

17    assets of the company at the end of the year.

18    Q.      Is that on a book basis?

19    A.      Yes.

20    Q.      All right.  My question to you, sir, you have told us

21    in the past during voir dire that you engaged in business

22    appraisals and valuations from time to time; is that correct?

23    A.      That is correct.

24    Q.      You have advised both buyers and sellers of companies?

25    A.      That is correct.

88

1    Q.        You   have   testified   with   respect   to   business

2    valuations, have you not, as an expert?

3    A.        Yes, I have.

4    Q.        All right.  Based upon that, sir, what is your opinion

5    as to the reasonableness of an arm's-length purchase of ten

6    percent  of  this  company's  stock  for  two  hundred  thousand

7    dollars  in  2000,  given  the  operating  results,  given  the

8    company's valuation of its assets?

9    A.        The  facts  I  have  would  say  that  the  ten  percent

10   purchase was not arm's length.

11   Q.        All right.  Could you elaborate on that?

12   A.        Well, the company is losing money.  For someone to pay

13   for a company that is losing money, you would then look to see

14   are  there  underutilized  assets  that  have  hidden  value,  and

15   there doesn't appear to be any of that type of information, at

16   least  available  to  me,  and  then,  as  we  all,  I  think,  know,  this

17   company ultimately filed for bankruptcy and is in Chapter 7.

18   Q.        Rough  math,  ten  percent,  two  hundred  thousand,  the

19   company would be worth two million dollars; is that correct?

20   A.        Ignoring minority discounts, which can be very steep

21   but, yes, very simply speaking, it would imply that the company

22   is worth more than two million dollars.

23   Q.        Did you see anything in these tax returns for '98, '99

24   and 2000 that led you to conclude that this company could

25   reasonably  be  valued  at  anything  approaching  two  million

89

1    dollars?

2    A.        No.

3    Q.        Let me turn your attention next to Exhibit 26.  That

4    is the 1120-S for the year 2001.  Am I correct that this

5    company, Perky Cap, experienced a loss in that year, an

6    operating loss of five hundred and nine thousand dollars?

7    A.        That is correct.

8    Q.        Depreciation of twenty-one thousand or, on a cash

9    basis, what, approximately four hundred and ninety thousand

10   dollars?

11   A.        That is correct.

12   Q.        And it was reflecting book assets at that time of six

13   hundred and eighty thousand dollars?

14   A.        That is correct.

15   Q.        All right.  Now, sir, if I could ask you to, while

16   we're on the 2001 tax return, I will direct your attention to

17   the K-1s.  They are the last several pages of that return, the

18   last four pages of that return.

19   A.        Yeah.  In my copy, they are after page four of the

20   1120 but I have them, yes.

21   Q.        All right.  What does that show with respect to –

22   there is a summary sheet for the state of Georgia corporation.

23   What does that show with respect to the percentage of stock

24   owned by Mr. Horton as of the end of 2001?

25   A.        It shows that he owns twenty-three point three-three

90

1    percent.

2    Q.      And what does it show with respect to James Reynolds?

3    A.      That Mr. Reynolds owns the same amount, twenty-three

4    and a third percent.

5    Q.      Thirty-three percent for Rudolph Terry and then the

6    two, ten percents sold to, I think we referred to earlier, the

7    Terry women; correct?

8    A.      That is correct.

9    Q.      All right.  Now you're aware, are you not, sir, that

10   Mr. Horton and Mr. Reynolds purportedly sold stock to Roy and

11   Rudolph Terry in May of 2002?

12   A.      That is correct.

13   Q.      That is what the documentation says, at least?

14   A.      That is right.

15   Q.      And they purportedly acquired approximately thirty,

16   thirty-one percent for, what, six hundred and twenty-seven

17   thousand dollars?

18   A.      That is my recollection, yes.

19   Q.      All right.  Now, let's look at that 2002 tax return.

20   It shows the company that year only lost eight thousand, three

21   hundred and seven dollars, correct?

22   A.      That is correct.

23   Q.      Now, if I could get you to look to the K-1s for that

24   year, they are the last six pages, I believe.  Do you see the

25   K-1 for Mr. Horton?

91

1    A.        I do.

2    Q.        And what does it show with respect to his ownership at

3    the end of 2002 and after he supposedly sold his stock to Roy

4    and Rudolph Terry?

5    A.        It shows him still being an owner of Perky Cap at the

6    same percentage of ownership as the previous year.

7    Q.        All right.  What about Mr. Reynolds?

8    A.        It shows Mr. Reynolds still being an owner in Perky

9    Cap at the same percentage as the previous year.

10   Q.        Now this return, like the other returns, was prepared

11   by David Giddens.  Have you noticed that?

12   A.        Yes.

13   Q.        All right.  Are you aware that Mr. Giddens has been

14   deposed in this proceeding?

15   A.        Yes.

16   Q.        You are aware that he is Mr. Horton's personal

17   accountant?

18   A.        Yes.

19   Q.        That he also provides accounting services for Mr.

20   Horton's various companies?

21   A.        Yes.

22   Q.        Finally, let's look at 2003, Exhibit 28.  The company

23   lost five hundred and seventy-four thousand dollars that year?

24   A.        That is correct.

25   Q.        Depreciation of thirty-three thousand dollars?

92

1    A.        Right.

2    Q.        Which means the cash loss was, what, approximately

3    five hundred and forty thousand dollars?

4    A.        Yes.

5    Q.        All right.  So am I correct, then, sir, this company

6    lost money every single year that you have studied Perky Cap?

7    A.        Yes.

8    Q.        Have you reviewed the K-1s for this year?

9    A.        Not that I can recall, no.

10   Q.        Well, let me direct your attention to –

11   A.        You said –

12   Q.        2003.

13   A.        Oh, yes, I have.  When you said this year, I thought

14   you meant the next year, 2005.

15   Q.        Well, I will direct your attention to the K-1s.  They

16   are the last, I believe, five or six pages of the exhibit.

17   A.        I have looked at those, yes.

18   Q.        And those returns continued to show stock owned by Mr.

19   Horton and Mr. Reynolds?

20   A.        Well, actually they don't.  They show Horton,

21   Reynolds, Terry, Cotina Terry and Allie Robinson filing final

22   K-1s and continuing K-1s for Jack Perkinson and Melanie Nugent.

23   But the confusing thing, and I think what you're talking about,

24   is the percentages shown would indicate that they still own the

25   company.  So I'm not sure if the form is filled out right and

93

1    the percentages are wrong, or if the percentages are right and

2    the form is filled out wrong.

3    Q.     You are aware, are you not, Mr. Horton has

4    acknowledged selling his stock to Ms. Nugent in 2003?

5    A.     I am.

6    Q.     Reviewing these documents, do you find any evidence

7    whatsoever that Roy and Rudolph Terry actually received any

8    stock in 2002 when they purportedly acquired thirty-one percent

9    of the stock from Mr. Horton and Mr. Reynolds?

10   A.     I don't see any evidence of stock acquisition by the

11   Terry brothers in that year.

12   Q.     How many hours, approximately, have you and your team

13   at AEA invested in reviewing and organizing the books and

14   records of Terry Manufacturing?

15   A.     I haven't looked at it lately but it is thousands of

16   hours.

17   Q.     During the course of those thousands of hours of

18   investment, have you uncovered a single document which

19   evidences that this stock sale actually occurred?  I'm talking

20   about the May of 2002 sale.

21   A.     No, other than what has been produced in this case,

22   no.

23   Q.     Now, sir, I would like you, if I could, to look at

24   Exhibits 31, two, three, four, five, six.  They are invoices of

25   Terry Manufacturing to Wholesale Distributors.

94

1    A.       I see those.

2    Q.       All right.    Each of these invoices references

3    merchandise and related services and then various amounts.  Do

4    you see what I am referring to?

5    A.       I do.

6    Q.       Did in fact Terry Manufacturing sell any product to

7    Wholesale Distributors as evidenced by those invoices?

8    A.       I can't find any product that was sold and it is my

9    belief that there was no product sold.

10   Q.       All right.    You are aware that Mr. Horton has

11   testified that this represented uniforms purchased by Wholesale

12   Distributors that never left the offices of Terry

13   Manufacturing?

14   A.       I recall that testimony, yes.

15   Q.       At the time that you took over this company, did you

16   find any uniforms lying about?

17   A.       Not that was property of – there were very few.  They

18   were reject uniforms but nothing in the magnitude of the

19   numbers shown on these invoices, no.

20   Q.       Did you interview persons involved in the actual

21   production at Terry Manufacturing at the time you became

22   trustee?

23   A.       Yes, I did.

24   Q.       In the course of those interviews, was there any

25   suggestion that Terry Manufacturing had produced and sold to

95

1    Wholesale Distributors what are referenced here as literally

2    millions of dollars of product?

3    A.       No, there was no indication that that ever occurred.

4    Their only customer for BDU's, which are the uniforms I think

5    Mr. Horton was referring to, was the U. S. Government and, at

6    the point those goods were finished and placed in a warehouse,

7    the title to those goods passed to the U. S. Government.

8    Q.       Was that pursuant to the contract with the United

9    States government?

10   A.       Yes, and they had strict oversight and they came in

11   and inventoried periodically and clearly marked the inventory.

12   That is how we could tell it was not the estate's.

13   Q.       Let me ask you next to turn to Exhibit 37.  It is an

14   invoice, Wholesale Distributors, American Testing Laboratories,

15   sold to Terry Manufacturing, miscellaneous merchandise, one

16   million, three hundred and seventy-five thousand dollars.  Do

17   you see where I am referring to?

18   A.       I do.

19   Q.       All right.  Based upon hundreds of hours, thousands of

20   hours you have invested in your study of this case, have you

21   found any evidence that Wholesale Distributors ever sold

22   anything to Terry Manufacturing?

23   A.       No.

24   Q.       Likewise, Exhibit 38 shows Wholesale Distributors

25   invoice for five hundred and ten thousand dollars.    Any

96

1    evidence whatsoever that that reflects the sale of actual goods

2    to Terry Manufacturing?

3    A.    None.

4    Q.    And finally one dated November 1, 2002, a monthly

5    statement for five hundred and ten thousand dollars.    Any

6    evidence that actually occurred?

7    A.    No.

8    Q.    It would follow the binder, sir, a series of

9    additional Terry Manufacturing invoices for product to

10    Wholesale Distributors.    Any evidence that any of those reflect

11    actual sales of goods or products to Wholesale Distributors?

12    A.    No, no evidence.

13    Q.    Let me direct your attention to Exhibit 30, a

14    memorandum from Rudolph Terry to Dudley Horton dated December

15    6, 2002.

16    A.    Okay.

17    Q.    Was this document among those that you secured at the

18    time you took over as trustee of Terry Manufacturing?

19    A.    Yes.

20    Q.    All right.    Have you attempted to correlate the

21    various switching of checks referenced in Mr. Terry's

22    memorandum to these various invoices?

23    A.    Yes.

24    Q.    And what have you concluded in that regard?

25    A.    With respect specifically to this memorandum, I can't

97

1    recall, and they are not all provided as exhibits here, but

2    generally speaking what we were able to determine is that

3    simply checks were being swapped and the net result was money

4    would flow in for about forty-five days into the accounts of

5    Terry Manufacturing and then it would be paid back, plus a

6    substantial fee at the end of the forty-five day period.

7    Q.        Did this paper work have the effect of evidencing to

8    the outside world there was really a vendor/supplier

9    relationship here, a vendor/purchaser relationship, I should

10   say?

11   A.        Yes.  It also had the effect of evidencing sales to

12   the outside world that, for accounting purposes, at least, do

13   not exist.  That is unquestionable.

14            MR. BRAZEAL: Judge, I'm going to object and move to

15   strike unless Mr. Alexander can demonstrate that these invoices

16   were ever presented to the, quote, outside world.  In other

17   words, he may suspect that is what they were used for but,

18   unless he has some evidence that they were used for that

19   purpose, then I believe his testimony in that regard should be

20   stricken.

21            THE COURT: Overruled.

22   BY MR. BARRIERE:

23   Q.        Mr. Alexander, as a follow-up, have you reached a

24   conclusion as to whether the financial – strike that.  You are

25   aware of financial statements routinely being issued to banks

98

1    and creditors of Terry Manufacturing by Terry Manufacturing;

2    are you not?

3    A.      Yes.

4    Q.      And those financial statements routinely had

5    statements of operations reflecting sales by Terry

6    Manufacturing?

7    A.      Yes.

8    Q.      And have you reached a conclusion as to the accuracy

9    of those statements of operation and, in particular, the

10   representation with respect to sales?

11   A.      The sales are grossly overstated.

12   Q.      Are you of the opinion, sir, that the machinations as

13   reflected by these exhibits are one of the machinations used to

14   fabricate those sales?

15   A.      Yes.

16   Q.      Now, sir, I will note for the purposes of the record

17   that the first of these dummy invoices is dated early summer of

18   2002, shortly after the purported sale of the stock.  Based

19   upon your review of these invoices, based upon your review of

20   the tax returns, have you reached an opinion as to whether the

21   stock in Perky Cap was actually conveyed from Mr. Horton and

22   Mr. Reynolds to Roy and Rudolph Terry?

23   A.      Based on my review of all of the evidence and

24   principally placing heavy weight on the tax return, I do not

25   believe that the sale took place.  I believe it was a

99

1    simulation.

2    Q.        You have been a certified fraud examiner for how long

3    sir?

4    A.        Since the early nineties.

5    Q.        So based upon that approximately sixteen years basis,

6    you have from time to time been called upon to evaluate whether

7    purported transactions were in fact simulations?

8    A.        Correct.  Substance over form evaluations is one of

9    the roles fraud examiners and CPAs play traditionally.

10    Q.        And you brought that experience to bear here today?

11          MR. BRAZEAL: Your Honor, I think I'm going to have to

12    object to this line of questioning.  This was not contained in

13    Mr. Alexander's report.  There has been no notice provided that

14    he was going to proceed with this line of questioning.  I don't

15    think it is even appropriate to have experts opine in that

16    regard, Your Honor.

17          MR. BARRIERE: Do you want me to respond?

18          THE COURT: Yes.

19          MR. BARRIERE: Well, two points, Your Honor.  First,

20    Mr. Giddens wasn't made available to us until March 17.  That

21    is when we got these tax returns.  Let me finish, Ellis, and

22    then you can respond.  That we would dispute whether these

23    transactions occurred has been, I think, known to all parties.

24    Indeed the stipulation itself, number eleven, says the parties

25    do    not    stipulate    as    to    whether    shares    were    actually

100

1    transferred.  I don't think we have got either a surprise issue

2    here.

3              MR. BRAZEAL: Well, the –

4              MR. BARRIERE: Let me finish.  This is information we

5    derived directly from their accountant from information that

6    was first made available to us on March 17.

7              MR. BRAZEAL: Your Honor, there was no effort made to

8    depose Mr. Giddens until the end of January.  That was when we

9    were first asked if Mr. Giddens could be deposed and we

10   accommodated him in that regard.

11             I don't have any problem, Your Honor, with the facts

12   being laid out.  The facts are the facts and Mr. Horton can

13   testify about the facts.  I do have a problem with someone who

14   claims to be and has experience in fraud accounting providing

15   some opinion about whether this was fraudulent or not when we

16   have not previously been made aware that he was going to

17   testify in that regard.

18             THE COURT: Okay.  I am going to overrule the

19   objection.  I want to hear the testimony and sort it out but I

20   do want to hear the testimony.

21   BY MR. BARRIERE:

22   Q.    I think my question is you brought to bear your

23   experience of fifteen or sixteen years as a fraud examiner?

24   A.    Yes.

25   Q.    And based upon that you concluded these transactions

101

1    were a simulation?

2    A.       That is correct.  Mr. Barriere, because of the break

3    and the objection, you were talking about the stock sales being

4    a simulation, correct?

5    Q.       Yes, and that is your conclusion?

6    A.       That is my conclusion and the other thing I forgot to

7    mention is further evidence of that is a pattern and practice

8    of simulating transactions as it relates to these Wholesale

9    Distributors transactions.

10   Q.       I may have asked this question, and I apologize.  You

11   previously testified that in your judgment the price paid by

12   Cotina Terry and Allie Robinson does not reflect an arm's-

13   length transaction?

14   A.       You have asked me that and I said that it is not.

15   Q.       All right.  What is your conclusion with respect to

16   the price purportedly paid by Mr. Roy and Rudolph Terry in the

17   summer of 2002?

18   A.       It is the same conclusion.

19            MR. BARRIERE: Your Honor, I may be finished with the

20   witness if you will bear with me for just a moment.

21            (Pause)

22   Q.       Sir, you were asked, were you not, to consider whether

23   Terry Manufacturing received any benefit, any value, from

24   having paid just shy of six hundred thousand dollars for the

25   stock.  Have you reached any conclusions in that regard?

102

1    A.     I have.

2    Q.     And what are those conclusions?

3    A.     Terry Manufacturing received no benefit whatsoever.

4  In fact, the relationship related to the stock, if it is

5  related to Perky Cap, was a loss.

6    Q.     Now one of the loans that has been at issue, loan

7  dated August 6, 2001.  The information pertaining to that

8  appears behind tab forty-five.  Do you see that promissory

9  note, sir?

10    A.     Yes.

11    Q.     All right.  Are you aware of any document which

12  purports to tie the granting of this loan on August 6, 2001, to

13  either the Terry women's purchase of stock in November of 2000

14  or Roy and Rudolph's purchase of stock in 2002?

15    A.     Would you mind re-asking that question?

16    Q.     Sure.  Are you aware of any document that purports to

17  condition the making of this loan to the Terry family buying

18  stock from Mr. Reynolds and Mr. Horton?

19    A.     No.

20    Q.     All right.  Now the third page, right behind the

21  promissory note, is a payment history produced by American Real

22  Estate.  Do you see that?

23    A.     Yes.

24    Q.     All right.  And that evidences this loan was made on

25  August 7 and repaid in full on October 31?

103

1    A.        That is correct.

2    Q.        The loan was a million, five hundred thousand dollars;

3    is that correct?

4    A.        Yes.

5    Q.        And American Real Estate was paid back a million, six

6    hundred and fifty-nine thousand dollars on this loan?

7    A.        That is right.

8    Q.        Have you attempted to ascertain what that works out to

9    on an annual basis as far as an interest rate?

10   A.        I have made an approximation of it, yes.

11   Q.        And what is that, sir?

12   A.        Over forty percent.

13   Q.        Okay.  Does the fact that Terry Manufacturing was out

14   borrowing money at forty percent in your view support your

15   conclusion as to reasonableness or adequacy of capital?

16   A.        Yes.

17   Q.        In what regard?

18   A.        It is clear evidence that they have inadequate

19   capital.

20   Q.        Borrowing at twice credit card debt?

21   A.        Yes.  Twice many times junk-bond debt, yes.

22   Q.        Sir, I would like for you to turn now to Exhibit 22.

23   This is an agreement between American Real Estate, Perky Cap,

24   Roy and Rudolph Terry.  Are you familiar with it generally?

25   A.        Yes, I am.

104

1    Q.      All right.  Does this agreement contemplate American

2    Real Estate assisting in the solicitation of a loan from

3    Peoples Bank?

4    A.      Yes.

5    Q.      Okay.  Is there any mention made in this document

6    whatsoever that as a condition to soliciting Peoples Bank, the

7    Terry brothers would buy the balance of Mr. Horton and Mr.

8    Reynolds' stock?

9    A.      No.

10   Q.      What consideration, if any, is to be given to American

11   Real Estate for its assistance in securing that loan pursuant

12   to this document?

13   A.      What I see this document doing is paying off the

14   Farmers and Merchants Bank of Eatonton loan.  That was the

15   purpose of this transaction.

16   Q.      You have reviewed Mr. Horton's deposition in this

17   case?

18   A.      I have.

19   Q.      And you are aware as a result that he had personally

20   guaranteed that loan?

21   A.      The Farmers and Merchants Bank loan, yes, I am aware

22   of that.

23   Q.      So the net result of getting the Peoples Bank loan was

24   to pay off a loan that he was personally liable for?

25   A.      That is correct.

105

1    Q.        And just so the record is clear, there seems to be no

2    connection based on this document between the Peoples Bank loan

3    ultimately made and the sale of stock?

4    A.        That is correct.

5    Q.        Now you are aware from opening statements, among

6    others, that there was a five million, five hundred thousand

7    dollar line of credit made available to Terry Manufacturing by

8    – excuse me – to Roy and Rudolph Terry personally by American

9    Real Estate.  You are aware of that, are you not?

10   A.        I am.

11   Q.        Okay.  Have you seen any document that suggests in any

12   way that the granting of that loan to the Terrys individually

13   was somehow conditioned upon Cotina Terry and Allie Robinson

14   buying stock from Mr. Reynolds and Mr. Horton?

15   A.        No.

16            MR. BARRIERE: Your Honor, in connection with this

17   witness' testimony, I would like to introduce as Exhibit 51 the

18   recap of payments made on these loans.

19            THE COURT: Okay.  And where is that?

20            MR. BARRIERE: It may be easier for me to take your

21   PowerPoint back, Your Honor.

22            MS. LASKY: I have got an extra one.

23            MR. BARRIERE: That would be 51.   His asset and

24   liability sheet is already a part of his tax return but, for

25   your purposes, Judge, I am going to go ahead and reintroduce it

106

1   because it would be easier for you to review, if you wish to,

2   in connection with post-trial briefing.

3           I'm going to introduce – that will be 51 – excuse me

4   – 52.  The accounts payable vendor analysis we would offer as

5   Exhibit 53.  This is already part of the record.  The cost

6   benefit analysis as Exhibit 54.

7           And with that, Your Honor, I would ask to pass the

8   witness.

9           THE COURT: Okay.  Any objections to those?

10          MR. BRAZEAL: Your Honor, I don't have any objection.

11   I wonder if I could just get a copy.

12          MS. LASKY: Yes, I will provide you a copy in one

13   moment.

14          THE COURT: Let's do this.  It is almost twelve noon.

15   We are going to break for lunch and then we will start cross-

16   examination at 1:30 p.m. and, in the meantime, you can exchange

17   whatever documents.

18          All right.  We will see you at 1:30.

19          (Recess from 12:02 p.m. until 1:47 p.m.)

20          THE COURT: Please be seated.  All right.  We have got

21   Mr. Alexander on the stand.  We finished direct examination

22   before lunch and now, Mr. Brazeal, you will start Cross.

23          MR. BRAZEAL: Thank you, Your Honor.  Before we get

24   started, I wanted to move to introduce Exhibits – let's see,

25   Your Honor.  I have provided you with a copy of a listing of

107

1    defendants' trial exhibits or I gave it to your deputy.  I

2    believe that Mr. Barriere was fine with Exhibits 1 through 61,

3    and then the remaining ones are the expert reports which we

4    will take up at some point.

5               THE COURT: All right.

6               MR. BARRIERE: When you listed globally Peoples Bank

7    loan documents, what does that consist of, Ellis?

8               MR. BRAZEAL: It is the note and – I can show it to

9    you.

10              MR. BARRIERE: Why don't we do this?  Why don't you go

11   ahead and admit 1 through 56 and then you and I at the break

12   can talk about 57 and 58 just so I can see what they are.  Does

13   that work for you?

14              THE COURT: That is fine.  We will admit 1 through 56

15   now and, if there is a problem later, just let me know.

16              MR. BARRIERE: I don't anticipate one, Your Honor.  I

17   just wanted to look at what he is referring to.

18              THE COURT: Okay.

19              MR. BRAZEAL: And then, Your Honor, the other point

20   that I wish to make, I believe my CD with the exhibits has been

21   loaded onto your computer and hopefully you are more computer

22   proficient than I am.  It wouldn't be hard.

23              THE COURT: Yeah, I have them right here.

24              MR. BRAZEAL: Okay.

25              THE COURT: Go ahead.

108

1          MR. BRAZEAL: Thank you, Judge.

2                     CROSS EXAMINATION

3    BY MR. BRAZEAL:

4    Q.      Mr. Alexander, during your direct examination, your

5    counsel asked you whether there was any evidence of this stock

6    acquisition from May of 2002, and your testimony was not a

7    single document other than what has been produced in this case.

8    Is that substantially what you testified?

9    A.      Yes.

10   Q.      All right, sir.  What documents have been produced in

11   this case which you reviewed related to that stock sale and as

12   evidence of whether it occurred or not?

13   A.      I was principally referring to the bill of sale which

14   I think exists in that transaction.  I would have to review the

15   documents, but I have seen a bill of sale.  What I haven't seen

16   is a stock certificate.

17   Q.      All right.  Mr. Alexander, what I have brought up is

18   Exhibit 46.  Is this the bill of sale of common stock that you

19   were referring to?

20   A.      Yes, and you can see where the stock certificate

21   number is blank.

22   Q.      Right.  Okay.  Did you also review the document which

23   I have pulled up as Exhibit 47 which reflects that Mr. Horton

24   and Mr. Reynolds resigned from the Board of Directors and as

25   officers of Perky Cap?

109

1    A.      Yes, I saw that.

2    Q.      All right.  Is that some evidence that a stock sale

3    did or did not take place?

4    A.      It could be but it could not be.  I mean, it is not

5    directly related to the sale of the stock.

6    Q.      Well, I think you have read Mr. Horton's testimony,

7    have you not?

8    A.      I was there when he testified.  I don't believe I have

9    read it.

10   Q.      All right, sir.  Did you hear his testimony that he

11   and Mr. Reynolds stepped down from the board and as officers at

12   the time that the stock sale occurred on or about May 30 of

13   2002?

14   A.      Yes, I remember that.

15   Q.      All right, sir.  Mr. Alexander, what about Exhibit 48?

16   A.      I have seen that, too, yes.

17   Q.      All right.  Do these documents lend any credence to

18   the fact that there was a stock sale on or about May 30, 2002?

19   A.      I gave them all consideration when I rendered my

20   opinion.

21   Q.      Okay.  And it is your opinion that no stock was ever

22   transferred, is that your opinion?

23   A.      I guess I would say in my vernacular, which is the

24   stock sale, based on the totality of the evidence, okay, the

25   stock sale was a simulation.  And the evidence that I am

110

1    looking at is the tax returns that reflect the ownership

2    remaining constant and the lack of a stock certificate in spite

3    of the paperwork that was done that, on the face of the

4    paperwork, appears to be a transfer of ownership occurred.

5    Q.      Were there any actions taken by the Terrys as if they

6    had become controlling members and now could direct the

7    transactions that Perky Cap would undertake?

8    A.      In what sense?  Are you talking about the Peoples Bank

9    loan?

10    Q.      Yeah.  Was the Peoples Bank loan evidence that the

11    Perky Cap members, the Terrys, saw themselves as the stock

12    owners of Perky Cap and had the ability to control it?

13    A.      I have heard Mr. Horton's testimony along those lines

14    and I can't recall it but I have heard his testimony along

15    those lines.  I have also seen the documents that say the

16    purpose of the Peoples Bank loan was to pay off the Farmers and

17    Merchants Bank loan, and I am also aware that – I'm not sure

18    that occurred.

19    Q.      Mr. Alexander, I will represent to you that this is

20    the one point five million dollar loan document evidencing the

21    one point five million dollar loan that Perky Cap obtained from

22    Peoples Bank.  Are you familiar with that loan, Mr. Alexander?

23    A.      I am.

24    Q.      All right, sir.  And the signature lines of the note

25    indicate that Roy Terry is the vice-president and Rudolph Terry

111

1    is the secretary/treasurer; do they not?

2    A.      That is what it says, yes.  Mr. Brazeal, do you have

3    a hard copy?

4    Q.      I do have a hard copy.

5    A.      I would appreciate being able to review the whole

6    document.

7    Q.      I will be more than happy to bring you the whole

8    document.

9            (Pause)

10           MR. BRAZEAL: Your Honor may I approach the witness?

11           THE COURT: Yes.

12           MR. BRAZEAL: Thank you, Your Honor.

13   Q.      Mr. Alexander, I want to direct your attention to the

14   last two pages of the document, which is a corporate resolution

15   to borrow.

16   A.      Corporate resolution to borrow or to guarantee?

17   Q.      That one is for Terry Manufacturing.  Look at the next

18   document, which is from Perky Cap Company which is a corporate

19   resolution.  Mr. Alexander, does that not reflect, at least

20   based upon the representations of Mr. Perkinson, Mr. Terry, Mr.

21   Roy Terry and Mr. Rudolph Terry, that they are the officers of

22   Perky Cap?

23   A.      That is what the document says.

24   Q.      All right, sir.  And could you tell us what you

25   understand about the one point five million dollar loan from

112

1    Peoples Bank?  And by that, I mean do you understand the

2    purpose for which the loan was taken out?

3    A.      Well, I understand there are different versions of the

4    purpose of that loan.  There is the version stated in the

5    documentation reviewed on my direct, which would release Mr.

6    Horton of the guarantee, and transfer, I think, the guarantee

7    obligation to Terry Manufacturing.  There is another purpose

8    that has been asserted somehow to provide temporary, at least

9    a portion of it, temporary working capital for a limited period

10   of time.  There is a lot of conflicting evidence about the time

11   and how the money was used.

12   Q.      All right. Was there any conflict about the fact that

13   the entire one point five million dollars that was borrowed

14   from Peoples Bank by Perky Cap was ultimately deposited into a

15   debtor bank account?

16   A.      No, there is no conflict there.

17   Q.      All right, sir.  And at the same time, Perky Cap

18   pledged certain of its assets, did it not, to secure the one

19   point five million dollar loan?  Namely, the plant and

20   equipment.

21   A.      Yeah.  I couldn't remember whether the equipment was

22   pledged or not but I remember the real estate was pledged and

23   I also remember this side deal that Mr. Horton cut for the

24   promise to repurchase that collateral if for some reason there

25   was a default in the note by Perky Cap.

113

1    Q.      And is it unusual for one company to borrow money and

2    funnel it directly into another company?

3    A.      You know, this transaction had a lot of unusual

4    elements about it.  It starts with how the bank underwrote the

5    transaction.  Instead of their chief credit officer who is

6    responsible for underwriting the credit, the president overrode

7    that person and completely usurped their underwriting process

8    to make this loan.  The credit officer even testified that he

9    thought Perky Cap was insolvent when the loan was made, which

10   is unusual.

11          And then the third point that was unusual was the

12   after the fact, side deal struck between Mr. Horton and Peoples

13   Bank to repurchase the collateral in the event of default.

14   And, yes, the money transferring the way it did is unusual.

15   Now, if you take out all of those unusual elements and then

16   assume they don't exist, then the answer to your question is,

17   no, companies borrow money and transfer it all of the time, but

18   it is the totality of the facts and circumstances that make

19   this a relatively unique transaction.

20   Q.      Was it customary for company "A," Perky Cap, to borrow

21   money from a bank, to pledge its collateral and then to pay all

22   of the proceeds of that loan into company "B," the debtor?

23   A.      Is it customary for Perky Cap to pledge its assets and

24   pay them into the debtor?  The whole transaction of the money

25   being borrowed to pay off the loan guaranteed by Mr. Horton,

114

1    okay, and then it to be diverted through the Terry accounts and

2    ultimately, based on my analysis, out to the Terrys, the whole

3    thing is unusual, and I don't know the answer to your question

4    about is this customary beyond saying it is really unusual.

5    Q.      All right.  What analysis have you conducted to show

6    that the money went out to the Terrys?

7    A.      We are talking about the Peoples Bank loan again?

8    Q.      Right.

9    A.      The analysis that I testified to last summer.

10   Q.      Okay.  Have you reviewed the analysis from the Warren

11   Averett firm which shows that those funds were utilized to

12   sustain the debtor's business?

13   A.      I have read their report.

14   Q.      Do you not agree that that money was utilized to

15   sustain the debtor's business?

16   A.      I don't agree that that analysis shows where the money

17   went at all, no.

18   Q.      Okay.  Were you aware that they reached the

19   conclusion, though – and that is the Warren Averett firm –

20   reached the conclusion that the one point five million dollars

21   from Peoples Bank was used to sustain the operations of the

22   debtor?

23   A.      I believe so, yes.  I think I have read that.

24   Q.      And were you aware that that analysis was based upon

25   records, all of which were in your custody and control?

115

A.        I know that they came and they used the records that
we used to come up with their analysis.  Also I know there are
several fundamental flaws in their analysis.

Q.        All right.  Well, we will get to that in due course,
Mr. Alexander.   You do believe that this was a dummy stock
sale, the sale in May of 2002; is that correct?

A.        The evidence indicates to me, when you weigh it all,
that the stock sale was a simulation.  It is based on the fact
that Mr. Horton has engaged in other simulated transactions,
not the least of which to mention the Wholesale Distributors'
transaction is a carbon copy of the Omni Investment Credit
factor fraud transaction that resulted in Mr. Rudolph Terry
going to prison.  The documentation is virtually identical.

          So based on that pattern and practice and based on
other elements, yeah, I believe it is a simulation.

Q.        The document that you have that leads you to believe
that it is a simulation is Mr. Horton's tax return; is that
correct?

A.        It is the tax return, it is the lack of a stock
certificate, and then it is also the price paid for the stock
in light of the operating history of the company.

Q.        What would've been the purpose for dummying up a stock
sale?

A.        There is a lot of transactions that I have looked at
in this bankruptcy that I believe we will never know the real

116

1    story and this is one of those that I am not sure why this was

2    done the way it was done.

3    Q.    So, Mr. Alexander, you're telling us that you don't

4    have any opinion that you can give us today about why the stock

5    sale was dummied up, so to speak?

6    A.    I can't answer the motive question on that.

7    Q.    Or how it could have been used?

8    A.    I don't understand that question.

9    Q.    Well, I mean, you were saying the motive for it, and

10   my question is – I mean, how would it have been used?  How

11   would the stock sale have been used for some improper purpose?

12   A.    I can't answer that question.

13   Q.    All right, sir.  And did you review Mr. Giddens'

14   deposition?

15   A.    I don't believe so, no.

16   Q.    All right.  Were you aware that in Mr. Giddens'

17   deposition that he confirmed that Mr. Horton never took a loss

18   write-off from the Perky Cap stock?

19   A.    I will have to let that speak for itself.

20   Q.    All right, sir.  I mean, you're saying that the K-1

21   evidences that there was no stock transaction and one possible

22   reason perhaps for not actually transferring the stock would be

23   so that someone could obtain the write-down or the write-off of

24   the loss from the company.  Is that a possibility?

25   A.    I don't think that is what I am saying.  What I am

117

1    saying is that tax return was filed with the federal government

2    under penalties of perjury and it reflects that he still owns

3    the stock.  So I am placing more weight on that evidence than

4    the paperwork that was done up to try to support that the stock

5    did transfer.

6    Q.        Okay.  And what I am asking you to consider is that

7    there was no monetary advantage to Mr. Horton in reporting it

8    that way on his tax return, as confirmed by Mr. Giddens,

9    because he was unable to use the loss to his benefit. Were you

10   aware of that?

11   A.        I can't speak to that.

12   Q.        All right, sir.  Were you aware of the fact that Mr.

13   Giddens testified that he did not discuss the stock transaction

14   with Mr. Horton?

15   A.        I will really just have to let his testimony speak for

16   itself.  No, I haven't read his deposition.

17   Q.        All right, sir.  Are you aware of the fact that he

18   said that he did not present the K-1 to Mr. Horton – I am sorry

19   – that he did not review the K-1 with Mr. Horton?

20   A.        No.

21   Q.        All right, sir.  As I understand it, Mr. Alexander,

22   Perky Cap Company filed bankruptcy; is that your understanding?

23   A.        That is my recollection.

24   Q.        All right, sir.  Did you ever contact the trustee in

25   the Perky Cap Company to try to ascertain from the Perky Cap

118

1    stock book whether the stock transfer actually occurred?

2    A.    I did not.

3    Q.    All right, sir.  So thousands of hours spent in this

4    case trying to determine whether the debtor's business

5    operations, we now have got you impugning the integrity of Mr.

6    Horton, claiming that he dummied up a stock sale, and you never

7    attempted to review the stock book or the corporate records of

8    Perky Cap; is that what you're telling us, Mr. Alexander?

9    A.    No, that is not true.

10    Q.    Well, tell us what you did.

11    A.    I didn't make any attempts after they filed for

12    bankruptcy but, before they filed for bankruptcy, I had several

13    conversations with Melanie Nugent and her husband, who I can't

14    remember his name at this time.  They sent us substantial

15    amounts of records and we reviewed all of those.  It raised as

16    many questions as it answered and it did not answer this

17    question.

18    Q.    What about the Perky Cap stock book; did you ever

19    review that?

20    A.    We asked for everything they had and, to my knowledge,

21    we didn't receive a Perky Cap stock book.

22    Q.    All right, sir.  Mr. Alexander, we reviewed earlier

23    the documents associated with the May 30 of 2002 stock sale,

24    the one we have been discussing, and you were there for Mr.

25    Horton's deposition.  Do you recall that Mr. Horton indicated

119

1  that part of the overall transaction was that they were

2  acquiring the remaining stock of Perky Cap, that being the

3  Terrys, to the exclusion except for Mr. Perkinson's stock and

4  that, because of that, they were stepping down from the board

5  and resigning as officers.  Do you recall that?

6  A.  Not in that level of detail but that sounds right.

7  Q.  All right.  You made some mention in your direct

8  testimony, Mr. Alexander, that you thought that, or a purpose

9  of the loan from Peoples Bank was to see that the Farmers and

10  Merchants Bank was paid off, the loan was paid off, and that

11  that loan had been guaranteed by Mr. Horton.  Do you recall

12  that?

13  A.  Yes.

14  Q.  All right, sir.  Do you know or were you aware that

15  Mr. Horton actually had to pay off the Farmers and Merchants

16  note himself?

17  A.  I wasn't aware if it had been paid off.  I was aware

18  that the proceeds of the Peoples Bank of Eatonton loan was not

19  used for that purpose.

20  Q.  All right, sir. So we have reviewed several documents

21  concerning the stock sale that purport to exhibit that a stock

22  sale occurred.  There is one document that is the K-1 to Mr.

23  Horton's tax return that did not reflect any change in the tax

24  return in the K-1 reflection of the stock ownership.  And Mr.

25  Giddens testified that he did not discuss the K-1 with Mr.

120

1    Horton.

2          Isn't it just as likely, Mr. Alexander, that the

3    document that is wrong is the one document that you are relying

4    upon, the K-1 to Mr. Horton's return that Mr. Giddens admits

5    that he never reviewed with Mr. Horton?  Isn't that just as

6    possible, Mr. Alexander?

7    A.        You know, if that is all that there was, that might be

8    worth additional consideration but, even if the stock did

9    transfer, it is not possible for those payments that were made

10   to in any way equate to the fair value of that stock.  In other

11   words, those payment streams couldn't possibly be equivalent

12   value because that stock is a stock in a company that is losing

13   money, is insolvent and all of its assets are pledged.

14   Q.        I understand that, Mr. Alexander, and I understand

15   your point about it is that the stock payments themselves,

16   whether they actually paid more for the stock than you or I

17   would've paid, that is your point about it.

18   A.        Paid more than fair market value.

19   Q.        Paid more than fair market value but, if we go back to

20   November 10 of 2000, there is no dispute but what that sale

21   took place; is that right, the stock sale from November 10 of

22   2000?

23   A.        I don't have the same criticisms of that.  That is the

24   Cotina Terry and Allie Robinson transaction?

25   Q.        Yes.

121

1    A.        No, I don't have the same criticisms of that

2    transaction.

3    Q.        And they paid the same pro rata price back in November

4    of 2000; did they not?

5    A.        I think the math works out that way.

6    Q.        All right, sir.  So the exorbitant price that you

7    claim for May of 2002 where you say they dummied up the stock

8    sale, that was the same price per share from November of 2000

9    where you admit that the stock sale occurred; is that not

10   right, Mr. Alexander?

11   A.        I think that is right.  So when the ten percent

12   transaction took place, the price per share was the same as

13   when the controlled transaction took place, which is another

14   extremely unusual event because control comes with a premium,

15   so normally you would pay more for that.  But the whole thing

16   just doesn't make any sense because you have got a company,

17   like any company who is having severe financial trouble and

18   ends up filing for bankruptcy, stockholders don't usually

19   receive any value in those situations and their stock is

20   usually not worth very much.  And both of these transactions

21   people are paying, what you would back into on a conservative

22   basis, two million dollars for this company.

23   Q.        Mr. Alexander, since you brought up the issue of the

24   price paid for the stock, let's consider your testimony earlier

25   this morning where you indicated that the value of the stock,

122

1    I believe you indicated that it was not an arm's-length

2    transaction; is that essentially what you testified or is that

3    your opinion?

4    A.    Yes.

5    Q.    All right, sir.  And that applies to both the stock

6    sale in November of 2000, which you admit occurred, and the

7    stock sale in May of 2002, which you dispute occurred; is that

8    correct?

9    A.    Yes.

10   Q.    All right, sir.  Now, if it wasn't arm's-length, that

11   implies there was something else going on; right?  Is that what

12   you're telling us, that there was some impropriety or something

13   going on other than just the purchase of the stock?

14   A.    Well, if you want to back into it, maybe what I am

15   really talking about is arm's-length in the context of fair

16   market value, willing buyer/willing seller.  It is not a fair

17   market value transaction, and that is what I meant by saying it

18   was not arm's length.

19   Q.    Okay.  So you're not intimating that there was

20   anything improper about the price paid, that there was some

21   other motive or something going on; you're basically just

22   saying because more than fair market value was paid for the

23   stock, that it wasn't arm's length?

24   A.    Yeah, I think what I'm really saying is that to the

25   extent there was any benefit to the estate of Terry

123

1   Manufacturing of having this relationship with Perky Cap, to

2   the extent that relationship was purchased above fair market

3   value, that diminishes the estate.

4   Q.      Do you have any judgment as to why the Terrys paid the

5   amounts that they did for the stock at issue, the Perky Cap

6   stock?

7   A.      No.

8   Q.      Have you read the testimony or were you aware of the

9   testimony from both Mr. Horton and Mr. Terry that Mr. Terry

10  believed that he could develop a synergy between Terry

11  Manufacturing, which manufacturers, as I understand it,

12  everything basically but caps, and Perky Cap, which

13  manufactures the caps?  Were you aware of that testimony?

14  A.      Yes.

15  Q.      All right, sir.  And so the value to Mr. Terry might

16  be greater than fair market value, or at least he might have

17  thought that it was; is that not true?

18  A.      I don't know.  I am here testifying about fair market

19  value.

20  Q.      All right, sir.  So you're not here to tell us that

21  Mr. Terry himself didn't believe that that might have been a

22  fair value when he was purchasing the stock, a fair value to

23  him, something he was willing to pay to procure that stock?

24  A.      I don't want to mince words with you but fair value in

25  the context that I am using it here is fair value to the

124

1    estate, which is fair market value, and if Mr. Terry for

2    whatever reason believed that it was worth more to him

3    personally than fair market value, I think it is only

4    appropriate for me to testify to what fair market value is and,

5    if there is any special value that goes beyond that that would

6    not inure to the benefit of the estate, I don't think is fair

7    to the estate to count that in this analysis.

8    Q.    I understand.  Because you said it was not an arm's-

9    length transaction, I just want to make sure that you weren't

10   aware of any facts or evidence that might suggest that, you

11   know, Mr. Terry wasn't buying it at what he deemed to be an

12   appropriate price.  That is meant to be a question.

13   A.    I'm not sure I understood what the question was.

14   Q.    Well, the question about it is what you are testifying

15   is it is not arm's-length because it wasn't fair market value

16   for the stock; is that correct?

17   A.    Yes, it is one of the reasons.

18   Q.    All right, sir.  And my question for you is are you

19   aware of any facts which would suggest that Mr. Terry had any

20   improper motive in paying that much for the stock?

21   A.    In the micro view of just this one transaction, am I

22   aware of any facts, I think any of the facts I have already

23   testified about.  In the macro view, I mean, there is a lot of

24   information that raises a lot of questions about Mr. Terry's

25   motives.

125

1    Q.      What did Mr. Terry have to gain by paying too much for
2    the stock?

3    A.      I can't possibly answer that question.  I do not know.

4    Q.      That is my point, Mr. Alexander.  Thank you.

5            Mr. Alexander,  you earlier testified that you could
6    find  no  connection  between  the  November  10,  2000,  stock
7    purchases by the Terry women and the five point five million
8    dollar loan of that same date from American Real Estate; is
9    that correct?

10   A.      That is correct.

11   Q.      All right, sir.  Were you aware that in the loan
12   agreement for the five point five million dollar – that in the
13   loan agreement for the five point five million dollar loan that
14   there was cross-default language between the five point five
15   million dollar loan and the stock purchase notes?

16   A.      Yes.

17   Q.      All right, sir.  Did that not join the two together in
18   some sense?

19   A.      I considered it when I rendered my opinion.

20   Q.      All  right.   So  your  opinion  is  there  was  no
21   connection.  You're not telling the court that there are not
22   documents which reflect a connection between the two?

23   A.      Well, you know, I think that the evidence is clear
24   there  is  a  cross-default  provision  in  there.   Also  cross-
25   default provisions are common between multiple loan agreements

126

1    all done for different purposes when the lender is the same

2    entity.  So I don't think it establishes any special connection

3    between the two transactions, and that was considered in my

4    opinion.

5    Q.    All right.  Mr. Alexander, I guess my question for you

6    is suppose that the payments on the stock purchase notes had

7    stopped, suppose that Terry Manufacturing had stopped making

8    the payments from the Cotina Terry note and the Allie Robinson

9    note, would American Real Estate, owned by Mr. Horton, have had

10   the right to call the five point five million dollar loan due

11   and payable based upon the cross-default language?

12   A.    And based upon my training as an accountant, I will

13   answer that question.  I would assume so.

14   Q.    All right, sir.  Were you aware from the payment

15   history on the Cotina Terry and the Allie Robinson notes that

16   they were always timely made?

17   A.    Yes.

18   Q.    All right, sir.  And is that unusual for this debtor

19   to make timely payments?

20   A.    Oh, it depends on who it is.

21   Q.    I think that's right.  And with the trade vendors,

22   they did not pay timely but with the banks and with Mr. Horton,

23   American Real Estate, it appears that they did pay timely; is

24   that right?  Is that essentially true?

25   A.    You can really cut it a little bit differently with

127

1    the – I'm going to set Mr. Horton to the side but, if you set

2    off Mr. Horton to the side, he fits in the same category as

3    everyone else who would have immediately terminated this

4    company's existence if they hadn't been paid timely.  The power

5    company, people like that, transportation companies, all were

6    paid timely and Mr. Horton also fits in that category, but I

7    don't understand why.

8    Q.    You don't think calling a five point five million

9    dollar loan due might not have been a reason to keep him paid

10   timely?

11   A.    A five point five million dollar loan?

12   Q.    Yes, sir.

13   A.    You know, not having a debt come due immediately, yes,

14   that would be a reason to pay it.  They didn't pay a lot of

15   debts timely.

16   Q.    No, I understand that, but they paid Southtrust

17   timely, correct?

18   A.    Correct.

19   Q.    And they paid Mr. Horton timely and his company,

20   American Real Estate, correct?

21   A.    The situation with Southtrust is a little different

22   because what you have is you have Southtrust is on one side of

23   what I will call the knowledge wall.  In other words, they are

24   outside.  They do not have any idea of the financial problems

25   Terry Manufacturing is going through.  Okay.  And then even the

128

1    unsecured creditors who also are on the outside are probably

2    even further away.  And then you have this group of people,

3    which I will call, for lack of a better word, profiteers who

4    are kind of inside the wall.  I mean, their only existence in

5    many cases is to serve and feed the desperate financial

6    situation of Terry, and the transactions of Mr. Horton's fit

7    right into that category because I have looked at two of his

8    transactions, one through American Real Estate and one through

9    Wholesale Distributors, and he was earning forty percent fees.

10   And it is impossible for a company in the textile business to

11   ever pay that type of return on capital.  In other words, they

12   were walking dead.

13        The profiteers were in there.  They had to know that

14   they were there to extract a profit while the company was still

15   a walking corpse.  So I put them in a different category than

16   Southtrust.  Southtrust had be paid timely because you couldn't

17   keep the facade going if you ever missed a payment with

18   Southtrust.

19   Q.      What about the facade with Mr. Horton?  You don't

20   think there was any facade towards Mr. Horton?

21   A.      I think it is a measure of degrees.  You know, it kind

22   of raises a question about victims and the range of victims.

23   There are the innocent victims and then there is the people who

24   were profiting on the situation and some of them got burned,

25   too.

129

1    Q.      Well, and my point about it is, if Mr. Horton is owed

2    five point five million dollars on note "A," which is from

3    American Real Estate, is he going to engage in activity that is

4    going to bring about – that he thinks is going to bring about

5    the debtor's downfall so that the debtor won't be able to repay

6    the five point five million dollars?

7    A.      I can't speak to that.

8    Q.      Well, I mean, I think what you're saying is that he

9    was a profiteer and he was going in and he was making forty

10    percent and that is one of the things that contributed to the

11    debtor's downfall.  Why would anybody engage in activity he

12    thinks is going to bring about the downfall of a company when

13    he is owed five and a half million dollars by them?

14         MR. BARRIERE: Let me just interpose an objection, Your

15    Honor. I don't mean to break this off, but there seems to be

16    some misleading questioning.  The loan at issue here is not to

17    Terry Manufacturing.  I want to make sure we are talking about

18    the same loan.  This is a loan to Roy and Rudolph Terry, so the

19    constant reference to the debtor under this loan is misleading,

20    and I think it is confusing the testimony we are getting in

21    response.

22         THE COURT: Okay.  I mean, basically we have got a

23    fraudulent conveyance case and we have heard very little lately

24    about the Cotina Terry and the other Terry family member, and

25    then we are kind of going off into other stuff.  I mean, I am

130

1    just – I think we are getting a little bit far afield.  Let's

2    try to stick close to the issues.  I know it is a complicated

3    and there are a lot of pieces.

4        I mean, I guess the point is there is a five point

5    five million dollar loan from this real estate outfit that Mr.

6    Horton owns or has an interest in and, you know, that has an

7    impact.  I think I see your point, that it has an impact.

8    Okay.  I mean, I think I see the point.  Let's try to stick

9    with what we have got here, the fraudulent conveyance case and

10    this five hundred and ninety-six thousand dollar piece that is

11    really at issue.

12        MR. BRAZEAL: Judge, respectfully, the Cotina Terry and

13    Allie Robinson notes were both executed on the same day as the

14    five point five million dollar loan and, as Mr. Barriere

15    pointed out, the five point five million dollar loan was to the

16    Terry brothers individually, but that money went into the

17    debtor's coffers.  There was money advanced in November,

18    December and January.

19        And under *Rubin versus Manny Hanny*, the case that we

20    talked about earlier today, Your Honor – and I am digressing a

21    bit but I'm trying to lay the groundwork for the remainder of

22    his examination – Mr. Barriere says that the guaranty that

23    Terry Manufacturing gave for those two stock notes on November

24    10 of 2000 was in itself a fraudulent conveyance because the

25    debtor didn't receive any value.

131

1           THE COURT: Right.  I understand that.

2           MR. BRAZEAL: And my argument is that the five point

3      five million dollar loan from Mr. Horton, which closed on the

4      same day, and which was to the Terry brothers and it was

5      guaranteed by Terry Manufacturing, that those proceeds were

6      then  put  into  the  debtor.   So  the  totality  of  the

7      circumstances, in looking at reasonably equivalent value, is

8      that on November 10 of 2000 Terry Manufacturing, and over the

9      next couple of months, obtained five and a half million dollars

10     from the Terrys who borrowed it and gave a guaranty of four

11     hundred thousand dollars.

12          THE COURT: But didn't Mr. Alexander already testify

13     that there is no – I mean, they may have taken place on the

14     same day but is there a relationship between those two?

15          MR. BRAZEAL: Well, that is what I was trying to get

16     at, Your Honor.  I was getting at the fact that they are cross-

17     defaulted.

18          THE COURT: Okay.

19          MR. BRAZEAL: And under the *Rubin versus Manny Hanny*

20     case, benefit to a debtor – I mean, essentially what happened

21     is – well, I guess I ought to question Mr. Alexander about it.

22          THE COURT: Well, if you think it is central to your

23     defense, I don't want to cut you off but I am kind of

24     struggling with this.  I am kind of struggling with the

25     connection between the five point five million, you know, in

132

1   this case but go ahead.  I will overrule the objection and let

2   you go for a while.

3           Why don't you rephrase your question.  I'm sure Mr.

4   Alexander has lost track of –

5           MR. BRAZEAL: I'm sure, Judge.  I have, as well.

6   BY MR. BRAZEAL:

7   Q.      Mr. Alexander, my question was having to do with

8   whether you thought that Mr. Horton had inside knowledge about

9   the debtor.  You talked about a facade.  Is it possible, Mr.

10  Alexander, that the debtor was making regular payments to Mr.

11  Horton, (a), so that the five point five million dollar loan

12  didn't get called, which the debtor had guaranteed, and, (b),

13  so that Mr. Horton would think everything was rosy?  Is that a

14  possibility?

15  A.      I am having difficulty because I don't think I have a

16  copy of the five point five million dollar loan and, if I could

17  get a copy of that loan, if I am going to be cross-examined on

18  it, and –

19          THE COURT: Okay.  It is Exhibit 1; isn't it?

20          THE WITNESS: Yes, that is all I need.

21          MR. BARRIERE: If I could approach, Your Honor, I have

22  a copy of the loan agreement if that would be of any assistance

23  to the witness for the five point five million dollar loan.

24          THE WITNESS: Yeah.

25          (Pause)

133

1    BY MR. BRAZEAL:

2    Q.       Where I want to wind up on the loan agreement or on

3    the five point five million dollar loan with you is for you

4    confirm through the loan agreement, or whatever documents you

5    deem appropriate, that there was cross-default language and

6    that, had the Terrys not made payments timely on the note – or

7    the debtor not made payments timely on the Cotina Terry note or

8    the Allie Robinson note, that American Real Estate would have

9    had the right to call the five point five million dollar loan?

10          MR. BRAZEAL: Do you stipulate to that?

11          MR.  BARRIERE:  Your  Honor,  in  the  interest  of

12   expedition, the document says that there are cross-default

13   provisions and I presume if the Terrys hadn't paid their other

14   notes, those rights might or might not have been exercised.

15          THE COURT: Okay.  I see Exhibit 2, which is the loan

16   agreement, paragraph twelve, which begins at the bottom of page

17   five, which is this cross-default provision, I believe, that

18   Mr. Brazeal is referring to.  I see it right here.

19          MR. BRAZEAL: Thank you, Your Honor.  And Exhibit 10 –

20   I may not even have to approach the witness.  Brent, do you

21   stipulate that Exhibit 10 is a guaranty by the debtor, Terry

22   Manufacturing, of the five point five million dollar loan?

23          MR. BARRIERE: I do.  It speaks for itself.

24          MR. BRAZEAL: All right.  Thank you.

25   BY MR. BRAZEAL:

1    Q.        So, Mr. Alexander, when the loan agreement and the

2    guaranty are taken into account, is it true that if defaults

3    had been made on the two stock purchase notes that American

4    Real Estate could have demanded the balance on the five point

5    five million dollar loan from Terry Manufacturing Company?

6    A.        As an accountant, I would assume so, but I want to

7    make sure the record is clear that I am a CPA and not a lawyer.

8    Q.        Okay.

9    A.        I'm not trying to not answer the question; I just -

10   there are licensing issues at hand here.

11   Q.        Fair enough.  Mr. Alexander, I would like to turn your

12   attention to Exhibit 54.  I wish I could figure out how to show

13   it on the screen.

14            MR. BARRIERE: It is our exhibit?

15            MS. LASKY: Uh-huh.

16            MR. BARRIERE: There is a binder in front of him.

17            THE COURT: That is not it.  It is the other one.

18            MS. LASKY: I will get it.

19            (Pause)

20   BY MR. BRAZEAL:

21   Q.        Mr. Alexander, as I understand it, Exhibit 54 is where

22   you looked at the debtor's relationship with Perky Cap and

23   tried to ascertain whether there was a benefit received by the

24   debtor from the transaction or whether there was a net cost; is

25   that correct?

135

1    A.        Yes, based on cash received and cash paid.

2    Q.        All right, sir.  Now the five hundred and ninety-seven

3    thousand dollars represents the amount that the debtor paid on

4    the three stock purchase notes; is that correct?

5    A.        Yes.  The three loans at issue, yes.

6    Q.        All right, sir.  And what does the one point two – I

7    am  sorry – one  point  three-two-two  million  dollar  figure

8    represent?

9    A.        Those are Perky Cap sales to Terry Manufacturing over

10   the same period of time.

11   Q.        All right.  So that was money that was – no, those

12   were caps, I take it, received by Terry from Perky?

13   A.        It is the value of the caps received from Perky.

14   Q.        All right, sir.  Then you have got payments to Terry

15   Manufacturing to Perky during the same time of one point six-

16   seven-one?

17   A.        That is correct.

18   Q.        Were those payments for the purchase of the caps?

19   A.        Some of them were.

20   Q.        Okay.  What were the other payments for?

21   A.        Some of them appear to be paying Perky Cap's payroll

22   and other advances for Perky Cap's working capital needs.

23   Q.        Okay.  We discussed earlier the Peoples Bank loan of

24   one point five million dollars, the proceeds of which were paid

25   into the debtor; were they not?

1    A.        They were deposited into a debtor account.

2    Q.        All right, sir.  And if you really wanted to conduct

3    or present the court with a benefit cost analysis on that

4    relationship, would it not include the one point five million

5    dollars that the debtor obtained through the loan initiated

6    with Peoples Bank by Perky Cap and Mr. Horton?

7    A.        That is a listing of Perky Cap sales off of their

8    sales register and checks made payable to Perky Cap and it does

9    not include anything else.  Now whether you should include the

10   loan proceeds or not gets back, I think, to a fundamental

11   difference in my position in the bank cases and I think the

12   banks, which boils down to whether or not anyone could

13   reasonably trace on a specific identification those loan

14   proceeds in light of the degree of commingling, falsification

15   of documentation like the Wholesale Distributors transactions

16   that we saw in this matter.

17           And it is my opinion that you cannot do it on a

18   specific identification; that you have to step back and do it

19   the same way the IRS does it when they have people evading

20   taxes and look at it in global.  When you do that, you see that

21   the money, when you analyze the money, including this Peoples

22   Bank of Eatonton loan, that it came in and that money was

23   funneled out, in addition to money that was actually earned on

24   the operations was funneled out on top of that money.  So more

25   money was funneled out than ever came in from sources like

137

1    Peoples Bank of Eatonton.

2    Q.        I understand what you're saying about that, Mr.

3    Alexander, when you look globally; but if we look only at the

4    Perky Cap transactions with the debtor, the transactions where

5    money went into the debtor, regardless of what happened to it,

6    right, would you not have to say that there was a net benefit

7    to the debtor by virtue of the fact that they obtained another

8    one point five million dollars from Peoples Bank?

9    A.        What I just said was the money came in and went out.

10   Q.        All right.  So if the money came in, if the one point

11   five million dollars had come in and was then utilized by the

12   debtor in its operations, that instead of there being a net

13   cost of nine hundred and forty-six thousand dollars, there

14   would be a net benefit of a little over five hundred thousand;

15   is that correct?

16   A.        In the purely hypothetical sense, in the simplest

17   world where you have books and records and arm's-length

18   transactions, had the money come in and been spent for company

19   purposes, I would agree in that hypothetical that the one

20   million five should be shown on that chart; but that is not the

21   situation we are dealing with.  We are dealing with the

22   situation where thirteen million dollars in fifty days was

23   deposited into an account.  That is the same time frame of the

24   May 2000 loan.  And of the thirteen million, seven million of

25   it was just them churning money all over the place causing it

138

1    to lose its identity.

2          So in that scenario it is my opinion that you cannot

3    assert that the million five went into this account and was

4    spent on operations, and there is a whole litany of reasons why

5    you can't.

6    Q.    Were you aware that Mr. Slaton and Mr. Averett differ

7    with your analysis?

8    A.    I am aware that they differ with me.

9    Q.    Were you aware that they contend that the one point

10   five million dollars was used to sustain the debtor's

11   operations?

12         MR. BARRIERE: Your Honor, I'm going to have to object.

13   I believe the record is, one, that those were –

14         THE COURT: I will tell you what.  If I don't have to

15   listen to your explanation, I will sustain your objection.

16         MR. BARRIERE: Thank you.

17   BY MR. BRAZEAL:

18   Q.    As far as the Wholesale Distributors and American

19   Testing Laboratories transaction, you testified, Mr. Alexander,

20   that those would have affected the outside world or something

21   to that effect; is that correct?

22   A.    I am not sure I recall that testimony affecting the

23   outside world.

24   Q.    Well, I think you were trying to say that those

25   transactions could have been presented to the outside world as

139

1    a means of pumping up sales of the debtor; is that consistent

2    with your recollection of your testimony?

3    A.     Well, if that is what you heard, let me restate it to

4    be more clear.   The documentation of those transactions

5    attempts to support a legitimate sale that, when you further

6    probe into it, you quickly discover was, under accounting

7    terms, which looks at the substance of the transaction over the

8    form, was not a legitimate sale, that goods never shipped, they

9    never transferred, no sale occurred.   One would do that when

10   they were trying to generate support, including cash movement,

11   okay, one would do that if they were trying to generate

12   legitimate support to support the scams and shams that they

13   were running with their audited financial statements.

14   Q.     My only question, Mr. Alexander, was do you have any

15   testimony today, is there any evidence that those particular

16   transactions at issue were ever listed in the debtor's accounts

17   payable – I am sorry – well, accounts receivable or accounts

18   payable?

19   A.     As I started this out, you recall that there is no

20   debtor's accounts payable record, and the only receivables

21   record relates to the McDonald's business.   There was never any

22   accounts receivable records located.   So the answer to that

23   question is I have no idea what was listed, if one ever

24   existed, in the accounts payable or the accounts receivable

25   record.

140

1    Q.       Do you know whether those specific transactions were

2    ever utilized in any financial statement that the debtor

3    provided to any one?

4    A.       I think the limit of my testimony is it is the type of

5    documentation that one would generate to disguise and support

6    the legitimacy of otherwise illegitimate circumstances, just

7    like the Omni Investment Credit transactions –

8    Q.       I understand.  Just so we can try to get to the bottom

9    of the testimony, Mr. Alexander, I am just trying to make sure

10   that you're not telling the court that there was some specific

11   use that you are aware that was made of those transactions as

12   far as deceiving Southtrust Bank or anyone in the outside

13   world?

14   A.       All I am saying is I'm holding up – all I'm saying is

15   it lists merchandise and related services, no quantity, there

16   is no price, there is no date shipped.  It is all indicia of a

17   bogus transaction, and then the money being transferred is

18   being transferred in such an obvious way that you can see a

19   million three goes out – comes in and a million, three seventy-

20   five is paid back forty-five days later.

21   Q.       Mr. Alexander, that is not my question.

22   A.       I am sorry.

23   Q.       My question is do you have any evidence that the

24   documents related to these sets of transactions were ever

25   utilized to present a false picture to the outside world?

141

1    A.        I don't know of a circumstance where these particular

2    documents were used by anyone other than the Terrys and Mr.

3    Horton.

4    Q.        That's my question.  Thank you, sir.

5              MR. BRAZEAL: Judge, that concludes a significant part

6    of my testimony or cross-examination of Mr. Alexander; however,

7    I do have some other things to run by him.  For instance, Your

8    Honor, the debtor's conduct and the fact that the debtor –

9    well, I just have some other questions for him in that regard.

10             THE COURT: Now is as good a time as any.

11             MR. BRAZEAL: Okay.

12   BY MR. BRAZEAL:

13   Q.        Mr. Alexander, you have already testified that the

14   debtor engaged in what you have termed as commingling; is that

15   correct?

16   A.        Yes.

17   Q.        All right, sir.  What about money-laundering?

18   A.        Earlier I have referred to the process of transferring

19   the money around and the issuance of checks to fictitious

20   vendors and the creation of bogus documentation as the kind of

21   techniques that people use when money-laundering, and that is

22   the extent of my reference to that word.

23   Q.        All right, sir.  Did the debtor, Terry Manufacturing,

24   ever use its funds to pay what you deemed to be personal

25   obligations of members of the Terry family?

142

1    A.       There is a large list of payments to a large group of

2    people that fall outside of the normal business activities of

3    the company.  Some of them are very clear to see that they were

4    directly related to the Terrys' personal benefit and some of

5    them were to people that we have so far determined just do not

6    exist.

7    Q.       Sir, is it your testimony that Terry Manufacturing

8    customarily paid obligations of the individual Terrys?

9    A.       No, it is my testimony that the Terrys individually

10   looted the company, but I don't ascribe that to Terry

11   Manufacturing, the entity.

12   Q.       Well, now, my only point about it was and I think what

13   you're saying is the Terrys who controlled Terry Manufacturing

14   utilized the company to pay many of their personal obligations;

15   is that true?

16   A.       I don't know.  What I don't know is the whole question

17   of control, I think, is a murky legal question because there

18   are fifty-two stockholders that held preferred stock but they

19   all had the unilateral right to convert it to common and I

20   haven't even run the numbers of whether they could end up

21   controlling the company after that happened.  I don't know.

22   But clearly the Terrys were the operators.  They were the

23   owner/operators.

24   Q.       Do you have any evidence that the preferred

25   shareholders ever participated in running the company or

143

1   operating the company?

2   A.      No, I don't think they ever did.  They are just like

3   any other passive shareholder where someone who is running the

4   company owns some interest in the company but that the company

5   is largely held by a wider group of people.

6   Q.      I'm just trying to make sure that I have got your

7   testimony correct because I keep getting some – well, the

8   Terrys operated the company; is that right?  The Terrys

9   individually, Roy and Rudolph, operated Terry Manufacturing; is

10  that right?

11  A.      Well, as you may or may not be aware, there are others

12  matters, recovery actions I am pursuing, and there are certain

13  joint venture partners that played an active role.

14  Q.      Cintas?

15  A.      Certain individuals at Cintas, yes.

16  Q.      All right, sir.  Well, I guess my question for you is

17  did the Terrys, through their operation of the company – I'm

18  talking about the Terrys individually – utilize company assets

19  for personal benefit?

20  A.      I have been able to show they utilized some of the

21  company assets for personal benefit.

22  Q.      All right, sir.  In your prior testimony you also

23  indicated that they had engaged in what you termed skimming?

24  A.      Yes.

25  Q.      All right, sir.  Could you tell us what skimming is

144

1    and, as briefly as you can, how that was utilized to divert

2    assets from Terry Manufacturing?

3    A.        And I want to be clear, when you say "they," we

4    arrived on-site and took control over the property on a Friday

5    afternoon, sometime around three o'clock.  I can't remember the

6    date.  And we were supposed to come on Monday, so we surprised

7    them a little bit.  And when we entered the controller's

8    office, there was a stack of deposits related to the McDonald's

9    business that dates back six months where they had set this

10   money aside and had bundled it up.  It was in check form still

11   and they were holding it.  I subsequently deposited those

12   checks and, by and large, they all cleared.  And during that

13   same six-month period, they were depositing some of the checks.

14   So in that sense they were taking one check and setting it

15   aside – that's the skim – and then maybe two or three checks

16   they would deposit and run through their bank account, and that

17   is what I meant by my previous testimony on skimming.

18   Q.        All right, sir.

19   A.        And the person that I believe was doing that, because

20   I located the documents in his office, is not one of the

21   Terrys.

22   Q.        All right.  So you believe it was someone other than

23   the Terrys who was skimming those proceeds off or those funds?

24   A.        I just know that is where I found the money, in

25   someone else's office, not one of the Terrys.

145

Q.       Is it true that the Terrys provided fraudulent financial statements to some of the creditors of Terry Manufacturing?

A.       I believe Mr. Terry has admitted to that in his plea arrangement.

Q.       All right, sir.  Is it true that the Terrys, as you testified earlier, came up with a fraudulent appraisal for the plant or your best judgment about it is that they did?

A.       I would like to just stop at the point of recognizing his handwriting.  I don't really know who all was involved in that.

Q.       What about check kiting; did the debtor engage in check kiting?

A.       You know, check kiting has a real specific, narrow, legal definition.  It has a definition in my trade, too.  So to set that issue aside, there was rampant transferring of money, some might be kiting, some not, but it all achieved an increase in float, usable cash balances higher than the true available funds, which is one of the problems of doing any kind of tracing analysis because the bank says the money is there but it is really not there.  It is only there because they have been transferring the money around.  So you can clear a check but, had they been operating legitimately, it shouldn't have ever cleared.

Q.       Is that why the debtor maintained twenty-three bank

146

1    accounts, so that it could transfer the money around as you

2    have described?

3    A.    I don't know that.  I don't know why they maintained

4    so many accounts.

5    Q.    Is it typical for a company of Terry Manufacturing's

6    size to maintain twenty-three bank accounts?

7    A.    The number of accounts is unusual.

8    Q.    Did you ever find any books and records which

9    reflected any Board of Directors meeting or meetings of

10    shareholders of Terry Manufacturing?

11    A.    Well, I was shown the Board of Directors book and I

12    was shown what I believe to be the stock book and I was shown

13    a whole filing cabinet of legal documents related to corporate

14    formalities on Friday and Friday night we were broken into and

15    there was only two things that we have identified that were

16    stolen and one was everything in that filing cabinet containing

17    the corporate formalities was stolen and ten empty boxes for

18    computers was stolen.

19    Q.    Okay.  So your testimony is, I suppose, that you at

20    one point saw a stock book or a minute book but you were never

21    able to review them in any detail?

22    A.    Well, that day I didn't review the corporate documents

23    but later, particularly related to the stock offerings that

24    were done, we went to the law firms and we recovered their copy

25    of those documents, so we have those.

147

1    Q.        Do you have any documents which indicate that they had

2    any regular Board of Directors meetings of Terry Manufacturing?

3    A.        You know, when you say regular, I don't have anything

4    that would indicate monthly meetings.  Like I said, I have any

5    documents that would be entered into at the time of making a

6    loan transaction, some of the stuff you were showing me earlier

7    today.  I have got typical, closely-held company documentation.

8    Q.        All right, sir.

9             (Pause)

10            MR. BRAZEAL: Judge, I am in the place of my cross-

11   examination where I was going to deal with the tracing analyses

12   that were performed by Mr. Slaton, which was the report of

13   February 24.  And if Mr. Slaton is going to testify about that,

14   then I really won't belabor the point of going through it with

15   Mr. Alexander.

16            THE COURT: Here is what I would like you to do.  Mr.

17   Barriere had Mr. Alexander up for about two hours this morning

18   and you have had him for about an hour and a half.  If you have

19   any more questions that deal with his approximately two hours

20   of testimony, I think now is the time to ask them; but I really

21   don't want you to spend any more time trying to force other

22   stuff through his mouth because, I mean, he is not going to

23   agree with what those guys say, so I think it is a waste of

24   time to try to get him to do it because I can tell you right

25   now he is not going to do it.

1          MR. BRAZEAL: I concur with you, Your Honor.

2          THE COURT: So why don't you just finish up with

3     anything more you need to ask that he has testified to this

4     morning, and then if you want to offer – well, actually it is

5     not your case yet, so you're going to have to wait for your

6     case in chief and then we will see what you're going to offer.

7          So let's just see if we can finish cross if you have

8     any more but getting into this other stuff is really pretty far

9     afield at this point.

10         MR. BRAZEAL: Judge, the point about it is that Mr.

11    Slaton's report utilizes –

12         THE COURT: You have to remember we are on cross-

13    examination.  He didn't say anything about those guys unless

14    maybe it was responsive to a question you put to him earlier.

15    So I don't see – I just don't see where you're going at this

16    stage of the trial with all of that.

17         MR. BRAZEAL: Judge, what he did testify to was that

18    there was no consideration received by the debtor, no

19    reasonably equivalent value that the debtor received.  The

20    records that Mr. Slaton based his report on were all taken from

21    the trustee and they reflect that those three loans at issue,

22    the three that I have argued –

23         THE COURT: I don't really care what this guy Slaton

24    said at this point.  If you have got a document that you want

25    Mr. Alexander to look at that you don't think he has

149

1    considered, that he has misinterpreted, you can do that; but I

2    don't really want to argue about what this other guy – I mean,

3    I understand we have got this mass of documents out there.

4    Alexander has looked at the documents.  He has come to one

5    conclusion.  You have had some guys who have looked at them and

6    maybe come to a different conclusion.  Let's just stick with

7    Mr. Alexander's view at this point and then, if you want to

8    offer testimony at a later part of the trial as to somebody

9    else's view, fine, but I would really like to kind of stick

10   with what Mr. Alexander said and any further cross you have of

11   that.  I mean, I just don't want you to try to force somebody

12   else's testimony through his mouth.  It is just not going to

13   get us anywhere.

14           MR. BRAZEAL: I understand that, Your Honor.  I guess

15   what I want to make sure of is on my direct that –

16           THE COURT: But you are on cross.

17           MR. BRAZEAL: No, I understand but that on my direct

18   there is not going to be an objection made if I have to put Mr.

19   Alexander back on to identify some of these records.

20           THE COURT: We are going to end this real quick because

21   I don't want to sit here and argue about what you might do and

22   what he might object to in the future.  All I want to do is if

23   you have got any more questions within the scope of the direct

24   examination, ask them and, if you are done, let's move on.

25           MR. BRAZEAL: Okay.  Thank you, Judge.

150

1    BY MR. BRAZEAL:

2    Q.      Mr. Alexander, I have pulled up on the screen what we

3    have marked as, and what has been proffered to the court as

4    Defendant's Exhibit 58.

5    A.      Can you give me a shot of the whole document?

6    Q.      Sure.  I will give you the entire document.  We

7    utilized it in your deposition.

8            THE COURT: Did Mr. Alexander prepare this list?

9            MR. BRAZEAL: That is my understanding, Your Honor.  At

10   least that is what came out in his deposition.

11           May I approach him, Your Honor?

12           THE COURT: Yes.

13   BY MR. BRAZEAL:

14   Q.      Mr. Alexander, during your deposition I had just asked

15   you to confirm that this exhibit and the attachments reflect

16   funds  that  were  paid  into  the  Bank  of  Wedowee,  Terry

17   Manufacturing account; and I believe you confirmed that they

18   did, and that is my sole question as to this exhibit?

19   A.      I honestly don't recall that.  I'm still back on did

20   I prepare this document, and anything you have got to refresh

21   my memory about the source of this document, I would appreciate

22   it.

23           MR. BARRIERE: Your Honor, not to belabor this, I am

24   fairly confident this is a document generated by counsel for

25   the Bank of Wedowee.  It has his exhibit identification on it.

151

1    If the witness can identify it, fine; if he can't, I would

2    suggest we move on.

3           THE COURT: Okay.  Mr. Brazeal, what is this?  I'm

4    looking at Exhibit 58, third-party checks deposited into Terry

5    Manufacturing Company, Inc. Account.

6           MR. BRAZEAL: Judge, during Mr. Alexander's deposition

7    I just asked him whether he disputed whether any of these

8    checks were actually deposited into the debtor's account.  I

9    think Mr. Barriere is correct, I misspoke.  I do not believe

10   that Mr. Alexander prepared the document.

11          MR. BARRIERE: I object to this on relevance, Your

12   Honor –

13          THE COURT: I'm going to sustain.  I don't see the

14   relevance.

15   BY MR. BRAZEAL:

16   Q.      Mr. Alexander, do you still have a copy of your report

17   before you?

18   A.      I do.  I think it is Exhibit 44.

19   Q.      I would like to direct your attention, Mr. Alexander,

20   to paragraph one on page four of your report.  I would like to

21   direct your attention to the last sentence in that paragraph.

22   You testified during your direct examination that the debtor

23   used trade debt as a de facto revolving credit facility, which

24   is the language that you used here also.  And I believe you

25   testified a bit earlier today during your cross about the check

152

1    kiting, and you also indicated that the debtor borrowed money

2    or had off-balance-sheet loans, I believe, and that all of

3    these were used as a way to sustain the debtor's business

4    operations.  Is that correct?

5    A.      Yes.

6    Q.      All right, sir.

7    A.      To continue.

8    Q.      And is it true that, when you referred to private

9    persons in this opinion, that that would include the loans from

10    Mr. Horton and/or American Real Estate?

11        MR. BARRIERE: I object to the form of the question.

12    As to which loans are you talking about?  Are you talking about

13    the three loans or a different loan?

14        MR. BRAZEAL: I'm talking about the three loans at

15    issue.

16        THE COURT: I will overrule the objection.  I mean, I

17    think the question – you're talking about TMC obtained off-

18    balance-sheet loans from private persons; were those persons

19    either Mr. Horton or who was the other –

20        MR. BARRIERE: Mr. Reynolds.

21        THE COURT: Mr. Reynolds.

22        THE WITNESS: In the analysis – let me back up.  The

23    analysis that I did of sources and uses of cash, we broke the

24    cash receipts into two – three groups – customers, capital

25    contributors which would be direct banks and stockholders, and

153

1    then this large group of other moneys that flowed through the

2    accounts.  And then we analyzed the use of those funds in those

3    groups the same way anyone who was trying to find out where the

4    money went and trace the funds would do it given the amount of

5    transfers and lack of documentation.

6         Mr. Horton's loans are in that third group, which is

7    the group of deposits that came in.  Whether all of his money

8    is in there or not, Your Honor, I don't know.  I haven't even

9    looked to see, but there is money coming in.  It goes into the

10   accounts and then it goes out.

11        You cannot ascertain from this language that it is my

12   opinion – it is not to say that it is my opinion that that

13   money was used for operations.  What I'm trying to say is that

14   money flowing into this company from undisclosed sources was

15   used to hide the true economic circumstances of Terry, and they

16   did it by transferring money around and creating thirteen

17   million in float when there is really only twelve – six million

18   in float and that kind of stuff.  But when you go through a

19   tracing analysis the way it can be done, which is back to my

20   opinion, more money went out than came in.  So it was all spent

21   by being taken out of the company.

22   Q.    Mr. Alexander, I am just trying to determine whether

23   you believe that some of these loans from private persons were

24   used to sustain the operations of the debtor?

25   A.    I think my opinion is, based on the way I have

154

1     approached the analysis, is the loans from the private persons,

2     to the extent there was any benefit, it was merely temporary.

3     Q.        Did you say in order to sustain its operations

4     temporarily in your report?

5     A.        No.

6     Q.        Thank you.  Mr. Alexander, I'm going to refer you to

7     what we have tendered as Exhibit 60, which I believe you

8     indicated was a document that you prepared while you were

9     working on the case to reflect funds that the Terrys

10    themselves, the Terry brothers received.  Is that correct?

11    A.        I can't recall my testimony but I think – at least I

12    was trying to convey that that is a preliminary schedule and

13    the reason I can tell that, the number on there is twenty

14    million, one hundred and eight thousand dollars, and – is that

15    a receipts or a disbursement schedule?  I can't tell that.

16    Q.        I took it that it was a receipts because it said

17    receipts.

18    A.        Well, because it has got brackets on it, I believe it

19    is a disbursement schedule and the actual, final total of that

20    number was thirty-one million, two hundred and eighty-three

21    thousand dollars.  So that is a preliminary schedule.

22    Q.        As far as American Real Estate Investment Co., do you

23    believe that that number is correct, the eight point six-seven-

24    two, nine twenty-eight?

25    A.        No.

155

1   Q.      Do you believe it is greater or lower?

2   A.      I believe that number is too high.  Like I said, it is

3   preliminary.

4   Q.      Well, do you believe it is a net number?

5   A.      Sitting here today, I don't know, Ellis.  There was

6   ten boxes, about twenty-five hundred documents in each box that

7   backs up that work and that is one schedule out of a process

8   that took place over many months.

9   Q.      All right.  I will present you with what has been

10  marked as Exhibit 61.  Do you recognize that document?

11  A.      It is part of a document.  Can I see the whole thing?

12  Q.      Sure.

13          (Pause)

14  A.      It is also a preliminary document.

15  Q.      So you don't know whether the numbers on American Real

16  Estate are correct or not?

17  A.      I couldn't tell you from that document.

18          MR. BRAZEAL: Judge, I think that completes my cross of

19  Mr. Alexander.

20          THE COURT: All right.  We will break for fifteen

21  minutes.

22          (Recess from 3:23 p.m. until 3:44 p.m.)

23          THE COURT: Please be seated.

24          MR. BARRIERE: Your Honor, unless the court has

25  questions, I am going to ask that Mr. Alexander be excused and

156

1    I will call my next witness.

2              THE COURT: All right.  Thank you.  You may step down.

3              MR. BARRIERE: Your Honor, the trustee calls N. D.

4    Horton.

5              THE COURT: Okay.

6              (N. D. HORTON, JR., WITNESS, SWORN)

7                        DIRECT EXAMINATION

8    BY MR. BARRIERE:

9    Q.        Good afternoon, Mr. Horton.

10   A.        How do you do, sir?

11   Q.        My name is Brent Barriere.  I think we have met

12   before.  I have a few questions for you this afternoon.  The

13   first of which is could you state your full name and address

14   for the record, please?

15   A.        Nevilles Dudley Horton, Jr., 257 Rose Creek Road,

16   Eatonton, Georgia, 31024.

17   Q.        Mr. Horton, what is American Real Estate?

18   A.        It is a company that primarily deals in real estate

19   investments and it is a limited partnership between N. D.

20   Horton, Jr., myself, as a limited partner; Jamie Reynolds is a

21   limited partner; and RJ&J Enterprises, Inc., which is the

22   general partner; and I am the president of RJ&J Enterprises,

23   Inc.

24   Q.        It is a Georgia limited partnership?

25   A.        Yes.

157

1    Q.        And where is its offices located?

2    A.        In Eatonton, Georgia.

3    Q.        All right.  Does American Real Estate have offices

4    separate from your personal office?

5    A.        Yes, sir.

6    Q.        Does it have its own employees?

7    A.        It has an office in Greensboro, Georgia.

8    Q.        In Greensboro, Georgia?

9    A.        Yes, sir.

10   Q.        All right.  If I go to that office today, am I going

11   to meet persons employed by American Real Estate?

12   A.        Yes, sir.

13   Q.        How many employees does American Real Estate have?

14   A.        Two, I think.

15   Q.        Two, you think.  All right.

16   A.        Maybe three.

17   Q.        Two or three employees?

18   A.        Yes.

19   Q.        All right.  And it keeps its own financial books and

20   records separate and apart from N. D. Horton's books and

21   records?

22   A.        Yes.

23   Q.        And there is an American Real Estate tax filing

24   separate from N. D. Horton's tax filing; is that correct?

25   A.        Yes.

158

1    Q.        All right.  It has its own bank accounts?

2    A.        Yes.

3    Q.        All right.  It has investments in a variety of real

4    estate which is not your personal real estate; is that correct?

5    A.        That is true, yes.

6    Q.        And that has been true from the time American Real

7    Estate was formed until today; is that correct?

8    A.        Yes.

9    Q.        All right.  When was American Real Estate formed?

10   A.        It was in the mid eighties.  I think it was '84, but

11   it may have been '85.

12   Q.        Okay.  Now, in Louisiana we use a terribly gobbled

13   term, that it is a separate juridical entity, and that just

14   means it is a separate legal entity separate from N. D. Horton.

15   Is that true about American Real Estate?

16   A.        Yes, sir.

17   Q.        All right.  Now, what about Wholesale Distributors;

18   is Wholesale Distributors a corporation?

19   A.        It is a trade name actually.  American Testing

20   Laboratories, Inc. is the corporation that does business as

21   Wholesale Distributors and also as Horton Components.

22   Q.        Horton Components.  Where is American Testing

23   Laboratories?  Shall I refer to it as Wholesale Distributors or

24   American Testing Laboratories, or you don't care, either one?

25   A.        Whichever way you want to.

159

1    Q.        Either one will work.  All right.  Wholesale

2    Distributors, where is its office located?

3    A.        It is located on the Milledgeville Highway adjoining

4    Horton Homes property.

5    Q.        It is a corporation, I take it?

6    A.        Yes, sir.

7    Q.        Organized under the laws of the state of Georgia?

8    A.        Yes, sir.

9    Q.        Files its own tax returns?

10   A.        Yes, sir.

11   Q.        Has its own auditors?

12   A.        Yes, sir.

13   Q.        American Real Estate has its own auditors; is that

14   correct?

15   A.        Yes, sir.

16   Q.        Does it generate annual audited financial statements?

17   A.        We don't do audited statements.  We do a statement.

18   Q.        You do a financial statement for American Real

19   Estate.  Is that reviewed by an outside accounting firm?

20   A.        No, sir.

21   Q.        All right.  Wholesale Distributors, it generates an

22   annual financial statement, I take it?

23   A.        Yes, sir.

24   Q.        Is that reviewed by an outside accounting firm?

25   A.        No, sir.

160

1    Q.        All right.  Who generates those financial statements

2    for Wholesale Distributors?

3    A.        Rick Cogdill.

4    Q.        What firm is he with?

5    A.        Well, he is a CPA and he is employed by American

6    Testing or Wholesale Distributors.

7    Q.        Okay.  And who prepares the financial statements for

8    American Real Estate?

9    A.        Carol Jones.

10   Q.        Okay.  And she is an employee of American Real

11   Estate?

12   A.        Yes.

13   Q.        All right.  Now, Wholesale Distributors, you told me

14   has its offices there in Eatonton, has its own office.  Does it

15   have its own employees?

16   A.        Oh, yes, sir.

17   Q.        How many employees, approximately?

18   A.        I would say around a hundred and fifty.

19   Q.        A hundred and fifty employees?

20   A.        Yes.

21   Q.        Could you describe for the court the business of

22   Wholesale Distributors; what does it do?

23   A.        Well, it is a distribution company.  It started out

24   -

25   Q.        I am sorry.  I was distracted.  It is a distribution

161

1    company?

2    A.        It is a distribution company.  It sells to

3    manufacturers or businesses or wholesalers.  They make molding,

4    picture frame molding, pictures, mirrors.  They buy from

5    different companies and then sell it to smaller EOM

6    manufacturers or EOM manufacturers of large size.

7    Q.        I am sorry.  EOM?

8    A.        Yes.

9    Q.        I am sorry.  That acronym, I am not familiar with.

10   What does that stand for?

11   A.        It is a designation that suppliers use and they sell

12   an EOM manufacturer who takes their product, along with other

13   products, and puts them together and then sells the finished

14   product like we do with houses with Horton Homes.

15   Q.        All right.  Does Wholesale Distributors primarily

16   sell to manufacturers of mobile homes or prefabricated houses?

17   A.        They sell – it is a big portion of their business but

18   it is not half of their business even now.

19   Q.        Does Wholesale Distributors sell fabric?

20   A.        Yes.

21   Q.        All right.  Sell uniforms?

22   A.        No, sir.

23   Q.        No finished goods of that sort?  It is not in the

24   textile business?

25   A.        No, sir.

162

1  Q.        All right.  Are there other shareholders of Wholesale

2  Distributors besides yourself?

3  A.        Yes.

4  Q.        Or this is American Testing?

5  A.        American Testing, yes.

6  Q.        There are other shareholders?

7  A.        Yes.

8  Q.        All right.  You are an officer of that company?

9  A.        Yes.

10  Q.        You are a director of that company?

11  A.        Yes.

12  Q.        And you told me a moment ago with respect to American

13  Real Estate that it has a corporate general partner.  I think

14  you called it RJR?

15  A.        RJ&J Enterprises, Inc., and it is a general partner

16  and makes all of the decisions for American Real Estate because

17  Jamie Reynolds is a limited partner and is not involved in the

18  day-to-day operation, and I am a limited partner and can make

19  no decisions as a limited partner, as an individual, but as the

20  president of RJ&J Enterprises, Inc., I can make the decision.

21  Q.        All right.  Who are the officers of RJ&J Enterprises?

22  A.        I couldn't name them from - I know that my wife is an

23  officer, Helen N. Horton; my nephew is an officer, R. W. Hicks,

24  Jr.; I am an officer.

25  Q.        Are you a member of the board of directors?

163

1    A.        Yes, sir.

2    Q.        Are you a shareholder of RJ&J?

3    A.        RJ&J is owned a hundred percent by Horton Industries.

4    Q.        And you are a shareholder of Horton Industries?

5    A.        Well, not really.  I am the president of Horton

6    Industries but I am not a shareholder.

7    Q.        Really my purpose isn't to go through your entire

8    conglomerate, sir.  I just want to make sure I am clear that in

9    your mind, at least, there is American Real Estate.  That is a

10   separate entity?

11   A.        Yes.

12   Q.        You have got a partner there, passive but a partner,

13   Mr. Reynolds?

14   A.        Yes.

15   Q.        And then we have got Wholesale Distributors, American

16   Testing.  That is yet a separate entity?

17   A.        Yes.

18   Q.        Where there are other shareholders besides yourself;

19   right?

20   A.        Yes.

21   Q.        And then we have got here, for today's purposes,

22   individually N. D. Horton and James Reynolds.  All four,

23   separate distinct entities; correct?

24   A.        Yes.

25   Q.        All right.  Good.  Now I want to hand you two things

164

1    if I may.  The binder, and I am going to have some questions

2    about the documents there, and a loan agreement, and that loan

3    agreement has been marked by your attorney and introduced into

4    evidence – let me see here.  I think that is Exhibit 3.  You

5    are generally familiar with that loan agreement, sir?

6    A.       I recognize it, yes.

7    Q.       All right.  And this was prepared by your attorney,

8    Mr. Schmidt; is that correct?

9    A.       Well, I think it was actually prepared by a member of

10   that firm.  I think it was prepared by Mr. Ashley at that time,

11   Seab Ashley, who was one of the partners of the firm.

12   Q.       All right.  And that is a firm that represents you on

13   a routine basis; is that correct?

14   A.       Yes, sir, with American Real Estate.

15   Q.       Now we talked a bit today about the five point five

16   million dollar loan referenced in this loan agreement.  Who did

17   you negotiate that loan with?

18   A.       With Roy and Rudolph Terry.

19   Q.       All right.  Now, sir, I have read this loan agreement

20   and I don't see anywhere that it conditions American Real

21   Estate loaning Roy and Rudolph Terry up to five point five

22   million dollars upon the Terry women buying your stock.  Do you

23   agree with that?

24   A.       I don't think it was conditioned that we would make

25   them this loan if they bought the additional stock.

165

1    Q.        Okay.  You didn't at any time tell them I am only

2    going to loan you this money, Roy and Rudolph, if your wives,

3    your women, or you buy some more stock from me and my partner;

4    did you?

5    A.        Let me tell you how the deal came about.

6    Q.        Well, first answer my question and then you can give

7    me an explanation.

8    A.        No, sir, I didn't do that.

9    Q.        Okay.  Fair enough.  Now if you look at the loan

10   agreement, paragraph nineteen, I am going to read it into the

11   record, sir, and please correct me if I misstate it.  Quote:

12           "This agreement, the promissory notes, the security

13            agreement, pledge agreement and the irrevocable stock

14            powers, guaranty of equity participation, other

15            documentation evidencing the matter set forth herein,

16            hereinafter the loan documents, constitute the entire

17            agreement between the parties.  No representations,

18            covenants or warranties not herein expressly set forth

19            shall be binding on the parties hereto.  No

20            modification hereof shall be effective unless in

21            writing and subscribed by the parties hereto."

22   Unquote.  Did I read that accurately, sir?

23   A.        Yes.

24   Q.        All right.  Is that paragraph nineteen true and

25   accurate?

166

1    A.        To borrow a phrase from Mr. Alexander, I am not a

2    lawyer.

3    Q.        Fair enough.

4    A.        And it has got some legalese in there that I think

5    were put in there for our protection, but I couldn't tell you

6    exactly what it means.

7    Q.        Well, let me come at it this way, sir.  You may never

8    have heard of the term "integration clause," but an integration

9    clause in a contract basically says this deal as written is the

10   sole deal, there are no side deals, there are no oral

11   modifications or side agreements.

12   A.        That's true.

13   Q.        And that was true here; was it not?

14   A.        Yes.

15   Q.        So there was no side deal not set forth in this loan

16   agreement that there was only going to be a loan if Cotina

17   Terry and Allie Robinson bought stock from you and your

18   partner; correct?

19   A.        That's true.

20   Q.        And in fact you didn't exchange or American Real

21   Estate didn't exchange its agreement to make this loan for five

22   and a half million dollars for their, Ms. Terry and Ms.

23   Robinson, agreeing to buy your stock; correct?

24   A.        Well, I am not real smart, wasn't the head one in my

25   class, but I don't believe I would send five and a half million

167

1    dollars after four hundred thousand.

2    Q.        Fair enough.  Fair enough.  So am I correct, sir,

3    consistent with what you told me, that nobody would trade five

4    and a half million dollars for four hundred thousand dollars,

5    these were two separate transactions; correct?

6    A.        Yes, sir.

7    Q.        Okay.  And just so I am clear, if Allie Robinson and

8    Cotina Terry hadn't bought your stock, American Real Estate was

9    going to make this loan; was it not?

10   A.        Well, I asked to tell you how this developed and you

11   asked me to answer your question.

12             THE COURT: Okay.  Well, you can do it now.

13   Q.        Now you can do it.

14   A.        The Terrys came to me with a plan to make Perky a

15   minority firm.  They already owned a third of it, and they

16   wanted to buy an additional twenty percent so Perky could bid

17   on government contracts, contracts with Coca-Cola and Delta

18   that required minority-owned companies to do it.  And they

19   talked to me about doing that, and that made a little sense to

20   me.

21             And then they asked me about starting Terry

22   Promotional Products, and I said what would that do, and they

23   said, well, they wanted to go on the Internet and that they

24   thought they could really generate some big numbers, and they

25   had some numbers that they called, something like an optimistic

168

1      forecast, a realistic forecast and a very conservative

2      forecast.

3              Well, in looking at it, it looked to me like if they

4      could hit the conservative forecast that it would be a very

5      profitable deal. So I looked at both of them and I said would

6      you all be willing to guarantee these very conservative

7      forecasts if we did the deal, and they both said that they

8      would. And I said, well, you know that is going to be you,

9      Roy, and you, Rudolph, and Terry Manufacturing Company

10     guaranteeing it and guaranteeing cross-default on all the notes

11     that we have with you or that we do with you in the future, and

12     they said that they would.

13             And their plan was that they would buy the additional

14     twenty percent of Perky so they then would have fifty-three

15     percent of it and it would be a minority-controlled firm. And

16     then I can't recall which one of the brothers, whether it was

17     Rudolph or Roy, that said, "Mr. Horton, we may want to put this

18     in our wives' names." And he kind of grinned and he said, "You

19     are married. You know how women kind of want something in

20     their name." And I grinned back at him and said, "Yeah, I

21     understand that."

22             And I didn't know that the one that is called Terry,

23     I believe it is Cotina Terry, was Roy's daughter. I thought

24     that was Roy's wife up until they filed for bankruptcy. I did

25     know that Allie Robinson went by a different last name and she

1    was Rudolph's wife, but that is how we got to where we are and,

2    had they come in to close and wanted to change their plan, it

3    would have raised some skepticism on my part as to whether they

4    knew what their plan was, but that's the way they laid it out

5    and they said they had no problem – and I said to them, I said,

6    "You know, I don't know you all's wives, and you all are

7    willing to guarantee these notes?" And they said they were and

8    that Terry Manufacturing would guarantee them also.

9         And then our lawyer put in the cross-default and the

10   legalese that is required to tie – we thought that we tied them

11   as tight as you could tie a borrower, and I had never loaned

12   anybody five and a half million dollars before.  That was the

13   most money I had ever loaned anybody, and I thought it was a

14   real good deal and, as Mr. Alexander described the facade, if

15   there was anybody on the outside of the facade with SouthTrust

16   Bank, it was N. D. Horton, Jr., Jamie Reynolds and American

17   Real Estate and American Testing and Wholesale Distributors.

18   I thought these people were as straight as you could be, and I

19   didn't have any idea that they had several sets of books and a

20   CPA that produced an audit that we relied on tremendously that

21   was fraudulent.

22   Q.         I think we are getting a little ahead of ourselves.

23   Let me see if I can break it down because you have covered a

24   lot of territory there.  First, just so I understand, the five

25   point five million dollar loan agreement, that was five and a

170

1    half million dollars to fund what you referred to as the Terry

2    Promotional Products deal; is that correct?

3    A.        That's what they described it to me as, yes, sir.

4    Q.        And that was the deal where there were conservative

5    and ambitious projections and you wanted a guarantee behind

6    that?

7    A.        Yes.

8    Q.        Now separate and apart from that we had their asking

9    you can we buy another twenty percent of the stock.  These are

10   two separate deals; correct?

11   A.        Two totally separate deals, yes, sir.

12   Q.        All right.  Fair enough.  Now time passes and in

13   August of 2001 there is another loan for a million and a half

14   dollars by American Real Estate.  Do you recall that?

15   A.        If you ask me do I specifically recall it, my answer

16   would have to be no.  That has been a long time ago.

17   Q.        Fair enough, but it is a good chunk of change and you

18   remember making that loan at some point; don't you?

19   A.        Yes.

20   Q.        Okay.  Now I can certainly put the records up if you

21   would like, but I will ask you to accept that your note from

22   Ms. Terry and your note from Ms. Robinson were executed in

23   November of 2000.

24   A.        Yes.

25   Q.        So about ten months before this loan agreement, okay.

171

1    And the sale, purported sale to Roy and Rudolph Terry occurred

2    in May of 2002.  Does that sound right to you?

3    A.        You are talking about the third stock transaction

4    that we did with them?

5    Q.        Yes, sir.

6    A.        That date sounds reasonably familiar.  It was a good

7    while later but I couldn't tell you from my memory whether that

8    is the date.

9    Q.        Fair enough.  I just want to be clear this one

10   million, five hundred thousand dollar loan, that didn't have

11   anything to do with Cotina and Allie buying your stock back in

12   the prior November; did it?

13   A.        Oh, no, sir.

14   Q.        All right.  And it didn't have anything to do with

15   Roy and Rudolph buying stock the following May; did it?

16   A.        No, sir.

17   Q.        You hadn't even discussed that yet; had you?

18   A.        I wouldn't want to testify whether we had discussed

19   it.  I don't know whether we had or not.  I don't recall it.

20   Q.        Fair enough.  But, again, like you told me with the

21   last document, two separate transactions, correct?

22   A.        Yes, sir.

23   Q.        All right.  Now, sir, if I can approach for a second,

24   I will make it a little easier for you.

25   A.        Yes.

172

1 Q.  Now what I am showing you, sir, is part of Exhibit

2 45. It is a loan payment history on that million five

3 transaction. It is behind tab 45 there.

4 A.  Yes.

5 Q.  Do you see what I am referring to? Generated by

6 American Real Estate; correct?

7 A.  Yes.

8 Q.  And is that the sort of loan payment history that I

9 think you have identified as Carol typically puts together on

10 your various loans by American Real Estate?

11 A.  Yes.

12 Q.  All right. And that evidences that that loan was

13 repaid in, what, October 31, I believe? Do you see the date

14 there?

15 A.  I am not sure whether it was repaid on the 26th of

16 October except for twenty-four thousand dollars, and then on

17 October 31st it –

18 Q.  Fair enough. So it appears it was either paid in

19 full on Halloween, October 31st, or partly on the 26th and then

20 on Halloween; right?

21 A.  Yes.

22 Q.  Or approximately, what, two months after the loan

23 closed?

24 A.  Yes, sir.

25 Q.  All right. And how much were you repaid on that

1    million five loan?  What were the total payments on that?

2    A.        Well, as I look at this book, it looks like to me we

3    were repaid a million, six hundred and twenty thousand, four

4    hundred and ninety-six dollars and thirty-eight cents.

5    Q.        Okay.  Let's talk about that five point five million

6    dollar loan.  Who made the payments on that loan?

7    A.        Who made the payments?

8    Q.        Yes, sir.

9    A.        The Terrys.

10   Q.        Do you know was it the Terrys individually or was it

11   Terry Manufacturing?

12   A.        I don't know.

13   Q.        Well, let me ask it a different way.  Was that loan

14   being paid timely until Terry Manufacturing went into

15   bankruptcy?

16   A.        Very timely, yes.

17   Q.        Okay.  And I take it you don't know because you

18   didn't care as long as you got the payment; correct?

19   A.        Well, I didn't look at the checks to see who they

20   came in, you know.  Carol would call me sometimes and say the

21   Terry check came today or the Terry check is a day early, and

22   they were, in all of our dealings with them over nearly a ten-

23   year span, they were extremely prompt and seemed to look after

24   their business.  And I would look at their audited statements

25   and say how do they do it.  They just keeping making money and

174

1     making money and 9-11 comes along and it kind of kicked our

2     feet out from under us, and their CPA audited statements keep

3     coming in and they keep making more money and sales are going

4     up.

5             Jack Perkinson, who is deceased now, was the president

6     of Perky but had been in the cap business for forty years,

7     would tell me that when you get to doing forty million dollars

8     worth of garments a year that you are a major player in the

9     United States, that very few of them ever get to that size.

10    Q.        Just so I am clear, though, in response to my

11    question, that five point five million dollar loan was being

12    paid and was being paid timely, month-in, month-out, and you

13    are not sure by whom but somebody was sending you those checks;

14    correct?

15    A.        Yes.

16    Q.        All right.  Now what about the note Ms. Cotina Terry

17    gave, who was paying on that note?

18    A.        The payments were made monthly.  I don't know that I

19    ever looked at a check to see who the check came from.

20    Q.        Do you know who was paying on the Allie Robinson

21    note?

22    A.        No, sir.

23    Q.        All right.  Isn't it a fact as long as you got your

24    payment, you didn't care; did you?

25    A.        Well, to be honest, I don't guess I did.  If they

175

1    could get somebody else to make their payment, that was good

2    for me.

3    Q.        Fair enough.  So as I understand where we are, as of

4    – let's say as of November 2001 you have made a – or American

5    Real Estate – strike that – American Real Estate has made a

6    five point five million dollar loan that is being paid timely;

7    right?

8    A.        Yes, sir.

9    Q.        You had American Real Estate make a loan of one point

10   five million dollars that has been repaid in full, and you have

11   got these two notes from the Terry women that were being paid

12   month-in and month-out to you and Mr. Reynolds personally?

13   A.        Yes.

14   Q.        And those are all four, separate transactions;

15   correct?

16   A.        Yes.

17   Q.        Okay.  Now let's go forward to May of 2002 when you

18   negotiate the sale of the stock to Roy and Rudolph Terry.  The

19   first thing I would like to ask you to look at, sir, is – can

20   I get you to look in that binder behind tab twenty-two, sir?

21   A.        Yes.

22   Q.        All right.  And that is an agreement, sir, would you

23   not accept, by which American Real Estate is going to try and

24   help Perky Cap get a one point five million dollar loan?

25   A.        Yes.

176

1     Q.      All right.  Assist in the financing for Perky Cap.

2    Was that agreement prepared by your attorneys?

3     A.      I feel certain that it was.  You know, I couldn't

4    tell you that I positively knew or I know that he did it.

5     Q.      Now, sir, you can obviously take your time to read

6    the agreement.  It is only a page and a half long.  Would you

7    agree with me, sir, that that agreement doesn't in any way

8    condition American Real Estate assisting in procuring that loan

9    upon Roy and Rudolph Terry buying additional stock from you and

10   Mr. Reynolds; correct?

11        (Pause)

12   A.      It doesn't say it is conditioned upon it.

13   Q.      In fact, it doesn't even mention that stock

14   transaction; does it?

15   A.      No, sir.

16   Q.      Okay.

17   A.      But the Peoples Bank wouldn't have considered making

18   the loan if the Terrys hadn't been able to put up the land and

19   the building, the equipment and the inventory of Perky Cap.

20        MR. BARRIERE: Your Honor, I appreciate it but I am

21   going to move to strike.  I don't know how this witness is

22   competent to testify with respect to the mental process of

23   Peoples Bank.

24        THE COURT: All right.

25        THE WITNESS: Well, I was supposed to help negotiate –

1          THE COURT: Let's just do this.  I mean, I agree he

2     doesn't know those things but let's move on.  This is getting

3     kind of far afield again.

4          MR. BARRIERE: Fair enough, Your Honor.  And I will try

5     and be brief because I know the day grows late.

6     BY MR. BARRIERE:

7     Q.        Sir, am I correct, Terry Manufacturing started buying

8     caps from Perky Cap back in, oh, 1990 or so; isn't that

9     correct?

10    A.        I think they started right after Perky was started in

11    1987, in the late eighties, and continued to be either their

12    largest customer or their second largest customer before they

13    approached us on buying a third of the stock of Perky.

14    Q.        Okay.  So you are telling me Terry Manufacturing was

15    actually the largest or the second largest customer before even

16    that initial stock acquisition in 1994; is that correct?

17    A.        That is correct, yes.

18    Q.        Okay.  And I take it Terry Manufacturing remained a

19    customer of Perky Cap after that initial stock transaction?

20    A.        Yes, sir.

21    Q.        All right.  You saw earlier today in the court Mr.

22    Alexander's schematic showing a decline in the amount of caps

23    that Terry Manufacturing was buying after 1994.  Is that

24    consistent with your recollection?

25    A.        I spoke with the Terrys a couple of times about their

178

1    lack of additional business for Perky, that we though they were

2    going to stimulate Perky.  During that time, the cap business

3    in the United States was just devastated by imports, and there

4    were twenty-seven cap companies in Georgia and Perky was one of

5    two that survived and then Perky filed for bankruptcy after Mr.

6    Perkinson's death.   So to my knowledge there is just one

7    company making caps in Georgia.   The import business has

8    devastated the manufacturing of apparel in this country.

9    Q.        Sir, let me ask you, if you would, to turn to the

10   exhibit behind tab thirty-one.   It is an invoice by Terry

11   Manufacturing to Wholesale Distributors, dated July 26, 2002.

12   A.        Yes, sir.

13   Q.        Do you have that before you?

14   A.        Yes.

15   Q.        All right.  Did Wholesale Distributors actually take

16   delivery of any product from Terry Manufacturing?

17   A.        They bought it.

18   Q.        Can you describe the transaction for us?

19   A.        Yes.  The Terrys approached us that they had a big

20   contract with the Department of Defense to make combat uniforms

21   for Iraq, and the United States had not decided to go into Iraq

22   but, as Rudolph Terry told me, he said, "They are going because

23   we made these uniforms, but we can't get our money on the

24   uniforms until we ship them, and it is putting us in a terrible

25   strain."  And they were going through the process of untangling

179

1    their involvement with Cintas and were working on a deal with

2    Riverside to sell them forty-eight percent of Terry Uniforms,

3    and they said, "The two have just got us strapped.  Would you

4    consider buying some of this inventory until we get to ship it

5    and then we are just going to be flush with money."

6          So I had the utmost regard, and I know that I was on

7    the outside of the facade that Mr. Alexander relates to because

8    I thought they were just as straight and honest as they could

9    be.  So I told them that, yes, we would do it but, rather than

10   them shipping this stuff to Eatonton to Wholesale Distributors

11   and then shipping it out from there and experiencing the double

12   cost of freight, that if they would separate two times the

13   amount of inventory that we were going to pay for, that they

14   would put it there and separate it for Wholesale Distributors,

15   that we would do it.  They thought that they would have it

16   cleared up in thirty, sixty, ninety days and they still hadn't

17   shipped and still hadn't shipped and still hadn't shipped, and

18   we redid it several times.  But the intent was, and I really

19   wonder what happened to my uniforms and, if I can find out

20   where they are, I am going to try to retrieve them.

21   Q.       Sir, let me ask you, I am looking at Exhibit 31, 32,

22   33, 34, all the way back through 36.  These are all invoices.

23   I have totaled them.  You are welcome to do the same.  The face

24   amount is two million, five hundred thousand dollars.

25   A.       Yes.

180

1    Q.     So as I understand your testimony, that would have

2    come out to five million dollars worth of uniforms bought –

3    A.     Yes.  They claim they had twelve million dollars

4    worth.

5    Q.     Let me make sure I understand.  How many uniforms

6    amount to five million dollars?

7    A.     Mr. Perkinson could tell you.  I couldn't.  I don't

8    know but he was our man that was in charge of Perky and was the

9    garment guru of our operation.  And they said, you know, we

10    don't mind giving you twice as many, we will separate twice as

11    many uniforms.  So if something happened, surely we could sell

12    them for fifty to sixty cents on the dollar.

13    Q.     All right.  So you don't know how many uniforms we

14    are talking about.  Did anyone on your behalf go and inspect

15    these uniforms?

16    A.     Yes.

17    Q.     Who?

18    A.     Mr. Perkinson.

19    Q.     When?

20    A.     On several occasions.

21    Q.     Do you have any idea when that occurred?

22    A.     No, sir.

23    Q.     Mr. Perkinson is dead now, of course; is he not?

24    A.     Yes, sir.  He died of cancer.

25    Q.     Is there anybody who is still alive who inspected

181

1    these on your behalf?

2    A.        We did not send anybody other than Mr. Perky.

3    Q.        All right.  Did you put insurance on these uniforms?

4    A.        They were covered under the Terry policy.

5    Q.        Okay.  So just so I am clear, you totally had title

6    to these, but you didn't arrange for insurance on them; right?

7    A.        We do that at Wholesale Distributors.  A lot of

8    manufacturers put their supplies in our warehouse and then we

9    ship them out for them.

10   Q.        Okay.  So do you have any written reports you ever

11   received from Mr. Perkinson on the number of uniforms involved

12   here?

13   A.        No, sir.

14   Q.        Do you have a picture of any of those uniforms?

15   A.        No, sir.

16   Q.        All right.  How was Mr. Perkinson employed by

17   Wholesale Distributors?

18   A.        He wasn't.  He worked for Perky Cap.  He was the

19   president of Perky Cap Company and we were doing something to

20   facilitate the Terrys, who Mr. Perkinson thought was – and had

21   dealt with them for years, fifteen or twenty years, and he sold

22   them before he even came to – before he started Perky Cap.

23   Q.        All right.  Now Exhibit 37 is an invoice from

24   Wholesale Distributors back to Terry Manufacturing.  Do you see

25   that?

182

1    A.        Yes.

2    Q.        Okay.    What product did Wholesale Distributors

3    deliver to Terry Manufacturing as evidenced by that?

4    A.        We sold them our inventory that was in their plant

5    back.  They paid us for the material or the uniforms.

6    Q.        All right.  And the only knowledge you can offer the

7    court of what was actually that inventory is what Mr. Perkinson

8    may have observed; is that correct?

9    A.        Sir?

10   Q.        I just want to make clear you personally never saw

11   this stuff; is that right?

12   A.        No, sir.  I have never been to Roanoke to look at

13   Terry's operation.

14   Q.        And you never received an inventory from the Terrys

15   of what they were supposedly selling to you; right?

16   A.        Sir?

17   Q.        You never received an inventory, any detail of what

18   was being purchased by Wholesale Distributors; correct?

19   A.        Other than they was setting aside twice as much in

20   uniforms as we were buying from them.  So that if anything

21   should happen and if the government for some reason did not

22   take delivery of the uniforms, that, you know, they had agreed

23   to but, as to whether they did or didn't was still problematic.

24           THE COURT: Wait a minute.  I am losing the time frame

25   here.  Were those uniforms still supposed to have been at least

183

1    in your mind set aside as of the date of the petition or is it

2    later – now, the bankruptcy petition here was filed –

3              MR. BARRIERE: July 7, '03.

4              THE COURT: July of '03.

5              THE WITNESS: We thought our uniforms were in the

6    building and, of course, we were as shocked as – Mr. Alexander

7    said that there were people on the outside of the facade and,

8    when the Terry's wrote that they had overstated their inventory

9    and overstated their accounts receivable by tremendous numbers,

10   and the lady who was the inspector with the U.S. Department of

11   Agriculture said she was there within thirty days of the filing

12   for bankruptcy and the uniforms were there and she counted

13   them.  Now, I don't know whether she counted empty boxes or

14   whether she counted full boxes, but she said she counted them.

15             THE COURT: Okay.  But the deal was you actually – I

16   mean, your understanding is you were actually buying five

17   million dollars worth of uniforms.  Ten or twelve million were

18   supposedly supposed to be set aside to secure this, but then

19   they were going to buy them back from you at –

20             THE WITNESS: Well, at the time that they shipped, that

21   they would pay us back.

22             THE COURT: In other words, you weren't going to be the

23   seller to the government?

24             THE WITNESS: No, sir.  No, sir.

25             THE COURT: Okay.

184

1    BY MR. BARRIERE:

2    Q.        I am a little confused, sir.  You are aware of UCC

3    security devices; aren't you?

4    A.        Oh, yes.

5    Q.        You have given those on probably collateral that one

6    of your companies owned.  Why not simply put a UCC encumbrance

7    on these uniforms rather than going through these purported

8    sales?

9    A.        You know, in hindsight, I really wish I had done

10   that, but I didn't.

11   Q.        Now just so I am clear, sir, I take it not only did

12   you never see these uniforms prior to the Chapter 11 petition,

13   neither you nor anyone on your behalf saw them after the

14   Chapter 11 petition; right?

15   A.        That's correct.  You don't know where they are; do

16   you?

17   Q.        You will be the first I call, I promise.

18   A.        I appreciate it.

19   Q.        And all of these invoices going to Wholesale

20   Distributors  for  what  is  described  for  miscellaneous

21   merchandise, all of these represent resales of inventory you

22   thought you were buying from Terry Manufacturing; is that your

23   testimony?

24   A.        That's correct, and we came up about two million

25   dollars short.

185

1    Q.        And just so the record is clear, all of these sales

2    back and forth of inventory that may or may not have existed,

3    none of that had anything to do with you selling your stock in

4    Perky Cap to the Terry ladies or Roy and Rudolph Terry; right?

5    A.        That's correct.

6              MR. BARRIERE: If you will let me have a moment, Your

7    Honor, I may be close to done.

8              (Pause)

9    BY MR. BARRIERE:

10   Q.        Just a couple of final questions, sir.  As I

11   appreciate it, the one person you sent out to look at this

12   inventory was Jack Perkinson and he was at that time employed

13   just by Perky Cap Company?

14   A.        He was the president of Perky Cap Company, yes, sir.

15   Q.        Okay.  And how was it you got Mr. Perkinson to go do

16   this inspection when you were no longer a shareholder of Perky

17   Cap?

18   A.        Friendship is next to godliness.

19             MR. BARRIERE: I am going to pass the witness, Your

20   Honor.

21             THE COURT: All right.  Thank you.  Mr. Brazeal.

22             MR. BRAZEAL: Thank you, Your Honor.

23                         CROSS EXAMINATION

24   BY MR. BRAZEAL:

25   Q.        Mr. Horton, Mr. Barriere went to some lengths to get

186

1    you to say that the loaning of the five point five million

2    dollars was not conditioned upon the purchase of the stock by

3    the two Terry women.  That went on for a while; did it not?

4    A.       Yes.

5    Q.       At one point during his examination you indicated

6    that had the Terrys not gone forward with the stock purchase,

7    that you would have had some qualms about their overall

8    business plan; is that correct?

9    A.       Well, I would have questioned what their business

10   plan was in that their purpose in buying the twenty percent of

11   the stock was so Perky could go to a minority-owned firm and it

12   would increase the sales.  And I looked at it thinking I

13   believe my thirty something percent might make me more money

14   with them selling government contracts and Coca-Cola and Delta

15   and several other people that they named.  And they did sell

16   Coca-Cola a hundred thousand caps after that in one order.

17   Q.       All right, sir.  Well, my question for you, Mr.

18   Horton, is both of these transactions closed on the same date,

19   the stock purchases and the five point five million dollar

20   loan.  Suppose the Terrys had showed up or apprised you prior

21   to November 10 of 2000 that they still wanted the five point

22   five million dollars which you had been discussing but that

23   they told you that they no longer wanted to purchase the stock

24   in Perky Cap?

25   A.       I would have decided that they didn't have a plan,

187

1    that they were just there to get my five and a half million

2    dollars and wouldn't have gone forward.

3    Q.       Well, why was there never any discussion of it being

4    conditioned one upon the other?

5    A.       Well, I never had any qualms or doubts that their

6    business plan was to make Perky a minority firm, which made

7    sense.  That Perky being a minority firm would help on the

8    Terry Promotional Products side because they could reach more

9    people there.  They really thought and, based on their

10   projections, that Terry Promotional Products would be bigger

11   than Terry Manufacturing.

12   Q.       And is it true that when you had the discussions with

13   Mr. Terry concerning both the stock purchase and the five point

14   five million dollar loan that you never had any reason to doubt

15   that he was going to go forward with either one of them?

16   A.       No reason to question it.  They had always done for

17   nearly ten years everything they said they would do exactly as

18   they said they would, and I had no reason to question it.

19   Q.       All right, sir.  How many prior loans had you made to

20   American Real – I am sorry.  How many loans had you or American

21   Real Estate made to the Terrys individually or to the company

22   prior to the November 10, 2000, loan, the five point five

23   million dollar loan?

24   A.       I don't have the exact number but it was more than a

25   few.  It was a good many loans and they had always repaid and

188

1    been very prompt in their payment.

2    Q.        All right, sir.  Mr. Horton, would you say that it

3    wasn't conditioned, that is, the five point five million on the

4    stock sale, just because – I mean, that issue never came up in

5    any conversations with Mr. Terry; did it?

6    A.        No, sir, it never came up, and I had no reason to

7    question or to insert verbiage that it was conditioned one upon

8    the other.

9    Q.        All right, sir.  And since both transactions occurred

10   on the same day, just to make sure the record is clear, if Mr.

11   Terry had shown up or had apprised you that he was no longer

12   going to go forward with the stock purchase, would you have

13   made the five point five million dollar loan?

14   A.        I don't think I would have because he would not be

15   carrying out his plan as he outlined it to me and that he would

16   just – I don't think I would have.

17   Q.        Now the one point five million dollar note from

18   August of 2001, Mr. Alexander went through some calculations

19   and came up with a large interest rate that he said is many

20   times junk bond rate.  Could you explain to us, Mr. Horton, the

21   purpose for the hundred thousand dollar fee that was paid in

22   connection with that note?

23   A.        As I recall it, they had an opportunity to buy a big

24   buy of cloth at a real bargain price, they told me, and that

25   they would have the money to do it but that they had to do it

189

1    now or lose the opportunity to do it, and that if we would do

2    it, that they would pay us a hundred thousand dollars of profit

3    sharing, along with the nine and a half percent interest rate

4    or whatever it was.

5    Q.        All right, sir.  And, Mr. Horton, if we fast forward

6    to the Peoples Bank loan, which was the one point five million

7    dollar loan from Peoples Bank to Perky Cap, which occurred on

8    or about May 30 of 2002?

9    A.        Yes.

10   Q.        Were you instrumental in obtaining that loan from the

11   bank?

12   A.        Well, I went and talked to Chuck Haley who is the

13   president of the bank and told him that the Terrys had bought

14   thirty percent of Perky from us back in '94 and they had bought

15   another twenty percent several years later and that they wanted

16   to buy the rest of our stock, that Mr. Perkinson wanted to keep

17   his sixteen percent and that Jamie and I were going to sell

18   them the rest of our stock, and they wanted to put up the Perky

19   Cap building and land and borrow a million and a half dollars,

20   and I carried the audited financial statement for Terry

21   Manufacturing with him and he looked at that and I said they

22   are willing for Terry to guarantee the loan and Rudolph Terry

23   to personally guarantee it and Roy Terry to personally

24   guarantee it.  They are going to take this million and a half

25   dollars and put it into Terry Manufacturing until they can ship

190

1      these uniforms to Iraq and they can close this deal with

2      Riverside Manufacturing on the sale of forty-eight percent of

3      the Terry Uniforms to Riverside.

4              Riverside said they were willing to buy a minority

5      position in it in order for Terry Uniforms to be a minority

6      firm, and they thought they could make more money with forty-

7      eight percent of the income from them than they could a hundred

8      percent if they did it on their own.  And both of those deals

9      were supposed to close fairly soon, and Mr. Haley asked me, he

10     said how long –

11             MR. BARRIERE: Excuse me, Your Honor.  I think we are

12     about to get into just rank hearsay.

13             THE COURT: Sustained.

14     BY MR. BRAZEAL:

15     Q.      Mr. Horton, insofar as the one point five million

16     dollars from Peoples Bank, was it your understanding that that

17     money was going to be put into Terry Manufacturing?

18     A.      Absolutely, and the statement that they are reading

19     from this loan agreement that the million dollars would be paid

20     off at the Farmers and Merchants Bank within ninety days was

21     from the close of the Riverside deal or either the shipment of

22     the uniforms to Iraq.  It was never intended to be paid out of

23     the proceeds of the million and a half dollars.  And they keep

24     bringing up that –

25             MR. BARRIERE: I object, Your Honor.  It is completely

191

1    non-responsive.

2            THE COURT: Sustained.

3    Q.        Mr. Horton, did you have any conversations with

4    either Roy Terry or Rudolph Terry about obtaining this money

5    that was eventually obtained from Peoples Bank from SouthTrust

6    Bank?

7    A.        No, sir.

8    Q.        Did you ever have any discussions with them about –

9    well – (pause).  Now, as part of the Peoples Bank loan, were

10   you required to essentially guarantee that loan, you,

11   individually?

12   A.        I told Mr. Haley I would not guarantee it but that I

13   would buy it back if they defaulted on it, that whatever the

14   unpaid balance was, that I would pay it off, and they were to

15   pay five hundred thousand dollars in some ninety days and then

16   it would be amortized on a ten-year basis.

17   Q.        All right, sir.  Mr. Horton, this transaction that

18   has been contested by Mr. Alexander as to whether it actually

19   occurred, that is, the sale of the stock at the end of May of

20   2002, did that transaction take place?

21   A.        Yes, sir, it took place and I don't know why he

22   hasn't, in these thousands of hours he spent, he hasn't looked

23   –

24            MR. BARRIERE: Objection, Your Honor.

25   Q.        That's fine, Mr. Horton.

192

1    A.       – in the stock book.

2            THE COURT: Sustained.

3    Q.       Mr. Horton, my question for you is after May 30 of

4    2002, when you sold your – when you and Mr. Reynolds sold your

5    remaining stock in the company, did either one of you continue

6    to act in any way on behalf of Perky Cap?

7    A.       No, sir.

8    Q.       All right, sir.  So you didn't have any further

9    involvement with Perky Cap after May 30 of 2002?

10    A.       No, sir.

11    Q.       All right, sir.  And that is because you believed

12    that you had sold all of your stock?

13    A.       I had sold all of my stock in it.

14    Q.       All right, sir.  And insofar as your K-1 to your 2002

15    tax return, which reflects at the end of 2002 that there was

16    still some ownership by yourself in the Perky Cap Company, do

17    you have any recollection of reviewing that K-1?

18    A.       No, sir.  And, you know, I –

19            THE COURT: Okay.  He asked you if you recalled seeing

20    it and your answer is no.  Thank you.

21    Q.       Did you ever have any discussions with Mr. Giddens

22    about the May 30, 2002, stock transaction?

23    A.       At any time?

24    Q.       At any time.

25    A.       Well, we discussed it, you know –

193

1 Q.  Subsequently?

2 A.  Subsequently.

3 Q.  Did you have any discussion with Mr. Giddens about

4 the May 30, 2002, stock sale prior to the preparation or during

5 the preparation of your tax return for that year?

6 A.  I don't recall but, if I did, apparently he didn't

7 pick up on it and didn't record it.

8 Q.  All right, sir.  Now the transaction where the one

9 point five million dollars was obtained from Peoples Bank

10 occurred on or about May 30 of 2002?

11 A.  Yes.

12 Q.  As did the stock purchase by the Terrys of the

13 balance of your and Mr. Reynolds' stock in Perky Cap, the same

14 day; is that right?

15 A.  Yes.

16 Q.  All right, sir.  Had the Terrys reneged on their

17 obligation and, I take it – well, let me just ask you about

18 that, Mr. Horton.  What conversations did you have with them

19 about the sale of the remaining stock in the company?  That is,

20 either Roy or Rudolph.

21 A.  I couldn't recall the specific conversations that we

22 had.

23 Q.  All right.  Well, did they initiate this purchase of

24 your remaining shares, or did you initiate it?

25 A.  No, sir.  They asked me about buying the rest of it

194

1    and then mortgaging the assets of Perky, the land and building

2    and equipment, and I said, "Well, if Mr. Perkinson doesn't have

3    an objection to it and you buy us out, I don't care if you

4    borrow money on it because I won't own any of it."

5    Q.       All right, sir.  And, in fact, had you remained a

6    member of Perky Cap and not sold your stock at that point in

7    time, would you have arranged for the Peoples Bank loan?

8    A.       No, sir.

9             MR. BARRIERE: Judge, we have gone down this path

10    before, Your Honor, and I have kept my mouth shut.  This is

11    just complete speculation.  The witness has testified he did

12    sell and now the question is if you hadn't sold, what would you

13    have done.  It is not probative evidence and I ask that it be

14    excluded.

15             THE COURT: Sustained.

16             MR. BRAZEAL: Your Honor, we haven't been down this

17    particular path, with all due respect.

18             THE COURT: Sustained.

19             MR. BRAZEAL: Thank you, Your Honor.

20             THE COURT: Sustained.

21             MR. BRAZEAL: Yes.  Thank you, Your Honor.

22             THE COURT: All right.  We have gone quite a ways

23    afield and I kind of let everybody do it, okay.  It is twenty

24    until five.  We are going to go for twenty minutes.  I feel

25    certain we won't finish the trial but, from here on end, we are

195

1    going to rein in much tighter.  We have got a fraudulent

2    conveyance case.  I expect the evidence to relate somehow to

3    the issues that have been pled, you know, in the complaint and

4    the answer and, if I don't see it real quick, we are going to

5    move on, and I am certainly not above asking the lawyer to sit

6    down and the witness to stand down if I don't see it.  So we

7    are going to go from here.

8          And when I make an evidentiary ruling, that is it.  It

9    is no longer subject to argument.  Now if you don't like it,

10   you can take it up on appeal, but we are going to move on and

11   we are not going to argue evidence forever.

12         So with that, you get twenty minutes and then we are

13   going to call it a day and then I do intend to finish this

14   tomorrow.

15         MR. BRAZEAL: Thank you, Your Honor.  Your Honor, I

16   apologize if I appeared to be contesting your –

17         THE COURT: No apology.  Just move on.

18   BY MR. BRAZEAL:

19   Q.      Mr. Horton, how was American Real Estate capitalized

20   and, to be more specific, insofar as the loan that was made

21   from American Real Estate to Perky Cap – I am sorry – from

22   American Real Estate to the Terrys, the five point five million

23   dollar loan, where did American Real Estate obtain the five

24   point five million dollars?

25   A.      From their operating funds and from various – they

196

1    may have borrowed some of it from me personally and they may

2    have borrowed some of it from RJ&J Enterprises, Inc.

3            MR. BRAZEAL: Judge, I don't believe I have anything

4    more for Mr. Horton as far as the cross of his direct.

5            THE COURT: All right.  Redirect.

6            MR. BARRIERE: Very briefly, Your Honor.

7                         REDIRECT EXAMINATION

8    BY MR. BARRIERE:

9    Q.        Mr. Horton, I forgot to ask you, am I correct, sir,

10   is David Giddens your personal accountant?

11   A.        Yes.

12   Q.        He also acted obviously as the accountant for Perky

13   Cap Company?

14   A.        Yes, sir.

15   Q.        And he acts as the accountant for a number of your

16   companies; is that correct?

17   A.        That's correct.

18           MR. BARRIERE: Thank you, Your Honor.  Nothing further

19   from this witness.

20           THE COURT: Okay.  Thank you, sir.  You may step down.

21   Mr. Barriere, we have got about fifteen minutes.

22           MR. BARRIERE: I can be done in three.  Ms. Lasky is

23   going to introduce a number of depositions which we can do, I

24   suppose, with you on or off the bench.  Beyond that, sir, we

25   are going to be resting.

197

1         THE COURT: Okay.

2         MR. BARRIERE: I would simply re-urge, given that this

3    witness has now testified unambiguously that there was no

4    connection between these other loans and the three transactions

5    that bring us here today, I would re-urge my motion to exclude

6    the testimony on that, which I believe may permit us to finish

7    this trial today.

8         THE COURT: Okay.  Well, we would finish your part of

9    the trial today.

10        MR. BARRIERE: Fair enough.

11        THE COURT: Okay.  So what's with the depositions now?

12        MR. BARRIERE: We have multiple depositions we need to

13   enter into the record.  We have designations and I will simply

14   have Ms. Lasky identify those specific depositions to be

15   entered into the record on the record.

16        THE COURT: Okay.  Well, let's go ahead and let's do

17   that now.

18        MS. LASKY: The first is Plaintiff's Exhibit 55.  It is

19   a deposition of Mr. Horton, taken on February 8, 2006.

20        THE COURT: Okay.  Are you offering the whole thing?

21        MS. LASKY: Yes.  That is the whole transcript.

22        MR. BARRIERE: But you have designations, don't you,

23   specific designations?

24        MS. LASKY: I don't think we do for Mr. Horton.

25        MR. BRAZEAL: For Mr. Horton?

198

1          MS. LASKY: Yes.

2          MR. BRAZEAL: What would be the purpose for that?

3          MS. LASKY: Well, pursuant to Federal Rule 32, you can

4     designate depositions of a party for any purpose and this is so

5     that the court has a complete record of Mr. Horton's testimony

6     prior in this case.

7          MR. BRAZEAL: That's fine.  I thought we were just

8     trying to present it all to the judge and present any – well,

9     that's fine.

10          THE COURT: Let me see what it is.  I mean, we had Mr.

11     Horton testify.  Why do we need his deposition?

12          MR. BARRIERE: I don't know that you do.  I would

13     withdraw that one.

14          MS. LASKY: Okay.  So 55 will be the deposition of

15     David Giddens who was the accountant for Mr. Horton and that

16     has been designated.  The designations are attached.

17          THE COURT: Okay.  So is there any objection to the

18     deposition of David Giddens?

19          MR. BRAZEAL: None, Your Honor.

20          THE COURT: Okay.  So 55, the Giddens deposition, is

21     admitted.

22          MS. LASKY: And the next set of depositions are

23     collectively appraisers' depositions and these are relevant

24     based on the solvency issue that Mr. Brazeal –

25          THE COURT: Okay.  So those are appraisals of Terry

199

1    Manufacturing assets and it supports your contention that Terry

2    would have been insolvent as of December 31, 1999?

3         MR. LASKY: It supports that and it also – yes, it

4    does, and it would also rebut any presumption or any evidence

5    that Terry Manufacturing was solvent during that time.

6         THE COURT: Okay.  Well, I mean, they haven't done

7    their case in chief, so all it is, is just your contention.

8    Okay.  Mr. Brazeal, any objection to the appraisals?

9         MR. BRAZEAL: No objection.

10         THE COURT: Okay.  Those are admitted.

11         MS. LASKY: 56 is Richard Dobbins and that has been

12    designated.  57 is David Bowen.   58 is John Hall.

13         MR. BARRIERE: Your Honor, we have a housekeeping

14    question.  Mr. Lambert's deposition, we are going to introduce

15    if and only if Mr. Averett testifies with respect to solvency.

16    Would you prefer we withhold that for rebuttal purposes?

17         THE COURT: Yeah, why don't you save that for rebuttal.

18    That would make that easier.

19         MR. BARRIERE: Fair enough.

20         MS. LASKY: Do you want to save Mr. Henderson, as well?

21         MR. BARRIERE: I would go ahead and –

22         MS. LASKY: We referenced that today.  So now I am on

23    59, James Henderson.

24         THE COURT: Okay.  And who is he?

25         MS. LASKY: He was – well, his letterhead was used for

200

1    appraisals of equipment, and Mr. Alexander testified –

2            THE COURT: He is an appraiser?

3            MS. LASKY: Yes, he is an appraiser,

4            THE COURT: All right.  Any objection to 59?

5            MR. BRAZEAL: No, Your Honor.

6            THE COURT: Thank you.  It is admitted.

7            MS. LASKY: The next group are the creditor depositions

8    and these all evidence that these were creditors of Terry

9    Manufacturing as of November 10, 2000, the date of the first

10   transaction at issue in this case.

11           MR. BARRIERE: Your Honor, I guess a question for the

12   court.  We have a – these are being introduced solely for the

13   standing issue.

14           MS. LASKY: It is part of the stipulation.

15           MR. BARRIERE: If it is already covered by the

16   stipulation, I wonder if the court would prefer not to be

17   burdened by the additional deposition transcripts.  I am

18   referring specifically to stipulation fourteen which states,

19   and I quote:

20               "A number of entities were unsecured creditors of

21               Terry Manufacturing prior to November 10, 2000, the

22               date on which Cotina Terry and Allie Robinson deliver

23               their respective promissory notes to Messrs. Horton

24               and Reynolds and remain unsecured creditors of Terry

25               Manufacturing as of the date Terry Manufacturing filed

201

1          for relief under Chapter 11 of the Bankruptcy Code."

2          THE COURT: Okay.  I see where you are going.

3          MR. BARRIERE: "These unsecured creditors include," and

4     then a laundry list.  We have those depositions.  I am not

5     asking for advice on how to run my case but, quite frankly, if

6     the court is satisfied with the stipulation on this topic, I

7     will  not  burden  the  record  with  what  are  another  ten

8     depositions, I believe.

9          THE  COURT:  I  appreciate  that.   No,  I  think  the

10     stipulation is sufficient on that.  Thank you.

11          MR. BARRIERE: Thank you, Your Honor.  And I believe

12     with that, Your Honor, the plaintiff rests.

13          THE COURT: Okay.  We are going to call it a day.  We

14     will  start  back  at  nine  o'clock  tomorrow  morning  with  Mr.

15     Brazeal as your case in chief.

16          Good evening.

17          (Off the record at 4:59 p.m.)

202

C E R T I F I C A T E

        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.


        _____


        Patricia Basham, Transcriber
        Date:  April 17, 2006

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| TERRY MANUFACTURING COMPANY, | ) |
| INC., | ) |
| Debtor | ) Case No. 03-32063 |
| | |
| J. LESTER ALEXANDER, III | ) |
| Trustee for Terry Manufacturing | ) |
| Co., Inc. and Terry Uniform | ) |
| Co., LLC | ) |
| | ) |
| vs. | ) Adv. No. 05-03042 |
| | ) |
| N. D. HORTON, JR., ET AL. | ) |
| | Montgomery, AL |
| | March 29, 2006, 9:21 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

Vol. II - Pages 203 to 268

APPEARANCES:

Brent B. Barriere
Catherine E. Lasky
Phelps Dunbar, LP
365 Canal St., Suite 2000
One Canal Place
New Orleans, LA 70130

C. Ellis Brazeal, III
Walston, Wells
 & Birchall LLP
1819 Fifth Ave. N, #1100
Birmingham, AL 35203

Electronic Recorder
Operator:                          Linda Bodden

Transcriber:                       Patricia Basham
                                   6411 Quail Ridge Drive
                                   Bartlett, TN  38135
                                   9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

204

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jesse Slaton | 221 | 236 | -- | -- |

205

```
1            (CALL TO ORDER)

2            THE COURT: Please be seated.

3            MR. BARRIERE: Good morning, Judge.

4            THE COURT: Good morning.  Let's see.  My recollection

5      is the plaintiff rested yesterday afternoon.  So, Mr. Brazeal,

6      you are up.

7            MR. BRAZEAL: Thank you, Your Honor.  Judge, I believe

8      that we will have a fairly short day which I think is probably

9      in all of our interest.

10           First just a few housekeeping matters, Your Honor.

11     Yesterday there was an Exhibit 57 which constituted the Peoples

12     Bank loan documents and Mr. Barriere has stipulated to those

13     coming in.

14           MR. BARRIERE: That's correct, Your Honor.

15           THE COURT: Okay.  My recollection was we admitted

16     Exhibits 1 to 56 yesterday; is that correct?

17           MR. BRAZEAL: That's correct, Your Honor.

18           THE COURT: Okay.  So now we are saying 57 comes in?

19           MR. BRAZEAL: Yes, Your Honor, and then I have three

20     additional exhibits which are not contained on the disk which

21     are Exhibits 74, 75 and 76.  Exhibit 74 is a document, funds

22     received  personally,  which  Mr.  Alexander  has  indicated

23     constitute preliminary work as to funds that were received from

24     various entities such as American Real Estate and others.  And

25     what I have done since yesterday is added the backup to it or
```

206

1       the detail.

2                 THE COURT: Is that the one he said was wrong, though?

3                 MR. BRAZEAL: Well, I will get to that Judge.  I will

4       try to get to that.  Yeah, what he said was, I think, they were

5       preliminary numbers.  And what I did last night, Your Honor, is

6       I went back and I got the detail that goes along with it.  And

7       if you compare the detail of Exhibit 74 to Exhibit 76, in

8       exhibit 76 are payment histories on three of the American Real

9       Estate notes.  You know, they match up.  And Mr. Barriere is

10      stipulating to 76 coming in, not that it is correct but that

11      this is what my client has produced.

12                Mr. Alexander is not here this morning and that is why

13      Mr. Barriere has agreed to stipulate to those documents.

14                THE COURT: Okay.  So 74 and 76 come in or just 76?

15                MR. BRAZEAL: 74, 76 and also 75, Your Honor, which is

16      the backup to the document that says funds used personally.

17      Have I stated anything wrong?

18                MR. BARRIERE: Your Honor, I want to make the record

19      clear.  I am not objecting to the admission of these documents.

20      I have little trouble by the use of the term "stipulation."  As

21      I appreciate it from Mr. Alexander's testimony, the two

22      documents, 74 and 75, he identified as preliminary work papers

23      as to which he could not attest as to the accuracy or the

24      ultimate use.  So I am admitting them.  I am not stipulating it

25      for the accuracy and the like.

207

1    With respect to 76, we, again, do not object to its

2    admission.  This is a loan payment history that was produced by

3    American Real Estate.  We have no knowledge as to its accuracy.

4    THE COURT: Okay.  So we will admit 74, 75 and 76.

5    MR. BRAZEAL: Thank you, Your Honor.  The difference in

6    74 and 75 from yesterday is that they now have the backup.

7    THE COURT: Okay.

8    MR. BRAZEAL: Judge, the deposition of Roy Terry is on

9    your CD as Exhibit 73, and I would now offer the deposition of

10   Mr. Terry.

11   THE COURT: Okay.  And that is 73.  Mr. Barriere, any

12   objection to 73?

13   MR. BARRIERE: My only question, Your Honor, is it is

14   a rather lengthy deposition.  Are you seeking to admit the

15   entire or specific designations?

16   THE COURT: Well, this is forty pages.  Is that the

17   entire deposition or is that –

18   MR. BARRIERE: I think it is probably a hundred and

19   twenty pages.

20   MR. BRAZEAL: Your Honor, I have read that through, his

21   deposition –

22   THE COURT: Okay.  This is probably it.  The transcript

23   that I am looking at is pretty dense.

24   MR. BARRIERE: It is probably four pages to the page,

25   so I suspect it is a hundred and sixty pages.

208

1          MR. BRAZEAL: Well, I will tell you what, Judge, with

2     your permission, I have read that through and I thought most of

3     it was relevant.

4          THE COURT: We will just let it in.  I will look at it.

5     That is 73?

6          MR. BRAZEAL: Yes, Your Honor.

7          THE COURT: Okay.

8          MR. BRAZEAL: And then, Your Honor the two remaining

9     issues and potential witnesses are Mr. Slaton and Mr. Averett,

10    who are both here this morning, and it involves the deposition

11    testimony from Mr. Slaton concerning the tracing analysis of

12    the three loans and then Mr. Averett who provided some expert

13    testimony about insolvency.

14          As I understood Your Honor yesterday, you had grave

15    reservations, I guess, about the connection between the three

16    loans that we traced and the subject of this litigation, the

17    three stock purchase notes.

18          THE COURT: All right.  Well, here's the thing.  Every

19    once in awhile I pinch myself to remind myself that what we

20    have really got here is a five hundred and ninety-six thousand

21    dollar fraudulent conveyance case.

22          MR. BARRIERE: That's right.

23          THE COURT:  And you and Mr. Barriere filed right

24    before trial a fairly tight stipulation as to the mechanics of

25    how that took place and, you know, after reading the pleadings,

209

1    reading your stipulations and a few other things, I had sort of

2    a feeling that I thought maybe I knew what this case is about

3    and then there is all of this talk about all of this other

4    stuff that sounds to me like you're trying another case.  So I

5    was confused there.

6            You know, after listening to a day of testimony and

7    spending some time refreshing myself, I am very reluctant - I

8    mean, I will hear you out.  I am very reluctant to go down this

9    road of tracing all of this money.  I actually thanked in my

10   prayers one night Mr. Barriere and the lawyers for the three

11   banks when they managed to settle their case because I thought

12   I was going to have to spend a great deal of time tracing there

13   because it seemed to me that was central to that case.

14           You know, if I had my choice of a root canal and

15   looking at your tracing analysis, I think it is an easy call.

16           MR. BRAZEAL: Right.

17           THE COURT: I am not going to go there unless you can

18   show me why it is we need to because I still don't see any tie

19   at all between this tracing - or, maybe to put the question a

20   little bit differently, even if this evidence shows what you

21   think it shows, so what?  How does that impact this adversary

22   proceeding that we have got right here?  I mean, it may be

23   relevant, you know, in other context and other cases but how is

24   it relevant to this fraudulent conveyance case involving Mr.

25   Horton and Mr. Reynolds, and that is my question.

210

1      MR. BRAZEAL: And, Judge, I can understand from
2   reviewing the stipulation how you thought that the case had a
3   very narrow scope. But, you know, back in our response to the
4   summary judgment, there were a number of issues we raised and
5   the stipulations were not meant to be exclusive. Those were
6   just the ones that Mr. Barriere and I could agree upon.

7      THE COURT: Right. I understand that and I do remember
8   the summary judgment motion. I thought the nub of the issue
9   was – apparently there's really no dispute in the evidence or
10  among you that basically, you know, the Terry women got about
11  twenty percent of the stock and then at a later point in time
12  Roy and Rudolph Terry got some more Perky Cap stock.

13     MR. BRAZEAL: Yes, Your Honor.

14     THE COURT: And, in consideration, some notes were
15  signed and five hundred and ninety-six thousand dollars was
16  paid, half to Reynolds and half to Horton.

17     MR. BRAZEAL: That is correct.

18     THE COURT: So that is fairly focused. Then the
19  question is, okay, what did Terry Manufacturing get for this
20  five hundred and ninety-six thousand dollars. That is where I
21  thought that I couldn't say that there was simply no evidence
22  or no dispute, but now your standard is a lot different. It is
23  pretty easy to beat a summary judgment motion. All you have
24  got to do is show something. You know, before, Mr. Barriere
25  had to show there was no dispute at all in the evidence. Now,

211

1    instead of going a hundred percent of the way, he has only got

2    to go to fifty-one percent, preponderance.

3            MR. BRAZEAL: I understand.

4            THE COURT: Given that, how do you get there?  And like

5    I said, I am reluctant to wander through all of these

6    transactions which appear to me to be, you know, either

7    unrelated or just background unless you can make some showing.

8            MR. BRAZEAL: Judge, we believe that, when you look at

9    the totality of the transactions, that the debtor did receive

10   some value that it would not have received had the stock

11   purchases not occurred, and I will just try to make it brief,

12   Your Honor.

13           As to the first stock transaction at issue in this

14   case – there was a prior one back in the nineties, but the

15   first stock transaction that is at issue in this case was

16   November 10 of 2000, and that was the day that the Terry women

17   purchased twenty percent of the stock or a stock purchase note

18   – well, two of them, each in the amount of two hundred thousand

19   dollars.

20           On that same day, American Real Estate company, owned

21   by Mr. Horton which, according to Mr. Barriere under Louisiana

22   terminology, is juridically separate, but it is still a company

23   that Mr. Horton said that he controls and controlled alone,

24   loaned five point five million dollars to the Terry brothers

25   that day.

212

1          THE COURT: Let me stop you right here because I am

2     confused about something and maybe you can straighten me out

3     real quick.  There is this talk about a five point five million

4     dollar note or a five point five million dollar loan.  Do I

5     have a copy of it in here or somewhere?

6          MR. BRAZEAL: You do, Your Honor.  I believe it is

7     Exhibit 1.

8          THE COURT: All right.  Exhibit 1 of yours or Exhibit

9     of –

10         MR. BRAZEAL: Exhibit 1 of defendant's Your Honor, but

11    I will be glad to give you a hard copy.

12         THE COURT: No, I have got your exhibits right here.

13    Let me just get it up in front of me so that I can take a quick

14    look.  Yeah, here it is.  You're right.  It is five point five

15    million dollar promissory note and the payee is American Real

16    Estate and it is signed by Rudolph and Roy Terry.

17         Is this signed by them in their individual capacities

18    or as officers of –

19         MR. BRAZEAL: I believe in their individual capacities,

20    Your Honor.  We have not argued anything other than that.

21         THE COURT: Okay.  So we have had this reference, this

22    testimony as to this five point five million dollar.  Then also

23    there was some testimony yesterday – you know, first we heard

24    from Mr. Alexander about some invoices that he thought were

25    bogus and then we had some testimony from Mr. Horton, something

1    to the effect that there was this, you know, five million

2    dollars, I thought I paid for some uniforms that for some

3    reason or another Terry had sold but couldn't get shipped to

4    the military.  Is there any relationship between this five

5    point five million dollar note and those invoices and the

6    uniforms?  Is that completely unrelated?

7            MR. BRAZEAL: Your Honor, I would submit to you they

8    are unrelated.  There is no nexus in time.  And, Judge,

9    following the loan closing and the stock sale closing, which

10   both took place on November 10 of 2000, five point five million

11   dollars was advanced to the Terry brothers and I don't think

12   there is any dispute but what the five point five million

13   dollars was input into the debtor.  And Mr. Horton's testimony

14   was that Mr. Terry had asked him to go forward with both of

15   these transactions, the stock purchase and the loan, and that

16   Mr. Horton said he did not condition one upon the other and

17   that was because they never had any discussions about one not

18   taking place.

19           But he further said that had Mr. Terry not showed up

20   and purchased the stock, that he would have been, you know,

21   departing from his proposed business plan and therefore Mr.

22   Horton said that he did not believe that he would have loaned

23   him the five and a half million dollars.

24           And what's more, Your Honor, on some of these

25   triangular, reasonably equivalent value cases, a couple of

214

1    which we cited yesterday, they reflect that consideration can

2    come from another party.  So on the day that the four hundred

3    thousand  dollar  guaranty  of  the  two  stock  purchases  was

4    executed by Terry Manufacturing, the Terry brothers got the

5    right to draw down five and a half million dollars and then

6    over the next five months put that into the debtor.  And Mr.

7    Terry says in his deposition that, had he not go forward with

8    the stock purchase, he did not think Mr. Horton would've gone

9    forward with the other.

10          And then you have the same sort of testimony, Your

11   Honor, when you get to the Peoples – and remember, Your Honor,

12   which you probably do, that the stock purchase notes and the

13   five point five million dollar note were cross-collateralized

14   – not cross-collateralized but –

15          THE COURT: Cross-defaulted, right.  I remember that.

16          MR. BRAZEAL: Yes, sir.  And so we would say, (a), that

17   that demonstrates that there was some value for the guaranty

18   that Terry gave that day and that being the ability to get this

19   five and a half million dollars in the next few months.

20          Secondly, Your Honor, they have attached not only the

21   guaranty but each subsequent payment made on the notes.  And

22   because  the  loans  were  cross-defaulted,  if  the  debtor  had

23   stopped making payments on the stock note, Mr. Horton would

24   have been able to call the five point five million dollar note,

25   which had been guaranteed by Terry Manufacturing.

1        And so my point on that, Your Honor, was for each and

2    every payment that the debtor made, which they are seeking to

3    set aside, they were able to prevent the five point five

4    million dollar loan from being called.

5        And then, Your Honor, there is another loan in August

6    which was actually repaid, and then there is the one in May of

7    2002, which generated a fair amount of testimony yesterday over

8    whether the stock purchase actually occurred.

9        But Mr. Terry also testified that, had he not

10   purchased the stock on that day, that he would not have had

11   control over Perky Cap and did not believe that he would have

12   been able to obtain the loan from Peoples Bank.

13       So that is mine suggested nexus, Your Honor.

14       THE COURT: So you're wanting to put depositions in or

15   offer testimony or what is it you are seeking to do today?

16       MR. BRAZEAL: Today what we have, Your Honor, is Mr.

17   Slaton from the Warren Averett firm who can testify as to what

18   occurred with the proceeds of those loans.  I don't think there

19   is any dispute from the trustee's side – obviously as to the

20   entire report, right?  I mean, I know there is a dispute as to

21   that but there is no dispute that the money went into the

22   debtor.  The question is what happened after it went into the

23   debtor.

24       Your Honor, I believe that once the debtor receives

25   the money, that that is a benefit to the debtor; but I know

216

1    that in the prior case, Your Honor, you had indicated that you

2    wanted to look at the tracing analysis. I was trying to think

3    if there is some way to do it without taking up too much of

4    your time.

5        THE COURT: Mr. Barriere, I will hear from you in a

6    minute. I'm trying to gather my thoughts here for just a half

7    a second. Sort of the problem is Terry Manufacturing is such

8    a can of worms and you try to pick up one little piece of it,

9    or you start to pick one and you end up with a whole can of

10   worms no matter where you start in the whole mess.

11       I mean, certainly you can make an argument – well,

12   certainly you can make an argument that the evidence does not

13   support what it is he says it means. That is not really what

14   I'm trying to figure out right now. I mean, relevance is just

15   if there is any tendency to make the existence or nonexistence

16   of one material issue either more or less likely, and that is

17   all that Mr. Brazeal has to show to put it up and then, once it

18   is in, you know, then counsel can argue – I mean, there will

19   certainly be arguments as to what the evidence actually means

20   once it gets in.

21       I guess if that is the theory of your defense, you

22   know, I don't a hundred percent understand it yet, but I guess

23   the point is maybe it is better to let it in and try to grasp

24   it later. Mr. Barriere, what are your thoughts?

25       MR. BARRIERE: Well, if I may, Your Honor, I wanted,

1    because I do think there is a – a reference to the bank cases

2    isn't appropriate.  Maybe I can just illustrate what I think is

3    sort of the fundamental difference here.

4         In the bank cases we basically had this issue, the

5    banks, Terrys, Terry Manufacturing.  All right.  And I think

6    this part, at least, our cases agree to.  Money loaned to the

7    Terrys individually, the Terrys had then transferred a portion,

8    not all but most of the funds to Terry Manufacturing.  And

9    Terry Manufacturing, of course, has made all of the repayments.

10   So, here, we had a classic, triangular indirect benefit issue.

11   Did Terry Manufacturing get enough benefit from the funds

12   flowing through the Terrys to, if you will, equalize the

13   payments to the bank.  And the reason the tracing was so

14   relevant there, Your Honor, is part of the debate was is it

15   enough that the dollars just get into the account, or does it

16   matter actually how the funds were used?

17        And you will recall the debate between the trustee,

18   well, you know, this was really just part of an elaborate

19   scheme to get money to the Terrys or their benefit and, of

20   course, Mr. Averett apparently was going to tell us, no, no,

21   all of these funds really went for legitimate corporate

22   purposes.  That is why we were faced with that root canal like

23   undertaking.

24        We have a very different situation here.  What Mr.

25   Averett here proposes to talk about is money going from now

218

1    American Real Estate to Mr. Slaton to the Terrys down to Terry

2    Manufacturing, but that is not the transaction we are arguing

3    about.

4         The transaction we are arguing about is Horton,

5    Reynolds, sell stock, no loan.  It was stocks transferred to

6    Terry insiders with TMC paying on it.  There is no tracing to

7    be done in this transaction, okay.  What we have is this effort

8    to say, well, okay, but about the same time a related entity,

9    American Real Estate, makes a loan to the Terrys.  A loan I

10   might add the one thing I think we did hear, clear and

11   unambiguous, is they were two separate transactions.  You know,

12   we had a lot of talk about, well, if this had happened, I might

13   have done this, but one thing he told us several times was

14   these were two, separate, unrelated transactions.

15        He made that loan and now we are going to have a

16   witness to tell us, well, okay, the money went to the Terrys

17   and then it went down to Terry Manufacturing and, once it got

18   to Terry Manufacturing, it would have been used for legitimate

19   business purposes, not for personal needs or inappropriate

20   purposes, what have you.

21        It strikes me this is so far afield.  Again, in this

22   case, it was the case.  It was the loan that was at issue.

23   None of these loans are at issue other than being put up as

24   sort of a straw man, in my judgment, for value for these stock

25   transactions.

1      So, as I said, you have to go through multiple hoops.

2  You have to jump to the premise that somehow these, by the

3  definition of Mr. Horton, unrelated loans really provide value

4  for the stock payments.  And then to say, well, now that I have

5  gotten past that huge hurdle, I need to trace how those funds

6  were actually used.  And that is why I think it simply doesn't

7  meet the relevance threshold, Your Honor.

8      THE COURT: Okay.  Here is what I am going to find.  I

9  mean, I agree with one thing you say, Mr. Barriere, we have an

10  extra degree of attenuation here that we did not have in the

11  bank case.  The fact that Mr. Brazeal's defense is both

12  complicated and difficult to prove doesn't mean that he

13  shouldn't be allowed to – I mean, I agree there is certainly a

14  factual issue at some point I may have to decide or will have

15  to decide about whether or not there was in fact any factual

16  linkage.  If no, then that's the end of the story.  If yes,

17  then there still is a very difficult complicated case of the

18  so-what, even if it was, you know, in the final analysis, you

19  know, the Terry women end up with twenty percent of the stock

20  and didn't pay for it.  The Terrys ended up with – Roy and

21  Rudolph ended up with another block of stock.  Was it –

22      MR. BARRIERE: Thirty-one percent, assuming it was

23  transferred.  Thirty-one percent.

24      THE COURT: That's right.  The additional, the 2002

25  transfer and, again, that was paid.  But that is all something

220

1    kind of downstream that I am going to have to decide.  I think

2    today all I have got to decide is whether or not Mr. Brazeal

3    meets the threshold requirement.  And the fact that you can

4    look at the same evidence that he does and come to a different

5    conclusion doesn't necessarily keep the evidence out.  All it

6    says is we will get something to argue.

7         So I am going to overrule the trustee's objection.  I

8    am going to allow the defendants to put on that evidence.  Did

9    you want to do some by live testimony or is this going to be

10   all by deposition or how do you prefer to do it?

11        MR. BRAZEAL: Your Honor, I have him here.

12        THE COURT: Okay.  Well, that's fine.

13        MR. BRAZEAL: I don't have a problem with stipulating

14   to Mr. Averett's deposition that was taken on the tracing

15   analysis, but I think that Mr. Barriere may want to put him on

16   the stand.

17        THE COURT: Well, that is your call.

18        MR. BARRIERE: And just so the record is clear, Your

19   Honor, I am still going to object to Mr. Averett testifying

20   because of the fact that he didn't write, read or review the

21   report.  I am not going to object to Mr. Slaton testifying.

22        THE COURT: Okay.

23        MR. BRAZEAL: Your Honor, I will call Jesse Slaton.

24        THE COURT: All right.

25        (JESSE SLATON, WITNESS, SWORN)

221

                         DIRECT EXAMINATION

1

2    BY MR. BRAZEAL:

3    Q.       Would you state your name and address for the record?

4    A.       Jesse Slaton, 2500 Acton Road, Birmingham.

5    Q.       And, Mr. Slaton, where are you employed?

6    A.       Warren, Averett, Kimbrough & Marino.

7    Q.       All right, sir.  And what sort of business is that?

8    A.       It is a Certified Public Accounting firm.

9    Q.        Mr. Slaton, how long have you been with Warren

10   Averett?

11   A.       Approximately six years.

12   Q.       All right, sir.  Could you give us a brief sketch of

13   your educational background?

14   A.       I have a bachelor's of business administration degree

15   from the University of Montevalo with a concentration in

16   accounting.

17   Q.       All right, sir.  And subsequent to graduating from

18   Montevalo, did you go directly to work for Warren Averett?

19   A.       I did.

20   Q.       All right, sir.  And at some point did you take and

21   pass the CPA exam?

22   A.       I did.

23   Q.       All right.  So are you a licensed CPA in the state of

24   Alabama?

25   A.       Yes.

222

1    Q.        All right.  And have you ever had any challenges to

2    your licensure or any type of action against your CPA license?

3    A.        No, sir.

4    Q.        All right, sir.  Could you tell the court what type

5    of matters you work on at Warren Averett?

6    A.        Various types, including income tax issues, audits of

7    financial statements, consulting distressed businesses, various

8    things such as that.

9    Q.        In connection with your consulting of distressed

10   businesses, would you give us a little more elaboration on what

11   that involves?

12   A.        Generally we are the consultants for the debtor.  In

13   many cases when the debtor becomes distressed, we assist them

14   in improving their operations; we assist them in restructuring

15   their obligations.

16   Q.        All right, sir.  Were you and your firm asked to

17   provide some services to the defendants in this action?

18   A.        Yes.

19   Q.        All right, sir.  And could you tell us briefly what

20   you were requested to do?

21   A.        We were asked to trace the loan proceeds of certain

22   loans to their final use in Terry Manufacturing Company.

23   Q.        All right, sir.  And as I understand it, there were

24   three loans.  One was a five and a half million dollar loan

25   which we were discussing briefly before, and then there was a

223

1    one and a half million dollar loan in August of 2001 and a one

2    and a half million dollar loan in May of 2002; is that correct?

3    A.        That is my recollection, yes.

4    Q.        All right, sir.  And did you prepare a report in

5    connection with your engagement?

6    A.        Yes, I did.

7             MR. BRAZEAL: And, Judge, just because these documents

8    are so hefty, I thought what I would do is provide hard copies

9    to everyone.  It is a lot easier to go through them.

10            THE COURT: Okay.

11            MR. BRAZEAL:  Your Honor, may I approach the witness?

12            THE COURT: Yes, sir

13            MR. BRAZEAL: Thank you.

14   BY MR. BRAZEAL:

15   Q.        Mr. Slaton, I have presented you with what has been

16   marked as Defendant's Exhibit 62.  Could you identify that for

17   the record?

18   A.        This is the report that was prepared at the request of

19   you on February 24 of 2006.

20   Q.        All right, sir.  And tell the court what methodology

21   you utilized to determine or to trace the proceeds of the three

22   loans at issue?

23   A.        We first obtained from the trustee detail of the

24   specific loan proceeds related to the three loans in question

25   and we traced those loan proceeds into the operating account of

224

1    Terry Manufacturing at the Bank of Wedowee.  From there, we

2    traced those funds into either a sweep account at Bank of

3    Wedowee that is also a Terry Manufacturing account or to a

4    canceled check for a transaction that was written directly from

5    that account.

6         At times, that money – in all situations, that money

7    that was transferred to the sweep account was then transferred

8    back into that Bank of Wedowee operating account.  And from

9    that operating account, transfers were made to the First Bank

10   of Tuskegee and we traced those to the First Bank of Tuskegee

11   and to those deposit tickets.

12        And then once it arrived in the First Bank of

13   Tuskegee, we traced that to a canceled check or the ultimate

14   use of the funds.

15   Q.    All right, sir.  And what records did you use to

16   determine the ultimate use of the funds?

17   A.    We used the records that were provided by the trustee

18   and only those records.  That consisted of a report that he had

19   prepared that indicated the proceeds and the bank of deposit

20   for the proceeds, and then the bank statements specifically

21   that were also in his custody, and a worksheet of cash

22   disbursements from those accounts prepared by the trustee.

23   Q.    All right, sir.  I am going to –

24        MR. BRAZEAL: May I approach the witness, Your Honor?

25        THE COURT: Yes, sir.

225

1   Q.      Mr. Slaton, I have presented you with what has been

2   marked as Defendant's Exhibit 63 and 64.  Would you identify

3   Defendant's Exhibit 63 first and then the second one?

4   A.      Defendant's Exhibit 63 is a schedule of the loans and

5   their specific loan proceeds that were disbursed at various

6   times, which was prepared from a schedule provided by the

7   trustee entitled "Funds Received Personally Detail."

8   Q.      All right, sir.  What about Exhibit 64?

9   A.      Exhibit 64 is what I would refer to as a lead schedule

10  for the particular disbursement of the loan.

11  Q.      All right, sir.  And would you just walk us through

12  Exhibit 64 just as an example to show us how, first, the

13  proceeds that we're talking about and then, you know, the

14  different bank accounts they went into and then where they went

15  out of the bank accounts?

16  A.      To do that, I will start with Exhibit 63.

17  Q.      All right, sir.

18  A.      We had a loan from American Real Estate to Terry

19  Manufacturing Company, Inc. for five point five million dollars

20  that was – the first disbursement from that loan was dated 11-

21  13 for one million, nine hundred and ninety-four thousand, nine

22  hundred and sixty dollars, deposited into the Bank of Wedowee

23  account number 5011256.

24          That particular loan is reflected in Defendant's

25  Exhibit 64.  The proceeds –

226

1    Q.     Mr. Slaton, before we –

2          THE COURT: Let me just stop here for a minute.  Maybe

3    this is easy but I am confused.  I am looking at Exhibit 63,

4    and we have got a five point five million dollar loan and I see

5    that there is a loan dated November 20, 2000.  Do you see that?

6          THE WITNESS: Yes, sir.  I believe Mr. Averett in his

7    deposition stated that that 11-20 date was incorrect.  I

8    believe the date was the thirteenth?

9          THE COURT: Okay.  Because I was wondering how you are

10   showing a one point nine – million, nine ninety-four, nine

11   sixty drawn on the thirteenth if the loan wasn't entered into

12   until a week later.

13        THE WITNESS: Yes, sir.  It was an error.

14        THE COURT: Okay.

15        THE WITNESS: The eleven – I'm sorry, do you want me to

16   continue?

17        THE COURT: Go ahead.

18        THE WITNESS: This 11-13 loan for five point five

19   million dollars was broken up in multiple disbursements.  The

20   first of which appears to have occurred on 11-13 for one

21   million, nine ninety-four, nine sixty, as also is reflected in

22   the information prepared by the trustee which is referenced

23   behind it at D-1.1.

24        This one million, nine hundred and ninety-four

25   thousand dollar loan was then traced by us into the Bank of

227

1    Wedowee's account at the Bank of Wedowee by looking at the

2    deposit ticket and then also seeing it show up in the bank

3    account.

4    BY MR. BRAZEAL:

5    Q.        So then, Mr. Slaton, are you telling us – and let's

6    just take that first transaction, the one point nine-nine-four

7    million dollars.  Is that dealt with in Exhibit 64?

8    A.        Yes.

9    Q.        All right, sir.  And Exhibit 64 contains the documents

10   which reflect where those funds traveled?

11   A.        Exactly.

12   Q.        All right, sir.

13   A.        And in Exhibit 64 you will note that on 11-13 the bank

14   showed a balance of one thousand, eight hundred and eighty-four

15   dollars and seventy-seven cents prior to the deposit.

16   Q.        All right, sir.

17   A.        We can trace the deposit going in after that beginning

18   balance.  That is the start of the tracing with Defendant's

19   Exhibit 64.

20   Q.        All right, sir.  And then what else does Defendant's

21   Exhibit 64 reflect occurred with the one point nine-nine-four

22   million dollars?

23   A.        It reflects that portions of it were transferred out

24   into the sweep account, also a Bank of Wedowee account, and

25   then those same portions transferred back in, and then the

228

1    disbursement of two checks, one check, 1062, to the United

2    States Treasury for four hundred thousand, six hundred and

3    seventy dollars, and check number 1066 to the Bank of Wedowee

4    for a loan payment.  And then those proceeds were swept back

5    into this operating account and then transferred to the Bank of

6    Tuskegee.

7    Q.      All right, sir.  And once they were transferred to the

8    Bank of Tuskegee, do you have any records to reflect what

9    occurred to the funds then?

10   A.      Yes.  We have the bank statements that were provided

11   by the trustee for the First Bank of Tuskegee, as well as a

12   detail provided by the trustee of disbursements during this

13   same time frame that indicate the use of the funds for the same

14   time frame.

15   Q.      All right, sir.  And if you would just go through some

16   of the disbursements just by way of example on Defendant's

17   Exhibit 64?

18   A.      Sure.   For instance, if you refer to what is

19   referenced as BOW-1.3 titled "Phelps Cash Reconstruction

20   Tracking Sheet," that was prepared by the trustee, it has the

21   details of those transactions and you can see transactions such

22   as checks to the United States Postal Service, checks to

23   various companies that appear to be ordinary business

24   transactions of Terry Manufacturing.

25   Q.      All right, sir.  Mr. Slaton, how do we know that the

229

1    one point nine-nine-four million dollars in proceeds of the

2    first draw from the five point five million dollar loan were

3    then utilized for the checks reflected in the report prepared

4    by the trustee?

5    A.       Well, we determined the balance in the account prior

6    to the funds being deposited into the First Bank of Tuskegee

7    account.

8    Q.       All right, sir.  And how much was that?

9    A.       It was, to give you an exact, I can't just do it right

10   off of the top of my head.  Give me just one second.  (Pause)

11   It is included in our report titled D-2, balance detail for the

12   First Tuskegee Bank accounts for that particular loan.  We said

13   that on 11-10 the bank account had a balance of eighteen

14   thousand, one hundred and fifty-seven dollars and three cents.

15   Q.       All right, sir.  And can you show us where that is

16   reflected in Defendant's Exhibit 64?  In other words, take us

17   to the actual bank record and/or record of the trustee that

18   reflects that number.

19   A.       Sure.  The bank statement, First Tuskegee Bank account

20   number 1109308, which is referenced on the first page as BOW-

21   1.2, if you go to page ten of that bank statement under the

22   daily balance summary –

23           THE COURT:  Okay.  We are on Exhibit 64 and where

24   within Exhibit 64 now?

25           THE WITNESS:  Under the bank statement referenced as

230

1   BOW-1.2.

2          THE COURT: Okay.  All right.  1.2.

3          THE WITNESS: Page ten of that bank statement.

4          THE COURT: Okay.  I have it.

5          THE WITNESS: On 11-10, it shows that the balance in

6   the bank was eighteen thousand, one hundred and fifty-seven

7   dollars and three cents.

8          THE COURT: Okay.  I see that.

9          THE WITNESS: That is prior to the 11-13 deposit.

10         THE COURT: Okay.

11         THE WITNESS: Then from there, if you look at all of

12  the  transactions  prepared  by  the  trustee  during  that  time

13  frame,  and  then  you  look  at  the  bank  statements,  when  the

14  balance  drops  below  the  balance  of  eighteen  thousand,  one

15  hundred and fifty-seven dollars and three cents, which I have

16  dated on 12-11 of 2000, the balance shows to be five thousand,

17  three hundred and one dollar and ten cents.

18  BY MR. BRAZEAL:

19  Q.     All right.  So you started out with a balance, did you

20  say, of approximately eighteen thousand?

21  A.     Correct.

22  Q.     And that dropped down to how much?

23  A.     Five thousand, three hundred and one dollars and ten

24  cents.

25  Q.     All right.  And in the interim, this one point nine-

231

1     nine-four million dollars came into that First Tuskegee bank

2     account?

3     A.        Correct.

4     Q.        And was written out in various checks which have been

5     compiled in a report prepared by the trustee?

6     A.        Correct.

7     Q.        All right, sir.  And your review of that report from

8     the trustee reflects that most of the expenditures appear to be

9     ordinary business expenditures?

10    A.        They appear to be.

11    Q.        All right, sir.  And so your point about it, I take

12    it, is that if the one point nine-nine-four million was used

13    for those expenditures because you started out with a fairly

14    low balance in the account and then you looked at the

15    transactions that occurred following that until you arrived at

16    another low balance in the account; is that correct?

17    A.        Until I arrived at a balance that was lower than the

18    beginning balance and therefore proving that the one point nine

19    million dollars was used.

20    Q.        All right, sir.  Now in Defendant's Exhibit 64, were

21    there any other transfers to the First Tuskegee account during

22    that time frame that were used to write the checks that are

23    reflected in the trustee's report?

24    A.        On Defendant's Exhibit 64, down at the bottom of the

25    page you will see First Bank of Tuskegee operating as a listing

232

1    and there were six transactions totaling one point one million,

2    two hundred and ninety thousand dollars that were transferred

3    during that same time period that were a part of the one point

4    nine million dollars.

5    Q.      All right, sir.  What happened to the other seven,

6    approximately seven hundred thousand dollars?

7    A.      Well, we can document that check number 1062 was

8    written to the U.S. Treasury for four hundred thousand, six

9    hundred and seventy dollars.  We can document that check number

10   1066 was written to the Bank of Wedowee for a loan payment of

11   Terry Manufacturing for thirty-three thousand, four hundred and

12   five dollars.  And the remaining portions were used up in the

13   subsequent month, the month of December – excuse me – January.

14   Q.      All right, sir.  So just describe for us in general –

15   well, so your testimony then is that all of those funds or

16   substantially all of those funds appear to have been used for

17   ordinary business expenses?

18   A.      Correct.

19   Q.      All right, sir.  Mr. Slaton, did you employ this same

20   methodology for each of the loan disbursements that we have

21   described?

22   A.      Yes.

23   Q.      And so, for instance, if we move on to BOW-2, that

24   concerns a one million dollar draw on the five point five

25   million dollar loan; does it not?

233

1    A.      Correct.

2    Q.      All right, sir.  And you employed the same methodology

3    as you did for the one point nine-nine-four million dollar

4    draw?

5            THE COURT: Okay.  Now where is BOW-2?

6            MR. BRAZEAL: I have got all of those, Judge.

7            THE COURT: Okay.

8            MR. BRAZEAL: And I don't know if there is some way to

9    short-circuit it.  I will be happy to do that, or we can go

10   through each one of them.  I mean, I don't want to go through

11   each one of them.  I think they are all pretty self-

12   explanatory.

13           THE COURT: Well, I think I understand Mr. Slaton's

14   methodology.  I want to make sure I do.  What you're doing is

15   you are identifying when each draw from each one of these loans

16   was made, and then you look to see what happened, you know,

17   what bank account it was deposited in, the balance before and

18   then you see where the money went?

19           THE WITNESS: Yes, sir.

20           THE COURT: Okay.  So you used the same methodology in

21   all nine – were there nine of these, total?  Well, there would

22   be the five point five was paid out, I guess, in five separate

23   draws, BOW's one through five.

24           MR. BRAZEAL: That's correct, Your Honor.

25           THE COURT: The one point five million from August of

234

1    '01 was paid out in two draws, that being BOW eight and nine,

2    and then the one point five million dollars from May 30 of '02

3    was paid in one draw of one point five million, which is BOW-

4    10.  Okay.

5              THE WITNESS: That is a complete listing.

6              THE COURT: All right.  Well, I mean, I will let you

7    put the schedules in.  I am kind of reluctant to go through

8    every one of those transactions.  If you want to go through one

9    or two by way of example, that is fine, but I don't want to –

10   I mean, you have already done a couple of examples but, I mean,

11   we could spend a couple of days, at least, going through

12   everyone.

13             MR. BRAZEAL: I understand, Judge.  That was my

14   concern, as well.

15             THE COURT: I think I see your methodology.  Like I

16   said, I don't want to do every one.  If there are a couple more

17   you want to pick out, that is fine, or if you want to move on

18   to something else, that is fine, too.  It is your call.

19             MR. BRAZEAL: Judge, I think I will, if it is all

20   right, just introduce the exhibits and then I will move on.

21             THE COURT: Okay.  So which exhibits are these now

22   you're offering?

23             MR. BRAZEAL: I'm going to add, Your Honor, the

24   remainder of the tracing schedules if I could.  May I approach,

25   Your Honor?

235

1           THE COURT: Yes, sir.

2     BY MR. BRAZEAL:

3     Q.      Mr. Slaton, I have presented you with the additional

4     tracing schedules.  Would you just identify each of those for

5     the court, beginning with Exhibit 65?

6     A.      Defendant's Exhibit 65 is the BOW-2 loan proceeds

7     transaction that was indicated on Defendant's Exhibit 63.

8            Defendant's Exhibit 66 is the BOW-3 transaction also

9     indicated on Defendant's 63.

10           Defendant's Exhibit 67 is BOW-4, which is indicated on

11    Defendant's Exhibit 63.

12           Defendant's Exhibit 68 is BOW-5 which is indicated on

13    Defendant's Exhibit 63.

14           Defendant's Exhibit 69 is BOW-8, also indicated on

15    Defendant's Exhibit 63.

16           And BOW-10 is Defendant's Exhibit 71 indicated on

17    Defendant's Exhibit 63.

18    Q.      All right, sir.

19    A.      Excuse me.  One more.  BOW-9 is also Defendant's

20    Exhibit 70, which is indicated on Defendant's Exhibit 63.

21    Q.      All right, sir.

22           MR. BRAZEAL: Your Honor, I would move for the

23    introduction of Exhibits 62 through 71.

24           THE COURT: Okay.  Mr. Barriere.

25           MR. BARRIERE: I am objecting to the introduction of

236

1    all of those, Your Honor.

2              THE COURT: Okay.  And then I will overrule the

3    objection and will admit the exhibits.

4              MR. BRAZEAL: I rest, Your Honor.

5              THE COURT: Mr. Barriere.

6              MR. BARRIERE: Thank you, Your Honor.

7                        CROSS EXAMINATION

8    BY MR. BARRIERE:

9    Q.        Good morning, Mr. Slaton.  I am Brent Barriere.  We

10   haven't met face-to-face until this morning, I believe.  We did

11   visit briefly over the telephone.  Do you have a copy of your

12   expert report there, sir?

13   A.        I do.

14   Q.        Just so the record is clear, sir, if you would turn to

15   the first page of the February 24 report, "Purpose of

16   Engagement."  And as I appreciate, Mr. Slaton, you were the

17   author and signatory of this report; is that correct?

18   A.        Yes.

19   Q.        All right.  The last sentence under purpose of

20   engagement reads, and I'm quoting:

21                   "The analysis was performed on specific loans that are

22                   the subject of the claims against the defendants made

23                   by the trustee of Terry Manufacturing Co., Inc."

24   Do you see where I am reading from, sir?

25   A.        (No audible response.)

237

1    Q.       All right.  Now, just so the record is clear, sir,

2    you have performed no analysis whatsoever with respect to the

3    transaction by which Cotina Terry purchased stock from N. D.

4    Horton and James Reynolds and there was a payment on a

5    promissory note in connection with that; you haven't studied

6    that transaction in any way, have you?

7    A.       No.

8    Q.       Indeed you weren't even aware of that transaction

9    until the hour or so before I deposed you on March 17; is that

10   correct?

11   A.       That is correct.

12   Q.       All right.  And likewise you haven't done any analysis

13   whatsoever with respect to the stock transaction involving

14   Allie Robinson; correct?

15   A.       Correct.

16   Q.       And likewise you have done no analysis whatsoever with

17   respect to the purported stock sale to Roy and Rudolph Terry on

18   or about May 30, 2002?

19   A.       Correct.

20   Q.       All right.  And so the only loans that you have

21   studied, as I appreciate it, are those identified on D-1, which

22   was a five million, five hundred thousand dollar line of credit

23   by American Real Estate to – well, by American Real Estate – a

24   one point five million dollar line of credit by American Real

25   Estate and a one point five million dollar line of credit by

238

1    Peoples Bank; correct?

2    A.       Correct.

3    Q.       All right.  Now with respect to the first of those,

4    the American Real Estate shows as a creditor – you have Terry

5    Manufacturing Company, Inc. as the debtor; is that correct?

6    A.       I'm not real certain on that.

7    Q.       You don't know?

8    A.       No.

9    Q.       Were you provided with any of the loan documentation?

10   A.       I don't recall looking at the loan documentation.

11   Q.       Okay.  So you were just told to assume that Terry

12   Manufacturing was the debtor for that loan?

13   A.       No, I was asked to trace the use of the proceeds.

14   Q.       Okay.  But the presumption, I take it, for that

15   analysis was that Terry Manufacturing was the borrower on that

16   loan?

17   A.       I didn't make any presumption.

18   Q.       You didn't make any presumption.  All right.  And

19   didn't look at the loan documentation, as I understand.  All

20   right.  Now just so we're clear on what you actually did,

21   focusing on the first of those, 64, am I correct to understand

22   that in the period in question that you studied, the total

23   deposits into this account amounted to over three million

24   dollars and the payments out amounted to over three million

25   dollars also?

239

1    A.      I am not sure where you're getting that.

2    Q.      Well, I am just looking at the – you told us that you

3    relied upon these work papers, deposits and disbursements by

4    the trustee and I am looking at the last page, page eight of

5    eight down in the lower, right-hand margin.  It will be the

6    second to the last page, Judge, of Exhibit 64.

7           THE COURT: The second to the last page of 64. Okay.

8    A.      I did rely on this.

9    Q.      You did rely on it?

10   A.      I did rely on this.

11   Q.      Okay.  And that, at least, reflects that during the

12   period studied, the total debits or the total disbursements out

13   of this account amounted to three million, thirty-five thousand

14   dollars and the total deposits amounted to three million,

15   thirty-three thousand dollars; is that correct?

16   A.      I didn't sum it to get to that point but I suppose

17   that might be correct.

18   Q.      Okay.  Sir, did you attempt to ascertain – there are,

19   if you work up the column there, deposits into this account

20   from November 1 through November 30; correct?

21   A.      Correct.

22   Q.      So would I be correct, sir, that in addition to the

23   funds that you studied, the million two that came into this

24   account from the five point five million dollar line of credit,

25   there was an additional, what, one point eight million dollars

240

1    deposited into this account during the same time frame?

2    A.    Based on this sheet, yes.

3    Q.    All right.  And you would agree, sir, it is not

4    possible to identify how a specific dollar deposited into the

5    account is applied?

6    A.    I would say that it is not possible to specifically

7    identify every dollar, nor is there a need to do that because

8    we are not trading in hens and chickens, we are trading in

9    dollars.

10   Q.    Okay.  Let me be clear.  I have got three million

11   dollars coming into this account during the month of November.

12   I have got three million dollars coming out.  A million two is

13   the dollars you are attempting to trace; a million eight are

14   dollars you didn't trace.  You can't tell from which part or

15   from which particular bucket any particular expenditure was

16   made; correct?

17   A.    Not any particular but I can say from this time frame

18   to this time frame, the loan proceeds were used up with those

19   particular disbursements.

20   Q.    Well, by way of illustration, you have the first of

21   your deposits, if I'm reading this correctly, came into the

22   account on, what, the 14th of November; is that correct?

23   A.    Correct.

24   Q.    The 13th of November?

25   A.    As indicated on page eight of eight prepared by the

241

1    trustee, he shows that to clear on the thirteenth of November,

2    five hundred thousand dollars.

3    Q.    Okay.   And the same day you have a seventy-five

4    thousand dollar deposit, an eighty thousand dollar deposit.   Do

5    you see where I am referring to?

6    A.    Sure.

7    Q.    Okay.   And how the five hundred thousand dollars or

8    the hundred and fifty-three thousand dollars, all deposited on

9    the same day, those funds were all commingled in the account,

10   correct?

11   A.    Sure, all money is commingled in business.

12   Q.    And how any one of those six hundred and fifty

13   thousand dollars was ultimately applied, we can't tell.   There

14   are no isotopes attached to dollar bills; right?

15   A.    You cannot specifically identify them.

16   Q.    All right.   Now I think you told us and I wanted to

17   make sure I got your testimony that these appear to be ordinary

18   business expenses but you didn't go back to look at invoices or

19   any  supporting  documentation  for  any  of  these  specific

20   disbursements; did you?

21   A.    From time to time, we did vouch some canceled checks

22   back to the bank statement to kind of validate this listing.

23   From looking at the listing, it appears, just from scanning

24   through here, that many of these transactions would be ordinary

25   business  transactions,  such  as  transactions  to  the  United

242

1    States Postal Service, etc., etc.

2    Q.    Well, fair enough. Let me ask you a specific

3    question. Now you have got, for example, November 13, the

4    first day of the deposit, there is a check written to First

5    Bank of a hundred and fifty-one thousand, four hundred and

6    seventy-four dollars. Do you see where I am referring to? It

7    is on page four of eight of the trustee's detail.

8    A.    Four of eight?

9    Q.    Uh-huh.

10    A.    On the thirteenth to First Bank, a hundred and fifty-

11    one thousand.

12    Q.    Right.

13    A.    Okay.

14    Q.    And I presume, sir, you can't tell us today whether

15    that was the payment on a loan from First Bank or if it was a

16    transfer into Roy Terry's personal account at First Bank; can

17    you?

18    A.    Not with the documentation that we have.

19    Q.    And you didn't go beyond this documentation; did you?

20    A.    No.

21    Q.    All right.

22    A.    But on the same day I did find that the Terry

23    Manufacturing payroll account was increased by twenty thousand

24    dollars. So, you know, that is an ordinary type business

25    transaction based on the face of the transaction.

243

1    Q.       Based on the face.  That is what I'm trying to get to.

2    You simply accepted the name to where the monies went and those

3    appeared to be legitimate names; is that a fair summary?

4    A.       I don't know if I would say it that way, but –

5    Q.       And that is basically the procedure you followed for

6    the balance of the work you did; is that correct, the other

7    schedules?

8    A.       Correct.

9    Q.       Do you know how much money was paid back on this five

10   point five million dollar line of credit?

11   A.       I wasn't asked to look at that.

12   Q.       All right.  Do you know who paid it back?

13   A.       I have no idea.

14   Q.       All right.  How about this million five loan, do you

15   know how much money was paid back on that?

16   A.       No.

17   Q.       And how about the Peoples Bank loan, do you know how

18   much was paid on that?

19   A.       No.

20            MR. BARRIERE: I have no further questions, Your Honor.

21            THE COURT: I have got one.  I'm not going to cut off

22   your redirect.  I wanted to ask one.  Get Exhibit 64 in front

23   of you.

24            THE WITNESS: Sure.

25            THE COURT: Okay.  And flip to the third page which is

244

1    just some copies Of bank documents. Now it looks like the first

2    one in the upper left corner is the deposit for the one point

3    nine million dollar draw that we've been talking about?

4              THE WITNESS: Yes, sir.

5              THE COURT: And then these copies of checks that

6    follow, are these things that you think came from – are these

7    things where you think that the one point nine million dollars

8    went to?

9              THE WITNESS: Yes.  These checks are checks from the

10    one point nine million dollars.

11             THE COURT: Okay.  Good.  That is what I thought you

12    meant.  Look at 1056, which is just right below, immediately

13    below the deposit slip.

14             THE WITNESS: Sure.

15             THE COURT: And can you read the payee there?

16             THE WITNESS: Terry Manufacturing Company, Inc.

17             THE COURT: Okay.  So Terry is paying itself twenty-

18    five thousand bucks?

19             THE WITNESS: It is transferring money, yes, sir.

20             THE COURT: Are you aware, and I don't know how much

21    involvement – maybe it is good and maybe it is bad but I have

22    been living with this case for three years, and all I am

23    hearing is people fussing about Terry kiting checks and

24    churning accounts and things like that.  And it looks to me

25    like the first item I look at here is part of that very scheme

245

1    of churning money.  I mean, you're saying it is typical, you

2    know, that this money that came through was paid for business

3    expenses but yet it looks like to me, at least like the first

4    item I looked at, and there are several others to Terry

5    Manufacturing.  Actually the next one; the next one, 1056;

6    1057; 1058; 1061.  Let' see, 1062, it looks like maybe is some

7    taxes; and then 1063, again Terry Manufacturing; 1064, Terry

8    Manufacturing; 1065; and then 1066, Bank of Wedowee.

9         I mean, just based on all of the stuff I have heard in

10   the past, this just looks like more of the same check kiting.

11   How do you know that it is not that?

12        THE WITNESS: Can I take you through the transaction?

13        THE COURT: Yes, sir.

14        THE WITNESS: Okay.  Let's take this five hundred

15   thousand dollar transaction.  That was check number 1057

16   written from this account.

17        THE COURT: Yes, sir, I have got it right here.

18        THE WITNESS: We can trace that money – let me get the

19   right exhibit here.  Exhibit 64 on that first page, we can show

20   that check 1057 went out of the Bank of Wedowee account,

21   5011256, on 11-14, okay.

22        THE COURT: Okay.

23        THE WITNESS: Then that check was deposited into the

24   First Tuskegee Bank operating account on 11-14, okay, down at

25   the bottom.  We can trace that to a deposit in the First

246

1    Tuskegee bank account indicated – let me see here – indicated

2    on the bank statement, the First Tuskegee Bank.

3           THE COURT: Where is that?

4           THE WITNESS: Let me make sure I get you to the right

5    place here.  Okay.  Give me just a second.  Okay.  On page

6    eleven of the First Bank statement.

7           THE COURT: Okay.

8           THE WITNESS: On the second row from the bottom – it is

9    going to be kind of hard to read but it is circled and it says

10    BOW-1, one of those deposits on that total deposit that totaled

11    six hundred and fifty-five thousand, five hundred and fifty-six

12    dollars and seventy-five cents, one of those deposits was five

13    hundred thousand dollars.  That is a transfer of that money

14    into this First Bank account, okay.  From this First Bank

15    account, we looked at the bank statement balance before this,

16    okay.

17           THE COURT: Okay.

18           THE WITNESS: And then we looked at the deposit going

19    in and then we looked at where the balance went below where the

20    beginning balance was.  So we know that all of the funds were

21    used in that account during that time frame.

22           THE COURT: Now how do you know that?

23           THE WITNESS: Okay.  If you go to – in the expert

24    report we have a sheet in that report that is titled D-2, and

25    it is the balance detail for First Tuskegee Bank.

247

1           THE COURT: Okay.  And that is D-2?

2           THE WITNESS: And the title will say D-2.

3           THE COURT: And that is in Exhibit 62?

4           THE WITNESS: Yes, sir.

5           THE COURT: All right.  I have got D-2.  What do I need

6      to look at now?

7           THE WITNESS: Do you see on 11-10-2000, the eighteen

8      thousand dollar balance in that account, eighteen thousand, one

9      fifty-seven "o" three?

10          THE COURT: About how many pages deep should I be?

11          THE WITNESS: I am sorry.  The twelfth page.

12          THE COURT: Okay.  I think I am at the twelfth page, D-

13     2, balance detail, FTB –

14          THE WITNESS: First Tuskegee Bank.

15          THE COURT: Okay.  Now what is it you want me to look

16     at?

17          THE WITNESS: On 11-10-2000, the balance in the account

18     was eighteen thousand, one hundred and fifty-seven dollars and

19     three cents, okay.  Subsequent to that, just right after that,

20     you see the five hundred thousand dollar transaction come into

21     the account as a deposit.  I showed you that on the First

22     Tuskegee bank account statement.

23          THE COURT:  Okay.

24          THE WITNESS:  On 12-11-2000, the balance dropped below

25     where the balance was in the beginning to five thousand

248

1    dollars, which would indicate that all deposits made between

2    those two dates, the disbursements from those deposits would be

3    reflected in a listing of checks from that date until the end

4    date.  And in looking at – to answer your specific question, I

5    don't see any evidence of check kiting.  I am not asked to look

6    at that.  All I am seeing is there is money coming into that

7    account and I am seeing it being used for specific purposes.

8              THE COURT: All right.  Mr. Brazeal.

9              MR. BRAZEAL: Nothing, Your Honor.

10             THE COURT: Okay.  Thank you, sir.  You may step down.

11             THE COURT: Why don't we break for about fifteen

12   minutes.

13             (Recess from 10:38 a.m. until 10:56 a.m.)

14             THE COURT: Please be seated.

15             Did you just rest or did you just pass the witness?

16   I couldn't remember.

17             MR. BRAZEAL: Well, I passed and I now rest.

18             THE COURT: Okay.  Good enough.  Mr. Barriere, do you

19   have any rebuttal case?

20             MR. BARRIERE: I do not, Your Honor.

21             THE COURT: Okay.  Then we are done with the evidence.

22   Let me just tell you what I would like, would be helpful to me

23   and would be somewhat flexible as to the timing.  But I would

24   suggest about thirty days out, what I would like would be

25   proposed findings of fact and conclusions of law from each of

1    you, and I prefer simultaneous filings. That is, I want each of

2    you to put your best foot forward and tell me what you think,

3    what conclusions, what findings of fact that you want me to

4    draw from the evidence.  I am not really looking for a lot of

5    argument at this point.  If we stagger them, you know, and have

6    a few rounds – I'm not really looking for argument.  I am

7    looking for what each of you think, you know, the evidence

8    showed  and  basically  sort  of  your  dream  findings  and

9    conclusions that you would like.

10           Now if you feel you have to file a brief and actually

11    submit argument, that is fine.  If you want to do closing

12    arguments now, that is fine.  I mean, I am flexible as to how

13    you want to present the case.  I guess, Mr. Barriere, you're

14    the plaintiff.  What are your thoughts?  Do you want to

15    summarize now or would you rather do a brief?

16           MR. BARRIERE: I am happy to do either, Your Honor.  I

17    don't  think  the  closing  is  particularly  lengthy,  nor

18    particularly complicated.  And indeed with respect to the

19    findings of fact and conclusions of law, we could prepare them

20    in less than thirty days.  My only holdup potentially would be

21    if you want us to incorporate specific citations to the

22    transcript, and I'm not sure how long that is going to take.

23    I'm not familiar with the system you all have here.

24           THE COURT: No, I don't want to hold up.  No, I don't

25    want that.  All I want to do is I just want to pick a date out

250

1    that we can agree on and thirty days is reasonable.  As a

2    practical matter, it would be tough for me to get to it much

3    under thirty days anyway.  So I guess just pick thirty days and

4    give me your proposed findings and conclusions.

5            MR. BARRIERE: What about Friday, the 28th of April.

6            THE COURT: Okay.  All right.  Mr. Barriere, you're the

7    plaintiff, so you get to go first and last.

8            MR. BARRIERE: Thank you, Your Honor.

9            Your Honor, this is a core proceeding brought under

10   both the Alabama Fraudulent Conveyance Act and the Bankruptcy

11   Code.  It seeks the recovery of amounts paid in a period that

12   is slightly more than three years – less than three years prior

13   to the Chapter 11 petition which was filed on July 7, 2003.

14           I suppose I end my commentary on this case in some

15   measure where I began, which is in large measure I think the

16   core facts bearing upon the case are stipulated to.  There is

17   no dispute that we had three promissory notes given by insiders

18   for the payment of stock.  We have no dispute that that stock

19   was exclusively registered in the names of the insiders, if

20   indeed it wasn't acquired by Roy and Rudolph Terry, and I will

21   talk to that in a moment.  There is no dispute that Terry

22   Manufacturing didn't receive any stock, nor did it receive any

23   of the benefits flowing to a stockholder.

24           In that regard, the court saw the tax returns

25   generated by Mr. Horton's accountant, Mr. Giddens, that

251

1    confirms that there were K-1s issued to each of the

2    shareholders permitting them to take proportionate losses

3    pertaining to Perky Cap.  Terry Manufacturing did not benefit.

4         What it did was make all payments on these notes, five

5    hundred and ninety-seven thousand dollars approximately.  Those

6    facts are not disputed.

7         The Alabama statute and the Bankruptcy Code are

8    fundamentally similar in nature.  I am going to quote from the

9    Alabama Code because I think, if the court finds that they were

10   the trustee under the Alabama code, a finding under the

11   Bankruptcy Code is in effect redundant.

12        A transfer by a debtor is fraudulent as to a creditor

13   whose claim arose before the transfer was made if the debtor

14   made the transfer without receiving a reasonably equivalent

15   value in exchange.  I repeat, reasonably equivalent value in

16   exchange for the transfer and the debtor was insolvent at the

17   time or the debtor became insolvent as a result of the

18   transfer.

19        Whether a debtor is insolvent under Alabama law turns

20   on three components like the federal statute.  Any one of which

21   will satisfy from a balance sheet standpoint whether

22   unreasonably small capital or did it knowingly incur debts

23   beyond its abilities to pay.

24        The first element, the standing element, we have a

25   stipulation that there were a number of entities that were

252

1    unsecured creditors of Terry Manufacturing before the first of

2    the transactions at issue and remained creditors as of the date

3    of the Chapter 11 filing.  That is not in dispute.  Nor can

4    there be any dispute that there were transfers.  We have

5    payments totaling five hundred and ninety-six thousand dollars.

6        Nor do I believe is there serious dispute that Terry

7    Manufacturing was insolvent.  The only evidence in that regard

8    was that presented by Mr. Alexander, who has developed, based

9    on I believe credible, indeed compelling evidence, that Terry

10   Manufacturing's assets were of significantly less value than

11   the  amount  of  its  liabilities  throughout  the  period  in

12   question.  That this company consistently failed to pay its

13   debts  as  they  became  due  and  that  it  consistently  had

14   unreasonably small capital, causing management to basically use

15   its vendors as a de facto line of credit.

16       Hence, the only real question I submit is did Terry

17   Manufacturing receive reasonably equivalent value in exchange

18   for the transfer.  Well, we have heard through the course of

19   this case sort of a smorgasbord of what the defendants would

20   submit is reasonably equivalent value.  I submit none of those

21   meet the standard.

22       First, of course, there was a suggestion, at least

23   during the summary judgment papers – I'm not sure whether it is

24   being asserted at this time – that Terry Manufacturing has

25   somehow needed its insiders to purchase stock so it could be

253

1   assured of a source of caps from Perky Cap.  Well, the fact of

2   the matter is that Terry Manufacturing purchased a lot more

3   caps before than after the stock transactions at issue.

4          It was, from 1990 on, according to Mr. Horton, the

5   largest customer of Perky Cap.  There simply is no connection

6   between sales of caps and stock acquisitions.  Indeed by the

7   trustee's calculation during the period in question Terry sent

8   more money to Perky Cap than it got back in caps.

9          Second, of course, we had the citation to the loans.

10  Now, I have yet to hear evidence of any connection between

11  these loans and these stock transactions and the reason for

12  that is it simply doesn't exist.  You will recall that what

13  we're talking about are a sale to the Terry women of twenty

14  percent of the stock, notes given at that time, notes paid.

15         There is no question that there was a five point five

16  million-dollar line of credit for the benefit of Roy and

17  Rudolph Terry established at the same time.  But there is

18  simply no consideration connection.  Mr. Horton was asked

19  repeatedly was the purchase of the stock a condition of

20  American Real Estate – itself, by his definition, a separate

21  entity from himself, and properly so, it is a separate legal

22  entity – were those connected; would you have only made the

23  loan if they had bought the stock, and the answer was, no,

24  these were separate transactions.

25         Indeed I think he probably was most telling when he

254

1    gave us that sort of crooked smile and said, "I would be a fool

2    to loan five point five million dollars so someone would buy

3    four hundred thousand dollars worth of stock from me."  These

4    were separate transactions.

5         Next, we had a claim, well, if there was a default

6    under the stock notes, they would've gotten the rest of the

7    five point five or maybe they would have foreclosed or done

8    something on the five point five and they wouldn't have made

9    subsequent loans.  That is not value.  That is not value in

10   exchange for these payments.  I mean, let's not lose sight of

11   the reality.  Cotina Terry was the signatory to this note.

12   Allie Robinson was the signatory to these notes.  Had they

13   simply complied with their obligations, paid their notes, there

14   would be no issue with respect to default.  Avoidance of cross-

15   default cannot be value in exchange to the debtor.

16        We have a one million, five hundred thousand dollar

17   loan made in August and, from a temporal standpoint, at least,

18   it is really unclear how that has anything to do with any stock

19   sales.  The loan, as the court will recall, closed on August

20   30, or approximately ten months after the women acquired the

21   stock, approximately ten months before Roy and Rudolph Terry

22   allegedly acquired stock.

23        Again, Mr. Horton was candid enough to tell us that

24   one million dollar loan, one point five million dollar loan,

25   had nothing to do with any of the stock sales.  He doesn't even

255

1    recall having discussed the stock sales at the time.  The loan
2    closes, is paid off at about a forty percent APR within a
3    matter of sixty days.  Again, no connection between the two
4    other than this speculative thought that, well, if the Terry
5    women didn't pay on their notes as they appropriately should
6    have and Terry Manufacturing didn't pay on the notes as it in
7    fact did, then maybe there wouldn't have been a one point five
8    million dollar loan in August.  I suggest to you that sort of
9    speculation can't be evidence of value.

10           I will move forward to May 30.  Now Mr. Horton was
11    prepared to tell us, well, gee, he doesn't know if he could
12    have – he would have pursued the Peoples Bank loan if they
13    weren't buying this stock.  He didn't get that far.  What he
14    simply said was, "I sold my stock and I was instrumental in
15    getting the Peoples Bank loan."

16           I would point out to the court that this loan is
17    unusual in that it actually has an agreement setting forth why
18    it is being solicited.  There is a loan solicitation agreement
19    which Mr. Horton read carefully and confirmed, made no mention
20    of the sale of the stock to Roy and Rudolph Terry.  What it
21    says is they are going to try to get a loan from Peoples Bank
22    so they can pay off the Farmers and Merchants Bank and thereby
23    relieve him of his liability, Mr. Horton of his liability on
24    that.  Again, no connexity between the two whatsoever.

25           Now the question I suppose that we don't have a

1    definitive answer to with respect to that transaction is did it

2    in fact occur.  Mr. Horton tells us, oh, yes, I sold my stock,

3    and  there  indeed  is  evidence  confected  at  the  time  that

4    reflects the sale of the stock.  On the other hand, however, we

5    have fairly compelling evidence that it may well have been a

6    simulation.

7         First, the tax returns, one thing filed under penalty

8    of perjury.  Those don't show any sale of the stock.  Secondly,

9    the  price  paid,  six  hundred  and  twenty-four  thousand,  six

10   hundred and seventy thousand – I can't recall.  I could find

11   it for the court in a moment – is completely out of character

12   with any rational valuation of Perky Cap.  Now, recognize, this

13   is a company that is bleeding money.  It has lost money every

14   single year we have tax returns for and, within a matter of two

15   years, will go directly into Chapter 7.

16        Nonetheless,  supposedly  we  have  an  arm's-length

17   transaction resulting in six hundred, plus, thousand dollars

18   paid for the stock, not reflected on the tax returns, and done

19   at  a  time  where  we  plainly  have  highly  dubious  sales

20   agreements.  I mean, I heard the testimony, as the court did,

21   about how, well, these were sales of inventory that no one

22   could identify, don't know how many units, where it was stored,

23   who insured it and so forth but we really engaged in these

24   transactions.  Unfortunately, of course, the only witness who

25   actually ever saw anything has passed away.

257

1          What we do know, of certainty, is there was no
2    transfer of product and no one can identify any product that
3    actually transferred.

4          I submit to Your Honor that what was really going on
5    there were disguised, for some reason, disguised movement of
6    funds back and forth.  The fact that it occurs the same time as
7    the purported transfer of stock has caused the trustee, I
8    think, quite reasonably to conclude it likely is a simulation.
9    They all look the same.

10          Your Honor, in the final analysis, we have spent most,
11    in my judgment, of two days trying to force a square peg into
12    a round hole.  And by that, I mean the defense that was offered
13    in the bank cases that the loans at issue there really were for
14    the benefit of Terry Manufacturing is the theme that we have
15    consistently heard play out, which really has no relevance
16    here.  Citation repeatedly in the last two days to the *Rubin*
17    *case versus Manufacturers Hanover*, if I can return to my stand,
18    that, of course, was the first case to address the classic,
19    triangular indirect benefit issue where the transaction is
20    between a lender and insiders.  The insiders caused the funds
21    to be transferred to the debtor and the debtor repays it.  And
22    then the Second Circuit said, look, there is no requirement
23    that the value has to go directly to the debtor.  If a benefit
24    flows through the insider and ultimately gets to the debtor,
25    that is okay because what we are looking for here, what we are

258

1    ultimately looking for in these cases, when all is said and
2    done, is the balance, the balance of value to the debtor versus
3    value given by the debtor.  When all is said and done, that is
4    the equation.  And if that value comes through an insider but
5    it is a dollar for dollar or reasonably equivalent value, that
6    is sufficient.

7            Now taking that simplistic approach, which ultimately
8    is the question we are faced with, how does it play out here?
9    Well, the value to Terry Manufacturing from these transactions
10   is in fact zero.  The value, if it was given by Mr. Horton and
11   Reynolds, was stock that did not go to this company for which
12   it paid five hundred and ninety-six thousand dollars.

13           Now, you can't get around that basic equation, I
14   submit to the court, by saying, well, but gosh, there was other
15   stuff going on.  Mr. Horton and Mr. Reynolds, they control a
16   company and that company makes some loans to the Terrys and the
17   Terrys probably sent that money down to Terry Manufacturing.
18   Why?  Because the statute says it has to be an exchange for,
19   and plainly none of this was in exchange for the sale of the
20   stock.  No better evidence than the words that came from Mr.
21   Horton's mouth, they were completely separate.

22           So, Your Honor, at the end of the day I submit to you
23   when we go back to our balance, the value the defendants have
24   pointed to is simply ephemeral.  We started out with what I
25   will call the vendor relationship value.  Well, there's simply

259

1    no evidence of that, and that is why we didn't hear anything

2    about that.    So they defaulted to these unrelated loans.

3    That's no value because it wasn't given in exchange for this.

4         At the end of the day, what Mr. Brazeal has fought so

5    assiduously is a case we didn't bring.    The case we didn't

6    bring was – the case we considered, I might add – was American

7    Real Estate loaning five point five million dollars to the

8    Terrys and being repaid approximately two million dollars by

9    Terry Manufacturing, but that is not this case.    That case was

10   not brought.    There, I think we would have had relevant

11   testimony from Mr. Slaton about how that five point five was

12   used.    That would have made some sense, but that is not what we

13   are here to decide today.

14         Let me finally address an affirmative defense that was

15   alluded to in the opening, which is the notion that under the

16   Alabama statute benefit that flows to a third party is benefit

17   to the debtor.    There is, of course, no cases so hold.    As I

18   appreciate the argument that is going to be that, well, the

19   Terrys received stock having a value equal to or in the range

20   of what was paid for it, I question that.    I mean, obviously we

21   have had testimony as to whether the Perky Cap stock was worth

22   what was paid for it or not but I think that is really

23   irrelevant.    I don't think the court even needs to go there.

24         But the fact of the matter is if that is the law, it

25   simply    debases    fraudulent    conveyance    actions    involving

260

1    insiders.   If  the  debtor  gets  no  value,  how  then  can  we

2    possibly  understand  the  clear  and  unambiguous  language  of  the

3    statute?   If  the  debtor  made  the  transfer  without  receiving  a

4    reasonably  equivalent  value  in  exchange  for  the  transfer,  the

5    statute  simply  doesn't  support  the  reading.

6         Now  we  will  acknowledge  that  a  fair  reading  of  one

7    provision  of  the  code  is  that  the  debtor  in  this  situation,  if

8    the  debtor,  for  example,  were  indebted  to  its  insiders  for  a

9    hundred  dollars;  the  bank  pays  the  Terrys  –  gives  the  Terrys  a

10   hundred  dollars  and  TMC  pays  a  hundred  dollars  and  thereby  its

11   indebtedness  to  a  third  party  is  eliminated  in  that  sort  of

12   transaction,  that  makes  perfect  sense  because,  at  the  end  of

13   the  day,  that  is  value  to  the  debtor  albeit  not  coming  directly

14   from  the  party  with  whom  it  had  the  transfer.   That  makes

15   perfect  sense  and  we  don't  dispute  that,  but  that  is  not  the

16   case  here.

17        What  these  defendants  are  suggesting  is  fundamentally

18   different.   They  would  read  the  statute  as  such.   Horton,

19   Reynolds,  transfer  stock  of  the  value  of  six  hundred  thousand

20   dollars,  simply  for  our  discussion;  the  Terrys  get  paid  six

21   hundred  thousand  by  TMC,  Terry  Manufacturing;  and  that  that

22   value  to  the  Terrys  should  be  considered  the  value  to  Terry

23   Manufacturing.   That  is  simply  an  invitation  to  insiders  to

24   loot  a  company.   It  is  going  to  be  a  rare  occasion  where  in

25   this  sort  of  transaction  the  insiders  don't  get  something.   You

1      could routinely have the debtor make payments to third parties

2      and simply then transfer the money upstream to the insiders.

3      That is precisely the situation we have here.   The statue

4      doesn't permit that, and it would fundamentally debase at least

5      any notion I have or any understanding I have of fraudulent

6      conveyance law.

7              Your Honor, I will close by where I started.   I do

8      think this is a pretty straightforward case.   The bank cases,

9      we have had a lot of reference to.   Those were hard cases.

10     There was a real issue about the bank's monies ultimately

11     getting into the hands of Terry Manufacturing.   There was a

12     real issue about whether the banks had any inkling of the

13     troubles of Terry Manufacturing.

14             Those are not the case here.   Here, there is no issue

15     that the stock got to Terry Manufacturing.   There is no issue

16     Terry Manufacturing made the transfers.   And ultimately I have

17     to submit there is no issue that Mr. Horton's acknowledgment

18     that he was engaged in the movement of these peculiar, let's

19     put it gently, invoices, at least he had some doubts about the

20     integrity of Terry Manufacturing.   You don't go through that

21     level of machinations with a party you believe is going to be

22     repaying your debts in accordance with its terms.

23             But ultimately I submit that issue only goes to

24     whether with respect to that last transaction there was an

25     actual intent to hinder, delay or defraud.   This is an easy

262

1    case to decide on a constructive fraud basis, and I think it

2    hits on all fours.

3              Thank you, Your Honor.

4              THE COURT: Thank you.

5              MR. BRAZEAL: Your Honor, in responding to the

6    assertions of the trustee in this case, we have looked at the

7    totality of the relationship between Mr. Horton, his related

8    entity that he controlled, American Real Estate, the Terry

9    brothers, their wives and daughters, and the debtor.

10              And we have done that for this reason, Judge: While

11   Mr. Horton acknowledged that the stock purchase was separate

12   from the five point five million dollar note, and that was the

13   language that Mr. Barriere asked him about, he further

14   testified that they weren't completely separate because there

15   was the cross-default language between the two.

16              And he further testified, Your Honor, that if on

17   November 10 of 2000 Mr. Terry had shown up and said, "Well, you

18   know what, I have decided I am not going to buy the stock from

19   you for four hundred thousand dollars that I told you I was

20   going to buy it. I'm not going to buy the stock that I think is

21   part of my overall business plan," then Mr. Horton says he

22   doesn't think he would have loaned him the five and a half

23   million dollars.

24              That very same testimony, that testimony of Mr.

25   Horton, is confirmed by the testimony of Mr. Terry, Your Honor.

263

1           With respect to the Peoples Bank loan, Mr. Barriere

2    indicated that Mr. Horton testified maybe not that it wouldn't

3    have occurred but for his intervention but that he facilitated

4    it.  Well, that is true.  That is, obtaining the money from

5    Peoples Bank.  But he also unequivocally testified, Your Honor,

6    that had he not – had his stock in Perky Cap not been

7    purchased, had he not resigned from the Board of Directors, he

8    would not have authorized the loan to Perky Cap.

9           So had his stock not been purchased, had he not been

10   removed from the Board of Directors and as an officer of Perky

11   Cap, Perky Cap would not have been able to obtain the loan from

12   Peoples Bank that was used to put money directly into Terry

13   Manufacturing.

14          Your Honor, what Mr. Slaton's testimony has shown is

15   that for each of these loans that we have discussed that the

16   money went into Terry Manufacturing, and it appears that it was

17   used for ordinary business purposes.  So Mr. Horton has put

18   over seven million dollars into the debtor and so, when you

19   start weighing the scales to see what benefit did the debtor

20   give, which was six hundred thousand in payments, what benefit

21   did the debtor receive from its overall relationship to Mr.

22   Horton, the debtor certainly came off a lot better than Mr.

23   Horton did.

24          Your Honor, Mr. Barriere also referred to the

25   transaction in May of 2002 and suggested that it didn't occur

264

1    because it wasn't on the K-1 schedule.  He said that the price

2    of the stock was somehow indicative of it not actually

3    occurring.  Well, if Your Honor will recall, that was the same

4    price that was utilized for the stock purchase back in November

5    of 2000.

6         Your Honor, I would submit to you that the testimony

7    of Mr. Horton and Mr. Terry confirms that this seven million

8    dollars would not have made its way into the coffers had the

9    stock sales not taken place.

10        Finally, Your Honor, on this question about the

11   Alabama fraudulent conveyance statute, the Alabama fraudulent

12   conveyance statute contains language that the Uniform Act does

13   not contain and that no other state's act contains that I have

14   been able to find.

15        And if you read the comments to it, which are not

16   terrific – you didn't write them or Mr. Barriere.  It would

17   have been better.  If you read the comments to them, they do

18   suggest that this is a situation that they are trying to say is

19   not a fraudulent conveyance, and here's the reason, Your Honor:

20        If Mr. Horton and Reynolds give value to another,

21   which is the Terrys in this case, as a result of the payments

22   from the debtor, then what they are saying is if they give up

23   six hundred thousand dollars in value, we're not going to make

24   them pay twice.  In other words, if it goes to this person,

25   even if that is not the debtor, if it is to another person as

265

1    a result of the transaction, we are not going to make this

2    person pay twice.

3         And so I suggest to you, Your Honor, that the issue of

4    value does come in.  I am not suggesting that the stock was

5    worth six hundred thousand dollars fair market value, but I am

6    suggesting that there is a plethora of case law which reflects

7    that the six hundred thousand dollars in note payments on an

8    antecedent debt constitute value, and that the reduction in the

9    value from the Terrys to Mr. Horton and Mr. Reynolds was value

10   that was given to those individuals.  In other words, to a

11   person other than the debtor, as part of the transaction.

12        There is no case on it in Alabama.  Again, from what

13   I've been able to determine, Your Honor, there does not appear

14   to be a case in any other state because that language does not

15   appear anywhere.  And my suggestion is, because it is unique,

16   I think the legislature intended what Mr. Barriere would say is

17   a unique situation.

18        Thank you, Your Honor.

19        THE COURT: Okay.  Mr. Brazeal, you mentioned a case

20   several times yesterday.  I have forgotten the name of it.  Can

21   you give me the name and the citation of the case?

22        MR. BRAZEAL: It was the one that Mr. Barriere was

23   discussing.  I actually have a memo that has several cases

24   contained in it, which I was going to submit as part of my

25   order.

266

1          THE COURT: Well, that is fine.

2          MR. BRAZEAL: If you want to look at them in the

3    meantime, I will be glad to furnish them in the meantime.

4          THE COURT: No, that is okay. Realistically I probably

5    won't get to it much, but I wanted to make sure.  You had

6    mentioned the case a couple of times yesterday, and it was one

7    maybe I have read it in the past.  I just didn't remember.  I

8    just wanted to make sure at some point in time I have read the

9    case.

10          MR. BRAZEAL: Thank you, Your Honor.

11          THE COURT: Let's see.  Mr. Barriere, you get the last

12    word.

13          MR. BARRIERE: Your Honor, I will simply thank the

14    court for your time and indulgence.  As I said, I think at the

15    end of the day, this is an easy case.  There was no value to

16    this debtor.  Mr. Horton has acknowledged there was no value to

17    this debtor.

18          I take it from Mr. Brazeal's silence on the topic in

19    closing, indeed his failure to put on any evidence, there is no

20    dispute that the company was insolvent throughout this period

21    in question.  The debtor paid the bills it should not have paid

22    for its insiders' obligations.  And the trustee requests that

23    it be awarded judgment in the amount of the entire payments,

24    plus interest from date of demand and judicial costs.

25          Thank you, Your Honor.

267

1            THE COURT: Thank you all.

2                (Off the record at 11:29 a.m.)

268

C E R T I F I C A T E

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date: April 18, 2006

**The following items available for viewing US Bankruptcy Court:**

#1 Deposition Transcript and Exhibits of Roy Terry dated January 27, 2006

#2 Plaintiff's Trial Exhibits 1-22 and 45-46

#3 All Defendant's Trial Exhbits

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO.  03-32063-WRS |
| COMPANY, INC. | ) | |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO.  03-32213-WRS |
| TERRY UNIFORM | ) | |
| COMPANY, LLC, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF | ) | |
| TERRY MANUFACTURING | ) | |
| COMPANY, INC. AND | ) | ADVERSARY PROCEEDING |
| TERRY UNIFORM COMPANY, LLC | ) | |
| | ) | NO. 05-_____ |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND  JAMES M. | ) | |
| REYNOLDS, III | ) | |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes J. Lester Alexander, III, the duly

appointed and acting Chapter 7 trustee (the "Trustee") of Terry Manufacturing Company, Inc. ("Terry

Manufacturing") and Terry Uniform Company, LLC, ("Terry Uniform"), and for his Complaint against

N.D. Horton, Jr., and James M. Reynolds, III, seeking recovery of fraudulent conveyances and/or

NO:99539845.2

preferential payments made by Terry Manufacturing to N.D. Horton, Jr. and James M. Reynolds, III, respectfully represents:

## I.

Pursuant to Order of this Court dated May 13, 2004, Mr. Alexander is the duly appointed and acting Trustee of Terry Manufacturing and Terry Uniform.

## II.

N.D. Horton, Jr., is an individual who resides at 257 Rose Creek Road,  Eatonton, GA 31024 (hereinafter "Mr. Horton").

## III.

James M. Reynolds, III is an individual who resides at 591 River Lake Dr., N.E., Eatonton, Georgia 31024. (hereinafter "Mr. Reynolds").

## IV.

This action is a core proceeding within the meaning of 28 U.S.C. §157(b).  It falls under this Court's jurisdiction pursuant to 28 U.S.C. §1334 and the standard order of reference of core proceedings to this Court by the United States District Court for the Middle District of Alabama.

## V.

Venue is proper in this district pursuant to 28 U.S.C. §1409(a).

## **INTRODUCTION**

## VI.

This is an action seeking total recovery of approximately $596,738.42 which, upon information and belief, was paid by Terry Manufacturing to Mr. Horton in the approximate amount of $298,369.21 and to Mr. Reynolds in the approximate amount of $298,369.21 during the period commencing December 10, 2000 and ending July 7, 2003.  Mr. Horton and Mr. Reynolds made three personal loans, with the principal sums  totaling $1,024,000.00, to  Rudolph Terry and Roy Terry, Cotina Terry, and Allie Robinson.  Roy and Rudolph Terry, Cotina Terry and Allie Robinson executed promissory notes and loan agreements in order to purchase Perky Cap Company, Inc. ("Perky Cap") stock held by Mr. Horton and Mr. Reynolds. Terry Manufacturing made all payments on the three loans.  Terry Manufacturing did not  receive any benefit from these loans.  At the time of the payments, Terry Manufacturing had assets which were unreasonably small in relation to its business and/or was insolvent.

## GROUNDS FOR RELIEF

### VII.

Terry Manufacturing filed a Voluntary Petition for Reorganization under Chapter 11 of the United States Bankruptcy Code on July 7, 2003.  Mr. Alexander was appointed as its Chapter 11 trustee on July 11, 2003.  Terry Uniform filed a voluntary Chapter 11 petition on July 22, 2003.

### VIII.

Rudolph Terry was formerly an officer and director of Terry Manufacturing and, along with his brother Roy, was a controlling shareholder of Terry Manufacturing.

### IX.

Roy Terry was formerly an officer and director of Terry Manufacturing and, along with his brother Rudolph, was a controlling shareholder of Terry Manufacturing.

## X.

Cotina Terry was formerly an officer and director of Terry Manufacturing, and along with her brothers, Rudolph and Roy Terry, was a shareholder of Terry Manufacturing.

## XI.

Allie R. Robinson is the wife of Rudolph Terry and a shareholder of Terry Manufacturing.

## XII.

On May 20, 2002 Roy Terry and Rudolph Terry executed a Promissory Note in favor of Mr. Horton and Mr. Reynolds for the principal amount of $624,000.00 (the "Terry Note"). For and in consideration of the $624,000.00, Mr. Horton and Mr. Reynolds transferred to Cotina Terry, twenty-seven nine hundred (27,900) shares of Perky Cap stock. These shares represented 31 % of the outstanding Common Stock of that company.

## XIII.

The Terry Note was payable in monthly installments to Mr. Horton and Mr. Reynolds beginning on July 2, 2002 in the amount of $4,680.00 and continuing in that amount until December 2, 2002 at which time the outstanding balance was amortized over 36 equal monthly payments in the amount of $19,843.03. The final installment on the Terry Note was due on December 5, 2005.

## XIV.

Upon information and belief, Terry Manufacturing made payments to Mr. Horton and Mr. Reynolds totaling $127,986.90.

## XV.

NO:99539845.2

4

On November 10, 2002 Cotina Terry executed a Purchase Money Promissory Note ("Cotina Terry Note") in the principal sum of $200,000.00.  The Cotina Terry Note was made payable to Mr. Horton and Mr. Reynolds and was given for and in consideration of 9,000 shares of Perky Cap stock sold to Cotina Terry by Mr. Horton and Mr. Reynolds.   These shares  represented 10 % of the outstanding Common Stock of that company.

## XVI.

The Cotina Terry Note was payable in eighteen equal monthly installments in the amount of $11,965.42. Payments to Mr. Horton and Mr. Reynolds began on December 10, 2000. Based on information and belief, all payments were made timely and the Cotina Terry Note was never in default. Terry Manufacturing paid the Cotina Terry Note in full together with interest at the rate of 9.5 % per annum. Payments by Terry Manufacturing on the Cotina Terry Note totaled $234,375.81.

## XVII.

On November 10, 2002 Allie R. Robinson executed a Purchase Money Promissory Note ("Allie Robinson Note") in the principal sum of $200,000.00. The Allie Robinson Note was made payable to Mr. Horton and Mr. Reynolds and was given for and in consideration of 9,000 shares of Perky Cap stock sold to Allie Robinson by Mr. Horton and Mr. Reynolds. These shares represented 10 % of the outstanding Common Stock of that company.

## XVIII.

The Allie Robinson Note was payable in eighteen (19) monthly installments in the amount of $11,965.42. Payments to Mr. Horton and Mr. Reynolds began on December 10, 2000. Based on information and belief, all payments were made timely and the Allie Robinson Note was never in default. Terry Manufacturing paid the Allie Robinson Note in full together with interest at the rate of 9.5 % per annum. Payments by Terry Manufacturing on the Allie Robinson Note totaled $234,375.81

## XIX.

Terry Manufacturing paid Mr. Reynolds and Mr. Horton approximately $23,930.83

each month on the Cotina Terry and Allie Robinson Notes. That amount was divided equally between Mr. Horton and Mr. Reynolds.

## XX.

At the time of the payments by Terry Manufacturing to Mr. Horton and Mr. Reynolds, Terry Manufacturing did not have adequate assets to finance the business that had been conducted, or anticipated it would conduct. At all times, Terry Manufacturing had unreasonably small capital.

## XXI.

At the time of the payments to Mr. Reynolds and Mr. Horton, Terry Manufacturing was insolvent in that the fair value of its assets was less than the amount of its liabilities.

## XXII.

Terry Manufacturing received no value for its payments to Mr. Horton and Mr. Reynolds. Upon information and belief, all payments made by Terry Manufacturing to Mr. Horton and Mr. Reynolds were made for the purchase of stock in Perky Cap held by Cotina Terry and by Allie Robinson in their individual capacity.

## XXIII.

The payments made to Mr. Horton and Mr. Reynolds were made from the corporate assets of Terry Manufacturing, although the loans made by Mr. Horton and Mr. Reynolds were for the sole benefit of Rudolph Terry, Roy Terry, Cotina Terry, and Allie Robinson.

## <u>COUNT ONE</u>

**FOR FRAUDULENT CONVEYANCES PURSUANT
TO THE ALABAMA FRAUDULENT TRANSFER ACT,
ALABAMA CODE 1975, TITLE 8, CHAPTER 9A
AND THE GEORGIA FRAUDULENT TRANSFER ACT,
GEORGIA CODE, TITLE 18, CHAPTER 2, ARTICLE 4**

**XXIV**.

The Trustee incorporates by reference paragraphs I through XXIII above, as if fully set forth herein.

**XXV.**

Pursuant to 11 U.S.C. §544(b), the Trustee enjoys the rights and powers of an unsecured creditor. Included among these is the right to assert any claims, demands or causes of action an unsecured creditor would enjoy under the Bankruptcy Code or state law.

**XXVI.**

The payments made by Terry Manufacturing to Mr. Reynolds and Mr. Horton constitute fraudulent transfers within the meaning of the Alabama and Georgia Fraudulent Transfer Acts. Terry Manufacturing received no value for the transfers, and all of the transfers were made at a time when Terry Manufacturing had unreasonably small assets in relation to its business and was unable to pay its debts as they became due. Also, the payments occurred at a time when Terry Manufacturing was insolvent.

**XXVII.**

The Trustee is entitled to judgment against Mr. Horton and Mr. Reynolds voiding the payments made by Terry Manufacturing to them. At this time, the Trustee believes those payments total

$596,738.42,  but reserves the right to amend his complaint should discovery reveal payments by Terry

Manufacturing to Mr. Horton and/or Mr. Reynolds is in a different amount.

## COUNT TWO

### AVOIDANCE OF FRAUDULENT CONVEYANCE
### PURSUANT TO 11 U.S.C. §548

### XXVIII.

The Trustee incorporates by reference paragraphs I through XXVII  above, as if fully set forth

herein.

### XXIX.

The payments by Terry Manufacturing to Mr. Horton and Mr. Reynolds  constitute fraudulent

transfers and obligations within the meaning of 11 U.S.C. §548.  Terry Manufacturing did not receive any

value, much less reasonably equivalent value, for the payments, and the payments were made at a time

when Terry Manufacturing had unreasonably small capital within the meaning of  11 U.S.C. §548(a)(B)(2).

Certain of the payments occurred at a time when Terry Manufacturing was insolvent.

## COUNT THREE

### AVOIDANCE OF PREFERENCES PURSUANT TO 11 U.S.C. §547

### XXX.

The Trustee incorporates by reference paragraphs I through XXIX  above, as if fully set forth

herein.

NO:99539845.2

9

## XXXI.

To the extent Terry Manufacturing received any value for the payments to Mr. Reynolds and Mr. Horton (which is specifically denied by the Trustee) the payments are still avoidable as preferences. The payments were on account of an antecedent debt and were made when Terry Manufacturing was insolvent and permitted Mr. Horton and Mr. Reynolds to receive substantially more property than they would have received in a case under Chapter 7.

## XXXII.

As a result of a series of agreements between Roy Terry, Rudolph Terry, N. D. Horton, Jr. and James M. Reynolds, III, Messrs. Horton and Reynolds were either the owners of a majority of the common stock of Terry Manufacturing throughout the year preceding its Chapter 11 filing or had effective control and dominion over such common stock. Accordingly, Messrs. Horton and Reynolds should be deemed to be insiders of Terry Manufacturing within the meaning of 11 U.S.C. §101(31) and subject to the one year preference period set forth in 11 U.S.C. §547.

WHEREFORE, after due proceedings had, J. Lester Alexander, III, the duly acting and appointed Trustee of Terry Manufacturing and Terry Uniform respectfully requests that there be judgment in his favor and against N.D. Horton, Jr. and James M. Reynolds, III in the amount of $596,738.42 or such other amount as discovery may reveal to be paid by Terry Manufacturing to Mr. Horton and /or Mr. Reynolds, together with attorneys fees, interest, costs and such other relief as to which he may be entitled.

Respectfully submitted this 10th day of June, 2005.

Respectfully submitted,

**PHELPS DUNBAR LLP**

By:       /s/   Brent B. Barriere
          Brent B. Barriere, T.A.  (La. Bar No. 2818)
          David L. Patrón (La. Bar No. 22566)
          Katherine M. Determan (La. Bar No. 25381)
          Catherine E. Lasky (La. Bar No. 28652)
          365 Canal Street, Suite 2000
          New Orleans, Louisiana  70130-6534
          Telephone:  (504) 566-1311
          Facsimile:  (504) 568-9130

**ATTORNEYS FOR J. LESTER ALEXANDER, III,
TRUSTEE**

B 104
(Rev. 2/92)

# ADVERSARY PROCEEDING COVER SHEET

Instructions on Reverse

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| J. Lester Alexander, III, Trustee of Terry Manufacturing Co., Inc. and Terry Uniform, LLC | N.D. Norton, Jr. and James M. Reynolds, III |

| Attorneys (Firm Name, Address, and Telephone No.) | Attorneys (if Known) |
|---|---|
| Brent B. Barriere, David   (504) 566-1311<br>Phelps Dunbar    Patron, Katherine M.<br>365 Canal St., Suite 2000   Determan,<br>New Orleans, LA 70130    Catherine Lasky | |

**PARTY**   (Check one box only)     ☐ 1. U.S. PLAINTIFF      ☐ 2 U.S. DEFENDANT      ☒ 3. U.S. NOT A PARTY

**CAUSE OF ACTION**   (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This action seeks recovery of $596,738 pursuant to 11 U.S.C. Section 547 and 548, and for fraudulent conveyances pursuant to the Alabama Fraudulent Transfer Act, Alabama Code 1975, Title 8, Chapter 9A and the Georgia Fraudulent Transfer Act, Georgia Code, Title 18, Chapter 2, Article 4.

## NATURE OF SUIT

(Check the one most appropiate box only.)

☒ 454 To Recover Money or Property

☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property

☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in the property

☐ 424 To object or revoke a discharge 11 U.S.C. §727

☐ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan

☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523

☐ 434 To obtain an injunction or other equitable relief

☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action

☐ 459 To determine a claim or cause of action removed to a bankruptcy court

☐ 498 Other (specify)

**ORIGIN OF PROCEEDINGS**
(Check one box only.)

☒ 1 Original Proceeding     ☐ 2 Removed Proceeding     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from Another Bankruptcy Court

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐

| DEMAND | NEAREST THOUSAND<br>$ $597,000.00 | OTHER RELIEF SOUGHT<br>Attorney fees, costs, interest | ☐ JURY DEMAND |
|---|---|---|---|

### BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR<br>Terry Manufacturing Co., Inc. & Terry Uniform | BANKRUPTCY CASE NO.<br>03-32063 | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>Middle District of Alabama | DIVISIONAL OFFICE | NAME OF JUDGE<br>William Sawyer |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |
| DISTRICT<br>Middle District of Alabama | DIVISIONAL OFFICE | NAME OF JUDGE |

**FILING FEE**   (Check one box only.)     ☐ FEE ATTACHED      ☐ FEE NOT REQUIRED      ☒ FEE IS DEFERRED

| DATE<br>06/10/2005 | PRINT NAME<br>Katherine M. Determan | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|

# United States Bankruptcy Court

## Middle District Of Alabama

In re    Terry Manufacturing Co., Inc. and Terry Uniform LLC    ,    )
_____    )    Case No. 03-32063
                        Debtor    )    _____
                                )
                                )    Chapter 7
        J. Lester Alexander, III, Trustee of Terry Mfg.Co,Inc. €,    )    _____
_____    )
                        Plaintiff    )
                                )
                                )
        N.D. Horton, Jr. and James M. Reynolds, III    ,    )    Adv. Proc. No.
_____    )    _____
                        Defendant    )


### SUMMONS IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

Address of Clerk:



U.S. Bankruptcy Court
Middle District of Alabama
P.O. Box 1248
Montgomery, AL  36102

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

Name and Address of Plaintiff's Attorney:



Brent B. Barriere, David Patron, Katherine M. Determan, Catherine Lasky, Phelps
Dunbar, 365 Canal St., Suite 2000, New Orleans, LA 70130

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

6/10/05
_____
            Date

## CERTIFICATE OF SERVICE

I, <u>Katherine M. Determan</u>                    , certify that I am, and at all times during the
         (name)

service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made.  I further certify that the service of this summons and a copy of the complaint was made

_____ by:
     (date)

NOTE: If more space is needed, note "See Attached Page" in the appropriate box and add additional addresses to 3rd page of form.

[✔] Mail Service: Regular, first class United States mail, postage fully pre-paid, addressed to:

| | |
|---|---|
| N.D. Horton, Jr.<br>257 Rose Creek Road<br>Eatonton, GA 31024 | James M. Reynolds, III<br>591 River Lake Dr., N.E.<br>Eatonton, Ga 31024 |

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of <u>Alabama</u>          ,
as follows: [Describe briefly]                                    (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.


_____        _____
Date                        Signature

Print Name:

| Katherine M. Determan |
|---|

Business Address:

| Phelps Dunbar<br>365 Canal St., Suite 2000<br>New Orleans, LA 70130 |
|---|

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

IN RE:                                    )
                                          )
TERRY MANUFACTURING                       )        CASE NO. 03-32063-WRS
COMPANY, INC.,                            )
                                          )        CHAPTER 7
     Debtor                               )
                                          )
_____

IN RE:                                    )
                                          )
TERRY UNIFORM                             )        CASE NO. 03-32213-WRS
COMPANY, LLC,                             )
                                          )
     Debtor                               )

_____

J. LESTER ALEXANDER, III,                 )
TRUSTEE OF TERRY                          )
MANUFACTURING COMPANY,                    )        ADVERSARY PROCEEDING NO.:
                                          )        05-03042
INC, AND TERRY UNIFORM                    )
COMPANY, LLC                              )
                                          )
VERSUS                                    )
                                          )
N.D. HORTON AND JAMES M.                  )
REYNOLDS, III                             )

**ANSWER TO COMPLAINT**

COME NOW N.D. Horton, Jr. ("Horton"), and James M. Reynolds ("Reynolds"),

III, and for their answer to the Complaint of the trustee say as follows:

**First Defense**

In specific response to each of the numbered paragraphs of the trustee's

complaint, Horton and Reynolds say as follows:

1.      The defendants admit the averments of paragraph 1.

2.      The defendants admit the averments of paragraph 2.

3.      The defendants admit the averments of paragraph 3.

4.      The defendants admit the averments of paragraph 4.

5.      The defendants admit the averments of paragraph 5.

6.      The defendants admit that Mr. Horton and Mr. Reynolds made the three referenced loans; however, the defendants deny the remaining averments of paragraph 6.

7.      The defendants admit the averments of paragraph 7.

8.      The defendants are without sufficient information from which to determine the truth or varacity of the averments of paragraph 8, and, therefore, deny same.

9.      The defendants are without sufficient information from which to determine the truth or varacity of the averments of paragraph 9, and, therefore, deny same.

10.     The defendants are without sufficient information from which to determine the truth or varacity of the averments of paragraph 10, and, therefore, deny same.

11.     The defendants are without sufficient information from which to determine the truth or varacity of the averments of paragraph 11, and, therefore, deny same.

12.     The defendants admit the averments of paragraph 12.

13.     The defendants admit the averments of paragraph 13.

14.     The defendants are without sufficient information from which to determine the truth or varacity of the averments of paragraph 14, and, therefore, deny same.

15.     The defendants admit the averments of paragraph 15.

16.     The defendants admit the averments of paragraph 16, except the defendants deny that the payments were made by Terry Manufacturing.

17.     The defendants admit the averments of paragraph 17.

18.     The defendants admit the averments of paragraph 18, except the defendants deny that the payments were made by Terry Manufacturing.

19.     The defendants admit the averments of paragraph 19, except the defendants deny the payments were made by Terry Manufacturing.

20.     The defendants deny the averments of paragraph 20.

21.     The defendants deny the averments of paragraph 21.

22.     The defendants deny the averments of paragraph 22.

23.     The defendants deny the averments of paragraph 23.

24.     The defendants incorporate herein their responses to paragraphs 1-23 as set forth hereinabove.

25.     These averments do not require an admission or denial since they are not factual averments.

26.     The defendants deny the averments of paragraph 26.

27.     The defendants deny the averments of paragraph 27.

28.     The defendants incorporate herein their responses to paragraphs 1-27 as set forth hereinabove.

29.     The defendants deny the averments of paragraph 29.

30.     The defendants incorporate herein their responses to the above-referenced paragraphs 1-29.

31.     The defendants deny the averments of paragraph 31.

32.     The defendants deny the averments of paragraph 32.

## Second Defense

The complaint fails to state a claim upon which relief can be granted against these defendants.

## Third Defense

The trustee's claims are barred by the doctrine of unclean hands.

## Fourth Defense

The trustee's claims are barred by the doctrine of estoppel.

## Fifth Defense

The trustee's claims are barred by the doctrine of waiver.

## Sixth Defense

The trustee's claims are barred by the defense of ordinary course of business.

## Seventh Defense

To the extent that any transfers occurred, the defendants took in good faith and provided a reasonably equivalent value.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for American Real Estate Investment Company, Ltd, L.P.

OF COUNSEL:

WALSTON, WELLS, ANDERSON
  & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:    (205) 244-5237
Telecopier:   (205) 244-5437

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Answer to Complaint has been served by placing same in the United States mail, properly addressed and postage prepaid, as follows:

Brent B. Barriere
David L. Patron
365 Canal Street
Suite 2000
New Orleans, Louisiana 70130

This the \11th\ day of July, 2005.


\s\ C. Ellis Brazeal III
OF COUNSEL

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
|     Debtor | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM | ) | CASE NO. 03-32213-WRS |
| COMPANY, LLC, | ) | |
| | ) | |
|     Debtor | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, | ) | ADVERSARY PROCEEDING NO.: |
| | ) | 05-03042 |
| INC, AND TERRY UNIFORM | ) | |
| COMPANY, LLC | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND JAMES M. | ) | |
| REYNOLDS, III | ) | |

### AMENDMENT TO ANSWER

COME NOW the Defendants, N.D. Horton, Jr. ("Horton"), and James M. Reynolds ("Reynolds"), III, and hereby amend their previously filed answer to assert the following affirmative defense:

### Eighth Defense

33.    The defendants plead the applicable statute of limitations.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for American Real Estate
Investment Company, Ltd, L.P.

**OF COUNSEL:**

WALSTON, WELLS, ANDERSON
   & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:   (205) 244-5237
Telecopier:   (205) 244-5437

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the above and foregoing Amendment to Answer has been served by placing same in the United States mail, properly addressed and postage prepaid, as follows:

     Brent B. Barriere
     David L. Patron
     365 Canal Street
     Suite 2000
     New Orleans, Louisiana 70130

     This the \1st\ day of August, 2005.

     \s\ C. Ellis Brazeal III
     OF COUNSEL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
| **Debtor** | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM | ) | CASE NO. 03-32213-WRS |
| COMPANY, LLC, | ) | |
| | ) | |
| **Debtor** | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, | ) | ADVERSARY PROCEEDING |
| | ) | NO.:  05-03042 |
| INC, AND TERRY UNIFORM | ) | |
| COMPANY, LLC | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND JAMES M. | ) | |
| REYNOLDS, III | ) | |

### <u>MOTION TO AMEND ANSWER</u>

COME NOW the Defendants, N.D. Horton, Jr. ("Horton"), and James M. Reynolds, III ("Reynolds"), and hereby file this motion to amend answer say as follows:

1.    Pursuant to Bankruptcy Rule 7015, the Defendants hereby move to amend their answer in the above-referenced proceeding as set forth in the attached Amendment to Answer.

2.    Bankruptcy Rule 7015 provides that the amendment should be freely allowed when justice is required.

3.    There are two additional affirmative defenses stated in the answer. First, as the trustee is aware, the defendants loaned additional funds to the debtor. This may provide the basis for a defense under 11 U.S.C. § 547 and Alabama Code § 8-9A-8.

4.    Second, possibly unlike Georgia, Alabama law provides a defense for consideration paid to parties other than the debtor. See Ala. Code §§ 9A-8(d). While this arguably may be covered by Defendants' initial affirmative defenses, defendants want to ensure that there is no question about this defense being asserted.

5.    Both of these defenses previously have been made known to Plaintiff's counsel.

6.    Justice would require that the defendants be able to assert these defenses.

WHEREFORE, premises considered, Defendants, N.D. Horton, Jr., and James M. Reynolds, III, respectfully request this Court to allow them to amend their answer as set forth in the attached Amendment to Answer. The parties pray for such further and other relief as this Court may deem appropriate.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for N.D. Horton, Jr., and
James M. Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:    (205) 244-5237
Telecopier:    (205) 244-5437


**CERTIFICATE OF SERVICE**

       I hereby certify that a copy of the above and foregoing Motion to Amend Answer has been served by electronic filing purposes and/or by placing same in the United States mail, properly addressed and postage prepaid, as follows:

       Katherine Mille Determan
       Phelps Dunbar LLP
       City Plaza
       445 North Boulevard
       Suite 701
       Baton Rouge, LA 70802-5707


       This the \2nd\ day of December, 2005.


       \s\ C. Ellis Brazeal III
       OF COUNSEL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
| **Debtor** | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM | ) | CASE NO. 03-32213-WRS |
| COMPANY, LLC, | ) | |
| | ) | |
| **Debtor** | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, | ) | ADVERSARY PROCEEDING NO.: |
| | ) | 05-03042 |
| INC, AND TERRY UNIFORM | ) | |
| COMPANY, LLC | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND JAMES M. | ) | |
| REYNOLDS, III | ) | |

## AMENDMENT TO ANSWER

COME NOW the Defendants, N.D. Horton, Jr. ("Horton"), and James M. Reynolds ("Reynolds"), III, and hereby amend their previously filed answer to assert the following affirmative defenses:

## Ninth Defense

34.     To the extent that there was a voidable transfer, which the defendants deny, the defendants are entitled to a reduction in the amount of liability to the extent of value given to the debtor for the transfer or to another person as a consequence of the debtor's making such transfer.

## Eleventh Defense

35.     The defendants gave new value to or for the benefit of the debtor after the transfer was made.

## Tenth Defense

36.     The defendants are entitled to a setoff of the amounts due and owing to the defendants.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Defendants, N.D. Horton, Jr., and James M. Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS
   & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:     (205) 244-5237
Telecopier:     (205) 244-5437

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Amendment to Answer has been served via electronic filing and/or by placing same in the United States mail, properly addressed and postage prepaid, as follows:

Brent B. Barriere
Katherine M. Determan
365 Canal Street
Suite 2000
New Orleans, Louisiana 70130

This the \2nd\ day of December, 2005.


\s\ C. Ellis Brazeal III
OF COUNSEL

#47 TEXT ORDER GRANTING MOTION TO AMEND

NO PDF DOCUMENT AVAILABLE FOR VIEWING

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

IN RE:                              )
                                    )
TERRY MANUFACTURING                 )       CASE NO.  03-32063-WRS
  COMPANY, INC.              )
                                    )       CHAPTER 7
  Debtor                     )
                                    )

IN RE:                              )
                                    )       CASE NO.  03-32213-WRS
TERRY UNIFORM                       )
  COMPANY, LLC,              )       CHAPTER 7
                                    )
  Debtor.                    )

J. LESTER ALEXANDER, III,           )
TRUSTEE OF                          )
TERRY MANUFACTURING                 )
COMPANY, INC. AND TERRY             )
UNIFORM COMPANY, LLC                )       ADVERSARY PROCEEDING
                                    )       NO. 05-03042
VERSUS                              )
                                    )
N.D. HORTON, JR. AND JAMES M.       )
REYNOLDS, III                       )

## UNOPPOSED MOTION TO AMEND COMPLAINT

NOW INTO COURT, through undersigned counsel, comes J. Lester Alexander, III,

Trustee of Terry Manufacturing Company, Inc. and Terry Uniform Company, LLC and plaintiff

herein, and respectfully requests that he be permitted to amend his Complaint in the captioned

adversary proceeding.  In support of his motion, Mr. Alexander respectfully represents:

1.

The Trustee's Complaint was filed on June 10, 2005.  Defendants have answered the Complaint, some discovery has been conducted, and trial is scheduled to commence on March 27, 2006.

2.

The crux of this case is the Trustee's theory that the defendants received transfers which constitute voidable fraudulent conveyances under both state and federal law.  Specifically, Terry Manufacturing made payments on promissory notes given by Cotina Terry, Allie Robinson, Roy Terry and Rudolph Terry to the defendants in consideration of common stock of Perky Cap Company sold to them by the defendants.  None of the stock was transferred to Terry Manufacturing nor did it otherwise obtain any interest in the stock.

3.

Defendants have noted that Terry Manufacturing guaranteed the promissory notes given to defendants by Cotina Terry and Allie Robinson, and asserted that satisfaction of  Terry Manufacturing's contingent liability under those guarantees somehow constitutes reasonably equivalent value for payments Terry Manufacturing made on the Cotina Terry and Allie Robinson notes.  In response, the Trustee has asserted that Terry Manufacturing received no consideration whatsoever for the guarantees, that the granting of the guarantees was itself a fraudulent conveyance, and that neither the granting of the guarantees nor payments which may have satisfied the guarantees are supported by reasonably equivalent value.

4.

Defendants have expressed concern that the issues of whether the guarantees are enforceable, whether the granting of the guarantees was supported by reasonably equivalent

- 2 -

value and whether satisfaction of the guarantees constitute reasonably equivalent value are not expressly put at issue by the Trustee's Complaint. In order to eliminate this concern, the Trustee has proposed, and defendants have agreed, that he amend his Complaint to put the guarantees squarely at issue. The parties have further agreed that this amendment will not cause the extension, nor be cited as a basis for the continuance of any of the deadlines imposed by the Court in this case or the trial date.

WHEREFORE, J. Lester Alexander, III, Trustee, respectfully requests that he be permitted to file the amendment to the Complaint attached hereto as Exhibit A, and that he be provided such other and further relief as may be just and equitable.

Respectfully submitted,

**PHELPS DUNBAR LLP**

By:   /s/ Brent B. Barriere
      Brent B. Barriere, T.A.  (La. Bar No. 2818)
      David L. Patrón (La. Bar No. 22566)
      Catherine E. Lasky (La. Bar No. 28652)
      365 Canal Street, Suite 2000
      New Orleans, Louisiana  70130-6534
      Telephone:  (504) 566-1311
      Facsimile:  (504) 568-9130

**ATTORNEYS FOR J. LESTER ALEXANDER, III, TRUSTEE OF TERRY MANUFACTURING COMPANY, INC. AND TERRY UNIFORM COMPANY, L.L.C.**

- 3 -

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 27th day of January, 2006 served a copy of the

foregoing pleading on the party listed below by First Class Mail:

Mr. C. Ellis Brazeal, III
Walston Wells & Birchall, LLP
1819 5th Avenue North, Suite 1100
Birmingham, AL  35203

Mr. Dick Schmidt
Blasingame, Burch, Garrard, Bryant & Ashley
1040 Founders Row, Suite B
Greensboro, Georgia  30642

/s/ Brent B. Barriere

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

|  |  |  |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **TERRY MANUFACTURING** | ) | **CASE NO.  03-32063-WRS** |
| **COMPANY, INC.** | ) | |
| | ) | **CHAPTER 7** |
| **Debtor** | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **CASE NO.  03-32213-WRS** |
| **TERRY UNIFORM** | ) | |
| **COMPANY, LLC,** | ) | **CHAPTER 7** |
| | ) | |
| **Debtor.** | ) | |

|  |  |  |
|---|---|---|
| **J. LESTER ALEXANDER, III,** | ) | |
| **TRUSTEE OF** | ) | |
| **TERRY MANUFACTURING** | ) | |
| **COMPANY, INC. AND TERRY** | ) | |
| **UNIFORM COMPANY, LLC** | ) | **ADVERSARY PROCEEDING** |
| | ) | **NO. 05-03042** |
| **VERSUS** | ) | |
| | ) | |
| **N.D. HORTON, JR. AND JAMES M.** | ) | |
| **REYNOLDS, III** | ) | |

### FIRST AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, comes J. Lester Alexander, III, Trustee of Terry Manufacturing Company, Inc. and Terry Uniform Company, LLC, plaintiff herein, and hereby amends his complaint by adding thereto the following:

33.

Terry Manufacturing granted guarantees to Messrs. Horton and Reynolds in connection with the Allie Robinson note and Cotina Terry note. The granting of such guarantees was in itself a fraudulent conveyance because Terry Manufacturing received no value whatsoever for



the granting of the guarantees, much less value reasonably equivalent to the contingent liabilities assumed by it, and, as of the date of the guarantees, Terry Manufacturing was insolvent, had unreasonably small capital, and had assumed debts which it knew, or should reasonably have known, it could not pay timely.  As Terry Manufacturing received no value whatsoever for the guarantees and the guarantees are properly voidable, the release of the contingent liabilities represented by the guarantees did not constitute value for the payments Terry Manufacturing made with respect to the Allie Robinson note and Cotina Terry note.

Respectfully submitted,

**PHELPS DUNBAR LLP**

By:    /s/ Brent B. Barriere
          Brent B. Barriere, T.A.  (La. Bar No. 2818)
          David L. Patrón (La. Bar No. 22566)
          Catherine E. Lasky (La. Bar No. 28652)
          365 Canal Street, Suite 2000
          New Orleans, Louisiana  70130-6534
          Telephone:  (504) 566-1311
          Facsimile:  (504) 568-9130

**ATTORNEYS FOR J. LESTER ALEXANDER, III, TRUSTEE OF TERRY MANUFACTURING COMPANY, INC. AND TERRY UNIFORM COMPANY, L.L.C.**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 27th day of January, 2006 served a copy of the

foregoing pleading on the party listed below by First Class Mail:

Mr. C. Ellis Brazeal, III
Walston Wells & Birchall, LLP
1819 5th Avenue North, Suite 1100
Birmingham, AL  35203

Mr. Dick Schmidt
Blasingame, Burch, Garrard, Bryant & Ashley
1040 Founders Row, Suite B
Greensboro, Georgia  30642

/s/ Brent B. Barriere_____

- 3 -

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re:                                          Case No. 03-32063

TERRY MANUFACTURING
COMPANY INC.,

      Debtor.


In re:                                          Case No. 03-32213

TERRY UNIFORM
COMPANY, LLC,

      Debtor.


J. LESTER ALEXANDER III,                        Adv. Pro. No. 05-3042
TRUSTEE OF TERRY
MANUFACTURING COMPANY, INC.
AND TERRY UNIFORM COMPANY,
LLC

      Plaintiff,

v.

N.D. HORTON, JR., AND
JAMES M. REYNOLDS, III


# ORDER GRANTING TRUSTEE'S MOTION
## TO AMEND COMPLAINT


On January 27, 2006 the Plaintiff filed a Motion to Amend Complaint.  (Docs. 1,

55).  The main issue in this Adversary Proceeding is whether payments made by Terry

Manufacturing on promissory notes given by members of the Terry family in connection

with the purchase of stock sold by Defendants constitute fraudulent transfers.  The

Defendants have advanced the argument that certain guarantees made by Terry

Manufacturing on the promissory notes given by Cotina Terry and Allie Robinson

constitute reasonably equivalent value.  The Plaintiff asserts that the purpose for

amending the complaint is to put expressly at issue: (1) whether the guarantees are

enforceable; (2) whether the granting of the guarantee was supported by reasonably

equivalent value; and (3) whether the satisfaction of the guarantees constitute reasonably

equivalent value.  The Court has considered the motion and notes that it is unopposed.  In

view of that, it is hereby ORDERED that the Plaintiff's Motion to Amend Complaint is

GRANTED.  (Doc. 55).


        Done this 30th day of January, 2006.


                                        /s/ William R. Sawyer
                                        United States Bankruptcy Judge


c: Brent B. Barriere,
    Katherine M. Determan, Attorneys for Plaintiff
    Clyde E. Brazeal, Attorney for Defendant

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF ALABAMA**

In re:                                                    Case No. 03-32063

TERRY MANUFACTURING
COMPANY INC.,

      Debtor.


In re:                                                    Case No. 03-32213

TERRY UNIFORM
COMPANY, LLC,

      Debtor.


J. LESTER ALEXANDER III,                                  Adv. Pro. No. 05-3042
TRUSTEE OF TERRY
MANUFACTURING COMPANY, INC.
AND TERRY UNIFORM COMPANY,
LLC

      Plaintiff,

v.

N.D. HORTON, JR., AND
JAMES M. REYNOLDS, III


**<u>MEMORANDUM DECISION</u>**


      This Adversary Proceeding is before the Court upon the motion for summary

judgment filed by the Plaintiff and Trustee, J. Lester Alexander, III, ("Plaintiff").  (Docs.

34, 48, 49, 67).  The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H).  The Court has considered

the memoranda and arguments made by counsel therein.  For the reasons set forth below,

the Court finds that material facts are in dispute and in view of that the Plaintiff's motion

for summary judgment is DENIED.  (Doc. 34).

## I.  FACTS

The Plaintiff is seeking to avoid payments[1] made by Terry Manufacturing Company[2]

("Terry Manufacturing") to Defendant N.D. Horton, Jr., ("Horton"), in the amount of

$298,396.30, and to Defendant James M. Reynolds, III, ("Reynolds"), also in the amount

of $298,369.30.[3]  The crux of this Adversary Proceeding involves the purchase of Perky

Cap Company ("Perky Cap") stock by Roy and Rudolph Terry, Cotina Terry (daughter of

Roy Terry), and Allie R. Robinson (wife of Rudolph Terry).  At all times relevant to this

proceeding, Perky Cap was a manufacturer of headwear in Eatonton, Georgia.  (Doc. 48;

Horton Aff. ¶ 2).  The myriad of transactions underlying the claims asserted in this

Adversary Proceeding began sometime in 1994, when Horton, who at that time along

with Reynolds owned a majority of shares of Perky Cap, negotiated with the Terrys an

---

[1] In this Adversary Proceeding the Trustee asserts claims pursuant to the Georgia and Alabama fraudulent conveyance provisions, and as avoidable fraudulent conveyances and preferences pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 547.  (Doc. 1).  However, the present motion for summary judgment was brought solely upon the theory of constructive fraudulent transfers and hence that is the only theory addressed by this Memorandum Decision.

[2] Terry Manufacturing filed a voluntary Chapter 11 petition in this Court on July 7, 2003.  (Case No. 03-32063, Doc. 1).  Terry Uniform, an affiliated entity, filed a voluntary Chapter 11 petition on July 22, 2003.  (Case No. 03-32213, Doc. 1).  Joint Administration of these two cases was ordered by this Court's Order of October 3, 2003.  J. Lester Alexander, III, was appointed Chapter 11 Trustee by Order of this Court on July 10, 2003.  (Doc. 20).  The Chapter 11 cases of Terry Manufacturing and Terry Uniform were converted to cases under Chapter 7 of the United States Bankruptcy Code, by Order of the Court dated May 13, 2004.  (Case No. 03-32063, Doc. 579).  J. Lester Alexander, III, was appointed Trustee of both Chapter 7 cases.

[3] Horton and Reynolds will at times be collectively referred to as Defendants.

option agreement to purchase 30,000 shares of the outstanding common stock of Perky

Cap which amounted to 33% of the outstanding shares.  (Doc. 48; Horton Aff. ¶ 2).  In

accord with that understanding, on June 6, 1994, Roy and Rudolph Terry purchased

10,000 shares each individually, and purchased 10,000.00 shares jointly.  (Doc. 48;

Horton Aff. ¶ 2).  On that same day, Horton and Reynolds granted the Terry family the

option to purchase an additional 45,900 shares of outstanding Perk Cap common stock.

(Doc. 48; Horton Aff. ¶ 2-3)

    With the aforementioned purchases of stock in mind, in November 2000, the Terrys

and the Defendants engaged in the following transactions which are at the heart of this

Adversary Proceeding.  On November 10, 2000, Allie R. Robinson purchased 9,000

shares of Perky Cap common stock.  In exchange for the stock, Allie Robinson executed

a promissory note payable jointly to Horton and Reynolds in the amount of $200,000.00

plus 9.5% interest.  These shares represented 10% of the outstanding common stock of

Perky Cap.  (Docs. 34, 38; Lester Aff. ¶ 14-15; Horton Aff. ¶ 2-3).

    On November 10, 2000, Cotina Terry executed a promissory note identical in form to

that of the Allie Robinson note.  The principal sum of the note made payable jointly to

Horton and Reynolds was $200,000.00, with an interest rate of 9.5%, and was given in

consideration of 9,000 shares of Perky Cap stock sold to Cotina Terry.  (Docs. 34, 38;

Lester Aff. ¶ 14-15; Horton Aff. ¶ 2-3).  Terry Manufacturing was a guarantor on both

the Cotina Terry and Allie Robinson notes. (Doc. 49; Ex.'s 6, 8).

    On May 20, 2002, Roy and Rudolph Terry executed a promissory note payable to

Horton and Reynolds jointly in the principal amount of $624,000.00 at an interest rate of

9.0%.  In consideration of the note, Horton and Reynolds transferred to Roy and Rudolph

Terry jointly, 27, 900 shares of Perky Cap stock.  These shares represented 31% of the

outstanding common stock of that company.  (Doc. 34; Lester Aff. ¶ 17).  Combined with

the aforementioned transfers of stock, this purchase resulted in the Terry family owning

84% of Perky Cap, with the ability to exercise full control over the company.  (Docs. 34,

48; Lester Aff. ¶ 17; Horton Aff. ¶ 3).

Terry Manufacturing made payments to Horton on the Cotina Terry and Allie

Robinson note in the amount of $234,375.81.  Identical payments, totaling $234,375.81

were also made on these notes by Terry Manufacturing to Reynolds.  Terry

Manufacturing made payments totaling $127,986.98 on the Roy and Rudolph Terry

notes.  (Doc. 34; Lester Aff. ¶ 16).  It is these payments that the Plaintiff is now seeking

to avoid.

## II.  CONCLUSIONS OF LAW

### A.  Summary Judgment Standard

Summary judgment is proper only when there is no genuine issue of any material

fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P.

56, made applicable to Adversary Proceedings pursuant to Fed. R. Bank. P. 7056;

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265

(1986); Jones v. City of Columbus, 120 F.3d 248, 251 (11th Cir. 1997).  Federal Rule of

Civil Procedure 56(c) states the following:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The facts must be viewed in a light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 LED. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. at 322;  Hail v. Regency Terrace Owners Association, 782 So.2d1271, 1273 (Ala. 2000).  At the stage of summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  To avoid an adverse ruling on a motion for summary judgment, "the nonmoving party must provide more than a mere scintilla of evidence." See Loyd v.Ram Industries, Inc., 64 F.Supp.2d 1235, 1237 (S.D. Ala. 1999) (quoting Combs v.Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997).

**B. Discussion**

The Court finds that there are material facts in dispute in this Adversary Proceeding.  Central to the Plaintiff's fraudulent conveyance claims on the theory of constructive fraud is determining whether Terry Manufacturing received reasonably equivalent value in exchange for making payments on promissory notes executed by the Terrys for the purpose of purchasing Perky Cap Stock.  The Plaintiff avers that Terry Manufacturing did not receive any value at all for making payments to Horton and Reynolds, much less reasonably equivalent value.  (Doc. 34).  The Plaintiff further asserts that Terry Manufacturing received no benefit from making the payments and that

it was not a signatory to any of the subject notes.  The Defendants have put forth several ways in which they claim Terry Manufacturing received reasonably equivalent value: (1) by realizing a dollar for dollar reduction on its guaranteed obligation; (2) by receiving an indirect benefit from the business decision of the Terrys to acquire Perky Cap stock; and (3) because Terry Manufacturing and the Terrys were alter egos, a benefit to one constituted a benefit to the other.  The Defendants also alternatively argue that under Alabama Code § 8-9A-8(d), Horton and Reynolds are entitled to an offset in the amount of the value of the stock given to the Terrys.  The Trustee has vigorously countered each of the arguments advanced by the Defendants, however, the Court finds that at this point the necessity for a trial has been amplified.  (Doc. 67).

The Court finds material facts in dispute rendering disposition by way of summary judgment inappropriate.  See Taylor v. Riverside-Franklin Prop. (In re: Taylor), 228 B.R. 491, 498 (Bankr. M.D. Ga. 1998)(the court is hesitant to decide such matters at summary judgment stage because fraudulent conveyances are fact intensive by nature).

### III. CONCLUSION

For the reasons stated above, the Plaintiff's motion for summary judgment is DENIED.  (Doc. 34).  The Plaintiff's claims asserted in the Complaint pursuant to the Alabama and Georgia fraudulent conveyance statutes, and as avoidable fraudulent conveyances and preferences pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 547, are subject to trial.  The Defendants' Motion to Extend Deadline to Respond to Plaintiff's

Reply Brief is DENIED as moot. (Doc. 65). The Court will enter an Order consistent with this Memorandum Decision by way of a separate document.

Done this 16th day of February, 2006.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: Brent B. Barriere, Attorney for Plaintiff
   C. Ellis Brazeal, III, Attorney for Defendants

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM | ) | CASE NO. 03-32213-WRS |
| COMPANY, LLC, | ) | |
| | ) | |
| Debtor | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, | ) | ADVERSARY PROCEEDING NO.: |
| | ) | 05-03042 |
| INC, AND TERRY UNIFORM | ) | |
| COMPANY, LLC | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND JAMES M. | ) | |
| REYNOLDS, III | ) | |

### <u>ANSWER TO FIRST AMENDED COMPLAINT</u>

COMES NOW the defendants, N.D. Horton, and James M. Reynolds, and for their response to the first amended complaint of the trustee say as follows:

33.    The defendants admit that they received guaranties from Terry Manufacturing regarding the Allie Robinson Note and Cotina Terry Note.  The defendants deny the remaining averments of paragraph 33.

## GENERAL

The defendants incorporate herein all of their previously pled responses and defenses to the claims set forth in this action.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Defendants N.D. Horton and James M. Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS, & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:    (205) 244-5237
Telecopier:    (205) 244-5437

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Answer to First Amended Complaint has been served by electronic filing purposes, as follows:

Brent B. Barriere
Katie Lasky
365 Canal Street
Suite 2000
New Orleans, Louisiana 70130

This the \24th\ day of March, 2006.

\s\ C. Ellis Brazeal III
OF COUNSEL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **TERRY MANUFACTURING** | ) | **CASE NO. 03-32063-WRS** |
| **COMPANY, INC.,** | ) | |
| | ) | **CHAPTER 7** |
| **Debtor** | ) | |
| | ) | |

---

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **TERRY UNIFORM** | ) | **CASE NO. 03-32213-WRS** |
| **COMPANY, LLC,** | ) | |
| | ) | |
| **Debtor** | ) | |

---

| | | |
|---|---|---|
| **J. LESTER ALEXANDER, III,** | ) | |
| **TRUSTEE OF TERRY** | ) | |
| **MANUFACTURING COMPANY,** | ) | **ADVERSARY        PROCEEDING** |
| **NO.:** | | |
| | ) | **05-03042** |
| **INC, AND TERRY UNIFORM** | ) | |
| **COMPANY, LLC** | ) | |
| | ) | |
| **VERSUS** | ) | |
| | ) | |
| **N.D. HORTON AND JAMES M.** | ) | |
| **REYNOLDS, III** | ) | |

## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY</u>
## <u>DEFENDANTS</u>

COME NOW Defendants N.D. Horton, Jr. ("Horton"), and James M. Reynolds, III ("Reynolds"), and submit herewith their proposed findings of fact and conclusions of law, which are attached hereto.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Defendants N.D. Horton, Jr. and James M. Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:    (205) 244-5237
Telecopier:   (205) 244-5437

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Proposed Findings of Fact and Conclusions of Law by Defendants has been served by electronic filing and/or by placing same in the United States mail, properly addressed and postage prepaid, as follows:

Catherine E. Lasky
Phelps Dunbar LLP
City Plaza
445 North Boulevard
Suite 701
Baton Rouge, LA 70802-5707

This the \28th\ day of April, 2006.

\s\ C. Ellis Brazeal III
OF COUNSEL

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF ALABAMA**

In re:                                                    Case No. 03-32063-WRS

TERRY MANUFACTURING
COMPANY INC.,

      Debtor.


J. LESTER ALEXANDER III, TRUSTEE

      Plaintiff,                                    Adv. Pro. No. 05-3042-WRS

v.

N.D. HORTON, JR., AND
JAMES M. REYNOLDS, III

      Defendants.


<u>**MEMORANDUM DECISION**</u>


      This Adversary Proceeding came before the court for trial on March 28 and 29, 2006.

Plaintiff J. Lester Alexander, III (Trustee), present in person and by counsel Brent B. Barriere

and Catherine E. Lasky.  C. Ellis Brazeal, counsel for the Defendants N.D. Horton and James M.

Reynolds, III, was present as was Defendant N.D. Horton, Jr.  The Court heard evidence and

took the Adversary Proceeding under advisement.  The Parties have filed Proposed Findings of

Fact and Conclusions of Law.  (Docs. 86, 87).  For the reasons set forth below, judgment is

entered in favor of the Trustee and against Defendants Horton and Reynolds in the amount of

$596,738.60.

# I. FACTS

This Adversary Proceeding is part of a large and unusually complex bankruptcy case. The discussion of the facts will be divided in three parts. In the first part, the Court will discuss the Terry Manufacturing bankruptcy case and the criminal proceedings against Roy and Rudolph Terry. The transactions which gave rise to this Adversary Proceeding did not take place in a vacuum but rather in the context of a larger universe of facts. It is necessary to provide some background to give context to the immediate facts of the transactions in question. In the second part, the Court will set out the facts of the transactions which are directly relevant to this Adversary Proceeding. These facts are not in dispute and are taken directly from a stipulation filed by the parties. In the third part the Court makes findings of fact on several matters which are in dispute, most notably the question of whether Terry Manufacturing received reasonably equivalent value in return for cash transfers totaling $596,738.60.

## A. Background

Terry Manufacturing, Inc., filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code in this Court on July 7, 2003. J. Lester Alexander was appointed as a Trustee in the Chapter 11 case on July 11, 2003.[1] This Chapter 11 case was converted to a case under Chapter 7 on May 13, 2004. This Court's Memorandum Decision of May 13, 2004, details some of the Court's concerns in this case. (Case No. 03-32063, Doc. 580). The record in

---

[1] Trustees are not usually appointed in cases under Chapter 11 in this Court. See, 11 U.S.C. § 1104. It is highly unusual for one to be appointed so soon after the filing of the petition.

this bankruptcy case is replete with evidence of missing records, check kiting, and large unexplained transfers of millions of dollars.

Terry Manufacturing was in the business of making uniforms and sportswear. It had contracts to supply uniforms to the McDonalds' hamburger restaurants and to the United States Department of Defense. Terry Manufacturing was a minority owned business which, from all outside appearances, was well positioned to compete for large contracts to supply uniforms to large institutional purchasers. Terry Manufacturing had its principal place of business in Roanoke, Alabama, and at one time employed a large number of people there.

The principals of Terry Manufacturing are two brothers, Roy and Rudolph Terry. Roy Terry was the Chief Executive Officer, first in command, and Rudolph Terry was the Chief Financial Officer, second in command and partner in crime. In June of 2005, Roy Terry entered into an agreement with the Government to plead guilty to 13 counts of mail fraud, wire fraud and a whole potpourri of wrongdoing and skullduggery, all relating to Roy Terry's leadership at Terry Manufacturing. The Government's criminal case against Roy Terry is set forth in considerable detail in a Plea Agreement which is on file with the District Court in Case No. 05-CR-141, in proceedings styled United States v. Roy Terry. The parties (Roy Terry and the Government) agree, on page 9 of the Plea Agreement, that "the actual loss in this case is more than $20 million but less than $50."[2]

Roy Terry pledged his cooperation to the Government in the Plea Agreement, which resulted in the indictment of Rudolph Terry on similar charges in proceedings styled United

---

[2] Roy Terry reserved his right to argue that the loss would have been less had he been permitted to "implement his business plan for Terry Manufacturing Company into and through the Company's bankruptcy proceedings." Such a claim is outrageous. Roy Terry's only plan was to loot the estate. Had he been permitted to fully implement his plan, the loss would have been more than $50 million.

<u>States v. Rudolph Terry</u>, Case No. 06-CR-52.  The Government has concluded that Rudolph is

less culpable than Roy in that his recommended sentence is only 48 months, while Roy's is 133

months.  Neither Rudolph nor Roy has, as of yet, been sentenced.  It is of more than passing

interest here that the $5.5 million loan from American Real Estate to Roy Terry is discussed in

both plea agreements.  Both Roy and Rudolph Terry have pleaded guilty to, among other things,

having made misrepresentations to Horton in connection with the loan.


### B.  Stipulated Facts


The parties entered into a Stipulation of Facts.  (Doc. 83).  The stipulation provides as

follows:


1.  Messrs.  Horton and Reynolds were owners of common stock of Perky Cap Company,

Inc. ("Perky Cap"), a manufacturer headquartered in Eaton [sic], Georgia.

2.  On November 10, 2000, Cotina Terry, daughter of Roy Terry, executed a Purchase

Money Promissory Note (the "Cotina Terry Note") in the principal sum of TWO

HUNDRED THOUSAND NO/100 ($200,000.00) DOLLARS, bearing interest at the

rate of 9% per annum.

3.  The Cotina Terry Note was made payable to Mr. Horton and Mr. Reynolds, and was

purportedly given in consideration of 9,000 shares of Perky Cap common stock to

Cotina Terry by Messrs. Horton and Reynolds.  These shares represented ten (10%) percent of the outstanding common stock of the Company.

4. Terry Manufacturing was not a signatory to the Cotina Terry Note.

5. All payments on the Cotina Terry Note were made by Terry Manufacturing to Messrs. Horton and Reynolds.  The Note was paid in full with payments totaling TWO HUNDRED THIRTY-FOUR THOUSAND, THREE HUNDRED SEVENTY-FIVE DOLLARS AND 81/100 ($234,375.81).

6. On November 10, 2000, Allie Robinson, wife of Rudolph Terry, executed a promissory note in a form identical to that executed by Cotina Terry.  The note was designated a Purchase Money Promissory Note (the "Allie Robinson Note"), and, like the note executed by Cotina Terry, was in the principal sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS, and provided for 9.5% interest.  Also, like the Cotina Terry Note, the promissory note executed by Allie Robinson was given for and in consideration of 9,000 shares of Perky Cap Stock sold to Ms. Robinson by Messrs. Horton and Reynolds.  These shares represent (10%) percent of the outstanding common stock of Perky Cap.

7. Terry Manufacturing was not a signatory to the note executed by Ms. Robinson.

8. Terry Manufacturing executed written guarantees of the promissory notes executed by Ms. Terry and Ms. Robinson.

9. The Perky Cap common stock purchase by Cotina Terry and Allie Robinson was registered in their names, and they received all benefits flowing to holders of Perky

Cap Stock, which would have included recognizing for federal tax purposes their respective shares of losses recorded by Perky Cap, a sub-s corporation.

10. Terry Manufacturing was never a shareholder of Perky Cap.  None of the stock purchased by Ms. Robinson or Ms. Terry was registered in its name.

11. On May 20, 2002, Roy and Rudolph Terry jointly executed a promissory note, in favor of Messrs. Horton and Reynolds, in the principal amount of SIX HUNDRED TWENTY-FOUR THOUSAND NO/100 ($624,000.00) DOLLARS, and bearing interest at the rate of 9.5% per annum.  In consideration thereof, Messrs. Horton and Reynolds purportedly transferred to Roy and Rudolph Terry, jointly, 27,900 shares of Perky Cap common stock, representing thirty-one (31%) percent of the outstanding common stock of that company.  The parties do not stipulate as to whether the shares were actually transferred.  If, in fact, the shares were transferred, they were registered in the name of Roy and Rudolph Terry, individually, and Terry Manufacturing had no interest in the shares whatsoever.

12. Terry Manufacturing made all payments on the note executed by Roy and Rudolph Terry.  Payments continued until May, 2003, and totaled ONE HUNDRED TWENTY-SEVEN THOUSAND, NINE HUNDRED EIGHTY-SIX DOLLARS AND 98/100 ($127,986.98).  No payments were made after the Chapter 11 filing by Terry Manufacturing.

13. Terry Manufacturing made total payments of FIVE HUNDRED NINETY-SIX THOUSAND, SEVEN HUNDRED THIRTY-EIGHT DOLLARS AND 60/100

($596,738.60) to Messrs. Horton and Reynolds in connection with the promissory

notes executed by Cotina Terry, Allie Robinson and Roy and Rudolph Terry.

14. A number of entities were unsecured creditors of Terry Manufacturing prior to

November 10, 2000 (the date on which Cotina Terry and Allie Robinson delivered

their respective promissory notes to Messrs. Horton and Reynolds), and remained

unsecured creditors of Terry Manufacturing as of the date Terry Manufacturing filed

for relief under Chapter 11 of the Bankruptcy Code.  These unsecured creditors

include American Express, Southern Mills, Arkansas State Highway Employees

Retirement System, Arkansas Department of Economic Develop, CIT Financial

Services, Miliken & Company, Darwood Manufacturing, HLC Industries, Inc.,

Atlantic Thread and Supply Company, Inc., and Bonifay Manufacturing Company.

### C.  Additional Findings of Fact

#### 1.  Reasonably equivalent value

Reduced to its most basic terms, this Adversary Proceeding involves the repayment of

debts owed by Terry insiders, (Roy Terry, Rudolph Terry, Cotina Terry and Allie Robinson), by

Terry Manufacturing.  The debts were owed to Defendants Horton and Reynolds.  As set forth in

Part I(B) above, the parties do not dispute this much.  The dispute here centers on whether Terry

Manufacturing received reasonably equivalent value in exchange for the payments of the

indebtedness owed by the Terry insiders.

The Defendants contend that Terry Manufacturing received value in that on the same date of the execution of the Promissory Notes by Cotina Terry and Allie R. Robinson, (November 10, 2000), in favor of Horton and Reynolds, American Real Estate Investment Company made a loan of $5,500,000, to Rudolph and Roy Terry. The loan was guaranteed by Terry Manufacturing. The logic of this claim is immediately suspect. Why such a byzantine structure? American Real Estate loans $5.5 million to Roy and Rudolph, so Terry Manufacturing should pay the promissory notes owed by Cotina and Allie to Horton and Reynolds? Arguments such as this leave one grasping madly for a bottle of aspirin.

Apparently recognizing the incongruity of their argument on its face, the Defendants layer an additional claim on what is already a convoluted argument. Roy and Rudolph, the Defendants claim, transferred some, or most, or all, of the $5.5 million to Terry Manufacturing. Why so much? Horton testified at trial that one would not send $5.5 million to safeguard $400,000. It is also true, that there is a daisy chain of millions of dollars of cash transferred between Terry Manufacturing and related entities. Even if one can identify $5.5 million transferred by Roy and Rudolph to Terry Manufacturing, tens of millions of dollars were transferred out, leaving one no closer to an explanation which rings true.

Horton testified at trial that he would not have made the loans to Cotina Terry and Allie Robinson for the purchase of the Perky Cap stock, but for the repayment of the loan by Terry Manufacturing. Horton's claim is wholly lacking in logic. The repayment of the Cotina and Allie loans by Terry Manufacturing was not done until a later point in time. The documentary evidence at trial shows a complex relationship between Terry Manufacturing on the one hand and Horton and Reynolds on the other. None of this documentary evidence suggests any

relationship to the Cotina and Allie loans. Having considered Horton's testimony, the Court finds that it is not credible and that his claims of a tie have been fabricated to provide a defense to the Trustee's avoidance action.

The Terry Manufacturing bankruptcy proceedings have been of unusual complexity. The Court has struggled with the bankruptcy case and dozens of adversary proceedings such as this spun off in all directions for more than three years. If one thing can be said with any certainty at all, it is that nothing in this case is as it first glance seems. Having considered the testimony of the witnesses, having considered the voluminous record in this Adversary Proceeding, having struggled to make some sense of this matter, the Court finds that the $5.5 million loan to Roy and Rudolph, while made on the same day as the promissory notes by Cotina and Allie, were not made in exchange for one another. None of the documents created on November 10, 2000, suggest such a connection and no credible evidence supports such a finding. Indeed, it appears that the $5.5 million loan was made as a result of the fraud perpetrated by Roy and Rudolph Terry and had nothing to do with the purchase of the Perky Cap stock by Cotina and Allie.

The Defendants argue that Terry Manufacturing further received a benefit in that when Cotina and Allie bought stock in Perky Cap they assured Terry Manufacturing a ready source of caps, which would enhance the sales of uniforms by Terry Manufacturing. The evidence did not bear out this contention. First, it appears that Perky Cap had been selling caps to Terry Manufacturing long before Cotina and Allie had purchased any stock. The evidence further showed that Perky Cap was anxious to sell its products to Terry Manufacturing and that it was not necessary to purchase Perky Cap stock as an inducement. Second, there are many suppliers of caps throughout the world who are capable of producing the caps needed by Terry

Manufacturing.  There was no evidence that the purchase of caps had ever been a problem for Terry Manufacturing.

The Defendants contend that further value to Terry Manufacturing may be inferred from a $1.5 million loan from Peoples Bank, which Horton claims he was instrumental in obtaining for Terry Manufacturing.  The Peoples Bank loan was the subject of another fraudulent conveyance proceeding which was pending in this Court for several years.  See, Alexander v. The Peoples Bank, Adversary Proceeding No. 04-3061, in the United States Bankruptcy Court for the Middle District of Alabama.  The Peoples Bank Adversary Proceeding was consolidated with Adversary Proceedings brought against First Tuskegee Bank and Bank of Wedowee in Adversary Proceedings 04-3062 and 04-3063.  The three Adversary Proceedings were consolidated and referred to informally as the "Three Bank Case."  The Three Bank Case was hotly litigated for more than two years and came before the Court a number of times on motions to dismiss, motions to compel, motions for summary judgment and the like.  The Trustee reached separate settlements with each of the three banks and none went to trial.  Nevertheless, the Court became familiar with the facts of those cases.  Each of the Three Banks screamed long and loud about fraud perpetrated by Roy and Rudolph Terry, check kiting, destruction of records, and the rest of a now familiar litany of depredations.

The problem with all of the Defendants' arguments which contend that value for the payments in question was given in the form of one or more loans to Terry Manufacturing is that there is no credible evidence that this is so.  The Terry Manufacturing bankruptcy has generated a mountain of paper, not one page of which suggests that there was a connection.  Second, considering the way in which Terry Manufacturing did business, this claim does not make sense.

Third, the trial testimony offered in support of this defense suffers from the appearance that it is nothing more than a post hoc attempt to bolster a defense to the Trustee's fraudulent conveyance suit, which does not ring true. Having considered all of the evidence, the Court finds that none of the loans to Terry Manufacturing (the $5.5 million from American Real Estate, the $1.5 from Peoples Bank, and the advance from Wholesale Distributors) were given in exchange for the payments in question on the indebtedness owed by the Terry insiders.

## 2. Insolvency

The payments in question were made between December 10, 2000, and May of 2003. It is necessary for the Trustee to prove that Terry Manufacturing was insolvent at the time the payments were made. The Trustee is a Certified Public Accountant. Alexander, together with his firm AEA Group, LLC, examined the books and records of Terry Manufacturing. Alexander's report is offered as Plaintiff's Exhibit 44. Alexander concludes that Terry Manufacturing was insolvent at least as early as July 7, 1999. The Court, having heard Alexander's testimony and having reviewed his report, finds that he is forthright and credible. Based upon Alexander's testimony, the Court finds that Terry Manufacturing was insolvent on July 7, 1999, and at all times subsequent through the date of the petition in bankruptcy, which was July 7, 2003.

## II.  CONCLUSIONS OF LAW

This Adversary Proceeding was brought by a Trustee in bankruptcy to recover certain payments made by the Debtor as fraudulent conveyances.  This Court has jurisdiction to hear this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding.  28 U.S.C. § 157(b)(2)(F).

## A.  Fraudulent Conveyance law

A trustee in bankruptcy may recover a fraudulent conveyance under several different theories.  Applicable here is 11 U.S.C. § 544(b) and Alabama Code § 8-9A-5.[3]  The stipulation provided by the parties identifies a number of actual creditors who were in existence as of November 10, 2000.  See, Section I(B)(14) above.

The Trustee in bankruptcy succeeds to the interests of existing creditors.  Section 544(b)(1), of Title 11, United States Code, provides as follows:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

---

[3]  The Alabama Fraudulent Conveyance Act, 8-9A-1, et. seq., defines the cause of action differently depending upon whether the creditor who brings suit is in existence at the time of the transfer.  Because the cause of action for creditors who are in existence at the time of the transfer action requires proof of fewer elements than does the cause of action for creditors whose claim arises after the transfer, a trustee in bankruptcy will usually try to identify creditors whose claims were in existence at the time of the transfer.  Cf. 8-9A-5 (present creditors) and 8-9A-4 (future creditors).  Because the Trustee in this case has elected to stand in the shoes of existing creditors, the Court will consider Ala. Code § 8-9A-5, rather than § 8-9A-4.

As we have identified creditors whose rights the Trustee has succeeded to, we must next look to "applicable law," which is the Alabama Uniform Fraudulent Transfer Act. Section 8-9A-5(a) of the Code of Alabama, provides as follows:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time.

There are four elements to the Trustee's case:

1. Is there a creditor who was in existence at the time the transfers in question were made?

2. Were transfers made?

3. Did the Debtor receive "reasonably equivalent value in exchange for the transfer?"

4. Was the Debtor insolvent at the time?

The first two elements are established pursuant to stipulations entered into by the parties. The fourth element, solvency, was established by Alexander's testimony and was not disputed in the Defendant's case. Therefore, this case turns on the question of whether the cash transfers in question, which total $596,738.60, were made in exchange for reasonably equivalent value.

## B.  Reasonably Equivalent Value

This Adversary Proceeding turns on the question of whether Terry Manufacturing was given reasonably equivalent value for the cash transfers in question. Value is further defined, at Ala. Code § 8-9A-3, as follows:

(a) Value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor or another person made otherwise than in the ordinary course of the promisor's business.

* * *

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

The facts of this Adversary Proceeding are analogous to the facts of a case handed down by the United State Court of Appeals for the Eleventh Circuit sixteen years ago. General Electric Credit Corporation of Tennessee v. Murphy (In re: Rodriguez), 895 F.2d 725 (11th Cir. 1990). In Rodriguez, a corporate debtor, Domino Investments, Inc., made payments on a loan made to International Aviation Investment, Inc., by General Electric. International Aviation had purchased a jet airplane financing the purchase with a loan from General Electric. When International Aviation could no longer make the payments, Domino Investments made the payments for a period of time. International Aviation was a wholly owned subsidiary of Domino. The trial court found that General Electric had failed to show that Domino had received either a direct or indirect benefit as a result of the transfer.

The analysis provided by the Eleventh Circuit in Rodriguez is instructive here. "The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate. (citations omitted). Therefore, this provision does not authorize voiding a transfer which 'confers an economic benefit upon the debtor.' either

directly or indirectly." <u>Rodriguez</u>, 895 F.2d 725, 727.  Also instructive is this passage from

<u>Chase & Sanborn</u>.

> It has long been established that "whether fair consideration has
> been given for a transfer is 'largely a question of fact, as to which
> considerable latitude must be allowed the trier of the facts.'" <u>Mayo
> v. Pioneer Bank & Truste Co.</u>, 270 F.2d 823, 829-30 (5th Cir.
> 1959)(Wisdom, J.), <u>cert</u>. <u>denied</u>, 362 U.S. 962, 80 S.Ct. 878, 4
> L.ed.2d 877 (1960).  The burden of proving lack of "reasonably
> equivalent value"  *  *  *  rests on the trustee challenging the
> transfer.  (citation to <u>Rodriguez</u>).   <u>Nordberg v. Arab Banking
> Corporation, (In re: Chase & Sanborn Corporation)</u>, 904 F.2d 588,
> 593-94 (11th Cir. 1990).

It should be noted that both <u>Rodriguez</u> and <u>Chase & Sanborn</u> are fraudulent conveyance

cases decided under § 548 and not under State fraudulent conveyance statutes.  However,

operative language of § 548 and Alabama Code § 8-9A-5 is nearly identical.  For this reason, the

analysis provided in <u>Rodriguez</u> and <u>Chase & Sanborn</u> is exceedingly persuasive, if not strictly

speaking, binding on this Court.  The Defendants have cited the Court to the indirect benefit rule,

citing a case from the Second Circuit.  This Court agrees that the indirect benefit rule applies

here and further finds, as a factual matter upon its independent review of the evidence, that no

indirect benefit was provided to Terry Manufacturing.[4]   Therefore, this Court has considered

whether an indirect benefit was provided to Terry Manufacturing and finds that one has not.

Some of the promissory notes owed by Terry insiders, and paid by Terry Manufacturing,

were guaranteed by Terry Manufacturing.  Thus, it might be argued that Terry Manufacturing

---

[4]  In a decision handed down in 1993, this Court applied the "indirect benefit rule" in a case
decided under § 547 of the Bankruptcy Code.  <u>See</u>, <u>Memory v. Alfa Mutual Fire Insurance
Company (In re: Martin)</u>, 205 B.R. 646, 650 (Bankr. M.D. Ala. 1993)(Steele, C.J.)(Applied
indirect benefit rule without expressly determining that it applied in that case).

received value by discharging its liability on the guarantee.  However, the execution of the

guarantee agreements by Terry Manufacturing was, in itself, a fraudulent conveyance because it

is part and parcel of a transfer for which it did not receive consideration.

The Defendants cite the Court to decision handed down by the Eleventh Circuit in

Grissom v. Johnson (In re: Grissom), 955 F.2d 1440 (11th Cir. 1992), as controlling precedent

here.  (Doc. 86, p. 10). As Grissom is no longer good law in light of the Supreme Court's

decision in BFP v. Resolution Trust Corporation, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556

(1994); the Court declines to consider Grissom here.

## III.  CONCLUSION

Terry Manufacturing made payments totaling $596,738.60 to Horton and Reynolds for

debts owed by the Terry insiders.  As the Court has found that no value was received by Terry

Manufacturing in exchanges for the payments, the payments in question are constructively

fraudulent and are to be set aside for the benefit of the creditors of Terry Manufacturing.

Judgment will be entered by way of a separate document.


Done this 30th day of May, 2006.


                                                    /s/ William R. Sawyer
                                                    United States Bankruptcy Judge

c: Brent B. Barriere,
   Catherine E. Lasky, Attorneys for Trustee
   C. Ellis Brazeal, III, Attorney for Defendants

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re:                                                   Case No. 03-32063-WRS

TERRY MANUFACTURING
COMPANY INC.,

     Debtor.


J. LESTER ALEXANDER III, TRUSTEE

     Plaintiff,                                    Adv. Pro. No. 05-3042-WRS

v.

N.D. HORTON, JR., AND
JAMES M. REYNOLDS, III

     Defendants.


## <u>JUDGMENT</u>


     For the reasons set forth in the Court's Memorandum Decision of this date, the

Court finds in favor of the Plaintiff and against Defendants N.D. Horton, Jr., and James

M. Reynolds, III, in the amount of $596,738.60.


     Done this 30th day of May, 2006.


                          /s/ William R. Sawyer
                        United States Bankruptcy Judge

c: Brent B. Barriere,
   Catherine E. Lasky, Attorneys for Plaintiff
   C. Ellis Brazeal, III, Attorney for Defendants

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM | ) | CASE NO. 03-32213-WRS |
| COMPANY, LLC, | ) | |
| | ) | |
| Debtor | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, | ) | ADVERSARY PROCEEDING NO.: |
| INC, AND TERRY UNIFORM | ) | 05-03042 |
| COMPANY, LLC | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON AND JAMES M. | ) | |
| REYNOLDS, III | ) | |

<u>MOTION TO ALTER OR TO AMEND
AND/OR FOR FURTHER FINDINGS</u>

COME now the defendants, N.D. Horton, Jr. ("Horton"), and James M.

Reynolds, III ("Reynolds"), and pursuant to Bankruptcy Rules 9023 and 7052, hereby

move this Court to alter or to amend its judgment and/or to make additional findings of

fact and conclusions of law. For its motion, the defendants say as follows:

1

1.    By Judgment dated May 30, 2006, this Court rendered a judgment in favor of the Trustee and against defendants Horton and Reynolds.  The basis for this judgment is set forth in this Court's Memorandum Decision of like date.

2.    Pursuant to Rule 9023, the defendants request this Court to reconsider its decision and to vacate the judgment for all of the reasons set forth in the defendants' proposed Order of Judgment (Doc. 86).

3.    More specifically, but without limitation, the defendants request this Court to address their arguments regarding:

a) the source of the funds (para. F. in Doc. 86);

b) Ala. Code §§ 8-9A-8 (para. H in Doc. 86); and

c) the efficacy of the guaranties.

4.    First, pursuant to the case of *Royal Crowne Bottlers of North Alabama, Inc., vs. Garrett* 23 B.R. 28 (Bkrtcy. N.D. Ala. 1982), this Court must determine the source of the funds utilized to pay the defendants.  This seems particularly imperative where the Trustee contends that extensive commingling occurred, and Mr. Horton and American Real Estate loaned millions of dollars to Terry Manufacturing Company, Inc. ("TMC").  Without requiring the Trustee to bear this burden, this Court is ordering Mr. Horton and Mr. Reynolds to re-pay funds that may have originated from their own coffers.

4.    Second, under Alabama Code Section 8-9A-8(d), a good faith transferee is entitled to an offset to the extent of value given to the debtor for the transfer "or to another person as a consequence of the debtor making such transfer."  It is clear that the benefit conferred on another, namely the reduction in the Terrys' liability on the

Notes, occurred as the result of the consequence of TMC making such payments on the Notes. It is further clear that a reduction in debt constitutes value under Alabama Code Section 8-9A-3(a). Therefore, Horton and Reynolds are due an offset which negates any award to the Trustee.

6.     Finally, the Court found that the guaranties submitted by TMC regarding the stock loans were fraudulent conveyances as well. However, it is undisputed that TMC obtained several million dollars on the same day that TMC executed the guaranties at issue. There was no evidence to suggest that the several million dollars did not constitute reasonably equivalent value for the execution of the guaranties.

7.     Pursuant to Rule 7052, even if this Court does not vacate the judgment against Horton and Reynolds, this Court should render further findings of fact and conclusions of law regarding issues a) and b) set forth in paragraph 3 hereof.

WHEREFORE, premises considered, N.D. Horton, Jr. and James M. Reynolds, III, respectfully request this Court to reconsider and vacate its Judgment and Memorandum Decision of May 30, 2006, and/or to render further findings of fact and conclusions of law. The Defendants pray for such further and other relief as this Court may deem appropriate.

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for N.D. Horton, Jr., and
James M. Reynolds, III

3

**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:     (205) 244-5237
Telecopier:    (205) 244-5437

## CERTIFICATE OF SERVICE

       I hereby certify that a copy of the above and foregoing Motion to Alter or to Amend and/or for Further Findings has been served via electronic filing purposes and/or by placing same in the United States mail, properly addressed and postage prepaid, as follows:

       Catherine E. Laskey
       Phelps Dunbar LLP
       City Plaza
       445 North Boulevard
       Suite 701
       Baton Rouge, LA 70802-5707

This the \9$^{th}$\ day of June, 2006.

       \s\ C. Ellis Brazeal III
       OF COUNSEL

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO.  03-32063-WRS |
| COMPANY, INC. | ) | |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO.  03-32213-WRS |
| TERRY UNIFORM | ) | |
| COMPANY, LLC, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, INC. | ) | |
| AND TERRY UNIFORM | ) | |
| COMPANY, LLC | ) | ADVERSARY PROCEEDING |
| | ) | NO. 05-03042 |
| VERSUS | ) | |
| | ) | |
| N.D. HORTON, JR. AND JAMES | ) | |
| M. REYNOLDS, III | ) | |

### TRUSTEE'S OPPOSITION TO THE MOTION TO ALTER OR TO AMEND
### AND/OR FOR FURTHER FINDINGS FILED BY DEFENDANTS

Trial of this adversary proceeding was conducted over two days with the Court

admitting numerous exhibits and accepting 14 stipulations from the parties.  At the

Court's request, the Trustee and Defendants then submitted extensive proposed findings

of fact and conclusions of law.  Approximately one month later the Court issued a

detailed sixteen-page decision in which it concluded, *inter alia*, that the Trustee had

sustained his burden of proof that transfers to the Defendants constitute fraudulent

conveyances under both the Alabama Fraudulent Transfer Act and the Bankruptcy Code,

and granted judgment in favor of the Trustee.

Acting under the guise of Rule 7052 motion, Defendants seek a complete reversal of the Court's decision. Specifically, Defendants assert:

(1)     The Trustee was required, but failed to demonstrate that funds paid to Defendants were the funds of Terry Manufacturing;

(2)     The Court failed to recognize that relieving Terry Manufacturing insiders of debts owed to Defendants constituted reasonably equivalent value to Terry Manufacturing; and

(3)     The Court erred in concluding that other loans to Roy and Rudolph Terry constitute reasonable value for transfers made by Terry Manufacturing notwithstanding Mr. Horton's often repeated testimony that those loans and payments were completely unrelated.

What Defendants seek is nothing less than a new trial followed by reversal. That relief is generally not available under Rules 9023 and 7052 and is particularly inappropriate under the facts of this case.

**1.     The Standard For Relief Under Rules 7052 and 9023.**

Reconsideration of a judgment "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Wendy's Int'l v. Nu-Cape Construction*, 169 F.R.D. 680, 685 (M.D. Fla. 1996). Courts considering motions which demand substantive changes to the judgment[1] and are brought pursuant to Bankruptcy Rule 9023 or Rule 59(e) of the Federal Rules of Civil Procedure have held that such motions should only be granted when there is: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct

---

1       As discussed *infra*, the Trustee has sought amendment to the judgment to grant pre-judgment interest and costs. A request for this sort of ministerial relief is subject to a far less exacting standard.

clear error or manifest injustice." *Wendy's Int'l*, 169 F.R.D. at 684; *Sussman v. Salem, Saxon and Nielsen*, 153 F.R.D. 689, 694 (M.D. Fla. 1994).    More specifically, "reconsideration under Fed. R. Civ. P. 59(e), made applicable here by Bankruptcy Rule 9023, is merited when there has been a clear error or manifest injustice in an order of the court or if newly discovered evidence is unearthed." *In re Bird*, 222 B.R. 229, 235 (Bankr. S.D.N.Y. 1998).    Defendants have not alleged that any of those circumstances have occurred in this case and, in fact, cannot make such a showing.

A Rule 59(e) motion should not be used to advance arguments or theories that could <u>and</u> should have been made before the court entered judgment.  *See, e.g.*, *Mincey v. Head*, 206 F.3d 1106, 1137 (11th Cir. 2000); *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263 (7th Cir. 1995); *Concordia College Corp. v. W.R. Grace & Co.*, 999 F.2d 326 (8th Cir. 1993); *In re Bruetman*, 259 B.R. 672, 673-74 (Bankr. N.D. Ill. 2001); *In re James B Downing & Co.*, 94 B.R. 515, 523 (Bankr. N.D. Ill. 1988).  A Rule 59 motion cannot be used to give a party "two bites at the apple."  *See American Home Assur. Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237 (11 Cir. 1985).

In addition to the Defendants' request that this Court reverse its previously rendered judgment, the Defendants' Motion asks this Court to make additional factual findings pursuant to Bankruptcy Rule 7052.  That Rule and its counterpart, Federal Rule of Civil Procedure 52, "are essentially designed to create a record upon which the appellate court may obtain the necessary understanding of the issues to be determined….".  The rules are not to be employed to create "findings more favorable to [the movant"], rather than for the purpose of creating more accurate findings for purposes of appellate review.  Rule 52(b) is not to be used to obtain a rehearing on the merits nor

to relitigate old questions and such a motion may not be used to raise arguments which could have been made in advance of the prior court's ruling." *Midwestone Bank and Trust v. Commercial Federal Bank*, 331 B.R. 802, 813 (S.D. Iowa 2005) (citing *Gutierrez v. Ashcroft*, 289 F.Supp.2d 555, 561 (D.N.J. 2003) and *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1397 (8th Cir.1996)).

Rule 7052 does not require this Court to make any further factual findings or conclusions of law in this matter. "An issue that is distinctly presented in the pleadings and necessarily resolved may be reflected in the decision that includes that point, although it may not be expressly mentioned in the decision." *Grubb v. Public Utilities Commission*, 281 U.S. 470 (1930).

> 1.   Defendants Stipulated That the Funds Received By Them Were Paid From Accounts of Terry Manufacturing. The Trustee Did Not Have the Burden of Disproving the Unsubstantiated Theory – First Suggested in Defendants Present Motion – That Funds Loaned by Defendants May Have Been Used For Payments to Them.

For the first time in this litigation, the Defendants now assert that the Trustee did not bear his burden of determining "the source of the funds utilized to pay the defendants." Motion at ¶ 4. The Trustee proved, and the Defendants did not dispute, that all payments to the Defendants were made from Terry Manufacturing's accounts. In fact, the Defendants' expert witness, Jesse Slaton, testified regarding his elaborate tracing analysis, but never suggested that any funds other than those of Terry Manufacturing were used to pay the Defendants. The Defendants' attempt to raise this issue for the first time at this late date is untimely and improper as the Defendants have presented no new evidence to substantiate this claim.

The Defendants' reliance upon *Royal Crowne Bottlers of North Alabama v. Garrett* for this proposition is also untimely and misplaced. 23 B.R. 28 (Bankr. N.D. Ala. 1982). First, because *Royal Crowne* was decided in 1982, it is certainly not "an intervening change in controlling law." In addition, there is no dispute in this case that the funds paid to the defendants came from Terry Manufacturing's accounts. The parties specifically stipulated to that fact. *See* Paragraphs 5, 12 and 13 of the Stipulated Facts, May 30th Memorandum Decision.

    2.    The Court Properly Rejected the Novel Theory That Relieving Insiders of
          Indebtedness Owed to Defendants Constitutes Reasonably Equivalent
          Value to Terry Manufacturing.

The Defendants attempt to reassert their previously rejected argument that under the Alabama Fraudulent Transfer Act, if the transferee gives value to a third person in consideration of the transfer by the debtor, the value given by the transferee is set off against the value of the property the transferee received from the debtor. Specifically, the defendants argue that as a result of the payments by Terry Manufacturing, the Cotina Terry Notes and Allie Robinson Notes were paid in full, and the balance of the Roy/Rudolph Terry Note was substantially reduced. The Terry family members received a benefit by the reduction of their indebtedness to Horton and Reynolds. This "benefit," defendants argue, must be offset against any liability Horton and Reynolds may have to the Trustee.

The Trustee already addressed this issue in his Proposed Findings of Fact and Conclusions of Law and addresses it here only to restate that under the Defendants' reading of the statute, creditors will have no remedy when insiders cause the debtor to make transfers which solely benefit the insiders. Indeed, if the Defendants are correct, an

insider may cause a corporate debtor to employ all of its assets in transactions for which the debtor receives absolutely no benefit and those transfers will be effectively immune from attack as long as the insiders receive some benefit. This would completely eviscerate any possibility of recovering fraudulent transfers involving insiders and as this Court recognized is an untenable and erroneous interpretation of the law.

As this Court recognized, the various "benefits" supposedly received by Terry Manufacturing and cited by the defendants do not constitute value given in exchange for the payments made by Terry Manufacturing. Further, this Court explicitly held that it agrees that the

> indirect benefit rule applies here and further finds, as a factual matter upon its independent review of the evidence, that no indirect benefit was provided to Terry Manufacturing. Therefore, this Court has considered whether an indirect benefit was provided to Terry Manufacturing and finds that one has not.

Memorandum Decision at page 15. This Court unequivocally rejected the Defendants' indirect value theory and their novel interpretation of the Alabama Fraudulent Transfer Act. The Defendants' Motion provides no valid reason for a reconsideration of those findings.

3. Defendants Are Badly Mistaken That The Evidence Established That Loans to Roy and Rudolph Terry Were Tied to the Payments At Issue; On the Contrary, Mr. Horton Repeatedly Acknowledged That the Loans and Payments Were Entirely Unrelated.

This Court also repeatedly rejected the defendants' arguments that the Perky Cap stock purchases by Roy and Rudolph Terry, the Perky Cap stock purchases by Cotina Terry and Allie Robinson, or the loan from the Peoples Bank were related to or "given in exchange for the payments in question on the indebtedness owed by the Terry insiders." *See, e.g.*, Memorandum Decision at pages 8-9 ("Horton testified at trial that he would not

have made the loans to Cotina Terry and Allie Robinson for the purchase of the Perky Cap stock, but for the repayment of the loan by Terry Manufacturing.  Horton's claim is wholly lacking in logic….None of this documentary evidence suggests any relationship to the Cotina and Allie loans."); Memorandum Decision at 10 ("The problem with all of the Defendants' arguments which contend that value for the payments in question was given in the form of one or more loans to Terry Manufacturing is that there is no credible evidence that this is so."); Memorandum Decision at 16 ("…the execution of the guarantee agreements by Terry Manufacturing was, in itself, a fraudulent conveyance because it is part and parcel of a transfer for which it did not receive consideration.").

This Court found unequivocally that the stock purchases, loans or guarantees provided no value in exchange for the payments made by Terry Manufacturing to the defendants.  Neither Rule 9023 nor Rule 7052 require this Court to make any further factual findings or conclusions of law on this issue because the defendants' Motion offered no additional evidence, changes in the law nor proof of clear error.

4.    The Trustee's Motion to Alter or Amend Seeks Ministerial Relief Which May Be Granted Under Rule 9023 Relief.

The Trustee also filed a Motion to Alter or Amend requesting that the judgment include an award of interest and costs in its judgments.  As more fully detailed in that Motion, the Trustee's Motion asks this Court to address a purely ministerial issue that is provided for under the Federal Rules of Civil Procedure and Bankruptcy Rules. The Trustee's Motion, unlike the Motion filed by the defendants, does not require any additional findings of fact or conclusions of law or reversal of this Court's prior findings on substantive issues.

In fact, the Trustee's motion seeking costs need not rely upon Rule 59 of the Federal Rules of Civil Procedure. "A motion respecting costs is not a motion to alter or amend a judgment under Rule 59. Rule 59 applies to motions for reconsideration of matters encompassed in a decision on the merits of the dispute, and not matters collateral to the merits. A motion for costs does not seek reconsideration of substantive issues resolved in the judgment, but relates exclusively to the collateral question of what is due because of the judgment." *Lucas v. Florida Power & Light Co.*, 729 F.2d 1300, 1301 (11th Cir. 1984).

In fact, the United States Supreme Court has held that a post judgment motion for costs seeks "only what was due because of the judgment….Assessment of such costs does not involve reconsideration of any aspect of the decision on the merits. Under Rule 54(d), the 'prevailing party' automatically is entitled to costs 'unless the court otherwise directs.'….we are satisfied that a motion for costs filed pursuant to Rule 54(d) does not seek 'to alter or amend the judgment' within the meaning of Rule 59(e). Instead, such a request for costs raises issues wholly collateral to the judgment in the main cause of action, issues to which Rule 59(e) was not intended to apply." *Buchanan v. Stanships, Inc.*, 485 U.S. 265, 268-69 (1988). *See also*, *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 450 n.9 (1982); *United States. v. Real Property and Residence Located at Route 1, Box 111, Firetower Road, Semmes, Mobile County, Alabama*, 920 F.2d 788, 791, n. 4 (11th Cir. 1991); *Samaad v. City of Dallas*, 922 F.2d 216 (11th Cir. 1991); *Alimenta v. Anheuser-Busch Companies, Inc.*, 803 F.2d 1160, 1162-63 (11th Cir. 1986).

Similarly, post-judgment interest is statutorily mandated (28 U.S.C. § 1961) and therefore "does not involve reconsideration of any aspect of the decision on the merits." *See, e.g.*, *Lorenzen v. Employees Retirement Plan of the Sperry and Hutchinson Co., Inc.*, 896 F.2d 228, 233 (7th Cir. 1990) (holding that "a request for post judgment interest is plainly not an attempt to alter or amend the judgment"). The Trustee's request for pre-judgment interest is properly styled as a Rule 59 Motion, but unlike defendants' Motion, does not ask the Court make any additional findings on substantive issues and causes of action already fully considered by the Court.

For the foregoing reasons, the Trustee respectfully requests that this Court deny the defendant's Motion to Alter or Amend and/or for Further Findings and affirm its May 30, 2006 judgment in its entirety.

Respectfully submitted,

**PHELPS DUNBAR LLP**

By:     /s/     Catherine E. Lasky
        Brent B. Barriere, T.A.  (La. Bar No. 2818)
        David L. Patrón (La. Bar No. 22566)
        Catherine E. Lasky (La. Bar No. 28652)
        365 Canal Street, Suite 2000
        New Orleans, Louisiana  70130-6534
        Telephone:  (504) 566-1311
        Facsimile:  (504) 568-9130

        ATTORNEYS FOR J. LESTER ALEXANDER, III, TRUSTEE

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing pleading has been filed into the record and further served on the following counsel by facsimile, this 23rd  day of June, 2006:

C. Ellis Brazeal III
Watson, Wells, Anderson & Berchall LLP
1819 5th Avenue North, Suite 1100
Birmingham, AL 35203

<u>/s/      Catherine E. Lasky         </u>

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                        Case No. 03-32063-WRS
                                                             Chapter 7

TERRY MANUFACTURING
COMPANY INC.,

       Debtor

J. LESTER ALEXANDER III, TRUSTEE,

       Plaintiff                                    Adv. Pro. No. 05-3042-WRS

   v.

N. D. HORTON JR.,

       Defendant

### ORDER DENYING MOTION TO ALTER OR AMEND FILED
### BY THE DEFENDANTS AND GRANTING IN PART AND
### DENYING IN PART PLAINTIFF'S MOTION TO ALTER AND AMEND

      This Adversary Proceeding came before the Court for a telephonic hearing on July 11,

2006, upon the Motion to Alter and Amend filed by Defendants N.D. Horton, Jr., and James M.

Reynolds, III, (Doc. 91); and upon the Motion to Alter and Amend filed by Plaintiff J. Lester

Alexander, III.  (Doc. 90).  The Plaintiff was present by counsel Brent B. Barriere and the

Defendants were present by counsel C. Ellis Brazeal, III.  The Court would note that these

matters first came on for hearing on June 27, 2006.  These motions have been briefed.  (Doc. 99,

100).

      For the reasons set forth on the record, both on June 27, 2006, and on July 11, 2006, the

Motion to Alter and Amend filed by the Defendants is DENIED.

For the reasons set forth on the record, both on June 27, 2006, and on July 11, 2006, the Motion to Alter and Amend filed by the Plaintiff is GRANTED insofar as the Plaintiff contends that he is entitled to costs.  The motion is DENIED insofar as the Plaintiff seeks an award of prejudgment interest.

Done this 17th day of July, 2006.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: Brent B. Barriere, Attorney for Plaintiff
   C. Ellis Brazeal III, Attorney for Defendant