NO. 06-00746-WHA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| N.D. HORTON, Jr., JAMES M. REYNOLDS, III, | ) ) ) |
| Appellants. | ) ) ) |
| J. LESTER ALEXANDER, III, | ) ) ) |
| Appellee. | ) |

Adversary Proceeding No.
05-3042

---

## ON APPEAL FROM THE BANKRUPTCY COURT FOR MIDDLE DISTRICT OF ALABAMA

## BRIEF OF APPELLANTS N.D. HORTON AND JAMES M. REYNOLDS, III

---

C. Ellis Brazeal III
Attorney for N.D. Horton &
James M. Reynolds, III

OF COUNSEL:
Walston, Wells & Birchall, LLP
1819 5th Avenue North
Suite 1100
Birmingham, AL 35203
Telephone: (205) 244-5237
Telecopier: (205) 244-5437

**NO. 06-00746-WHA**
**N.D. HORTON, JAMES M. REYNOLDS, III V. J. LESTER**
**ALEXANDER, III**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 11th Cir. R. 26-1, counsel for Appellants, N.D. Horton, Jr., and James M. Reynolds, III, hereby discloses any publicly held corporate affiliation of Appellants and certifies that the following judges, attorneys, persons, associations of persons, firms, partnerships, and corporations have an interest in the outcome of the above-styled cause:

**A.    Corporate Disclosure Statement**

None.

**B.    Certificate of Interested Persons**

N.D. Horton, Jr., Appellant

James M. Reynolds, III, Appellant

C. Ellis Brazeal III, Attorney for Appellants

Walston, Wells & Birchall, LLP, Attorneys for Appellants

William R. Sawyer, U.S. Bankruptcy Court Judge

J. Lester Alexander, Plaintiff, Appellee

Brent Barrier, Jr., Attorney for Appellee

Phelps Dunbar, LLP, Attorneys for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellants submit that this case involves a legal question of first impression - - the interpretation of Ala. Code § 8-9A-8(d).  Appellants respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ........................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF CITATIONS ............................................................................... iv

STATEMENT OF JURISDICTION ............................................................ vi

STATEMENT OF ISSUES ............................................................................ 1

STATEMENT OF THE CASE ...................................................................... 4

     I.     Course of Proceedings Below .................................................. 4

     II.    Statement of the Facts ............................................................. 4

     III.   Standard of Review ................................................................ 14

SUMMARY OF THE ARGUMENT .......................................................... 15

ARGUMENT AND CITATIONS TO AUTHORITY ................................ 22

     I.     The Trial Court Erred in Failing to Determine that Ala.
           Code § 8-9A-8(d) Applies and Provides a Complete
           Defense to, or Offset Against, the Trustee's Claims .............. 22

     II.    The Trial Court Erred in Determining that the $5.5
           million in loan proceeds did not constitute "Reasonably
           Equivalent Value" for the Debtor's Payments........................ 25

     III.   The Trial Court Erred in Determining that the
           Forbeance in Calling the Loans Did Not Constitute
           "Reasonably Equivalent Value.".............................................. 31

IV.     The Trial Court Erred in Determining that the Forbearance
        Calling the Loans Did Not Constitute "Reasonably
        Equivalent Value." .................................................................. 35

V.      The Trial Court Erred in Determining that the $1.5 million
        Loan from Peoples Bank did not constitute "Reasonably
        Equivalent Value." .................................................................. 36

VI.     The Trial Court Erred in Failing to Determine that Other
        Loans by Horton Directly to Terry Manufacturing
        Provided "Value." .................................................................. 37

VII.    The Trial Court Erred in Failing to Determine that Terry
        Manufacturing and the Terrys were Alter Egos or held an
        "identify of interest" such that any benefit to one
        constituted benefit to the other. ............................................. 38

CONCLUSION ............................................................................ 42

CERTIFICATE OF COMPLIANCE ........................................... 43

CERTIFICATE OF SERVICE ................................................... 44

# **TABLE OF CITATIONS**

## **Cases**

*International Administrative Services, Inc.,* 408 F.3d 689, 698 (11th Cir. 2005) ................................................................................................ 13

*Grisson,* 955 F.2d 1440, 1444 (11th Cir. 1999 ........................................... 18

*Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125-26 (5th Cir. 1993).................. 18

*Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2nd Cir. 1981) . 18

*Cavalier Homes of Ga., Inc.,* at 886 ............................................................ 23

*Day Telecommunications, Inc.,* 70 B.R. 904, 909 ....................................... 23

*Kallen v. Litas,* 47 B.R. 977, 982-83 (N.D. Ill. 1985) ................................. 23

*Sunset Enterprise, Inc., v. B & B Coal Co.,* 38 B.R. 712, 717 (Bankr. W.D. Va. 1984)) ................................................................................................. 23

*Uniroyal Tire Company,* 779 So.2d 227, 236 (Ala. 2000) .......................... 24

*Volkswagen of America, Inc., v. Dillard,* 579 So.2d 1301, 1305 (Ala. 1991) ............................................................................................... 24

*Bockman v. WCH L.L.C,* 2006 WL 1361126 (Ala. 2006)........................... 25

*Supertrail Manufacturing Co., Inc.* 276 B.R. So.2d 610 (Ala. 1964) .......... 25

*Worthington v. USA,* 21 F.3d 399 (11th Cir. 1994)..................................... 30

*Rodriguez,* 895 F.2d 725 (11th Cir. 1990)................................................... 31

*Martin,* 205 B.R. 646 (Bankr. M.D. Ala. 1993) .......................................... 31

*Cavalier Homes of Georgia, Inc.,* 102 B.R. at 878 (Bankr. M.D. Ga. 1989)................................................................................................... 31

*Pembroke Development Corporation v. Commonwealth Savings & Loan Association,* 124 B.R. 398 (Bkrtcy. S.D. Ala. 1991).............................. 35, 39

*BBL Group, Inc.,* 205 B.R. 625 (Bankr. N.D. Ala. 1996) ........................... 41

## **Statutes**

Ala. Code § 8-9A-8(d) .................................... 2, 14, 17, 18, 20, 21, 22, 23, 26
Ala. Code § 6-5-253(a)(4) ................................................................. 24
Ala. Code 1975 § 40-27-1................................................................. 26
11 U.S.C. § 548................................................................................ 33
11 U.S.C. § 548(d)(2)(A)................................................................. 34
Ala. Code § 8-3-2............................................................................ 36
Ala. Code § 8-3-11.......................................................................... 36

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 158(a).

## STATEMENT OF THE ISSUES

1.    Whether the Court erred (or misinterpreted the law) in finding that the $5.5 million in loan proceeds received by the Debtor from the loan made by Mr. Horton's company, American Real Estate Investment Company, Ltd., L.P. ("American Real Estate"), did not constitute "reasonably equivalent value" for the guaranties and payments from Terry Manufacturing Company, Inc. ("Terry Manufacturing" or "Debtor")?

2.    Whether the Court erred (or misinterpreted the law) in finding that the $1.5 million in loan proceeds received by the Debtor from Peoples Bank did not constitute "reasonably equivalent value" to the Debtor in exchange for the Debtor's payments?

3.    Whether the Court erred (or misinterpreted the law) in failing to find that the following loans constituted "reasonably equivalent value:"

(1) one for $500,000 from American Real Estate dated February 25, 2003; (2) one for $175,000 from N.D. Horton, Jr. dated January 10, 2003; and (3) one for $88,000 from N. D. Horton, Jr. dated February 10, 2003.

4.    Whether the Court erred (or misinterpreted the law) in failing to find that the Terrys and the Debtor were "alter egos" or had a

1

substantial "identity of interest" such that the reduction of the Terrys' obligations by payments from the Debtor constituted "reasonably equivalent value?"

5.    Whether the Court erred (or misinterpreted the law) in failing to find that the Terrys and the Debtor were "alter egos" or had a substantial "identity of interest" such that the guaranties provided by the Debtor were supported by "reasonably equivalent value?"

6.    Whether the Court erred (or misinterpreted the law) in failing to find that the payments by the Debtor to Horton resulted in "reasonably equivalent value" by having Horton and/or American Real Estate defer from calling their various loans?

7.    Whether the Court erred (or misinterpreted the law) in failing to hold that the defendants were entitled to relief pursuant to Ala. Code § 8-9A-8(d)?

8.    Whether the Court erred (or misinterpreted the law) in not finding that the payments by the Debtor (and the commensurate reduction in its contingent liability) constituted "reasonably equivalent value?"

9.    Whether the Court applied the correct legal standard in assessing whether "reasonably equivalence value" had been received by the Debtor for its guaranties and payments?

## STATEMENT OF THE CASE

### I.    Course of Proceedings Below

Alexander, the Trustee in the bankruptcy case of Terry Manufacturing Company, Inc., pending in the U.S. Bankruptcy Court for the Middle District of Alabama bearing Case No. 03-32063-WRS, commenced this Adversary Proceeding No. 05-3042 seeking to set aside purportedly fraudulent pre-petition transfers by the debtor to Horton and Reynolds. After a trial, the bankruptcy court rendered a judgment in favor of the Trustee and against the Defendants in the amount of $596,738.60. The Defendants filed a timely post-trial motion, which was denied, and then timely commenced this appeal.

### II.    Statement of the Facts

The Trustee and the Appellants stipulated to the following facts at trial:

1.    Messrs. Horton and Reynolds were owners of common stock of Perky Cap Company, Inc. ("Perky Cap"), a manufacturer headquartered in Eaton, Georgia.

2.    On November 10, 2000, Cotina Terry, daughter of Roy Terry, executed a Purchase Money Promissory Note (the "Cotina Terry

Note") in the principal sum of TWO HUNDRED THOUSAND NO/100 ($200,000.00) DOLLARS, bearing interest at the rate of 9.5% per annum.

3.     The Cotina Terry Note was made payable to Mr. Horton and Mr. Reynolds, and was purportedly given in consideration of 9,000 shares of Perky Cap common stock sold to Cotina Terry by Messrs. Horton and Reynolds.    These shares represented ten (10%) percent of the outstanding common stock of the Company.

4.     Terry Manufacturing was not a signatory to the Cotina Terry Note.

5.     All payments on the Cotina Terry Note were made by Terry Manufacturing to Messrs. Horton and Reynolds.  The Note was paid in full with payments totaling TWO HUNDRED THIRTY-FOUR THOUSAND, THREE HUNDRED SEVENTY-FIVE DOLLARS AND 81/100 ($234,375.81).

6.     On November 10, 2000, Allie Robinson, wife of Rudolph Terry, executed a promissory note in a form identical to that executed by Cotina Terry.  The note was designated a Purchase Money Promissory Note (the "Allie Robinson Note"), and, like the note executed by Cotina Terry, was in the principal sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS, and provided for 9.5% interest.  Also, like the Cotina Terry

Note, the promissory note executed by Allie Robinson was given for and in consideration of 9,000 shares of Perky Cap Stock sold to Ms. Robinson by Messrs. Horton and Reynolds.  These shares represent ten (10%) percent of the outstanding common stock of Perky Cap

7.    Terry Manufacturing was not a signatory to the note executed by Ms. Robinson.

8.    Terry Manufacturing executed written guarantees of the promissory notes executed by Ms. Terry and Ms. Robinson.

9.    The Perky Cap common stock purchase by Cotina Terry and Allie Robinson was registered in their names, and they received all benefits flowing to holders of Perky Cap Stock, which would have included recognizing for federal tax purposes their respective share of losses recorded by Perky Cap, a sub-s corporation.

10.    Terry Manufacturing was never a shareholder of Perky Cap.  None of the stock purchased by Ms. Robinson or Ms. Terry was registered in its name.

11.    On May 30, 2002, Roy and Rudolph Terry jointly executed a promissory note, in favor of Messrs. Horton and Reynolds, in the principal amount of SIX HUNDRED TWENTY-FOUR THOUSAND NO/100 ($624,000.00) DOLLARS, and bearing interest at the rate of 9.5%

per annum.   In consideration thereof, Messrs. Horton and Reynolds purportedly transferred to Roy and Rudolph Terry, jointly, 27,900 shares of Perky Cap common stock, representing thirty-one (31%) percent of the outstanding common stock of that company.  The parties do not stipulate as to whether the shares were actually transferred.  If, in fact, the shares were transferred, they were registered in the name of Roy and Rudolph Terry, individually, and Terry Manufacturing had no interest in the shares whatsoever.

12.    Terry Manufacturing made all payments on the note executed by Roy and Rudolph Terry.  Payments continued until May, 2003, and totaled ONE HUNDRED TWENTY-SEVEN THOUSAND, NINE HUNDRED EIGHTY-SIX DOLLARS AND 98/100 ($127,986.98).   No payments were made after the Chapter 11 filing by Terry Manufacturing.

13.    Terry Manufacturing made total payments of FIVE HUNDRED NINETY-SIX THOUSAND, SEVEN HUNDRED THIRTY-EIGHT DOLLARS AND 60/100 ($596,738.60) to Messrs. Horton and Reynolds in connection with the promissory notes executed by Cotina Terry, Allie Robinson and Roy and Rudolph Terry (collectively the "Stock Purchase Notes").

14.    A number of entities were unsecured creditors of Terry Manufacturing prior to November 10, 2000 (the date on which Cotina Terry and Allie Robinson delivered their respective promissory notes to Messrs. Horton and Reynolds), and remained unsecured creditors of Terry Manufacturing as of the date Terry Manufacturing filed for relief under Chapter 11 of the Bankruptcy Code.  These unsecured creditors include American Express, Southern Mills, Arkansas State Highway Employees Retirement System, Arkansas Department of Economic Development, CIT Financial Services, Milliken & Company, Darwood Manufacturing, L.L.C. Industries, Inc., Atlantic Thread and Supply Company, Inc., and Bonifay Manufacturing Company.

In addition to the stipulated facts, Appellants submit the following facts:

15.    On November 10, 2000, pursuant to a Line of Credit Promissory Note, Roy and Rudolph Terry borrowed $5.5 million from American Real Estate Investment Company, Ltd., L.P.  ("American Real Estate").  *Transcript, pp. 168-170.  Horton Ex. 1.  (all references to Appellants' exhibits will be as "Horton Ex.")* Mr. Horton testified that the general partner of American Real Estate is RJ & J Enterprises, Inc., and that Mr. Horton is president of RJ & J Enterprises, Inc.  *Transcript, pp. 156, 162.*

16.    On the same date November 10, 2000, the Cotina Terry Note and Allie Robinson Note were executed and they purchased 20% of the stock of Perky Cap. (Stipulated)

17.    A loan agreement was executed in connection with the $5.5 million loan.  *Transcript, p. 168.  Horton Ex. 3.*    This was cross-defaulted with the Cotina Terry Note and the Allie Robinson Note.  *Id.*  The $5.5 million loan was guaranteed by Terry Manufacturing.  *Horton Ex. 10.*

18.    N.D. Horton testified that he would not have made the $5.5 million loan (the largest loan that American Real Estate had ever made) had Mrs. Terry and Ms. Robinson not purchased the stock pursuant to Mr. Terry's oral commitment in that regard.  *Transcript, pp. 186, 187-188.*  Mr. Alexander testified that, had Terry Manufacturing ever ceased making payments on either of these notes, American Real Estate could have called the $5.5 million loan.  *Id., pp. 126-128.*

19.    Although the $5.5 million loan was to the Terrys individually, the Terrys transferred all of these funds into Terry Manufacturing.  *Transcript pp. 223-232.  Horton Ex. 62.  Terry Depo. Pp. 26-27.*

20.    On May 30, 2002, Perky Cap borrowed $1.5 million from Peoples Bank of Eatonton and transferred this money into Terry

Manufacturing. *Id. at 223, 224, 228.  Horton Ex. 57, 62.  Terry Depo. Pp. 33-34.*

21.    On the same date as the Perky Cap loan, Roy and Rudolph Terry purchased 31% of the stock of Perky Cap from Mr. Horton and Mr. Reynolds, which constituted all of Horton and Reynolds' remaining interest in Terry Manufacturing. *Id. at  pp, 68, 186-187.  Horton Ex. 54. Horton Ex. 43.*

22.    At that time, Mr. Horton and Mr. Reynolds resigned as officers of Perky Cap and resigned from the Board of Directors of Perky Cap (the "Board"). *Id. at  pg. 192.  Horton Ex. 47.*

23.    After Mr. Horton and Mr. Reynolds resigned from the Board, Roy Terry, Rudolph Terry, and Jack Perkinson consented to obtaining the $1.5 million loan from Peoples Bank. *Horton Ex. 48.*

24.    Mr. Horton testified that, had he not been bought out of Perky Cap, he would not have facilitated the loan from Peoples Bank. *Id. p.194.*

25.    Mr. Horton facilitated the loan with Peoples Bank. *Id., p. 189..*  Accordingly, but for Mr. Horton's intervention, Terry Manufacturing would not have received the $1.5 million. *Id. p. 189 .*

26.    As testified to by Jesse Slaton, the Appellant's accounting expert, all of the proceeds from the $5.5 million loan to the Terrys was deposited into bank accounts of Terry Manufacturing.   Mr. Slaton further testified that all of these loan proceeds appear to have been used for ordinary business expenses of Terry Manufacturing. *Id. at  p. 228, 231-232, 241. Horton Ex. 62*

27.    As to the Peoples Bank loan, Mr. Slaton testified that all of these proceeds were deposited into bank accounts of Terry Manufacturing. *Transcript*, pp. 228, 231-232, 241. *Horton Ex. 62*.   He further testified that all of these proceeds appear to have been used for ordinary business expenses of Terry Manufacturing.  *Id*.

28.    The payments by the Debtor on the Cotina Terry Note and the Allie Robinson Note totaled $468,751.62 and resulted in a commensurate reduction of indebtedness under those notes.  (Stipulated)

29.    The payments by Terry Manufacturing on the Roy and Rudolph Stock Purchase Notes totaled $127,986.98 and resulted in a commensurate reduction of the indebtedness under that note.  (Stipulated)

30.    The Terry's desired, and communicated to Horton their desire, to have control of Perky Cap, a company which manufactured the products which their company did not manufacture. *Transcript, p. 186;*

*Terry depo. p. 9-12.*    This was done so that Terry Manufacturing could supply the entire uniforms to customers such as McDonald's Corporation

31.    The Terrys told Horton, and Roy Terry testified that, one of their biggest customers, McDonald's Corporation, would not buy uniforms piecemill. *Terry Depo. p. 12.*  Instead, McDonald's purchased the cap, shirt and pants from one supplier.  *Id*

32.    Each purchases of the Perky Cap stock was for a price of $200,000 per 10% of stock purchased.  *Id. At 13-14.*    This was true from 1994 through 2002.  *Id.*

33.    The Trustee acknowledged that, due to the Peoples Bank loan to Perky Cap, Terry Manufacturing's net relationship with Perky Cap was a positive $500,000.00. *Transcript p. 137-138*.

34.    The promissory notes from Allie Robinson and Cotina Terry were guaranteed by Terry Manufacturing.  (Stipulated) Cotina Terry is Roy Terry's daughter. Terry Depo. *p. 16.* Allie Robinson is Rudolph Terry's wife. *Id at 16.*    Horton was unwilling to extend credit to Mrs. Terry and Mrs. Robinson individually.  *Transcript, pp. 168-169.*    As a condition to the stock purchase, he required Terry Manufacturing to guarantee those promissory notes.  *Id. at 169.*

35.    Terry testified that Terry Manufacturing had a least three other loans with Horton or American Real Estate: (1) one for $500,000 dated February 25, 2003; (2) one for $175,000 dated January 10, 2003; and (3) one for $88,000 dated February 10, 2003. *Terry Depo., pp. 98-99. Ex. 11, 12, and 13.* Terry further testified that, had Terry Manufacturing not made payments on the $624,000 note, Terry Manufacturing would not have received these funds, *Id. pp. 99-100.*

36.    The Trustee has acknowledged the following conduct which would warrant finding that the Debtor and the Terrys were "alter egos" or had a substantial "identity of interest":

a)    certain financial records of Terry Manufacturing were either erroneous, highly misleading, or outright fraudulent; *Id. at 145.*

b)    Terry Manufacturing prepared two sets of tax returns; *Id at 42.*

c)    Terry Manufacturing's financial statements were grossly misleading; *Id. at 98.*

d)    Terry Manufacturing engaged in check kiting, off balance sheet loans, trade debt, and ponzi schemes to sustain its operations; *Id. at 141, 143, 145.*

13

e)    Roy and Rudolph Terry used funds of Terry Manufacturing for personal obligations. *Id. at 142-143, and*

f)    Roy and Rudolph Terry were the two primary shareholders of Terry Manufacturing, and there is no evidence that any of the other shareholders exerted any control over Terry Manufacturing. *Id. pp. 142-143.*

37.    David Giddens, accountant for Mr. Horton acknowledged that he did not review Mr. Horton's 2002 tax return with him before it was filed. *Giddens Depo.* p. 38

III.    **Standard of Review**

The district court's review of factual findings of the bankruptcy court is for "clear error." *In re: International Administrative Services, Inc.,* 408 F.3d 689, 698 (11th Cir. 2005). The district court's review of the determinations of law by the bankruptcy court is "de novo." *Id.*

## SUMMARY OF THE ARGUMENT

In almost any fraudulent transfer action, one question which arises is whether the transferor received "reasonably equivalent value" for the transfers.    The trial court found that Terry Manufacturing (the transferor/Debtor) did not.  However, the trial court's findings in this regard were clearly erroneous - - the trial court's statement of the factual basis for these findings are <u>directly</u> contradicted by the record.   The millions of dollars in loans initially received by third parties, namely the Terry Family and Perky Cap, but then transferred to Terry Manufacturing, constituted "reasonably equivalent value" for the guaranty by Terry Manufacturing of the Stock Purchase Notes and the payments on said notes.  Moreover, even if these millions of dollars in loans are disregarded, under Alabama law, the reduction in the debts of the Terry Family through the payment of the Stock Purchase Notes entitles Horton and Reynolds to an offset in like amount under Ala. Code § 8-9A-8(d).  Despite being raised at trial, and in a motion to alter or amend, the trial court did not specifically address this "offset" argument.   It's failure to embrace this argument clearly presents an erroneous legal conclusion on the part of the trial court.

In order to understand the factual and legal arguments presented by this complex case, a thorough understanding of the players and transactions is imperative.

This case involves three companies and their principals:

a) Terry Manufacturing (a manufacturer of uniform shirts and pants) and its principals, brothers Roy and Rudolph Terry, and Cotina Terry (Roy's daughter) and Allie Robinson (Rudolph's wife) (collectively the "Terry Family");

b) American Real Estate (an investment partnership owned ostensibly by Horton and Reynolds); and

c) Perky Cap (a manufacturer of caps).

There are several transactions at issue but they fall into two categories:

a)    the sale of stock in Perky Cap from Horton and Reynolds to the Terry Family; and

b)    loans to the Terry Family or Perky Cap from which all loan proceeds - - more than $7 million - - were transferred to Terry Manufacturing and utilized to pay its ordinary bills and expenses.

The undisputed evidence reveals that the Terry Family purchased stock in Perky Cap from Horton and Reynolds so that the Terry

16

Family could gain control over a cap manufacturer to augment the manufacture of shirts and pants by Terry Manufacturing. (Roy Terry testified that a customer, McDonalds Corporation, required Terry Manufacturing to produce all parts of a uniform - - caps, shirts, and pants). This also rendered Perky Cap a Minority Owned Business, another desired result of the Terry Family. The Terry Family did not pay cash for the Perky Cap stock but instead executed the Stock Purchase Notes to pay for the stock. Terry Manufacturing guaranteed the Stock Purchase Notes from Cotina Terry and Allie Robinson since the stock purchase was part of the company's business plan to obtain control of Perky Cap and since Horton made it a requisite.

On the same dates that the stock purchases occurred, millions of dollars were loaned to the Terry Family and/or Perky Cap and then immediately transferred into Terry Manufacturing. On November 10, 2000, the first stock purchased occurred and American Real Estate loaned $5.5 million to the Terry Family for infusion into Terry Manufacturing. On May 30, 2002, additional stock in Perky Cap was purchased by the Terry Family, and Roy and Rudolph Terry replaced Horton and Reynolds on the Board of Directors of Perky Cap. Having gained control over Perky Cap (through the stock purchases), the Terrys caused Perky Cap to borrow $1.5 million from

Peoples Bank of Eatonton (with the assistance of Horton). This $1.5 million was transferred immediately into Terry Manufacturing.

The payments found to be fraudulent transfers were the payments that Terry Manufacturing made on the Stock Purchase Notes. The trial court found that these payments were not supported by "reasonably equivalent value." However, the trial court's factual and legal determinations are flawed. First, Terry Manufacturing did receive "reasonably equivalent value" - - millions of dollars. Second, as a separate and equally efficacious defense, Ala. Code § 8-9A-8(d) provides a complete defense or offset against the Trustee's fraudulent transfer claims.

In finding that the loaned funds did not constitute "reasonably equivalent value," the trial court made factual determinations that <u>directly contradicted</u> the testimony and documents at issue, thereby making clearly erroneous findings. As to Ala. Code § 8-9A-8(d), the trial court failed to address this Code provision in its Memorandum Decision and even upon consideration of the defendants' motion to alter or to amend. The reason appears clear - - a plain reading of § 8-9A-8(d) provides a complete defense to the defendants.

This case is clearly not as straightforward as many fraudulent transfer cases, but a careful review of the facts and law reveals that the trial

court's judgment of $596,738.60 against Horton and Reynolds is flawed. The trial court indicated that the defendants' arguments in this case left him "grasping madly for a bottle of aspirin."  *See Memorandum Decision, p. 8.* Furthermore, the trial court stated that:

"You know, if I had my choice of a root canal and looking at your tracing analysis, I think it is an easy call."  *Transcript, p. 209.*  (The tracing analysis demonstrated that the loan proceeds of several million dollars went to Terry Manufacturing.)

Perhaps the trial court was antipathetic towards this case, but, for whatever reason, the trial court:

a)      perhaps inadvertently, misstated testimony and mischaracterized documentary evidence; and

b)      failed to specifically consider Ala. Code § 8-9A-8(d).

In addressing fraudulent transfers, the Eleventh Circuit Court of Appeals recognizes that such cases are not always as straightforward as one might desire and, therefore, follows the "totality of the circumstances" approach to determine "reasonably equivalent value" and rejects the use of a mechanical mathematical formula.[1]  *In re Grissom,* 955 F.2d 1440, 1444

---

[1] The Eleventh Circuit has also acknowledged that "[c]aselaw applying the concept of 'fair consideration' under the old Bankruptcy Act of 1898 has been adopted as applicable to the concept of 'reasonably equivalent value' under the current Bankruptcy Code of 1978." *In re Chase & Sanborn Corp.,* 904 F.2d 588, fn 11 (11th Cir. 1990).

(11th Cir. 1999); *In the Matter of Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125-26 (5th Cir. 1993).   In reviewing the "totality of circumstances," this Court may consider benefit initially conferred upon a third party.   The seminal case involving benefit initially conferred upon a third party is *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2nd Cir. 1981).   There, the Second Circuit made clear that "the cases recognize . . . that a debtor may sometimes receive 'fair' consideration even though the consideration given for his property or obligation goes initially to a third person."   *Id. at 991.*  The Court further clarified that:

> Although transfers <u>solely</u> for the benefit of third parties do not furnish fair consideration under § 67(d)(1)(e), the transaction's benefit to the debtor need not be direct; it may come indirectly through benefit to a third person.  If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and § 67(d) has been satisfied-provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

*Id.*

A review of the "totality of circumstances" of the players and transactions in this case warrants a reversal of the bankruptcy court and a judgment in favor of Appellants.

In this case, the parties have stipulated that Terry Manufacturing made payments to Horton and Reynolds on the Stock Purchase Notes in the amount of $596,738.60, which notes were given in consideration for the purchase of the stock by the Terry Family. The question presented is whether the acquisition of the Perky Cap stock by the Terry Family and/or the payments by Terry Manufacturing on the Stock Purchase Notes resulted in transactions which conveyed "reasonably equivalent value" to Terry Manufacturing. By purchasing the stock, guaranteeing the Stock Purchase Notes, and/or making payments thereon, Terry Manufacturing received several million dollars, an amount greatly in excess of the $596,738.60 in payments which the trial court found to be fraudulent transfers. Clearly, these millions of dollars in transfers provided Terry Manufacturing with "reasonably equivalent value" such that no fraudulent transfers occurred. Additionally, Terry Manufacturing and the Terry Family held such an "identity of interest" that "what benefited one benefited the other" and, therefore, "reasonably equivalent value" was received. Finally, even if these millions of dollars in loans are not considered, under Ala. Code § 8-9A-9(d), the Appellants have a complete offset or defense to the amount claimed.

## ARGUMENT AND CITATIONS TO AUTHORITY

I.      **The Trial Court Erred in Failing to Determine that Ala. Code § 8-9A-8(d) Applies and Provides a Complete Defense to, or Offset Against, the Trustee's Claims.**

Under Ala. Code § 8-9A-8(d), a good faith transferee is entitled to an offset to the extent of value given the debtor for the transfer "<u>or to another person</u> as a consequence of the debtor's making such transfer." Accordingly, under the plain language of the statute, Horton and Reynolds are entitled to an offset in the amount of the value given to Ms. Robinson, Ms. Terry and Roy and Rudolph Terry (the "Terry Family"). The comments to the Ala. Fraudulent Transfer Act, at Comment 3, indicate that the language "or to another person as a consequence of the debtor's making such transfer to" was added to the Uniform Act to clarify the fact that a "good faith transferee is protected to the extent of value given by the transferee to one other than the Debtor." The Alabama legislature added this language to make it clear that, if a good faith transferee gives value (regardless of whether it is to the debtor or to another), the transferee will not have to reimburse the debtor to the extent of the value given.

Ala. Code § 8-9A-3(a) states that "value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied. . ." "An antecedent debt arises once the debtor

borrows the money or signs the agreement even though repayment may be postponed or contingent." *In re Cavalier Homes of Ga., Inc.,* at 886 (citing *In re Day Telecommunications, Inc.,* 70 B.R. 904, 909 (Bankr. E.D.N.C. 1987); *Kallen v. Litas,* 47 B.R. 977, 982-83 (N.D. Ill. 1985); *Sunset Enterprise, Inc., v. B & B Coal Co.,* 38 B.R. 712, 717 (Bankr. W.D. Va. 1984)). Accordingly, the Stock Purchase Notes constituted "antecedent debts" of the Terry Family. So, each payment on the Stock Purchase Notes by Terry Manufacturing provided a reduction in the amount of an antecedent debt of the Terry Family. Under Ala. Code § 8-9A-3(a), such reductions constitute value to the Terry Family. This "value" received by the Terry Family constitutes "value. . . received by another person as a consequence of the debtor's [Terry Manufacturing's] making such transfer" under Ala. Code § 8-9A-8(d). This results in an offset in the amount of such reduction in the debt under § 8-9A-8(d).

For some reason, the trail court failed to address this argument in its original memorandum decision and again failed to address it in response to the appellant's motion to alter or to amend. A review of Alabama law on statutory construction suggests why the trial court failed to address it - - there is simply no way to address this statute and not find for the Appellants.

The issue in the instant case is how to interpret § 8-9A-8(d) of the Alabama Fraudulent Transfers Act, specifically the phrase "or to another person," the only four words that separate the Alabama act from the uniform version. The Alabama legislature could have easily adopted the uniform act whole cloth, but chose to add "or to another person," to the original text of § 8-9A-8(d). By changing the act, the legislature manifested its clear intent for the Alabama Fraudulent Transfers Act to differ from the uniform act. *In Ex parte Uniroyal Tire Company*, 779 So.2d 227, 236 (Ala. 2000), the Alabama Supreme Court held that: "There is a presumption that *every word, sentence or provision* was intended for some useful purpose, has some force and effect, and that some effect is to be given to each…". *Id.* (emphasis added). Ignoring these four words in the Alabama Fraudulent Transfers Act as if the legislature never wrote or codified it is to act at cross-purposes with Alabama case law of statutory construction.

With that as a foundation, the question remains as to how to interpret the statute. The fundamental rule in interpreting acts of the legislature is to "ascertain and give effect to the intent of the legislature in enacting the statute." *Volkswagen of America, Inc. v. Dillard*, 579 So.2d 1301, 1305 (Ala. 1991). In doing so, the court must look to the "plain

meaning of the words as determined by the legislature."[2] *Bockman v. WCH, L.L.C.* 2006 WL 1361126 (Ala. 2006).

The law is well-settled that, under the plain reading of the statute, a reduction in, or satisfaction of, the debt of the debtor/transferor constitutes "reasonably equivalent value." *See Boyett's, Inc. v. Gross,* 163 So.2d 610 (Ala. 1964); *In re: Supertrail Manufacturing Co., Inc.,* 276 B.R. 136 (Bankr. N.D. Miss. 2000). By adding "or to another," the Alabama legislature clearly evidenced its intent that the reduction in the debt of "another" based upon the transferor's payments would constitute "reasonably equivalent value." Therefore, the trial court erred in not construing "or to another" in Ala. Code § 8-9A-8(d) to apply to the value received by the Terry Family for the reduction in their antecedent debts under the Stock Purchase Notes.

II.      **The Trial Court Erred in Determining that the $5.5 million in loan proceeds did not constitute "Reasonably Equivalent Value" for the Debtor's Payments.**

It is undisputed that, on November 10, 2000, two transactions took place: 1) Cotina Terry (daughter of Roy Terry) and Allie Robinson (wife of Rudolph Terry) each purchased 10% of the outstanding shares of

---

[2] "Words used in a statute must be given their natural, plain, ordinary commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." Chapman v. Smith, 893 So.2d 293, 297 (Ala. 2004) quoting Ex parte Alabama Dep't of Mental Health & Mental Retardation, 840 So.2d 863, 867 (Ala. 2002) (internal citations omitted).

Perky Cap and executed two stock purchase notes in connection therewith which were guaranteed by Terry Manufacturing; and 2) American Real Estate agreed to loan $5.5 million to the Terry Brothers pursuant to a $5.5 million Line of Credit Promissory Note guaranteed by Terry Manufacturing. It is further undisputed that $5.5 million was loaned to the Terry Family, then transferred to Terry Manufacturing, and then utilized by Terry Manufacturing to pay its customary bills and expenses.

Mr. Horton and Mr. Terry both testified, and there was no testimony to the contrary, that the stock purchases in Perky Cap by the Terry Family were designed to benefit Terry Manufacturing, not the Terrys individually. Both Horton and Terry testified that part of Terry Manufacturing's business plan was for the Terry Family to have a controlling interest in Perky Cap, a manufacturer of caps, so that Terry Manufacturing could manufacture, or control the manufacture of, entire uniforms including caps. Mr. Terry testified that this was important to existing customers such as McDonalds and potential customers such as Coca-Cola. Additionally, Terry testified that it was important for Perky Cap to be a minority-owned business ("MOB"), which was accomplished by the

Cotina Terry and Allie Robinson stock purchase.[3]  The question is whether the stock purchases (and the payments therefore by Terry Manufacturing pursuant to its guaranties) resulted in the receipt of "reasonably equivalent value" by Terry Manufacturing.

As to the nexity between the stock purchases (and the payments therefore) and the $5.5 million loan, under examination by Trustee's counsel, Mr. Horton explained that, while the stock purchase and the loan were separate business deals, they were related as follows:  1) the two transactions were cross-defaulted; and 2) the $5.5 million loan was made based, in part, upon Mr. Terry's business plan for Terry Manufacturing which involved the purchase of the Perky Cap stock by the Terry Family.

Mr. Horton testified, and there was no testimony to contradict it, that if the Terry Family had not purchased the Perky Cap stock, American Real Estate (which Mr. Horton controlled), would not have loaned the $5.5 million to the Terry Family.   Mr. Horton explained that, if Terry Manufacturing had departed from its business plan by not purchasing the Perky Cap stock, Mr. Horton would have had grave concerns about Terry Manufacturing's business plan and would not have loaned the $5.5 million - - the largest loan that American Real Estate had ever made.   Importantly,

---

[3] After these two purchases, Perky Cap was owned: Cotina Terry (10%); Allie Robinson (10%); Roy Terry

Mr. Terry and Mr. Slaton both testified that all of the proceeds from the $5.5 million loan were deposited into Terry Manufacturing accounts. Mr. Horton testified that the purpose of the loan was to fund the $5.5 million to Terry Manufacturing. So, as the result of purchasing the Perky Cap stock for Cotina Terry and Allie Robinson, Terry Manufacturing received $5.5 million, clearly more than "reasonably equivalent value."

In reaching its conclusion that the $5.5 million in loan proceeds did not constitute "reasonably equivalent value," the trial court ignored the above-recited evidence and made the following factual findings:

a) "Horton testified at trial that he would not have made the loans to Cotina Terry and Allie Robinson for the purchase of the Perky Cap stock, but for the repayment of the loan by Terry Manufacturing. Horton's claim is wholly lacking in logic. The repayment of the Cotina and Allie loans by Terry Manufacturing was not done until a later point in time." *Memorandum Decision, p. 8.*

b) "None of this documentary evidence suggests any relationship to the Cotina and Allie loans." *Id. at p.8-9.*

---

(10%); Rudolph Terry (10%); and Roy and Rudolph Terry (12%) for a total of 52%.

c)    "None of the documents created on November 10, 2000,
suggest such a connection and no credible evidence supports such a
finding." *Id. at p. 9.*

Horton did not testify that the loans to Cotina Terry and Allie
Robinson would not have been made "but for the repayment of the loan by
Terry Manufacturing."  Had Mr. Horton so testified, his testimony would
have lacked credibility since, as the Court pointed out, the repayment of the
loans were "not done until a later point in time."  Instead, Horton testified
that he would not have sold the stock to Ms. Robinson and Ms. Terry unless
Terry Manufacturing agreed to guarantee the Stock Purchase Notes which
were given in exchange for the stock.  Horton testified that he did not know
Ms. Robinson and Ms. Terry and therefore required the guaranty from Terry
Manufacturing.  Accordingly, this factual determination by the trial court is
clearly erroneous.

Moreover, the trial court's factual determination that" [n]one of
the documents created on November 10, 2000, suggest such a connection" is
clearly erroneous as well.  The very loan documents at issue (the Stock
Purchase Notes and the $5.5 million loan documents) demonstrate that the
loans were inextricably linked - - they were cross-defaulted.  In other words,
if Terry Manufacturing did not pay on the Stock Purchase Notes, Terry

Manufacturing would have been in default on the $5.5 million obligation and American Real Estate could have called both loans. How much more closely could the two loans have been linked?

The Eleventh Circuit was faced with a similar situation where the trial court's factual findings were directly at odds with the testimony adduced at trial. *See Worthington v. USA*, 21 F.3d 399 (11th Cir. 1994). The *Worthington* case involved a wrongful death action resulting from a plane crash. There the trial court found: "[u]nder the evidence presented, the Court does not credit testimony that [the decedent] suffered spatial disorientation as claimed by plaintiff." The trial court's determination was based upon the credibility of the witnesses. However, every expert witness who testified at trail acknowledged that the decedent suffered from spatial disorientation. Therefore, the Eleventh Circuit found the trial court's factual determination to be clearly erroneous.

Here, the bankruptcy court's factual determinations are similarly flawed. The two witnesses who spoke to the issue of the nexus between the Stock Purchase Notes and the $5.5 million loan both testified that, had the Stock Purchase Note transaction not gone forward, the $5.5 million loan would not have occurred. Additionally, the very loan documents link these two loan transactions. Accordingly, these factual

30

findings of the bankruptcy court are due to be overturned. Once overturned, this Court should find based upon the <u>only</u> evidence adduced that the two transactions were tied to one another and that they resulted in Terry Manufacturing receiving $5.5 million, a much greater amount than the payments at issue - - $596,738.60.

**III.      The Terry Manufacturing payments generated "reasonably equivalent value" through the reduction of Terry Manufacturing's guaranteed obligation.**

An alternate and equally compelling analysis reveals that the Terry Manufacturing payments on the Cotina Terry and Allie Robinson Stock Purchase Notes were exchanged for the "reasonably equivalent value" of the reduction in Terry Manufacturing's guaranteed obligation for these notes. Each Court that has considered whether transfers made pursuant to a guaranty constitute "reasonably equivalent value" has determined that they do. *See In re: Rodriguez,* 895 F.2d 725 (11th Cir. 1990); *In re: Martin*, 205 B.R. 646 (Bankr. M.D. Ala. 1993); and *In re: Cavalier Homes of Georgia, Inc.,* 102 B.R. at 878 (Bankr. M.D. Ga. 1989). The Courts have uniformly held that, since the debtor received a dollar for dollar reduction in its guaranteed obligation, the debtor did receive "reasonably equivalent value." *Id.* Importantly, both the Eleventh Circuit and the U.S. Bankruptcy Court for the Middle District of Alabama have embraced this argument.

*In Rodriguez,* the Eleventh Circuit not only recognized that a debtor may receive reasonably equivalent value from indirect benefits, but also acknowledged that repayment of a guaranteed obligation would constitute a "direct benefit" and, therefore, "reasonably equivalent value." Importantly, in considering the law applicable to the facts, the Eleventh Circuit stated:

> Since Domino was <u>not</u> liable for repayment of International's indebtedness, Domino could not be found to have benefited <u>directly</u> from repaying the loan absent a piercing of International's corporate veil.

*Id. at 727.* Accordingly, under the Eleventh Circuit's analysis, if the debtor had been "liable for payment of the . . . indebtedness," it would have received a "direct benefit." *Id.* Therefore, the "direct benefit" which Terry Manufacturing received from the reduction of its guaranty obligation constitutes "reasonably equivalent value." The Trustee acknowledges the precedential value of *Rodriguez* in his Memorandum of Law.

Notably, the *Martin* opinion was decided by the Bankruptcy Court for this District. In *In re: Martin*, C&C Land Corporation ("C&C") purchased certain real property from Alfa Mutual Fire Insurance Company. C&C signed a purchase money promissory note and a mortgage regarding the purchase of this real estate. The individual debtor, Don Martin,

guaranteed both the mortgage and the promissory note. Prior to his filing bankruptcy, Martin submitted a check in the amount of $105,062.49 as the final payment on the promissory note. When Martin later filed bankruptcy, the trustee filed suit to recover this payment under 11 U.S.C. § 548 as a fraudulent conveyance. The trustee argued that Martin did not receive "reasonably equivalent value" since C&C received value through the satisfaction of its debt and the release of its mortgage. However, Judge Steele found that, since the debtor was a guarantor of the debt, the debtor received "reasonably equivalent value" in the satisfaction of its antecedent debt. *Id. at 648*. In rendering this opinion, Judge Steele noted the opinion in *In re: Cavalier Homes, supra*.

In *Cavalier Homes*, defendant AmSouth Bank issued an industrial revenue bond in favor of the individual defendants, who were principals of the company which leased real property to Cavalier Homes. As part of the transaction, the defendants executed a promissory note for $800,000 payable to the Development Authority of Jones County. This note was assigned by that authority to AmSouth Bank. Also as part of the transaction, the debtor executed a guaranty agreement in favor of AmSouth Bank guaranteeing payments under the bond. Pre-bankruptcy, the debtor made payments under its guaranty. The trustee filed suit to set aside these

payments as fraudulent transfers, arguing that no value flowed to the debtor. The defendants argued that the debtor received "reasonably equivalent value," because its contingent obligation under its guaranty was reduced by the transfers. The Court noted that, under 11 U.S.C. § 548(d)(2)(A), "value" means: "property or satisfaction or securing of a present or antecedent debt of the Debtor…" The Court found that the transfer reduced the debtor's contingent liability under its guaranty and, therefore, received "reasonably equivalent value." *Id. at 880*.

The trial court found that it did not need to address this legal issue since it found the Terry Manufacturing guaranty to be a fraudulent transfer itself. However, the guaranties of the Stock Purchase Notes were exchanged for "reasonably equivalent value" - - the receipt by Terry Manufacturing of $5.5 million. Horton testified that he required these guaranties from Terry Manufacturing for the stock purchase to go forward and that the stock purchase allowed Terry Manufacturing to receive $5.5 million. Since the guaranties were valid, the $596,738.60 in payments thereon were valid. Alternatively, as set forth in Section VII. below, and more specifically the *Pembroke* and *BBL Group* opinions, the guaranty from Terry Manufacturing was supported by "reasonably equivalent value."

IV.        **The Trial Court Erred in Determining that the Forbearance in Calling the Loans Did Not Constitute "Reasonably Equivalent Value."**

At trial, the Trustee acknowledged that, had Terry Manufacturing ceased making payments on the Stock Purchase Notes, the $5.5 million loan could have been called as to Terry Manufacturing pursuant to its guaranty of that loan. So, the payments at issue allowed Terry Manufacturing to continue its operations. This also represents "reasonably equivalent value." *See Pembroke Development Corporation v. Commonwealth Savings & Loan Association*, 124 B.R. 398 (Bkrtcy. S.D. Ala. 1991). In *Pembroke*, the Court found that forbearance on collecting a debt constituted "reasonably equivalent value," without the necessity of proving the amount of the value. Similarly, while the value cannot be calculated with certainty, the forbearance in calling the $5.5 million loan was brought about by the payments on the Stock Purchase Notes and had to create substantial value to Terry Manufacturing. Had Terry Manufacturing been sued for the $5.5 million, it appears that Terry Manufacturing would have ceased operations much earlier.

V.        **The Trial Court Erred in Determining that the $1.5 million loan from Peoples Bank did not constitute "Reasonably Equivalent Value."**

The nexity between the stock purchases by the Terry Family and the loan from Peoples Bank is without dispute.  Although the Trustee contends that they are unrelated, this admittedly unusual loan transaction which put $1.5 million into Terry Manufacturing's coffers would not have occurred unless the Terry Family owned substantially all of the stock of Perky Cap.  Had Terry Manufacturing not made the payments on the Stock Purchase Notes, Horton and Reynolds would have been entitled to recall the stock pursuant to their security interest therein; and Horton and Reynolds would not have resigned from the Perky Cap board of directors.

On May 30, 2002, Roy and Rudolph Terry purchased 31% of Perky Cap stock, purportedly giving them 84% of the stock of Perky Cap. The Trustee contends that this stock purchase never occurred since it was not reflected on Mr. Horton's K-1s and due to certain transaction involving Wholesale Distribution and American Testing Laboratories.[4]  Even if the stock was never transferred, the stock purchase transaction enabled the Terrys to obtain control of Perky Cap by replacing Horton and Reynolds as

---

[4] The evidence weighs in favor that the stock purchase occurred; 1) a $624,000 note was executed as payment for the stock and payments in the amount of $127,986.98 were made; 2) Horton's accountant admitted that he did not recall discussing the K-1 with Mr. Horton or reviewing his 2002 tax return with him; 3) Horton and Reynolds resigned as officers of Perky Cap (and the Terrys became officers); 4) Horton

36

officers of the corporation and members of the Perky Cap Board of Directors. Once Mr. Horton and Mr. Reynolds were removed, Perky Cap borrowed $1.5 million from Peoples Bank on that same day (May 30, 2002), which $1.5 million was funneled into Terry Manufacturing. Furthermore, Mr. Horton arranged the loan with Peoples Bank. He testified that he would not have arranged the loan had he remained an owner of Perky Cap. Accordingly, due to Terry Manufacturing making the payments on the Stock Purchase Notes, and thereby maintaining ownership of the Perky Cap stock by the Terry Family, the Terry Family (acting as members of the Board of Perky Cap) utilized Perky Cap to borrow $1.5 million which was funneled immediately into Terry Manufacturing. Had the Terry Family not been in control of Perky Cap, it is inconceivable that Perky Cap would have borrowed the $1.5 million only to funnel it into Terry Manufacturing.

VI.     **The Trial Court Erred in Failing to Determine That Other Loans by Horton Directly to Terry Manufacturing Provided "Value"**

Horton and/or American Real Estate made three other loans directly to Terry Manufacturing:

(1) one for $500,000 from American Real Estate dated February 25, 2003; (2) one for $175,000 from N.D. Horton, Jr. dated January 10,

---

and Reynolds resigned from the Board of Perky Cap (and the Terrys joined the Board); and 5) Perky Cap

2003; and (3) one for $88,000 from N. D. Horton, Jr. dated February 10, 2003.

Both Horton and Terry testified that, had the Stock Purchase Notes not been paid, Horton would not have loaned these other funds to Terry Manufacturing. Accordingly, even if the Court rejects all of the other arguments, Horton and Reynolds are due an offset reduction in the amount of the judgment by the amount of these loans: $736,000.00, which completely eviscerates the judgment.

VII.    **The Trial Court Erred in Failing to Determine that Terry Manufacturing and the Terrys were Alter Egos or held an "identity of interest" such that any benefit to one constituted benefit to the other.**

In *Rodriguez, supra*, the Eleventh Circuit considered whether it should pierce the corporate veil and find that the debtor benefited from the consideration given to a subsidiary corporation on the grounds that the subsidiary corporation was an "instrumentality of the debtor." The Court noted that, for the "instrumentality" doctrine to apply, there must have been undue control over the other party and the use of that control must have harmed the transferee. *Id. at 728.* In finding that there was no evidence of undue control, the Eleventh Circuit noted that there was no evidence of "shared officers or intermingling of funds to support a claim" of undue

---

pledged its assets to borrow $1.5 million which was injected directly into TERRY MANUFACTURING.

control.  *Id*.  In this case, there were shared officers (the Terry Brothers were the officers of Terry Manufacturing) and the Trustee has determined that there <u>was intermingling of funds</u> and that the Terrys, in their business dealings, <u>made no distinction</u> between themselves and their company. Furthermore, this has worked an inequity on Horton and Reynolds, because they indicated that they would not have sold the stock to the Terry Family, but for the guaranty of Terry Manufacturing.

Another opinion from a court in the Eleventh Circuit which speaks to this issue is *In re: Pembroke Development Corporation*, 124 B.R. 398 (Bankr. S.D. Fla. 1991).  In *Pembroke*, the debtor executed a loan modification agreement, which the trustee claimed to constitute a fraudulent transfer.  The Court found that this loan modification was not a fraudulent transfer since the corporate debtor had guaranteed the loan.  Furthermore, the Court recognized that an indirect benefit to the transferor may be sufficient to establish "reasonably equivalent value" where the debtor and third party "are so related or situated that they share an identity of interest because what benefits one will, in such case, benefit the other in some degree."  *Id. at* 400.  In *Pembroke,* the bankruptcy guarantor and the party to the loan agreement were both controlled by the same person.  Here, the

relationship is even closer - - the debtor/transferor was controlled by the Terry Family, the obligors to Horton and Reynolds.

The Trustee has acknowledged that Roy and Rudolph Terry were the two primary shareholders of Terry Manufacturing, and there is no evidence that any of the other shareholders exerted any control over Terry Manufacturing. *Id. pp. 142-143.* The Terry Brothers utilized their control over Terry Manufacturing to engage in fraudulent conduct which resulted in an investigation of Terry Manufacturing by the U.S. Attorney's office and in a "plea agreement" by Roy Terry.

Some of this conduct included:

a)    the creation of financial records of Terry Manufacturing which were either erroneous, highly misleading, or outright fraudulent; *Id. at 145.*

b)    maintaining two sets of tax returns for Terry Manufacturing; *Id at 42.*

c)    preparing grossly misleading financial statements for Terry Manufacturing, *Id. at 98.*

d)    engaging in check kiting, off balance sheet loans, trade debt, and ponzi schemes to sustain its operations; *Id. at 141, 143, 145;*

e)    using funds of Terry Manufacturing for personal obligations of the Terry Brother's. *Id. at 142-143, and*

f)    defrauding many investors and lenders including Mr. Horton and Mr. Reynolds. *See Memorandum Decision, pp. 3-4.* (In fact, both Roy and Rudolph Terry pled guilty in connection with defrauding Mr. Horton insofar as the $5.5 million loan).

An Alabama bankruptcy court relied upon the *Pembroke* opinion in determining that the "identity of interest" between the debtor and its principals supported the guaranty which the debtor gave for its principals' obligation. *In re: BBL Group, Inc.,* 205 B.R. 625 (Bankr. N.D. Ala. 1996). In upholding the guaranty, Judge Sledge opined:

> This Court recognizes that an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party "are so related or situated that they share an identity of interests because <u>what benefits one will, in such case, benefit the other</u> to some degree. *Id. p. 636.*

In this case, it is undisputed that what benefited the Terry Family benefited Terry Manufacturing - - the Terry Family borrowed millions of dollars and funneled it to Terry Manufacturing. In this case, the bankruptcy court did not make any factual findings as to this issue. Accordingly, this Court should consider the undisputed facts and find that the "identity of interest"

41

between the Terry Family and Terry Manufacturing warrants the reversal of the judgment.

## **CONCLUSION**

This bankruptcy appeal involves the woeful end of Terry Manufacturing, which was once considered one of the most successful MOB's in America. Like many others, Horton and Reynolds were defrauded by the Terry Family through a complex series of transactions. This resulted in the loss of millions of dollars to Horton and Reynolds. Now, the bankruptcy court has added insult to injury by requiring Horton and Reynolds to repay $596,738.60 to the bankruptcy estate even though these very payments from Terry Manufacturing enabled it to receive over $7 million in loan proceeds. The bankruptcy court's judgment is due to be overturned and rendered in favor of Horton and Reynolds on factual and legal grounds. The millions of dollars in loan proceeds constituted "reasonably equivalent value." Even if this Court discounts or ignores the $7 million in loans, the judgment is still due to be reversed under Ala. Code § 8-9A-8(d), an absolute legal defense. Finally, there were loans directly to Terry Manufacturing in the amount of $736,000.00, which would not have been made but for the repayment of the Stock Purchase Notes. These loans completely eviscerate the judgment.

Respectfully submitted,


\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Appellants
N.D. Horton & James M. Reynolds, III


**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:  (205) 244-5237
Telecopier:  (205) 244-5437


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word-processing system used to generate this brief, this brief contains 9410 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

\s\ C. Ellis Brazeal III
OF COUNSEL

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that a copy of the above and foregoing Brief of Appellant N. D. Horton and James M. Reynolds, III has been served upon counsel of record by electronic filing purposes, as follows:

           Catherine E. Laskey
           Phelps Dunbar LLP
           City Plaza
           445 North Boulevard
           Suite 701
           Baton Rouge, LA 70802-5707

           This the \14th\ day of September, 2006.


           \s\ C. Ellis Brazeal III
           OF COUNSEL