# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **N.D. HORTON, Jr., JAMES** ) | |
| **M. REYNOLDS, III,** ) | |
| ) | |
| **Appellants.** ) | |
| ) | **NO. 06-00746-WHA** |
| **J. LESTER ALEXANDER, III,** ) | |
| ) | |
| **Appellee.** ) | |

_____

## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR MIDDLE DISTRICT OF ALABAMA

### ADVERSARY PROCEEDING NO.: 05-03042

### REPLY BRIEF OF APPELLANTS N.D. HORTON AND
### JAMES M. REYNOLDS, III

_____

C. Ellis Brazeal III
Attorney for N.D. Horton &
James M. Reynolds, III

OF COUNSEL:
Walston, Wells & Birchall, LLP
1819 5th Avenue North
Suite 1100
Birmingham, AL 35203
Telephone: (205) 244-5237
Telecopier: (205) 244-5437

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................... 2

TABLE OF CITATIONS ................................................................. 3

SUMMARY OF THE ARGUMENT ................................................. 4

ARGUMENT AND CITATIONS TO AUTHORITY ................................... 7

    I.    The "plan language" of Section 8-9A-8(d) provides a complete defense to the Trustee's claims ................................................. 7

    II.    At the Trustee's urging, the trial court incorrectly interpreted the "indirect benefit" rule ....................................................... 11

    III.    The application of the "indirect benefit" rule demonstrates that Terry Manufacturing received more than "reasonably equivalent value." ...................................................................... 13

    IV.    "Alter ego" and "identity of interest" arguments were timely. 18

CONCLUSION ............................................................................ 19

CERTIFICATE OF COMPLIANCE ................................................. 20

CERTIFICATE OF SERVICE ....................................................... 20

# TABLE OF CITATIONS

## Cases

*Rodriguez,* 895 F.2d 725 (11th Cir. 1990)................................................. 6, 12

*Rubin v. Hanover & Trust Co.,* 661 F.2d 979, 991 (2d Cir. 1981)......... 13, 19

## Statutes

Ala. Code § 8-9A-8(d) ......................................... 5, 6, 8, 9, 10, 11, 14, 15, 20
Ala. Code § 8-9A-8(b)(1) ....................................................................... 9, 10

## SUMMARY OF THE ARGUMENT

Just like the trial court's Memorandum Decision, the reply brief of the Appellee (the "Trustee") does not address the necessary legal analysis. Instead, the Trustee attempts, with pejorative language, to obscure the efficacy of the Appellants'/Horton & Reynold's defenses to this action.

First, like the trial court, the Trustee refuses to analyze the admittedly unique language contained in Alabama Code Section 8-9A-8(d). While admitting that the language is unique, the Trustee refuses to analyze the language. Instead, the Trustee contends that fraudulent transfer law is "well settled" and that this Court should not adopt the Appellants' novel theory. Appellants are not asking the Court to adopt a new novel theory, but rather to interpret the **plain** language of the statute. If fraudulent transfer law is "well settled", then the deviation of the Alabama Legislature from the language of the Uniform Fraudulent Transfer Act would seem to be an attempt to change such "well settled" law.

Additionally, the language in § 8-9-A-8(d) constitutes a defense and is designed to protect the transferee, not the transferor or the transferor's creditors. Finally, Appellants' reading of § 8-9A-8(d) does not leave the creditors of the transferor without recourse, as urged by the Trustee. Instead, the creditors always can sue the ultimate beneficiary to recover the benefit

received from the transferor.  Appellants' plain reading of § 8-9A-8(d) merely protects the transferee from having to pay twice.

Second, the Trustee seems to have a fundamental misunderstanding of the "indirect benefit" rule.  The Trustee stresses that the benefit received must have been "**in exchange for**" the allegedly fraudulent transfers.  Instead of relying upon the "in exchange for" language, the "indirect benefit" rule looks at whether the allegedly fraudulent transfers resulted in a diminution of the transferor's estate.  If there is a "direct benefit" to the transferor, then there is certainly a direct exchange. However, if there is an "indirect benefit", then there is not a direct exchange. So, the "in exchange for" language is inapposite to an "indirect benefit" analysis.

Third, there is indisputable evidence that, when the "indirect benefit" rule is applied, Terry Manufacturing received more than "reasonably equivalent value" for the allegedly fraudulent transfers.  When one applies the Eleventh Circuit "indirect benefit" test set forth in *Rodriguez*, 895 F.2d 725 (11th Cir. 1990), it is clear that, by making the allegedly fraudulent transfers totaling $596,738.60 on its guaranteed obligation, Terry Manufacturing received several loans totaling millions of dollars.  (Even if the court were to find that the benefit had to flow directly

from Horton & Reynolds (and not from American Real Estate), Horton and Reynolds are due on offset in the amount of $263,000.00). Both the Trustee and the trial court went to great lengths in an attempt to discredit this argument by referring to it as a "post hoc" attempt to defeat the Trustee's claims. However, an unclouded review of the facts reveals that "reasonably equivalent value" was received by Terry Manufacturing.

## ARGUMENT AND CITATIONS TO AUTHORITY

**I.    The "plain language" of Section 8-9A-8(d) provides a complete defense to the Trustee's claims.**

A.    The unique language in Section 8-9A-8(d) is meant to change "well settled" law.

In the Trustee's Reply Brief, the Trustee claims that the Appellants' construction of this Code Section is "novel" and would change "well settled" law. However, the Trustee does acknowledge that the language contained in this Code Section is unique. Indeed, it differs from the Uniform Fraudulent Transfer Act which codifies such "well settled" law. So, if one is to give any effect to the different language, one must determine that the Alabama Legislature decided to change "well settled" law. Had the legislature not decided to change "well settled" law, it would not have changed the language of the Uniform Fraudulent Transfer Act when it was adopted by the legislature.

B.    Section 8-9A-8(d) is meant to protect the transferee.

As set forth in the comments to this Code Section, the intent of the Alabama Legislature could not be more plain - - it desired to protect the transferee that gives value, even if it is to someone besides the debtor/transferor. The comments to § 8-9A-8(d) of the Alabama Fraudulent Transfer Act, at Comment 3, indicate that the language "or to another person

as a consequence of the debtor's making such transfer to" was added to the Uniform Act to clarify the fact that a "good faith transferee is protected to the extent of value given by the transferee to one other than the Debtor." The Alabama legislature added this language to make it clear that, if a good faith transferee gives value (regardless of whether it is to the debtor or to another), the transferee will not have to reimburse the debtor to the extent of the value given.  In other words, the transferee will not have to pay twice.

A review of the following hypothetical situation illustrates the reason behind the different language.

Parent decides to purchase a car for Son as a graduation present. While the loan from Bank is to Son, the car is in Son's name, and Parent guarantees the loan.  Parent makes all of the payments on the loan to Bank. Under the Trustee's interpretation of § 8-9A-8(d), if Parent's creditors sued Bank for fraudulent transfers based upon the loan payments, Bank would have to refund the payments since Parent received no benefit (that is if Parent's guaranty was also a fraudulent transfer).  Under Appellants' version of § 8-9A-8(d), Bank would be protected and creditors of Parent would have recourse against Son and not the Bank.  *See* Ala. Code § 8-9A-8(b)(1) and (b)(2).  In this example, just as in the case before this Court, Bank, i.e., Horton & Reynolds, provided "reasonably equivalent value" to **another**

**person** (Son or the Terry Family) in the form of a reduction of the debt.

"Value" under the Alabama Fraudulent Transfer Act includes reduction of

an indebtedness.

The Trustee argues that the Appellants' interpretation of § 8-

9A-8(d) would result in a diminution of the transferor's estate.  Indeed, the

Trustee states at p.21 of his Reply Brief:

> Under the Defendants' reading of the statutes,
> creditors will have **no remedy** when insiders cause
> the debtor to make transfers which solely benefit
> them.  Indeed, if the Defendants are correct, an
> insider may cause the corporate debtor to employ
> all of its assets in transactions for which it received
> absolutely no benefit, and those transfers will be
> effectively immune from attacks so long as the
> insiders receive some benefit.

This is simply untrue.  Either the Trustee is intentionally misstating the law,

or the Trustee should further acquaint himself with the provisions of

Alabama fraudulent transfer law.  Even though the initial transferee for

value is protected under § 8-9A-8(d), the subsequent transferee who gives no

value is not.  *See* Ala. Code § 8-9A-8(b).  So, the allegations that creditors

will have "no remedy" is simply wrong.

Under Ala. Code § 8-9A-8(b), a claim for a fraudulent transfer

is recoverable not only from the first transferee, but also from "the person

for whose benefit the transfer was made" [Son (in the example) or the Terry

Family (in this case)] and from any "subsequent transferee." So, interpreting Alabama Code Section 8-9A-8(d) in the manner warranted by the plain language of the statute does not diminish the transferor's estate, but merely provides protection to a transferee who provides value, such as Bank (in the example) or Horton & Reynolds.

C.    Section 8-9A-8(d) is not meant to codify the "indirect benefit" rule.

Rather than analyzing the plain language of the statute, the Trustee instead argues that this language was meant to codify the "indirect benefit" rule. However, just a cursory review of the plain language reveals that this is **not the case.** The language of the statute provides that the transferee has an offset to the extent of value given to the debtor "**or to another person** as a consequence of the debtor's making such transfer". It is the "or to another person" language that the Trustee refuses to deal with. The "indirect benefit" rule requires benefit to go to the debtor, **not** "to another person". Under the "indirect benefit" rule, the benefit must go first to another, but then ultimately has to reside with the debtor. If the Alabama Legislature had intended to codify the indirect benefit rule, it would have used language such as: "value initially transferred to another person which ultimately is received by the debtor" or "value given to another person which benefits the debtor." Instead, the Alabama Legislature clearly

provided that benefit "to another person" constitutes an offset for the transferee.  As set forth in the previous section, this is designed to protect the transferee from double payments or liability.

## II.    At the Trustee's urging, the trial court incorrectly interpreted the "indirect benefit" rule.

It cannot be disputed that, but for the allegedly fraudulent transfers of $596,738.60, Terry Manufacturing would not have received several loans.  If one looks at the "net benefit" to Terry Manufacturing, there is no fraudulent transfer.  Since the Trustee cannot withstand this analysis, the Trustee stresses that the benefit must have been received "in exchange" for the transfers.  Such would be the case if it were a direct benefit.  Instead, the "indirect benefit" rule looks at the "net effect" on the debtor's estate, not whether there was a direct "exchange" encompassing the allegedly fraudulent transfers and the benefit received.

The Trustee correctly explains the "indirect benefit" rule at p.14 of his Reply Brief:

> As the Eleventh Circuit explained in *In re Rodriguez,* the purpose of avoiding transfers unsupported by reasonably equivalent value is to protect creditors against depletion of the debtor's estate.  Therefore, "this provision [11 U.S.C. § 548] does not authorize voiding a transfer which confers an economic benefit upon the debtor either directly or indirectly.  In such a situation, a debtor's net worth has been preserved and the

> interests of the creditors will not have been injured by the transfer." 895 F.2d 725, 727 (11th Cir. 1990) (citing with approval *Rubin v. Hanover & Trust Co.,* 661 F.2d 979, 991 (2d Cir. 1981)).

The Trustee further states:

> The ultimate question is whether the transfer has materially affected the debtor's ability to satisfy his creditors' claims.

Reply Brief, p.13.

Then, because this explanation of the rule is availing to Appellants and not to the Trustee, the Trustee states:

> The fundamental and fatal law in Defendants' argument is that the supposed value provided by them or their affiliates was not "in exchange" for the challenged transfers, and there was a net diminution of the Terry Manufacturing estate.

The Trustee must attempt to rely upon the "in exchange" language. Otherwise, from the Trustee's standpoint, all is lost.

For it cannot be disputed that, if Terry Manufacturing had not made the $596,736.80 in payments, Terry Manufacturing would not have received the following:

a) $5.5 million in loan proceeds from the American Real Estate loan to the Terrys which were deposited by the Terrys into Terry Manufacturing;

b)    $1.5 million in loan proceeds from Peoples Bank to Perky Cap but deposited into Terry Manufacturing as a result of the purchase of the Perky Cap stock for $596,738.60;

c)    $500,000 loan from American Real Estate; and

d)    $263,000 in loans from N.D. Horton, Jr.

Terry Manufacturing also received a direct benefit in the amount of $596,738.60 due to the reduction of Terry Manufacturing's guaranteed obligation to Horton & Reynolds for the Stock Purchase Notes.

Any single one of these transactions, save the last, resulted in a net increase, not a net diminution, of the Terry Manufacturing estate. Even if one only considers the last transaction (where Horton individually was the transferor of value), an offset in the amount of $263,000.00 is owed.

## III.    The application of the "indirect benefit" rule demonstrates that Terry Manufacturing received more than "reasonably equivalent value."

Just as the Trustee refused to analyze the plain language of § 8-9A-8(d), the Trustee similarly refused to analyze the testimony of Mr. Horton. Once again, not unsurprisingly, the Trustee used rhetoric and pejorative language in an attempt to cloud or darken this Court's review. The Trustee states in his reply brief at p. 11:

> His counsel's [Horton's counsel] repeated and finally successful effort to coax him into claiming

13

> that American Real Estate would not have granted
> a line of credit to the Terrys if the stock sale did
> not close, was, the Bankruptcy Court properly
> found, "not credible and that his claims of a tie
> have been fabricated to provide a defense to the
> Trustee's avoidance action."

Just as this Court should review the plain language of § 8-9A-8(d), this Court should review the examination of Mr. Horton that the Trustee called a "repeated and finally successful effort to coax. . ." A review of the examination of Mr. Horton reveals the **complete consistency** between Horton's testimony when examined by Trustee's counsel and when examined by his own counsel. A review of the questions by both Mr. Barriere and Mr. Brazeal, and Mr. Horton's answers, further reveals that there was no "coaxing" involved, but rather direct questioning and answers thereto.

Mr. Barriere:

Okay. And just so I am clear, if Allie Robinson and Cotina Terry hadn't bought your stock, American Real Estate was going to make this loan; was it not?

Mr. Horton:

Well, I asked to tell you how this developed and you asked me to answer your question.

The Court:  Okay.  Well, you can do it now.

Mr. Barriere:

Now you can do it.

Mr. Horton:

The Terrys came to me with a plan to make Perky a minority firm. They already owned a third of it, and they wanted to buy an additional twenty percent so Perky could bid on government contracts, contracts with Coca-Cola and Delta that required minority-owned companies to do it.  And they talked to me about doing that, and that made a little sense to me.

And then they asked me about starting Terry Promotional Products, and I said what would that do, and they said, well, they wanted to go on the Internet and that they thought they could really generate some big numbers, and they had some numbers that they called, something like an optimistic forecast, as realistic forecast and a very conservative forecast.

And I said, well, you know that is going to be you, Roy, and you, Rudolph, and Terry Manufacturing Company guaranteeing it and guaranteeing cross-default on all the notes that we have with you or that we do with you in the future, and they said that they would.

Had they come in to close and wanted to change their plan, it would have raised some skepticism on my part as to whether they knew what their plan was, but that's the way they laid it out and they said they had no problem . . .

And then our lawyer put in the cross-default and the legalese that is required to tie - we thought that we tied them as tight as you could tie a borrower, and I had never loaned anybody five and a half million dollars before.

Transcript, pp. 167-169.

Mr. Brazeal:

Mr. Horton, Mr. Barriere went to some lengths to get you to say that the loaning of the five point five million dollars was not conditioned upon the purchase of the stock by the two Terry women.  That went on for a while; did it not?

Mr. Horton:

Yes.

Mr. Brazeal:

At one point during his examination you indicated that had the Terrys not gone forward with the stock purchase, that you would have had some qualms about their overall business plan; is that correct?

Mr. Horton:

Well, I would have questioned what their business plan was in that their purpose in buying the twenty percent of the stock was so Perky could go to a minority-owned firm and it would increase the sales.

Mr. Brazeal:

All right, sir.  Well, my question for you, Mr. Horton, is both of these transactions closed on the same date, the stock purchases and the five point five million dollar loan.  Suppose the Terrys had showed up or apprised you prior to November 10 of 2000 that they still wanted the five point five million dollars which you had been discussing but that they told you that they no longer wanted to purchase the stock in Perky Cap?

Mr. Horton:

I would have decided that they didn't have a plan, that they were just there to get my five and a half million dollars and wouldn't have gone forward.

Transcript, pp. 185-187.

This testimony demonstrates the nexus between the stock purchase deal and the $5.5 million loan. Not only were the deals cross-defaulted, but it seems logical that, if the Terrys had determined to renege on their business plan of purchasing the Perky Cap stock, Mr. Horton would not have loaned the $5.5 million. Even if one discounts this testimony of Mr. Horton, it seems logical, and the testimony was undisputed that, if Terry Manufacturing had ceased making payments on the Stock Purchase Notes: a) neither Horton nor American Real Estate would have made any further loans to the Terrys or Terry Manufacturing; and b) American Real Estate would have called upon Terry Manufacturing's guaranty of the $5.5 million dollar loan.

The Trustee relies upon the testimony of Mr. Horton that the stock purchase deal and the other deals were "separate deals." However, this does not mean that the transfers did not result in the debtor receiving "indirect benefit". A hypothetical situation here may be helpful as well. Company A, a real estate developer, obtains two loans from Bank B. The

loans are for "separate" subdivision developments.  Nevertheless, the Bank cross-defaults the loans, just as the loans given by Mr. Horton and American Real Estate were cross-defaulted.  Then, if Company A defaults on either of the loans, it is virtually inconceivable that Bank B will fund any further loan proceeds  on the other loan or on any new loans.  Furthermore, Bank B would call both loans.  Such is the situation here - - the payments on the Stock Purchase Notes resulted in "indirect benefit" to Terry Manufacturing.

## IV.    "Alter ego" and "identity of interest" arguments were timely.

Finally, the Trustee argues that this Court should not consider Appellants' "alter ego" theory.  The Appellants' "alter ego" theory was raised with the trial court (conducting a bench trial), prior to the entry of judgment through the draft memorandum decision prepared by Appellants in lieu of a post-trial brief.  Accordingly, the Trustee's argument about timeliness is baseless.  Furthermore, even if the evidence adduced at trial did not rise to the level necessary for a finding of "alter ego," there was clearly sufficient evidence of "identity of interest" to find that what benefited the Terrys also benefited Terry Manufacturing.  *See Rubin, supra*.  The case law concerning the "identity of interest" test was raised at trial and is just another nuance of the "indirect benefit" rule.

## CONCLUSION

The Trustee successfully directed the trial court's attention away from an analysis of § 8-9A-8(d) which provides a complete defense to the Trustee's claim.  Similarly, the Trustee effectively led the trial court down the wrong road in interpreting the "indirect benefit" rule and in analyzing the evidence.  While acknowledging on the one hand that the "indirect benefit" rule looks at "net diminution" to the debtor's estate, the Trustee with his other hand completely eviscerated this rule by focusing on the "exchange" language.  The Trustee then utilized the complex nature of the transactions to convince the trial court that there was no "exchange." Had the trial court instead looked at the "net effect" on the estate of Terry Manufacturing, one hopes that the trial court would have found "reasonably equivalent value."  In any event, Appellants respectfully request this Court to do so.

Respectfully submitted,

\s\ C. Ellis Brazeal III
C. Ellis Brazeal III
Attorney for Appellants
N.D. Horton & James M.
Reynolds, III

**OF COUNSEL:**

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:  (205) 244-5237
Telecopier:  (205) 244-5437


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word-processing system used to generate this brief, this brief contains 3,705 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).


\s\ C. Ellis Brazeal III
OF COUNSEL


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Reply Brief of Appellant N. D. Horton and James M. Reynolds, III has been served upon counsel of record by electronic filing purposes, as follows:

Catherine E. Laskey
Phelps Dunbar LLP
City Plaza
445 North Boulevard
Suite 701
Baton Rouge, LA 70802-5707

This the \6th\ day of October, 2006.


\s\ C. Ellis Brazeal III
OF COUNSEL